# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| *ex rel.* | ) |
| | ) |
| SERVICE EMPLOYEES | ) |
| INTERNATIONAL UNION; | ) |
| JAMES DOGHRAMJI; SHEREE | ) |
| COOK; and RACHEL BRYANT; | ) |
| | ) |
| Relators, | ) |
| | ) |
| v. | )   Case No. _____ |
| | ) |
| COMMUNITY HEALTH SYSTEMS, | )   **FILED IN CAMERA** |
| INC.; COMMUNITY HEALTH SYSTEMS | )   **AND UNDER SEAL** |
| PROFESSIONAL SERVICES | ) |
| CORPORATION; CHHS HOSPITAL | ) |
| COMPANY, LLC d/b/a | ) |
| CHESTNUT HILL HOSPITAL; | ) |
| DYERSBURG HOSPITAL | ) |
| CORPORATION d/b/a DYERSBURG | ) |
| REGIONAL MEDICAL CENTER; | ) |
| SHELBYVILLE HOSPITAL | ) |
| CORPORATION d/b/a HERITAGE | ) |
| MEDICAL CENTER; BROWNSVILLE | ) |
| HOSPITAL CORPORATION d/b/a | )   **JURY TRIAL DEMANDED** |
| HAYWOOD PARK COMMUNITY | ) |
| HOSPITAL CENTER; GALESBURG | ) |
| HOSPITAL CORPORATION d/b/a | ) |
| GALESBURG COTTAGE HOSPITAL; | ) |
| MARION HOSPITAL CORPORATION | ) |
| d/b/a HEARTLAND REGIONAL | ) |
| MEDICAL CENTER; BERWICK | ) |
| HOSPITAL CORPORATION, LLC d/b/a | ) |
| BERWICK HOSPITAL CENTER; | ) |
| MCNAIRY HOSPITAL CORPORATION | ) |
| d/b/a MCNAIRY REGIONAL | ) |
| HOSPITAL; VICKSBURG HEALTHCARE, | ) |
| LLC d/b/a RIVER REGION MEDICAL | ) |
| CENTER; CLINTON HOSPITAL | ) |
| CORPORATION d/b/a LOCK HAVEN | ) |

HOSPITAL; HOSPITAL OF                )
LOUISA, INC d/b/a THREE RIVERS       )
MEDICAL CENTER; NATIONAL             )
HEALTHCARE OF MT. VERNON,            )
INC. d/b/a CROSSROADS                )
COMMUNITY HOSPITAL; LAKE             )
WALES HOSPITAL CORPORATION           )
d/b/a LAKE WALES MEDICAL CENTER;     )
HOSPITAL OF MORRISTOWN, INC          )
d/b/a LAKEWAY REGIONAL HOSPITAL;     )
SOUTHCREST, LLC d/b/a SOUTHCREST     )
HOSPITAL; RUSTON LOUISIANA           )
HOSPITAL COMPANY, LLC d/b/a          )
NORTHERN LOUISIANA MEDICAL           )
CENTER; JACKSON, TENNESSEE           )
HOSPITAL COMPANY, LLC d/b/a          )
REGIONAL HOSPITAL OF JACKSON;        )
FOLEY HOSPITAL CORPORATION           )
d/b/a SOUTH BALDWIN REGIONAL         )
MEDICAL CENTER; POTTSTOWN            )
HOSPITAL COMPANY, LLC d/b/a          )
POTTSTOWN MEMORIAL MEDICAL           )
CENTER; COATESVILLE HOSPITAL         )
CORPORATION d/b/a  BRANDYWINE        )
HOSPITAL; WAUKEGAN ILLINOIS          )
HOSPITAL, LLC d/b/a VISTA MEDICAL    )
CENTER EAST; NATIONAL                )
HEALTHCARE OF LEESVILLE, INC         )
d/b/a BYRD REGIONAL HOSPITAL;        )
GREENVILLE HOSPITAL                  )
CORPORATION d/b/a LV STABLER         )
MEMORIAL HOSPITAL; MARTIN            )
HOSPITAL CORPORATION d/b/a           )
VOLUNTEER COMMUNITY                  )
HOSPITAL; SALEM HOSPITAL             )
CORPORATION d/b/a THE MEMORIAL       )
HOSPITAL OF SALEM COUNTY;            )
GRANITE CITY ILLINOIS HOSPITAL       )
COMPANY, LLC d/b/a GATEWAY           )
REGIONAL MEDICAL CENTER;             )
WARSAW HEALTH SYSTEM LLC             )
d/b/a KOSCIUSKO COMMUNITY            )
HOSPITAL; NORTHWEST ARKANSAS         )
HOSPITALS, LLC d/b/a NORTHWEST       )
MEDICAL CENTER – SPRINGDALE;         )
FALLBROOK HOSPITAL                   )

CORPORATION d/b/a )
FALLBROOK HOSPITAL; EMPORIA )
HOSPITAL CORPORATION d/b/a )
SOUTHERN VIRGINIA REGIONAL )
MEDICAL CENTER; NATIONAL )
HEALTHCARE OF NEWPORT, INC. )
d/b/a HARRIS HOSPITAL; MCKENSIE )
TENNESSEE HOSPITAL COMPANY, )
LLC d/b/a MCKENZIE REGIONAL )
HOSPITAL; SUNBURY HOSPITAL )
COMPANY, LLC d/b/a SUNBURY )
COMMUNITY HOSPITAL; )
WILLIAMSTON HOSPITAL )
CORPORATION d/b/a MARTIN )
GENERAL HOSPITAL; )
NORTHAMPTON HOSPITAL )
COMPANY, LLC d/b/a EASTON )
HOSPITAL; LANCASTER HOSPITAL )
CORPORATION d/b/a SPRINGS )
MEMORIAL HOSPITAL; )
LEXINGTON HOSPITAL )
CORPORATION d/b/a HENDERSON )
COUNTY COMMUNITY HOSPITAL; )
HOSPITAL OF FULTON, INC. d/b/a )
PARKWAY REGIONAL HOSPITAL; )
CRESTVIEW HOSPITAL )
CORPORATION d/b/a NORTH )
OKALOOSA MEDICAL CENTER; )
PHOENIXVILLE HOSPITAL )
COMPANY, LLC d/b/a )
PHOENIXVILLE HOSPITAL; )
JACKSON HOSPITAL )
CORPORATION d/b/a KENTUCKY )
RIVER MEDICAL CENTER; )
NAVARRO HOSPITAL, LP d/b/a )
NAVARRO REGIONAL HOSPITAL; )
TRIAD OF ALABAMA, LLC d/b/a )
FLOWERS HOSPITAL; )
PINEY WOODS HEALTHCARE )
SYSTEM, LP d/b/a WOODLAND )
HEIGHTS MEDICAL CENTER; )
BROWNWOOD HOSPITAL, LP d/b/a )
BROWNWOOD REGIONAL )
MEDICAL CENTER; WEST GROVE )
HOSPITAL COMPANY, LLC d/b/a )
JENNERSVILLE REGIONAL )

HOSPITAL; CHESTERFIELD/ )
MARLBORO, LP d/b/a )
CHESTERFIELD GENERAL )
HOSPITAL; FORT PAYNE )
HOSPITAL CORPORATION )
d/b/a DEKALB REGIONAL )
MEDICAL CENTER, BULLHEAD CITY )
HOSPITAL CORPORATION d/b/a )
WESTERN ARIZONA REGIONAL )
MEDICAL CENTER; PHILLIPS )
HOSPITAL CORPORATION d/b/a )
HELENA REGIONAL MEDICAL )
CENTER; AUGUSTA HOSPITAL, )
LLC d/b/a TRINITY HOSPITAL OF )
AUGUSTA; BLUE RIDGE )
GEORGIA HOSPITAL COMPANY, LLC )
d/b/a FANNIN REGIONAL HOSPITAL; )
PORTER HOSPITAL, LLC d/b/a PORTER )
HOSPITAL; BLUFFTON HEALTH )
SYSTEM, LLC d/b/a BLUFFTON )
REGIONAL MEDICAL CENTER; )
WESLEY HEALTH SYSTEM, LLC )
d/b/a WESLEY MEDICAL CENTER; )
SAN MIGUEL HOSPITAL )
CORPORATION d/b/a )
ALTA VISTA REGIONAL HOSPITAL; )
ROSWELL HOSPITAL CORPORATION )
d/b/a EASTERN NEW MEXICO )
MEDICAL CENTER; CARLSBAD )
MEDICAL CENTER, LLC d/b/a )
CARLSBAD MEDICAL CENTER; )
WOODWARD HEALTH SYSTEM, LLC )
d/b/a WOODWARD HOSPITAL; )
CLAREMORE  REGIONAL HOSPITAL, )
LLC d/b/a CLAREMORE REGIONAL )
HOSPITAL; MARY BLACK HEALTH )
SYSTEM LLC d/b/a MARY BLACK )
MEMORIAL HOSPITAL; QHG )
OF SOUTH CAROLINA, INC. d/b/a )
CAROLINAS HOSPITAL SYSTEM; )
CLARKSVILLE HEALTH SYSTEM, )
G.P. D/B/A GATEWAY HEALTH )
SYSTEM; CLEVELAND TENNESSEE )
HOSPITAL COMPANY, LLC d/b/a SKY )
RIDGE MEDICAL CENTER; LAREDO )
TEXAS HOSPITAL COMPANY, L.P. d/b/a )

LAREDO MEDICAL CENTER; NHCI OF )
HILLSBORO, INC. d/b/a HILL REGIONAL )
HOSPITAL; WEATHERFORD TEXAS )
HOSPITAL COMPANY, LLC d/b/a )
WEATHERFORD REGIONAL MEDICAL )
CENTER; CLEVELAND REGIONAL )
MEDICAL CENTER, L.P. d/b/a )
CLEVELAND REGIONAL MEDICAL )
CENTER; SAN ANGELO HOSPITAL, )
L.P. d/b/a SAN ANGELO )
COMMUNITY MEDICAL )
CENTER; BIG SPRING HOSPITAL )
CORPORATION d/b/a SCENIC )
MOUNTAIN MEDICAL CENTER; )
LONGVIEW MEDICAL )
CENTER, L.P. d/b/a LONGVIEW )
REGIONAL MEDICAL CENTER; )
PETERSBURG HOSPITAL COMPANY, )
LLC d/b/a SOUTHSIDE REGIONAL )
MEDICAL CENTER; FRANKLIN )
HOSPITAL CORPORATION d/b/a )
SOUTHAMPTON MEMORIAL )
HOSPITAL; CEDAR PARK HEALTH )
SYSTEM, L.P. d/b/a CEDAR PARK )
REGIONAL MEDICAL CENTER )
)
Defendants. )
_____)

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION AND VENUE ........................................................................ 5

III.  THE PARTIES .................................................................................................... 6

    A.    Relators ............................................................................................ 6

    B.    Defendants ....................................................................................... 8

        1.    CHS Parent Defendants ...................................................... 8

        2.    Individual Hospital Defendants ......................................... 9

            *Tennessee Defendants* ............................................... 9

            *Alabama Defendants* ............................................... 11

            *Arizona Defendant* .................................................. 12

            *Arkansas Defendants* .............................................. 12

            *California Defendant* ............................................... 13

            *Florida Defendants* .................................................. 13

            *Georgia Defendants* ................................................ 14

            *Illinois Defendants* .................................................. 14

            *Indiana Defendants* ................................................. 15

            *Kentucky Defendants* ............................................... 16

            *Louisiana Defendants* .............................................. 16

            *Mississippi Defendants* ............................................ 17

            *New Jersey Defendant* .............................................. 18

            *New Mexico Defendants* ........................................... 18

            *North Carolina Defendant* ........................................ 18

i

Oklahoma Defendants ................................................................... 19

Pennsylvania Defendants .............................................................. 19

South Carolina Defendants ........................................................... 21

Texas Defendants ........................................................................ 22

Virginia Defendants ..................................................................... 25

IV.  FACTUAL ALLEGATIONS ................................................................. 25

    A.  The Medicare Program and Medically Necessary Admissions .................... 26

        1.  Overview ..................................................................... 26

        2.  Incentives to Admit Rather than Observe or Discharge .................... 27

        3.  The Requirement of Medical Necessity .................................... 28

    B.  CHS' System-Wide Scheme to Increase ER Admissions ........................ 30

        1.  CHS' Corporate Scheme .................................................. 30

            a.  Corporate Structure ................................................. 30

            b.  The Corporate Scheme to Drive Medically Unnecessary ER
                Inpatient Admissions ................................................ 31

        2.  SEIU's Data Analysis .................................................... 36

            a.  Analysis of CHS ER Inpatient Admissions ............................ 36

                i.  Introduction ................................................... 36

                ii.  Methodology .................................................. 36

                iii.  Tracking System-wide Growth in Admissions with Years of
                      CHS Ownership ............................................... 37

                iv.  SEIU's Analysis of Specific Diagnostic Categories .............. 42

            b.  Analysis of CHS One-Day Stays ..................................... 44

ii

3. The Flaws in CHS Recent Responses to Tenet Allegations Concerning Admission Rates..................................................................................... 49

C. CHS Scheme at Individual Relator Hospitals................................................ 54

    1. Chestnut Hill Hospital ................................................................................ 54

        a. CHS Practices at Chestnut Hill............................................................ 54

        b. Medically Unnecessary Admissions at Chestnut Hill ......................... 59

            i. Chest Pain Patients ................................................................... 60

            ii. Syncope Patients ...................................................................... 63

            iii. Other Patients .......................................................................... 64

        c. Data Analysis of Overall ER Inpatient Medicare Admissions at Chestnut Hill........................................................................................ 65

    2. Dyersburg Regional Medical Center........................................................... 69

        a. CHS Practices at Dyersburg Regional Medical Center ....................... 69

        b. Data Analysis of ER Inpatient Admissions at Dyersburg ................... 73

    3. Heritage Medical Center ............................................................................. 77

        a. CHS Practices at Heritage Medical Center........................................... 77

        b. Data Analysis of ER Inpatient Admissions at Heritage ...................... 80

D. CHS Scheme at Other Defendant Hospitals................................................. 84

    1. Weatherford Regional Medical Center........................................................ 85

        a. CHS Practices at Weatherford ............................................................. 85

        b. Data Analysis of ER Inpatient Admissions at Weatherford................ 87

    2. Heartland Regional Medical Center in Illinois............................................ 88

    3. Lock Haven Hospital in Pennsylvania ........................................................ 90

iii

    4. Pottstown Memorial Medical Center in Pennsylvania ...................................... 91

    5. The Memorial Hospital of Salem in New Jersey .............................................. 93

    6. Gateway Regional Medical Center in Illinois .................................................. 94

    7. Henderson County Community Hospital in Tennessee .................................... 95

    8. Gateway Medical Center in Tennessee ........................................................... 97

E. Statistical Results for Other Defendant Hospitals at or above 80th Percentile
for Overall ER Admissions ................................................................................... 98

    1. Berwick Hospital Center .................................................................................. 99

    2. Brandywine Hospital ...................................................................................... 100

    3. Brownwood Regional Medical Center ........................................................... 101

    4. Byrd Regional Hospital ................................................................................. 102

    5. Chesterfield General Hospital ....................................................................... 103

    6. Crossroads Community Hospital .................................................................... 104

    7. DeKalb Regional Medical Center .................................................................. 105

    8. Easton Hospital .............................................................................................. 106

    9. Fallbrook Hospital .......................................................................................... 107

    10. Flowers Hospital ........................................................................................... 108

    11. Galesburg Cottage Hospital .......................................................................... 109

    12. Harris Hospital .............................................................................................. 110

    13. Haywood Park Community Hospital ............................................................. 111

    14. Jennersville Regional Hospital ..................................................................... 112

    15. Kentucky River Medical Center .................................................................... 113

    16. Kosciusko Community Hospital .................................................................... 114

    17. Lake Wales Medical Center .......................................................................... 115

iv

18. Lakeway Regional Hospital ...................................................................... 116

19. LV Stabler Memorial Hospital ................................................................ 117

20. Martin General Hospital ......................................................................... 118

21. McKenzie Regional Hospital ................................................................... 119

22. McNairy Regional Hospital ..................................................................... 120

23. Navarro Regional Hospital ...................................................................... 121

24. North Okaloosa Medical Center ............................................................. 122

25. Northern Louisiana Medical Center ....................................................... 123

26. Northwest Medical Center – Springdale ................................................ 124

27. Parkway Regional Hospital ..................................................................... 125

28. Phoenixville Hospital .............................................................................. 126

29. Regional Hospital of Jackson ................................................................. 127

30. River Region Medical Center .................................................................. 128

31. South Baldwin Regional Medical Center ............................................... 129

32. SouthCrest Hospital ................................................................................ 130

33. Southern Virginia Regional Medical Center .......................................... 131

34. Springs Memorial Hospital ..................................................................... 132

35. Sunbury Community Hospital ................................................................. 133

36. Three Rivers Medical Center .................................................................. 134

37. Vista Medical Center East ....................................................................... 135

38. Volunteer Community Hospital .............................................................. 136

39. Woodland Heights Medical Center ......................................................... 137

F. Statistical Results for Defendant Hospitals at or above 80th Percentile for
   Chest Pain Admission, but Not Overall ...................................................... 137

v

1. Alta Vista Regional Hospital ........................................................................ 138

2. Bluffton Regional Medical Center ............................................................. 139

3. Carlsbad Medical Center ........................................................................... 140

4. Carolinas Hospital System ........................................................................ 141

5. Cedar Park Regional Medical Center ....................................................... 142

6. Claremore Regional Hospital .................................................................... 143

7. Cleveland Regional Medical Center .......................................................... 144

8. Eastern New Mexico Medical Center ........................................................ 145

9. Fannin Regional Hospital .......................................................................... 146

10. Helena Regional Medical Center .............................................................. 147

11. Hill Regional Hospital ............................................................................... 148

12. Laredo Medical Center .............................................................................. 149

13. Longview Regional Medical Center ........................................................... 150

14. Mary Black Hospital .................................................................................. 151

15. Porter Valparaiso Hospital Campus .......................................................... 152

16. San Angelo Community Medical Center .................................................... 153

17. Scenic Mountain Medical Center .............................................................. 154

18. Sky Ridge Medical Center ......................................................................... 155

19. Southampton Memorial Hospital ............................................................... 156

20. Southside Regional Medical Center .......................................................... 157

21. Trinity Hospital of Augusta ........................................................................ 158

22. Wesley Medical Center .............................................................................. 159

vi

23. Western Arizona Regional Medical Center .................................................. 160

24. Woodward Regional Hospital ................................................................. 161

V.    CONCLUSION ............................................................................................. 161

VI.   CLAIMS ....................................................................................................... 162

First Cause of Action ................................................................................... 162

False Claims Act – 31 U.S.C. §§ 3729(a)(1)(A) .......................................... 162

Second Cause of Action ............................................................................... 163

False Claims Act – 31 U.S.C. § 3729(a)(1)(B) ............................................ 163

Third Cause of Action .................................................................................. 163

False Claims Act – 31 U.S.C. § 3729(a)(1)(C) ............................................ 163

VII.  REQUEST FOR RELIEF .............................................................................. 164

Request for Trial by Jury ................................................................................... 164

## COMPLAINT

Relators Service Employees International Union ("SEIU"), James Doghramji, Rachel Bryant, and Sheree Cook (collectively, "Relators") bring this action to recover damages and civil penalties on behalf of the United States of America arising from false claims presented, or caused to be presented, for payment or approval by Community Health Systems, Inc.("CHS"), its affiliates and subsidiaries and 74 of the hospitals it owns, operates, and/or leases through those affiliates and subsidiaries (collectively, "Defendants") in violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq.

## I.    INTRODUCTION

1.      This case is about corporate financial interests subverting medical decision-making through a nationwide scheme orchestrated by one of the largest publicly traded hospital operators in the United States, CHS, to admit patients through emergency rooms ("ERs") without regard to medical necessity.  CHS has engaged in a systematic scheme - which was virtually undetectable without the comprehensive statistical analysis conducted by Relator SEIU - to increase its revenues by making or causing to be made false claims for payment and/or approval to Medicare, and likely other third-party government payors as well, including but not limited to Medicaid, TriCare, and government employee health plans.  To service the high debt attributable to an aggressive business strategy of leveraged acquisitions, CHS embarked on a scheme to increase inpatient admissions from its ERs absent any corresponding change in the medical needs of CHS' potential patient populations.  The necessary and intended result of CHS' wrongful conduct has been a massive number of false and/or fraudulent claims by CHS hospitals across the country for medically unnecessary admissions.

1

2.      Whether measured by number of facilities or by net operating revenues, CHS is the

second largest publicly traded hospital operator in the United States. It owns or leases 130

hospitals, with over 19,000 licensed beds across 29 states. CHS's overall business strategy

includes aggressive growth by acquisition, financed largely by debt, resulting in 59 newly

acquired hospitals from 2007 to 2010. Pressed to service its debt, CHS caused false claims to be

made to and reimbursed by government payors -- specifically Medicare -- with reckless disregard

and/or deliberate ignorance of the medical necessity of the claimed services.

3.      CHS developed and implemented a CHS –wide, centrally administered corporate

protocol to water down clinical review criteria for admissions and then pressured emergency

departments to meet inpatient admission goals set without regard to medical need. To enforce

compliance with its goals, CHS implemented extensive, centralized monitoring and enforcement

systems to subvert traditional medical judgment in favor of revenue-driven admission quotas.

4.      CHS increased emergency room ("ER") admissions at its hospitals through

policies and practices that included:

a. requiring its case managers to "justify" admissions using criteria set forth in its own

"CHS Clinical Guidelines for Inpatient Care" or "Blue Book," rather than determining the

medically necessary level of care using independently vetted, evidence-based criteria; [1]

---

[1] In an investor conference on May 2, 2011, CHS Chief Financial Officer Larry Cash told a group
of investors that "seven or eight weeks ago" CHS decided to switch from the Blue Book to the
industry-standard "InterQual" admission criteria. It is unclear what prompted the announced
switch. In a Federal Schedule 14A filing on April 29, 2011, CHS revealed that it had been
conducting a "thorough internal investigation" in response to a CtW Investor Group letter
received in September 2010, questioning CHS' "above expected" inpatient Medicare admissions
based on statistical analysis similar to the SEIU's analysis presented in this Complaint. On April
11, 2011, Tenet Healthcare Corp. sued CHS to force disclosure of its "practice of systematically

2

b. centrally setting and enforcing goals for hospital-level ER admissions without regard to medical necessity and then requiring monthly reports to corporate headquarters on compliance;

c. installing an electronic tracking system in the ER, linked to corporate headquarters as well as hospital administration, to monitor the status of ER patients in real time and facilitate corporate intervention in ER decision-making;

d. interjecting hospital administrators into medical decision-making in the ER in order to promote the admission of identified Medicare patients who fall into certain "soft" diagnostic categories – such as chest pain, abdominal pain, and syncope (fainting) – regardless of whether medical necessity required inpatient admission;

e. forcing hospital administrators to set admissions quotas for the ER and for individual doctors, monitoring doctors' individual and physician group admission rates through electronic tracking, and attending physicians' meetings to pressure doctors to comply with the quotas; and

f. terminating the contracts of those ER physician groups refusing to comply with the CHS's unlawful goals.

5. A proprietary statistical analysis developed by SEIU evidences and confirms Defendants' unlawful schemes and their impact. The analysis identifies 74 CHS hospitals whose inpatient admissions through their ERs so far exceed national norms, whether overall or for the specific "soft" diagnosis of nonspecific chest pain, that, in combination with other facts alleged

admitting, rather than observing, patients for financial rather than clinical reasons." *See Tenet Healthcare Corp. v. Community Health Systems, Inc.*, No. 3:11-cv-00732-M, Doc. 1 (N.D. Tex. April 11, 2011).

3

herein, Defendants' wrongful conduct is transparent.[2] Relator, Dr. James Doghramji, for example, has confirmed the localized impact of Defendants' wrongdoing through detailed allegations of medically unnecessary "Medicare admissions" flowing from the implementation of CHS' scheme at Chestnut Hill Hospital in Pennsylvania.

6.      Medically unnecessary admissions do more than drain scarce Medicare resources; they can do great harm. Although admitting Medicare patients on an inpatient basis may simply seem like cautious medicine, hospitals can be hazardous places for people who should not be there, particularly the elderly. As many as 98,000 people die each year as a result of medical errors made in hospitals. And almost 100,000 more people each year die after developing hospital-acquired drug-resistant infections that are unrelated to the admitting diagnosis.

7.      After identifying the 74 Defendant CHS hospitals for whom the combination of statistical and direct evidence demonstrates wrongdoing,[3] Relators have alleged an overview of the Medicare reimbursement process and describe the pervasive nature of CHS' corporate scheme to increase admissions regardless of medical necessity. This Complaint then details the

---

[2] Each of these 74 hospitals is named as a Defendant because it is at or above the 80th percentile nationally based on the percent above expected ER admission rates (explained at paragraphs 119–121 below) either of its admission rate for all diagnosis groups or its admission rate for nonspecific chest pain. This statistic indicates that each defendant has a much higher than expected ER admissions rate as a result of CHS' corporate scheme to increase ER inpatient admissions rates regardless of medical necessity. For many of these hospitals, Relators also gathered corroborating testimony from current or former hospital employees, also set forth below.

[3] The caption in this case identifies the defendant hospitals first, for the three individual realtors, and then, for the next 45, in order of the "egregiousness" with which each hospital exceeded national norms for expected admissions overall out of the ERs. The remaining 26 hospitals, which were within national norms for ER admissions overall, are listed in order of how egregiously they exceeded national norms for admissions for nonspecific chest pain. For ease of reference, the "Parties" section below lists the hospitals alphabetically by state with the exception of the Tennessee hospitals, which are listed first.

4

methodology and results of SEIU's statistical analysis of CHS' system-wide Medicare admissions. The Complaint relates the facts of CHS corporate pressure at the individual Relators' hospitals, implementing the above-described policies and practices, and then shows by individualized statistical analysis the results of those practices at Chestnut Hill Hospital in Pennsylvania, Dyersburg Regional Medical Center in Tennessee, and Heritage Medical Center in Tennessee. Next, the Complaint alleges facts demonstrating how these same policies and practices were applied at Weatherford Regional Medical Center in Texas, and several other CHS hospitals, further confirming the system-wide nature of the alleged corporate schemes. Finally, the Complaint presents the statistical profiles of "above-expected" admissions at the remaining Defendant hospitals. These profiles show for each hospital that ER admissions overall, ER admissions in nonspecific chest pain, or both, were dramatically above-expected in 2009 as compared to national norms. Moreover, the profiles demonstrate that the excess admissions are clearly connected to years of CHS ownership. The sheer magnitude of the excess admissions in each of these hospitals over the studied period makes it a certainty that the excess includes false claims made or caused to be made to government payors for payment and/or approval. This is particularly true in light of the link to years of CHS ownership and therefore to the CHS corporate scheme outlined below.

## II.  JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

9.      Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because at least one Defendant can be found, resides, and/or transacts business

5

in this district. In addition, venue is proper pursuant to § 3732 because acts proscribed by § 3729 occurred in this district.

10. Relators' claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

11. To the extent that there has been a public disclosure unknown to the Relators, Relators are "original source[s]" and meet the requirements under 31 U.S.C. § 3730(e)(4)(B). Relators voluntarily disclosed the information upon which these allegations are based to the U.S. Attorney for the Middle District of Tennessee and to the U.S. Department of Justice, Health Care Fraud and Elder Justice Division in February 2011 and the U.S. Attorney's Office for the Eastern District of Pennsylvania in April 2011.

## III.    THE PARTIES

### A.    <u>Relators</u>

12. With 2.2 million members, including members in the State of Tennessee, Relator Service Employees International Union (SEIU) is one of the largest labor unions in the United States. As the nation's single largest union of healthcare workers, SEIU has 1.2 million members who work across a variety of settings in the healthcare industry, including hospitals, nursing homes and home care. Its members include doctors, registered nurses, technicians, professionals and other hospital workers. On behalf of its members and the patients they serve, SEIU is a leading advocate for quality care. With regard to CHS, SEIU local unions represent 3,500 members at eight CHS facilities in Washington, Oregon, Pennsylvania, California and Ohio.

6

SEIU maintains its national headquarters at 1800 Massachusetts Avenue, NW, Washington, DC 20036.

13.     Recognizing that its members are employees, consumers, shareholders, and taxpayers, it has been SEIU's mission to ensure that corporations are socially responsible actors, as employers who violate labor and employment laws tend to be lawbreakers in other areas. In addition to its work to uncover fraud and corruption in the Medicare program, an example of SEIU's work to reform industry practices is its support of five class action antitrust lawsuits on behalf of registered nurses to enforce Department of Justice guidelines regarding the exchange of detailed wage information among hospitals. Similarly SEIU has taken a strong stance against executive compensation schemes that creates incentives that are detrimental to the corporation, shareholders, and the public.

14.     Relator James Doghramji, M.D., is a citizen of the United States and a resident of Pennsylvania. Dr. Doghramji is a board-certified internal medicine physician with almost twenty years of experience in his field. From 1994 through 2006, Dr. Doghramji served as an attending physician in the Chestnut Hill Hospital Department of Emergency Medicine and was employed by Chestnut Hill Emergency Associates, a physician group that contracted with Chestnut Hill. Dr. Doghramji also worked for TeamHealth, which succeeded Chestnut Hill Emergency Associates as the emergency physician group at Chestnut Hill, from January 2007 until September 30, 2010. From 2005 through 2007, Dr. Doghramji was also a member of the Hospitalist Medicine Group at Chestnut Hill. He was a member of the Quality Improvement, Ethics, and Medical Executive Committees at Chestnut Hill and sometimes served as a utilization review physician for the hospital. In his role as a utilization review physician, Dr. Doghramji was

7

responsible for reviewing insurance claims to determine whether the services were medically necessary and were properly submitted to the insurer.

15.     Relator Sheree Cook is a citizen of the United States and a resident of Tennessee. Ms. Cook is a registered nurse with 13 years of experience. She was employed by Heritage Medical Center from May 2008 through October 2009 as a staff RN and charge nurse on a medical/surgical floor.

16.     Relator Rachel Bryant is a citizen of the United States and a resident of Tennessee. Ms. Bryant is a licensed practical nurse with 3 years of experience. She was employed by Dyersburg Regional Medical Center from January 2009 through February 2011 as a staff nurse on a medical/surgical floor.

17.     Relators have independent knowledge of the allegations alleged herein. As required under the False Claims Act, 31 U.S.C. § 3730(b)(2), Relators have provided to the Attorney General of the United States and to the United States Attorney for the Middle District of Tennessee, prior to the filing of this Complaint, material information related to their claims.

**B.     Defendants**

**1.     CHS Parent Defendants**

18.     Defendant Community Health Systems, Inc. is a Delaware corporation headquartered at 4000 Meridian Boulevard, Franklin, TN 37067, and doing business in Tennessee. CHS is a holding company whose affiliate organizations own, operate, or lease 130 hospitals in 29 states, including Chestnut Hill Hospital in Philadelphia, Pennsylvania, Dyersburg Regional Medical Center in Dyersburg, Tennessee, and Heritage Medical Center in Shelbyville, Tennessee.

8

19.     Defendant Community Health Systems Professional Services Corporation is a Delaware corporation headquartered at 4000 Meridian Boulevard, Franklin, TN 37067, and doing business in Tennessee. CHS Professional Services Corporation manages CHS' subsidiary hospitals and other affiliates of CHS.

## 2.     Individual Hospital Defendants

*Tennessee Defendants*

20.     Defendant Brownsville Hospital Corporation d/b/a Haywood Park Community Hospital is a CHS subsidiary incorporated in Tennessee with its principal place of business at 2545 N. Washington Ave., Brownsville, TN 38012. Haywood Park is an acute care hospital with approximately 62 beds. CHS acquired Haywood Park Community Hospital through its subsidiary in January 2003.

21.     Defendant Clarksville Health System, G.P. d/b/a Gateway Health System is a CHS subsidiary incorporated in Tennessee with its principal place of business at 651 Dunlop Lane Clarksville, TN 37040. Gateway Health System is an acute care hospital with approximately 270 beds. CHS acquired Gateway Health System through its subsidiary in July 2007.

22.     Defendant Cleveland Tennessee Hospital Company, LLC d/b/a Sky Ridge Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 2800 Westside Drive, NW, Cleveland, TN 37312. Sky Ridge Medical Center is an acute care hospital with approximately 351 beds. CHS acquired Sky Ridge Medical Center through its subsidiary in October 2005.[4]

---

[4] In its 2010 10-K, CHS lists the date of acquisition for Sky Ridge Medical Center as October 2005. However, Sky Ridge Medical Center includes two hospital campuses, one of which—the former Cleveland Community Hospital—was acquired by CHS in October 1994.

9

23.    Defendant Dyersburg Hospital Corporation d/b/a Dyersburg Regional Medical Center is a CHS subsidiary incorporated in Tennessee with its principal place of business at 400 Tickle Street, Dyersburg, TN 38024.  Dyersburg Regional is an acute care hospital with approximately 225 beds.  CHS acquired Dyersburg Regional Medical Center through its subsidiary in January 2003.

24.    Defendant Hospital of Morristown, Inc. d/b/a Lakeway Regional Hospital is a CHS subsidiary incorporated in Tennessee with its principal place of business at 726 McFarland Street, Morristown, TN 37814.  Lakeway Regional is an acute care hospital with approximately 135 beds.  CHS acquired Lakeway Regional Hospital through its subsidiary in May 1993.

25.    Defendant Jackson, Tennessee Hospital Company, LLC d/b/a Regional Hospital of Jackson is a CHS subsidiary incorporated in Tennessee with its principal place of business at 367 Hospital Blvd, Jackson, TN 38305.  Regional Hospital of Jackson is an acute care hospital with approximately 154 beds.  CHS acquired Regional Hospital of Jackson through its subsidiary in January 2003.

26.    Defendant Lexington Hospital Corporation d/b/a Henderson County Community Hospital is a CHS subsidiary incorporated in Tennessee corporation with its principal place of business at 200 West Church St, Lexington, TN 38351.  Henderson County Community Hospital is an acute care hospital with approximately 45 beds.  CHS acquired Henderson County Community Hospital through its subsidiary in January 2003.

27.    Defendant Martin Hospital Corporation d/b/a Volunteer Community Hospital is a CHS subsidiary incorporated in Tennessee with its principal place of business at 161 Mount Pelia Road, Martin, TN 38237.  Volunteer Community Hospital is an acute care hospital with

10

approximately 100 beds. CHS acquired Volunteer Community Hospital through its subsidiary in January 2003.

28.     Defendant McKenzie Tennessee Hospital Company, LLC d/b/a McKenzie Regional Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 161 Hospital Drive, McKenzie, TN 38201. McKenzie Regional is an acute care hospital with approximately 45 beds. CHS acquired McKenzie Regional Hospital through its subsidiary in January 2003.

29.     Defendant McNairy Hospital Corporation d/b/a McNairy Regional Hospital is a CHS subsidiary incorporated in Tennessee with its principal place of business at 705 Poplar Ave., Selmer, TN 38375. McNairy Regional is an acute care hospital with approximately 45 beds. CHS acquired McNairy Regional Hospital through its subsidiary in January 2003.

30.     Defendant Shelbyville Hospital Corporation d/b/a Heritage Medical Center is a CHS subsidiary incorporated in Tennessee with its principal place of business at 2835 Highway 231 North, Shelbyville, TN 37160. Heritage Medical Center is an acute care hospital with approximately 60 beds. CHS acquired Heritage Medical Center through its subsidiary in July 2005.

***Alabama Defendants***

31.     Defendant Foley Hospital Corporation d/b/a South Baldwin Regional Medical Center is a CHS subsidiary incorporated in Alabama with its principal place of business at 1613 North McKenzie Street, Foley, AL 36535. South Baldwin Regional is an acute care hospital with approximately 112 beds. CHS began leasing South Baldwin Regional Medical Center through its subsidiary in June 2000.

11

32.     Defendant Fort Payne Hospital Corporation d/b/a DeKalb Regional Medical Center is a CHS subsidiary incorporated in Alabama with its principal place of business at 200 Medical Center Drive, Fort Payne, AL 35968. DeKalb Regional is an acute care hospital with approximately 134 beds. CHS acquired DeKalb Regional Medical Center through its subsidiary in April 2006.

33.     Defendant Greenville Hospital Corporation d/b/a LV Stabler Memorial Hospital is a CHS subsidiary incorporated in Alabama with its principal place of business at 29 LV Stabler Drive, Greenville, AL 36037. LV Stabler is an acute care hospital with approximately 72 beds. CHS acquired LV Stabler Memorial Hospital through its subsidiary in October 1994.

34.     Defendant Triad of Alabama, LLC d/b/a Flowers Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 4370 West Main Street, Dothan, AL 36305. Flowers Hospital is an acute care hospital with approximately 235 beds. CHS acquired Flowers Hospital through its subsidiary in July 2007.

**Arizona Defendant**

35.     Defendant Bullhead City Hospital Corporation d/b/a Western Arizona Regional Medical Center is a CHS subsidiary incorporated in Arizona with its principal place of business at 2735 Silver Creek Road, Bullhead City, AZ 86442. Western Arizona is an acute care hospital with approximately 139 beds. CHS acquired Western Arizona Regional Medical Center through its subsidiary in July 2000.

**Arkansas Defendants**

36.     Defendant National Healthcare of Newport, Inc. d/b/a Harris Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 1205 McLain Street,

12

Newport, Arkansas 72112. Harris Hospital is an acute care hospital with approximately 133 beds. CHS acquired Harris Hospital through its subsidiary in October 1994.

37.     Defendant Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center – Springdale is a CHS subsidiary incorporated in Arkansas with its principal place of business at 609 West Maple Avenue, Springdale, AR 72764. Northwest Medical Center is an acute care hospital with approximately 222 beds. CHS acquired Northwest Medical Center through its subsidiary in July 2007.

38.     Defendant Phillips Hospital Corporation d/b/a Helena Regional Medical Center is a CHS subsidiary incorporated in Arkansas with its principal place of business at 1801 Martin Luther King Drive, Helena, AR 72342. Helena Regional is an acute care hospital with approximately 155 beds. CHS acquired Helena Regional Medical Center through its subsidiary in March 2002.

*California Defendant*

39.     Defendant Fallbrook Hospital Corporation d/b/a Fallbrook Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 624 East Elder Street, Fallbrook, California 92028. Fallbrook Hospital is an acute care hospital with approximately 47 beds. CHS began operating Fallbrook Hospital through its subsidiary in November 1998.

*Florida Defendants*

40.     Defendant Crestview Hospital Corporation d/b/a North Okaloosa Medical Center is a CHS subsidiary incorporated in Florida with its principal place of business at 151 East Redstone Avenue, Crestview, FL 32539. North Okaloosa is an acute care hospital with

13

approximately 110 beds. CHS acquired North Okaloosa Medical Center through its subsidiary in March 1996.

41.     Defendant Lake Wales Hospital Corporation d/b/a Lake Wales Medical Center is a CHS subsidiary incorporated in Florida with its principal place of business at 410 South 11th Street Lake Wales, FL 33853. Lake Wales is an acute care hospital with approximately 160 beds. CHS acquired Lake Wales Medical Center through its subsidiary in December 2002.

*Georgia Defendants*

42.     Defendant Augusta Hospital, LLC d/b/a Trinity Hospital of Augusta is a CHS subsidiary incorporated in Delaware with its principal place of business at 2260 Wrightsboro Road, Augusta, GA 30904. Trinity Hospital is an acute care hospital with approximately 231 beds. CHS acquired Trinity Hospital of Augusta through its subsidiary in July 2007.

43.     Defendant Blue Ridge Georgia Hospital Company, LLC d/b/a Fannin Regional Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 2855 Old Highway 5 North, Blue Ridge, GA 30513. Fannin Regional is an acute care hospital with approximately 50 beds. CHS acquired Fannin Regional Hospital through its subsidiary in January 1986.

*Illinois Defendants*

44.     Defendant Galesburg Hospital Corporation d/b/a Galesburg Cottage Hospital is a CHS subsidiary incorporated in Illinois with its principal place of business at 695 N. Kellogg Street, Galesburg, IL 61401. Galesburg is an acute care hospital with approximately 173 beds. CHS acquired Galesburg Cottage Hospital through its subsidiary in July 2004.

45.     Defendant Granite City Illinois Hospital Company, LLC d/b/a Gateway Regional Medical Center is a CHS subsidiary incorporated in Illinois with its principal place of business at 2100 Madison Avenue, Granite City, IL 62040. Gateway Regional is an acute care hospital with approximately 382 beds. CHS acquired Gateway Regional Medical Center through its subsidiary in January 2002.

46.     Defendant Marion Hospital Corporation d/b/a Heartland Regional Medical Center is a CHS subsidiary incorporated in Illinois with its principal place of business at 3333 West DeYoung, Marion, IL 62959. Heartland Regional is an acute care hospital with approximately 92 beds. CHS acquired Heartland Regional Medical Center through its subsidiary in October 1996.

47.     Defendant National Healthcare of Mt. Vernon, Inc. d/b/a Crossroads Community Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at #8 Doctor's Park Road, Mt. Vernon, IL 62864. Crossroads Community Hospital is an acute care hospital with approximately 57 beds. CHS acquired Crossroads Community Hospital through its subsidiary in October 1994.

48.     Defendant Waukegan Illinois Hospital Company, LLC d/b/a Vista Medical Center East is a CHS subsidiary incorporated in Illinois with its principal place of business at 1324 N. Sheridan Road, Waukegan, Illinois 60085. Vista Medical Center East is an acute care hospital with approximately 336 beds. CHS acquired Vista Medical Center East through its subsidiary in July 2006.

### Indiana Defendants

49.     Defendant Bluffton Health System, LLC d/b/a Bluffton Regional Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 303 South

15

Main Street, Bluffton, IN 46714. Bluffton Regional is an acute care hospital with approximately 79 beds. CHS acquired Bluffton Regional Medical Center through its subsidiary in July 2007.

50.     Defendant Porter Hospital, LLC d/b/a Porter Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 814 LaPorte Avenue, Valparaiso, IN 46383. Porter Hospital is an acute care hospital with approximately 301 beds. CHS acquired Porter Hospital through its subsidiary in May 2007.

51.     Defendant Warsaw Health System, LLC d/b/a Kosciusko Community Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 2101 East Dubois Drive, Warsaw, IN 46580. Kosciusko Community Hospital is an acute care hospital with approximately 72 beds. CHS acquired Kosciusko Community Hospital through its subsidiary in July 2007.

***Kentucky Defendants***

52.     Defendant Hospital of Fulton, Inc. d/b/a Parkway Regional Hospital is a CHS subsidiary incorporated in Kentucky with its principal place of business at 2000 Holiday Lane, Fulton, KY 42041. Parkway Regional is an acute care hospital with approximately 70 beds. CHS acquired Parkway Regional Hospital through its subsidiary in May 1992.

53.     Defendant Hospital of Louisa, Inc. d/b/a Three Rivers Medical Center is a CHS subsidiary incorporated in Kentucky with its principal place of business at 2483 Highway 644, Louisa, KY 41230. Three Rivers is an acute care hospital with approximately 90 beds. CHS acquired Three Rivers Medical Center through its subsidiary in May 1993.

54.     Defendant Jackson Hospital Corporation d/b/a Kentucky River Medical Center is a CHS subsidiary incorporated in Kentucky with its principal place of business at 540 Jetts Drive,

16

Jackson, KY 41339. Kentucky River is an acute care hospital with approximately 55 beds. CHS began leasing Kentucky River Medical Center through its subsidiary in August 1995.

### Louisiana Defendants

55.     Defendant National Healthcare of Leesville, Inc. d/b/a Byrd Regional Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 1020 Fertitta Blvd., Leesville, LA 71446. Byrd Regional is an acute care hospital with approximately 60 beds. CHS acquired Byrd Regional Hospital through its subsidiary in October 1994.

56.     Defendant Ruston Louisiana Hospital Company, LLC d/b/a Northern Louisiana Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 401 East Vaughn Avenue, Ruston, LA 71270. Northern Louisiana Medical Center is an acute care hospital with approximately159 beds. CHS acquired Northern Louisiana Medical Center through its subsidiary in April 2007.

### Mississippi Defendants

57.     Defendant Vicksburg Healthcare, LLC d/b/a River Region Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 2100 Highway 61 North, Vicksburg, MS 39183. River Region Medical Center is an acute care hospital with approximately 341 beds. CHS acquired River Region Medical Center through its subsidiary in July 2007.

58.     Defendant Wesley Health System, LLC d/b/a Wesley Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 5001 Hardy Street, Hattiesburg, MS 39402. Wesley Medical is an acute care hospital with approximately 211 beds. CHS acquired Wesley Medical Center through its subsidiary in July 2007.

17

*New Jersey Defendant*

59.     Defendant Salem Hospital Corporation d/b/a The Memorial Hospital of Salem County is a CHS subsidiary incorporated in New Jersey with its principal place of business at 310 Woodstown Rd., Salem, NJ 08079. The Memorial Hospital is an acute care hospital with approximately 140 beds. CHS acquired Memorial Hospital of Salem County through its subsidiary in September 2002.

*New Mexico Defendants*

60.     Defendant Carlsbad Medical Center, LLC d/b/a Carlsbad Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 2430 West Pierce Street, Carlsbad, NM 88220. Carlsbad is an acute care hospital with approximately 112 beds. CHS acquired Carlsbad Medical Center through its subsidiary in July 2007.

61.     Defendant Roswell Hospital Corporation d/b/a Eastern New Mexico Medical Center is a CHS subsidiary incorporated in New Mexico with its principal place of business at 405 West Country Club Road, Roswell, NM 88201. Eastern New Mexico is an acute care hospital with approximately 162 beds. CHS acquired Eastern New Mexico Medical Center in April 1998.

62.     Defendant San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital is a CHS subsidiary incorporated in New Mexico with its principal place of business at 104 Legion Drive, Las Vegas, NM 87701. Alta Vista is an acute care hospital with approximately 54 beds. CHS acquired Alta Vista Regional Hospital in April 2000.

*North Carolina Defendant*

18

63.     Defendant Williamston Hospital Corporation d/b/a Martin General Hospital is a CHS subsidiary incorporated in North Carolina with its principal place of business at 310 S McCaskey Rd., Williamston, NC 27892. Martin General Hospital is an acute care hospital with approximately 49 beds. CHS acquired Martin General Hospital through its subsidiary in November 1998.

### Oklahoma Defendants

64.     Defendant Claremore Regional Hospital, LLC d/b/a/ Claremore Regional Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 1202 North Muskogee Place, Claremore, OK 74017. Claremore is an acute care hospital with approximately 81 beds. CHS acquired Claremore Regional Hospital through its subsidiary in July 2007.

65.     Defendant SouthCrest, LLC d/b/a SouthCrest Hospital is a CHS subsidiary incorporated in Oklahoma with its principal place of business at 8801 South 101st East Avenue, Tulsa, OK 74133. SouthCrest is an acute care hospital with approximately 180 beds. CHS acquired SouthCrest Hospital through its subsidiary in July 2007.

66.     Defendant Woodward Health System, LLC d/b/a Woodward Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 900 17th Street, Woodward, OK 73801. Woodward is an acute care hospital with approximately 87 beds. CHS acquired Woodward Hospital through its subsidiary in July 2007.

### Pennsylvania Defendants

67.     Defendant Berwick Hospital Corporation, LLC d/b/a Berwick Hospital Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 701 East 16th St.,

19

Berwick, PA 18603. Berwick Hospital Center is an acute care hospital with approximately 101 beds. CHS acquired Berwick Hospital Center through its subsidiary in March 1999.

68. Defendant CHHS Hospital Company, LLC d/b/a Chestnut Hill Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 8835 Germantown Avenue, Philadelphia, PA 19118. Chestnut Hill is an acute care hospital with approximately 160 beds. CHS acquired Chestnut Hill through its subsidiary in February 2005.

69. Defendant Clinton Hospital Corporation d/b/a Lock Haven Hospital is a CHS subsidiary incorporated in Pennsylvania with its principal places of business at 24 Cree Drive, Lock Haven, PA 17745. Lock Haven Hospital is an acute care hospital with approximately 47 beds. CHS acquired Lock Haven Hospital through its subsidiary in August 2002.

70. Defendant Coatesville Hospital Corporation d/b/a Brandywine Hospital is a CHS subsidiary incorporated in Pennsylvania with its principal place of business at 201 Reeceville Road, Coatesville, PA 19320. Brandywine Hospital is an acute care hospital with approximately 243 beds. CHS acquired Brandywine Hospital through its subsidiary in June 2001.

71. Defendant Northampton Hospital Company, LLC d/b/a Easton Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 250 South 21st Street, Easton, PA 18042. Easton Hospital is an acute care hospital with approximately 254 beds. CHS acquired Easton Hospital through its subsidiary in October 2001.

72. Defendant Phoenixville Hospital Company, LLC d/b/a Phoenixville Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 140 Nutt Road, Phoenixville, PA 19460. Phoenixville Hospital is an acute care hospital with approximately 153 beds. CHS acquired Phoenixville Hospital through its subsidiary in August 2004.

20

73.     Defendant Pottstown Hospital Company, LLC d/b/a Pottstown Memorial Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 1600 E High Street, Pottstown, PA 19464. Pottstown is an acute care hospital with approximately 221 beds. CHS acquired Pottstown Memorial Medical Center through its subsidiary in July 2003.

74.     Defendant Sunbury Hospital Company, LLC d/b/a Sunbury Community Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 350 North 11th Street, Sunbury PA 17801. Sunbury is an acute care hospital with approximately 89 beds. CHS acquired Sunbury Community Hospital through its subsidiary in October 2005.

75.     Defendant West Grove Hospital Company, LLC d/b/a Jennersville Regional Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 1015 West Baltimore Pike, West Grove, PA 19390. Jennersville Regional is an acute care hospital with approximately 59 beds. CHS acquired Jennersville Regional Hospital through its subsidiary in October 2001.

### South Carolina Defendants

76.     Defendant Chesterfield/Marlboro, LP d/b/a Chesterfield General Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 711 Chesterfield Hwy., Cheraw, SC 29520. Chesterfield General is an acute care hospital with approximately 59 beds. CHS acquired Chesterfield General Hospital through its subsidiary in August 1996.

77.     Defendant Lancaster Hospital Corporation d/b/a Springs Memorial Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 800 W. Meeting Street, Lancaster, SC 29720. Springs Memorial Hospital is an acute care hospital with

21

approximately 231 beds. CHS acquired Springs Memorial Hospital through its subsidiary in November 1994.

78.     Defendant Mary Black Health System LLC d/b/a Mary Black Memorial Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 1700 Skylyn Drive, Spartanburg, SC 29307. Mary Black Memorial is an acute care hospital with approximately 209 beds. CHS acquired Mary Black Memorial Hospital through its subsidiary in July 2007.

79.     Defendant QHG of South Carolina, Inc. d/b/a Carolinas Hospital System; Marion Regional Hospital is a CHS subsidiary incorporated in South Carolina with its principal place of business at 805 Pamplico Highway Florence, SC 29505. Carolina Hospital System; Marion Regional Hospital is an acute care hospital with approximately 420 beds. CHS acquired Carolina Hospital System; Marion Regional Hospital through its subsidiary in July 2007.

***Texas Defendants***

80.     Defendant Big Spring Hospital Corporation d/b/a Scenic Mountain Medical Center is a CHS subsidiary incorporated in Texas with its principal place of business at 1601 W. 11th Place Big Spring, TX 79720. Scenic Mountain Medical Center is an acute care hospital with approximately 150 beds. CHS acquired Scenic Mountain Medical Center through its subsidiary in October 1994.

81.     Defendant Brownwood Hospital, LP d/b/a Brownwood Regional Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 1501 Burnet Drive, Brownwood, TX 76801. Brownwood Regional is an acute care hospital with

22

approximately 194 beds. CHS acquired Brownwood Regional Medical Center through its subsidiary in July 2007.

82.     Defendant Cedar Park Health System, L.P. d/b/a Cedar Park Regional Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 1401 Medical Parkway Cedar Park, TX 78613. Cedar Park Regional Medical Center is an acute care hospital with approximately 77 beds. CHS acquired Cedar Park Regional Medical Center through its subsidiary in December 2007.

83.     Defendant Cleveland Regional Medical Center, L.P. d/b/a Cleveland Regional Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 300 East Crockett Street Cleveland, TX 77327. Cleveland Regional Medical Center is an acute care hospital with approximately 107 beds. CHS acquired Cleveland Regional Medical Center through its subsidiary in August 1996.

84.     Defendant Laredo Texas Hospital Company, L.P. d/b/a Laredo Medical Center is a CHS subsidiary incorporated in Texas with its principal place of business at 1700 E. Saunders St. Laredo, TX 78041. Laredo Medical Center is an acute care hospital with approximately 326 beds. CHS acquired Laredo Medical Center through its subsidiary in October 2003.

85.     Defendant Longview Medical Center, L.P. d/b/a Longview Regional Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 2901 N. Fourth St. Longview, TX 75605. Longview Regional Medical Center is an acute care hospital with approximately 131 beds. CHS acquired Longview Regional Medical Center through its subsidiary in July 2007.

86.     Defendant Navarro Hospital, LP d/b/a Navarro Regional Hospital is a CHS subsidiary incorporated in Delaware with its principal place of business at 3201 West Highway 22, Corsicana, TX 75110. Navarro Regional is an acute care hospital with approximately 162 beds. CHS acquired Navarro Regional Hospital through its subsidiary in July 2007.

87.     Defendant NHCI of Hillsboro, Inc. d/b/a Hill Regional Hospital is a CHS subsidiary incorporated in Texas with its principal place of business at 101 Circle Drive Hillsboro, TX 76645. Hill Regional Hospital is an acute care hospital with approximately 92 beds. CHS acquired Hill Regional Hospital through its subsidiary in October 1994.

88.     Defendant Piney Woods Healthcare System, LP d/b/a Woodland Heights Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 505 South John Redditt Drive, Lufkin, TX 75904. Woodland Heights is an acute care hospital with approximately 149 beds. CHS acquired Woodland Heights Medical Center through its subsidiary in July 2007.

89.     Defendant San Angelo Hospital, L.P. d/b/a San Angelo Community Medical Center is a CHS subsidiary incorporated in Delaware with its principal place of business at 3501 Knickerbocker Road San Angelo, TX 76904. San Angelo Community Medical Center is an acute care hospital with approximately 171 beds. CHS acquired San Angelo Community Medical Center through its subsidiary in July 2007.

90.     Defendant Weatherford Texas Hospital Company, LLC d/b/a Weatherford Regional Medical Center is a CHS subsidiary incorporated in Texas with its principal place of business at 713 E. Anderson Street, Weatherford, TX 76086. Weatherford Regional Medical

24

Center is an acute care hospital with approximately 99 beds. CHS acquired Weatherford Regional Medical Center through its subsidiary in November 2006.

### *Virginia Defendants*

91.     Defendant Emporia Hospital Corporation d/b/a Southern Virginia Regional Medical Center is a CHS subsidiary incorporated in Virginia with its principal place of business at 727 North Main Street, Emporia, VA 23847. Southern Virginia Regional Medical Center is an acute care hospital with approximately 80 beds. CHS acquired Southern Virginia Regional Medical Center through its subsidiary in March 1999.

92.     Defendant Franklin Hospital Corporation d/b/a Southampton Memorial Hospital is a CHS subsidiary incorporated in Virginia with its principal place of business at 100 Fairview Drive Franklin, VA 23851. Southampton Memorial Hospital is an acute care hospital with approximately 105 beds. CHS acquired Southampton Memorial Hospital through its subsidiary in March 2000.

93.     Defendant Petersburg Hospital Company, LLC d/b/a Southside Regional Medical Center is a CHS subsidiary incorporated in Virginia with its principal place of business at 200 Medical Park Blvd., Petersburg, VA 23805. Southside Regional Medical Center is an acute care hospital with approximately 300 beds. CHS acquired Southside Regional Medical Center through its subsidiary in August 2003.

25

## IV.     FACTUAL ALLEGATIONS

### A.     The Medicare Program and Medically Necessary Admissions

#### 1.     Overview

94.     The Medicare program is a federal health insurance program that provides eligible individuals over the age of 65 as well as certain other beneficiaries with hospital and supplemental medical benefits. *See* 42 U.S.C. § 1395 *et seq.*

95.     The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program.

96.     The Defendant hospitals are Medicare Part A providers pursuant to the Medicare regulations because they have agreements to participate in Medicare. *See* 42 C.F.R. § 400.202. As providers, these hospitals can treat Medicare patients and bill Medicare for their services as long as they bill Medicare according to its regulations.

97.     Pursuant to Medicare regulations, there are typically two physicians involved in the decision to admit a patient who comes to the hospital through the emergency department. While the physician responsible for the patient's care at the hospital (e.g., a hospitalist or primary care physician) is responsible for ultimately deciding whether the patient should be admitted to the hospital, Medicare Benefit Policy Manual 100-02, Ch. 1, Sec. 10, in the context of admissions from the emergency department, the admitting physician must make an admissions decision based on information presented to him or her by the ER physician who treats the patient in the ER. This is the model followed by CHS hospitals.

98.     CMS reimburses Medicare providers through contractors referred to as Medicare Administrative Contractors ("MACs"), which are private insurance companies that are

responsible for determining the amount of payments made to providers. Pursuant to their contracts with the federal government, MACs review, approve, and pay Medicare claims received from hospitals that treat Medicare patients. These claims are paid with federal funds. In 2010, CHS received approximately 27.2 percent of its net operating revenue, about $3.4 billion, from Medicare claims.

### 2. Incentives to Admit Rather than Observe or Discharge

99. Hospitals receive different rates of reimbursement for different levels of care (e.g., inpatient versus outpatient care). Outpatient care includes treating a patient in the emergency room and sending her home as well as outpatient observation, in which a patient is treated, assessed, and observed for up to 48 hours to determine whether her condition has improved enough to be discharged or instead she requires admission to the hospital as an inpatient. Medicare Benefit Policy Manual 100-2, Ch. 6, Sec. 20.6.

100. On average, the reimbursement rates for a single patient's inpatient care are typically about $4,500 to $5,000 higher than those for outpatient care,[5] and for chest pain patients, reimbursement rates for inpatient admissions are almost $7,000 higher than those for outpatient observation.[6]

---

[5] In Hospital Observation Struggle, Uncertain Outcomes May Justify Inpatient Admissions, 15 Report on Medicare Compliance 37 (Oct. 23, 2006), *available at* http://www.ehrdocs.com/pdf/news/Hospitals_Observation_Struggle.pdf.

[6] Zach Gaumer & Dan Zabinski, Medicare Payment Advisory Commission (MedPAC) Presentation, Recent Growth in Hospital Observation Care, *available at* http://www.medpac.gov/transcripts/observation%20sept%202010.pdf. MedPAC is an independent Congressional agency established to advise Congress on issues affecting the Medicare program. *See* http://www.medpac.gov.cfm.

27

### 3. The Requirement of Medical Necessity

101. Under federal law, Medicare only reimburses hospitals for treatment that is "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). When MACs review inpatient hospital claims, "the medical record must indicate that inpatient hospital care was medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary." Medicare Program Integrity Manual, Ch. 6, Section 6.5.2. The Integrity Manual states that "[i]npatient care rather than outpatient care is required only if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting." Id.

102. Highmark Medicare Services, the MAC for Pennsylvania, Delaware, Maryland, New Jersey, the District of Columbia Metropolitan Area, and parts of Virginia, advises Medicare Part A providers that patients with certain "soft" diagnoses, which can encompass a variety of medical conditions, ranging from serious to very minor, are appropriately kept on outpatient observation status rather than admitted on an inpatient basis:

> [w]hile specific medical necessity for both inpatient admissions and outpatient observation is always determined on a case-by-case basis, certain diagnoses and procedures generally do not support an inpatient admission, and fall within the definitions of outpatient observation. *Uncomplicated presentations of chest pain (rule out MI), mild asthma/COPD, mild CHF, syncope and decreased responsiveness, atrial arrhythmias and renal colic are all frequently associated with the expectation of a brief (less than 24-hour) stay unless serious pathology is uncovered.*
>
> Highmark Medicare Services, Local Coverage Determination L27548 – Acute Care: Inpatient, Observation and Treatment Room Services, updated Feb. 21, 2011 (emphasis added).

103. Although admitting Medicare patients on an inpatient basis may simply seem like cautious medicine, hospitals can actually be hazardous places for people who should not be there,

28

particularly the elderly. As many as 98,000 people die each year as a result of medical errors made in hospitals.[7] And almost 100,000 more people each year die after developing hospital-acquired infections that are unrelated to the admitting diagnosis and are often drug-resistant.[8] Further, patient falls, which tend to happen when heavily medicated elderly patients are placed in an unfamiliar, dimly lit location like a hospital, are also very common; falls are a leading cause of death for people over age 65.[9]

104. Medicare requires that hospitals implement a utilization review plan to ensure that all inpatient admissions are medically necessary. *See* 42 C.F.R. § 482.30. As part of their utilization review plans, most hospitals use evidence-based criteria to determine whether an admission decision was medically necessary. Such criteria apply extensive medical research to clinical situations to assist treating physicians and utilization reviewers in making decisions about which level of care is appropriate for each patient.

105. InterQual Criteria are the most commonly used set of evidence-based clinical decision criteria in the country. CMS, many state Medicaid programs, federally authorized Medicare Quality Improvement Organizations in more than 40 states, approximately 4,000 hospitals, and numerous private health plans use InterQual evidence-based criteria to determine the medically necessary level of care for a patient. The InterQual criteria, which are published by

---

[7] Institute of Medicine, "To Err is Human" (Nov. 1999), *available at* http://www.iom.edu/~/media/Files/Report%20Files/1999/To-Err-is-Human/To%20Err%20is %20Human%201999%20%20report%20brief.pdf.

[8] Cathleen Crowley & Eric Nalder, Within health care hides massive, avoidable death toll, Dead By Mistake, Hearst Newspapers, Aug. 10, 2009, *available at* http://www.chron.com/disp/story.mpl/deadbymistake/6555095.html.

[9] Institute for Healthcare Improvement, Reducing Harm from Falls, *available at* http://www.ihi.org/IHI/Topics/PatientSafety/ReducingHarmfromFalls/.

29

McKesson Corporation, were developed over 30 years ago by a physician and are constantly being refined by an independent panel of more than 1,100 medical practitioners across the country. The criteria are updated annually and contain more than 16,000 references to medical literature.

106. The second most commonly used criteria are the Milliman Care Guidelines. The Guidelines are used by several large health plans, 25 CMS auditors, and more than 1,000 hospitals. The Milliman Care Guidelines are also evidence-based and contain more than 12,000 citations to medical literature. The Care Guidelines were developed by a physician and are also updated annually and reviewed by more than 100 independent experts prior to publication.

107. Together, InterQual and Milliman are used by almost 80 percent of U.S. hospitals.

## B. CHS' System-Wide Scheme to Increase ER Admissions

### 1. CHS' Corporate Scheme

#### a. Corporate Structure

108. Community Health Systems, Inc., is a holding company. The holding company is led by Wayne T. Smith, who serves as Chairman of the Board, President, and Chief Executive Officer, and W. Larry Cash, who serves as Executive Vice-President and Chief Financial Officer. CHS' business model is to identify acquisition candidates, such as hospitals and other medical facilities, in growing non-urban markets with little or no competition. CHS manages these subsidiary hospitals and affiliates through its subsidiary Community Health Systems Professional Services Corporation, which is led by five different Operations Leadership teams and a Corporate Leadership team.

30

109.    CHS explicitly states that each hospital affiliated with the holding company or the services corporation is owned or leased, and operated by a separate and distinct legal entity.  CHS maintains publicly that each of these legal entities is responsible for the healthcare services delivered at its respective facility and employs its own management.[10]  In practice, however, CHS does not allow these subsidiaries any autonomy in the most important aspect of running a medical facility: ensuring that patients receive medically appropriate care.

### b.    The Corporate Scheme to Drive Medically Unnecessary ER Inpatient Admissions

110.    As evidenced by a presentation given by CHS Executive Vice President and Chief Financial Officer Larry Cash at the March 2010 Raymond James Annual Institutional Investors Conference in Orlando, Florida, a key building block of CHS' growth strategy is increasing inpatient admissions from ER visits:

---

[10] *See* http://chs.net/company_overview/legal_information.html.



Significant Opportunities for Growth in Revenue and Operating Profit

111.    CHS is able to achieve growth through increasing inpatient admissions from ER visits by "standardiz[ing] and centraliz[ing]"[11] the ER operations at its hospitals. This process includes (1) centralizing ER management at CHS hospitals;[12] (2) setting and constantly monitoring admissions quotas at each hospital; (3) requiring that case managers at CHS hospitals use standardized, CHS developed admission criteria; (4) installing standardized software in its ERs that "assist[s] physicians in making diagnoses and determining treatments,"[13] tracks patients,

---

[11] Wayne Smith, CHS Presentation, Credit Suisse Group Healthcare Conference, Nov. 10, 2010.

[12] Larry Cash, CHS Presentation, Raymond James 32nd Annual Institutional Investor Conference, Orlando, Florida, March 8, 2010.

[13] Community Health Systems, Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) at 3 (filed Feb. 25, 2011).

32

and collects admissions data; and (5) "maintain[ing] strong controls over hospital physician contracts."[14]

112.    A good example of the centralized goal setting and accountability process was outlined by a former CHS hospital executive from Lock Haven Hospital in Lock Haven, Pennsylvania,[15] who was interviewed by an agent of the Relators on April 29 and May 2, 2011. That employee reported that CHS headquarters established annual goals for its individual hospitals' ER inpatient admissions and that CHS hospitals are required to send monthly report cards back to CHS corporate headquarters detailing the hospital's progress toward meeting its goal.

113.    CHS maintains tight corporate control over the operations of its hospitals. Department heads and executive officers at Lock Haven had weekly conference calls with their peers at other CHS hospitals in their division to discuss various issues, and a CHS regional manager would visit the former executive every two to three months to work on issues affecting the department in which the executive worked.

114.    In addition to strict control over the management of its hospitals, CHS helps ensure that it achieves inpatient admission growth by tying part of the cash incentive compensation of its

---

[14] Community Health Systems, Inc., CHS Response Presentation at 14-21, 23 (April 28, 2011), *available at* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9Mzk3Mjkw OHxDaGlsZElEPTQyNDEyNHxUeXBlPTI=&t=1.

[15] Retaliation against current and former CHS employees is of particular concern here because, given CHS' strategy of acquiring rural hospitals, many of these employees have very few, if any, employment opportunities in their areas if they cannot work at a CHS facility. *See* Wayne Smith, CHS Presentation, Goldman Sachs CEO Unplugged Conference, Jan. 6, 2010 (noting that for more than 80 CHS hospitals, CHS is the sole provider or the only hospital in the community). To protect the employees that Relators spoke with from retaliation, Relators have not included their names or specific identifying information in this Complaint.

Division Presidents, who oversee the management of CHS' geographic divisions, to "Non-Self Pay Admissions Growth."[16]

115.    This centralized control of hospital ERs allows CHS to implement its scheme to increase admissions even when medically unnecessary.  Specifically, CHS increases ER admissions at its hospitals through the centralized processes outlined above: (1) using the standardized data tracking system to monitor ER patients and the admissions rates for individual doctors and the ER as a whole, (2) having its hospital administrators call and visit the ER to push ER staff to admit Medicare patients who fall into certain "soft" diagnostic categories – such as chest pain, abdominal pain, and syncope (fainting) – regardless of whether medical necessity requires inpatient admission; (3) forcing its hospital administrators to pressure ER physicians to increase admissions rates regardless of medical necessity by setting admissions rate quotas, constantly monitoring admissions rates and attending physicians' meetings, (4) terminating the contracts of those ER physicians' groups who refuse to comply with the directives to admit patients regardless of medical necessity; and (5) requiring its case managers to "justify" admissions using internally developed criteria rather than determining the medically necessary level of care using independently vetted, evidence-based criteria.

116.    Rather than using InterQual, Milliman, or other evidence-based criteria, CHS has developed and uses its own set of criteria – called the CHS Clinical Guidelines for Inpatient Care or "Blue Book" – for utilization review.  The Blue Book, which CHS does not claim was

---

[16] *See* CHS Schedule 14A Proxy Statement at 29-31 (April 9, 2010).

developed by a physician, is not reviewed by independent physicians and focuses on "Admissions Justifications."[17]

117.    CHS' own comparison of its Blue Book with InterQual demonstrates that its "Justifications" are significantly looser than standard evidence-based criteria. Where, for example, for a chest pain admission, InterQual requires EKG changes that confirm that the patient has just suffered an acute myocardial infarction (heart attack), the CHS Blue Book criteria are satisfied with non-specific changes that are suggestive of ischemia (angina) or MI. If the concern is that the chest pain is caused by cardiac rhythm abnormalities, InterQual identifies for admission only specific arrhythmias that might be associated with a heart attack: ventricular tachycardia ("V Tach") or atrial fibrillation ("afib"). The Blue Book, on the other hand, lists only "arrythmias" generally, a criterion that could be satisfied by occasional extra beats, such as PACs (premature atrial contractions) or PVCs (premature ventricular contractions), which are both common and benign. Similarly, in the case of a patient with new onset atrial fibrillation or flutter faster than 120 beats per minute, the InterQual criteria require at least one other indicator of danger to meet the severity of illness requirement for admission, such as a systolic blood pressure below 90 that is a decrease from patient's baseline, while the Blue Book requires only a systolic blood pressure below 90 or a decrease from baseline, which may in fact be completely benign.[18]

118.    CHS' centralized strategy is working. According to its 10-K reports to the Securities and Exchange Commission, in 2009, 55 percent of its overall system admissions originated in the ER, and just one year later, that number had jumped to 60 percent.

---

[17] CHS Response Presentation, *supra* note 14, at 14-17.

[18] *Id.* at 106-07.

35

## 2. SEIU's Data Analysis

### a. Analysis of CHS ER Inpatient Admissions

#### i. Introduction

119. SEIU's data analysis demonstrates a pattern of aggressive admission practices for Medicare beneficiaries that enter CHS hospitals through the emergency room. ER admission rates at CHS hospitals are typically higher than would be expected, given the patient case mix and geographic status, indicating that many of these admissions are not medically necessary. These excessive ER admission patterns typically begin at hospitals after CHS acquires them and then increase thereafter, showing that the corporate scheme(s) outlined in paragraphs 110 through 118 are working.

#### ii. Methodology

120. To study ER admission patterns at CHS facilities, SEIU analyzed the Medicare Inpatient and Outpatient Limited Data Set Standard Analytic Files ("IP SAF" and "OP SAF") for Federal Fiscal Years ("FFY") 2003 through 2009. Following the methodology outlined in the Research Data Assistance Center's ("ResDAC") technical publication *How to Identify Emergency Room Services in the Medicare Claims Data*,[19] SEIU identified claims initiated in the ER using both the OP SAF and the IP SAF. ER claims found in the IP SAF represent those patients who were admitted, and claims found in the OP SAF represent those patients who were not admitted,

---

[19] Following this document, claims initiated in the ER are identified using Healthcare Common Procedure Coding System ("HCPCS") codes, which appear in the OP SAF, and revenue center codes, which appear in both the OP SAF and the IP SAF. *See* Research Data Assistance Center, January 2003, updated June 2008. *How to Identify Emergency Room Services in the Medicare Claims Data*. Technical Brief, ResDAC Publish Number TN-003. University of Minnesota, Minneapolis, MN. http://www.resdac.umn.edu.

including patients assigned to observation status. A hospital's total number of ER visitors was calculated by adding its total ER admissions to its total ER outpatient discharges. In order to compare apples to apples, certain restrictions were used in this analysis, including the limitation of analysis only to fee-for-service claims for age-eligible Medicare beneficiaries, as well as the restriction of analysis only to claims submitted by general short-term acute care hospitals.[20]

### iii. Tracking System-wide Growth in Admissions with Years of CHS Ownership

121. SEIU's analysis shows that the vast majority of CHS hospitals[21] have ER admissions totals that are in excess of national expectations[22] and that the rates by which many of their hospitals deviate from expectations are among the highest in the country. The chart below

---

[20] Other restrictions that were employed follow. Analysis inclusion was limited only to those hospitals with at least 12 ER admissions and at least 12 ER outpatient discharges in a given FFY. Claims included in analysis were limited only to those for age-eligible Medicare beneficiaries who had no Medicare HMO coverage during a given FFY. Claims were excluded from analysis if they had null or otherwise invalid coded values for patient age, patient sex, or patient discharge diagnosis. Claims were also excluded if they did not have positive Medicare payment amounts recorded or if they had frequency code values of "3," "4," or "5." ER outpatient discharge claims were excluded if the claims resulted in patients leaving the ER against medical advice, in patients being transferred from the ER to other acute-care hospitals for inpatient care, or in patients dying while still in the hospital's ER.

[21] Hospitals sold by CHS during a given FFY are not counted among CHS' total hospitals for that FFY or for any FFY afterwards.

[22] An "expected" ER admission rate was calculated for each hospital, with this calculation based on the national average ER admission rate, adjusted for patient age, patient sex, patient discharge diagnosis, and hospital geographic status (rural or not rural). From this rate, a total number of "expected admissions" was calculated for each hospital by multiplying the hospital's total number of ER visits by its expected ER admission rate. The percent to which each hospital was above or below its expected admissions total was calculated by subtracting the hospital's total number of expected admissions from its actual ER admissions total, and then dividing this outcome by the hospital's expected admissions total. The calculation of this "percent above expected ER admissions" rate is expressed as a formula below:

$$\frac{(Actual\ ER\ Admissions) - (Expected\ ER\ Admissions)}{(Expected\ ER\ Admissions)}$$

37

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 49 of 177 PageID #: 49

shows the percent above or below expected ER admissions for each CHS hospital in FFY 2009 –

the most recent year of data available – that met the restrictions of SEIU's analysis. Each bar

represents an individual CHS facility's percent above or below its expected ER admissions total.

The dotted line indicates the 80th percentile nationally among hospitals, as ranked by the percent

to which they are above or below their expected ER admission rates. As can be seen in the chart,

most CHS hospitals had ER admissions totals above expected.



122. The Short-Term Acute Care Program for Evaluating Payment Patterns Electronic

Report ("PEPPER") was designed to assist hospitals in monitoring compliance with Medicare

guidelines and preventing fraud and abuse.[23] It contains statistics for certain areas at risk for Medicare payment errors. PEPPER suggests that hospitals that are at or above the 80th percentile in these at-risk areas are outliers that warrant closer analysis. Using PEPPER's suggested 80th national percentile as a potential outlier indicator, SEIU finds that 48 of CHS' 113 qualifying hospitals (42.5%) reach this outlier status in FFY 2009. Of the 33 CHS hospitals with ER admission rates below expected amounts in FFY 2009, 22 of them have been owned by CHS for only two years or less by this period. Of the 65 facilities that have been owned for at least three years, 39 (60%) are at or above the 80th percentile.

123.    Combining the totals at the 80 CHS hospitals with ER admission rates above expected, SEIU found that CHS hospitals had 13,714 excess ER admissions in FFY 2009 alone. Using the average rate difference of $4,500 to $5,000 noted in the Report on Medicare Compliance, *see supra* paragraph 100, these excess admissions represented between $61,713,000 and $68,570,000 in overpayments to CHS hospitals in FFY 2009.

124.    The total of 13,714 excess ER admissions noted in paragraph 123 is likely a conservative estimate. Aggregating excess admissions across all patient discharge diagnoses can obscure higher-than-expected admission totals for diagnosis groups that are typically lower in acuity, such as nonspecific chest pain. The chart at below shows the percent above or below expected ER admission totals for nonspecific chest pain claims at CHS hospitals in FFY 2009. One hundred and one CHS hospitals have admission totals above their expected amounts, and 74 (73.3%) of these hospitals are above the 80th percentile nationally. SEIU analysis suggests that

---

[23] TMF Health Quality Institute. 2011. "Short-Term Acute Care Program for Evaluating Payment Patterns Electronic Report User's Guide, 6th Ed." *Program for Evaluating Payment Patterns Electronic Report.* http://www.pepperresources.org.

2,270 excess admissions alone occurred for patients diagnosed with nonspecific chest pain, and many of these occurred at hospitals that have overall ER admission rates that are not above their expected amounts. Again, most of the hospitals with nonspecific chest pain ER admission rates below expected are amongst CHS' most recent acquisitions: 8 of 12 such CHS hospitals in FFY 2009 had been owned only two years or less by the end of 2009.



125. From FFY 2003 through FFY 2009, CHS hospitals totaled 61,625 excess admissions among all diagnosis groups. During the same period, CHS hospitals had 10,183 excess admissions among patients diagnosed with nonspecific chest pain.

126. These excess admissions have occurred as a direct result of the CHS corporate scheme outlined herein. SEIU's analysis shows that, on average, ER admission rates tend to be

below national expectations at hospitals prior to their acquisition by CHS. In the first full year after the acquisition, CHS facilities admit above expected and that gap grows steadily for the first few years of ownership. This can be seen in the charts at paragraphs 121 and 124. The lighter shaded bars represent facilities owned for 2 years or less; the majority of facilities admitting below expected are in this group.

127. The chart below, which examines data from FFY 2003 through FFY 2009, makes clearer this connection between length of ownership and excessive ER admission rates.[24] The chart groups together CHS hospitals according to the length of time that CHS has owned them and analyzes their ER admissions rates relative to expectations.

---

[24] Hospitals acquired by CHS in FFY 2008 or later are excluded from analysis grouped by length of ownership. In addition, certain CHS hospitals appear to have at least partially combined their Medicare reporting efforts under a single reporting ID during the period of analysis, and they are therefore removed from years of ownership analysis. These specific hospitals are:

- Northwest Medical Center—Bentonville and Northwest Medical Center—Springdale of Arkansas (Acquired by CHS in July 2007)
- Both campuses of Affinity Medical Center in Ohio (Acquired by CHS in July 2007)
- Vista Medical Center East and Vista Medical Center West in Illinois (Acquired by CHS in July 2006)
- Both campuses of Sky Ridge Medical Center in Tennessee (Most recent campus acquired in October 2005)

41



Percent of ER Admissions Above Expected at CHS
Grouped According to Ownership Tenure
All Diagnosis Groups, FFYs 2003 - 2009

### iv.    SEIU's Analysis of Specific Diagnostic Categories

128.    SEIU's analysis shows that these deviations are more pronounced when considering "soft" diagnoses, as the following charts make clear. Respectively, these charts reflect ER admissions patterns for discharge diagnoses of nonspecific chest pain, syncope (fainting), and transient cerebral ischemia ("TIA"), which is a "mini-stroke."

42

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 54 of 177 PageID #: 54





43



### b. Analysis of CHS One-Day Stays

129.    ER one-day stay rates also exceed case mix-adjusted expectations by dramatic

amounts at CHS hospitals. One-day inpatient admissions are often flagged as those most likely to

be unnecessary admissions, as patients admitted without medical necessity require less intensive

care and therefore are likely not to stay in the hospital for long. PEPPER suggests that elevated

one-day stay rates may be symptomatic of admission problems,[25] though unnecessary admissions

---

[25] Being above the 80th percentile nationally for one-day stays "could indicate that there are
unnecessary admissions related to inappropriate use of admission screening criteria or outpatient
observation. A sample of one and/or two-day stay cases should be reviewed to determine if
inpatient admission was necessary or if care could have been provided more efficiently on an
outpatient basis (e.g., outpatient observation)." PEPPER Short-term Acute Care Program for
Evaluating Payment Patterns Electronic Report, User's Guide, 6th Ed. at 16.

44

can of course last longer than one day.[26]  Higher-than-expected rates of one-day stays among all

ER visitors[27] are observable at CHS hospitals, and again these high rates often develop at these

hospitals after being acquired by CHS.  The chart below shows the percent above expected one-

day stays among all ER visitors at CHS hospitals in FFY 2009:

---

[26] As a stand-alone metric, the OIG has recognized that the one day stay rate is inappropriate, as
hospitals can easily hold patients longer than one day in order to escape detection. *See* Office of
the Inspector General. *National DRG Validation Study: Short Hospitalizations*. May 1989.

[27] To identify hospitals' ER admissions that lasted only one day, SEIU identified claims in the IP
SAF that originated from the ER and had a coded value of either "0" or "1" for length of stay.
For the purposes of comparing hospitals' one-day stay rates, SEIU followed the PEPPER
guidelines.  As per PEPPER's recommendation, one-day inpatient stays that were preceded by
observation services of greater than 24 hours are eliminated from one-day stay totals.  Also
following PEPPER's recommendation, SEIU removed from totals those one-day stays that ended
with the patient leaving against medical advice, with the patient being transferred to another
acute-care hospital for inpatient care, or with the patient dying in the hospital.  SEIU then
calculated the rate of occurrences of such one-day stays at a given hospital ("ER one-day stay
rate") by dividing its resulting total number of one-day stays by the hospital's total number of ER
encounters that satisfy restrictions noted in paragraph 120 above.  This formula is expressed as:

$$\frac{(ER\ One\ Day\ Stays)}{(Total\ ER\ Visits)}$$

An "expected" one-day stay rate amongst total ER visits was also calculated for each hospital,
with this calculation based on the national ER one-day stay rate, adjusted for certain beneficiary
and facility characteristics.  These adjustment characteristics were patient age, patient sex, patient
discharge diagnosis, and hospital geographic status (rural or not rural).  From this rate, a total
number of "expected ER one-day stays" was then determined for each hospital by multiplying the
hospital's total number of ER visits by its expected ER one-day stay rate.  The percent to which
each hospital was above or below its expected one-day stays total was calculated by subtracting
the hospital's total number of expected one-day stays from its actual ER one-day stays total, and
then dividing this outcome by the hospital's expected one-day stays total.  The calculation of this
"percent above expected ER one-day stays" rate is expressed as the following formula:

$$\frac{(Actual\ ER\ One\ Day\ Stays) - (Expected\ ER\ One\ Day\ Stays)}{(Expected\ ER\ One\ Day\ Stays)}$$

45



**Percent Above Expected One-Day Stays Among All ER Visits**
All Diagnosis Groups, FFY 2009

Legend: Owned Over 2 Years | Owned 2 Years or Less | 80th Percentile

130.    PEPPER specifically targets for review one-day stays among patients diagnosed with chest pain, and CHS hospitals exceeded expected rates in this category by large margins in FFY 2009. Ninety-nine CHS hospitals exceeded their expected ER one-day stay rates, and 78 of these hospitals are at the 80th national percentile or above in FFY 2009 by this measure. The chart below shows this.

46



**Percent Above Expected One-Day Stays Among All ER Visits**
Nonspecific Chest Pain, FFY 2009

Legend: Owned Over 2 Years · Owned 2 Years or Less · 80th Percentile

131.     SEIU's analysis demonstrates that the higher-than-expected ER one-day stay rates at these hospitals are again the result of CHS ownership. Using data from FFY 2003 through FFY 2009, the following two charts group hospitals according to the length of time they have been owned by CHS, and then analyze the extent to which hospitals exceed or fall below expected ER one-day stay rates according to these ownership groupings. The first chart below focuses on ER one-day stay rates for all diagnoses, and the second chart specifically focuses on ER one-day stay rates for ER visitors diagnosed with nonspecific chest pain.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 59 of 177 PageID #: 59





48

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 60 of 177 PageID #: 60

### 3. The Flaws in CHS' Recent Responses to Tenet Allegations Concerning Admission Rates

132. On April 11, 2011, Tenet Healthcare Corporation sued CHS, alleging violations of federal securities laws based on inappropriate ER admission practices in its hospitals. On April 28, 2011, CHS management responded to Tenet's allegations in a presentation prepared for investors. Within this presentation, CHS management revealed the results of its own Medicare claims data analysis and asserted that their results showed that their system-wide average ER admission rates were within industry norms. The following slide is taken from this presentation and presents comparisons between CHS and its purported peer health systems.



133.    CHS does not fully detail the analytical parameters used to produce the preceding

chart, and it appears that CHS' analysis may have employed a different data set than was used by

SEIU.  Although CHS' system-wide rates are different than SEIU's analysis, a similar pattern

may be seen. According to the SEIU analysis, CHS has a system-wide ER admission rate of

45.5%, while the weighted average ER admission rate among this peer group is 44.1%.  The chart

below suggests that if the system-wide average ER admission rate is the sole basis of comparison,

then CHS indeed does not appear to be an outlier among its purported peer group.



134.    This comparison of system-wide ER admission rates, however, obscures the medically unnecessary ER admissions alleged to be occurring at CHS hospitals. The comparison as presented by CHS is inappropriate for two important reasons:

135.    First, these system-wide ER admission rates are not adjusted for patient case mix or for hospital geographic status, factors that are likely to be very different between these health systems. This is especially true given CHS' stated preference for acquiring non-urban hospitals because the patients seen at such hospitals are likely to present less complex cases than would be the norm at larger urban hospitals.[28]

136.    Second, CHS is a very acquisitive health system, and SEIU's analysis shows that the aggressive ER admission patterns seen among CHS hospitals grow as hospitals remain with the system for longer periods of time. However, CHS' overall ER admission rate appears to include all hospitals under its control within 2009 and does not adjust for the years of ownership.

137.    Once case mix differences between the health systems are considered, SEIU analysis reveals CHS to be an outlier, even among the peer group that CHS management has selected for its company. The following chart shows the system-wide unadjusted ER admission rates for patients with discharge diagnoses of nonspecific chest pain. SEIU analysis has already shown nonspecific chest pain ER admissions to be an area of concern at individual CHS hospitals, and the chart suggests this is a system-wide issue that exceeds the behavior of other comparable systems. Among this peer group, CHS has the highest system-wide ER admission rate for nonspecific chest pain in FFY 2009. The second highest system has a rate almost 7 percentage points less—and that system has only 19 hospitals, compared to CHS' 113 for FFY 2009.

---

[28] CHS 10-K, *supra* note 13, at 7.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 63 of 177 PageID #: 63



**System-Wide ER Admission Rates - Nonspecific Chest Pain**
For CHS-Identified Peer Group, No Adjustments, FFY 2009

138.    CHS continues to stand out among this peer group when its overall system-wide ER admission rate is adjusted for patient case mix and geographic status, and the effect is especially pronounced among hospitals that have been owned by CHS for a longer period of time. The chart at below presents the extent to which each system exceeds its expected ER admission rate, which is calculated using the same method described in paragraph 120 and weighted for system-wide ER admission and encounter totals.  When considering all systems that were a part of CHS at the end of FFY 2009, CHS would rank third among these systems—a much different scenario than that presented by the middle-range status of its unadjusted overall ER admission

52

rate. However, CHS nearly doubled the number of hospitals in its system in FFY 2007 when it acquired Triad Hospitals, Inc., and public comments by CHS management suggest that CHS has had to work to increase Triad's admission rate to be in line with the rest of CHS.[29] If these and all other hospitals acquired by CHS in FFY 2007 or later are then excluded from the system-wide average, CHS would place as the highest-ranked system by the extent to which it exceeds its expected ER admission rates. Even among its chosen peer group, then, CHS is clearly an outlier when it comes to its ER admission practices.



---

[29] CHS Presentation, Oppenheimer 20th Annual Healthcare Conference, Nov. 3, 2009.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 65 of 177 PageID #: 65

139.    SEIU's data analysis reveals a consistent pattern of aggressive ER admissions that indicates that inappropriate admissions criteria are being applied. In FFY 2009, 48 CHS hospitals are at or above the 80th percentile nationally based upon the percent to which hospitals are above or below their expected ER admissions rates. An additional 26 CHS hospitals[30] are below the 80th national percentile for this metric but are at or above the 80th national percentile based upon the percent by which they exceed their expected ER admission rates for nonspecific chest pain. These 74 hospitals named as Defendants show a clear and consistent outlier status that provides evidence of unnecessary admissions. Furthermore, CHS has had an opportunity to address these concerns and has not been able to provide a meaningful reason for this outlier status.

### C.    CHS Scheme at Individual Relator Hospitals

#### 1.    Chestnut Hill Hospital

##### a.    CHS Practices at Chestnut Hill Hospital

140.    CHS' pattern and practice of increasing inpatient ER admissions regardless of medical necessity has been evident throughout its system, including at Chestnut Hill Hospital in Philadelphia, Pennsylvania. The practices instituted at Chestnut Hill following CHS acquisition illustrate and confirm the specific policies and practices outlined above.

141.    A few months after CHS acquired Chestnut Hill in February 2005, the new CEO of the hospital, Brooks Turkel, attended one of the ER doctors' regular meetings, which Relator Doghramji also attended. Turkel informed the ER doctors that they were not admitting enough patients, saying that the ER doctors were "discharging a lot of admissions that we can capture."

---

[30]    Three other CHS hospitals are above the 80th percentile for nonspecific chest pain but with fewer than the minimum threshold of 12 ER admissions for nonspecific chest pain in FFY 2009.

54

Prior to this meeting, Dr. Doghramji had only seen hospital administrators in the ER when they were themselves being treated or visiting a VIP.

142.    In January 2007, Chestnut Hill Hospital, under CHS' management, replaced Chestnut Hill Emergency Associates, the ER group with which it had contracted for about 20 years, with another ER group, TeamHealth. On information and belief, CHS made this change because the ER director and the other Chestnut Hill Emergency Associates physicians refused to comply with the CEO's directive to admit more patients.

143.    When TeamHealth began running the ER, the percentage of patients admitted to the hospital from the ER increased dramatically. Under Chestnut Hill Emergency Associates, the ER admissions rate was approximately 18-20 percent. Under TeamHealth, the ER admissions rate rose to approximately 30-35 percent even though there was no evidence of a change in patient demographics.

144.    As soon as CHS took over management of the hospital, employees from CHS corporate headquarters held an in-service at Chestnut Hill to begin implementing the ProMed data tracking system in the ER.

145.    As part of the ProMed system, CHS installed an electronic tracking board in the ER, which contained information about patients in the ER such as a patient's initials, age, sex, chief complaint, triage acuity level, the doctor and nurse assigned to each patient, how long the patient had been in the ER, what tests had been ordered and completed, how the patient was being treated, and the disposition of the patient's case (e.g., admitted, sent home, etc.).

146.    The ER doctors were instructed to mark potential admissions on the electronic board with an asterisk – even before they gathered all of the necessary information about the

patients such as lab results. Significantly, Dr. Richard Lucas, who became the ER director after TeamHealth took over, told Dr. Doghramji that all chest pain patients should have an asterisk.

147. The electronic board was displayed on a large plasma screen in the CEO's office and at CHS' corporate headquarters in Tennessee.

148. The ER nurse managers would receive calls and visits from CEO Turkel, Assistant CEO Andy Goldfrach, and Director of Nursing Theresa Kelly asking why they were not admitting more patients and whether certain patients could be admitted. These calls and visits occurred on an almost daily basis. The administrators told the nurse managers they were getting calls from CHS corporate headquarters in Tennessee asking why certain patients had not yet been admitted.

149. After TeamHealth began running the ER at Chestnut Hill, Dr. Doghramji, who worked as a hospitalist at Chestnut Hill in addition to working in the ER, noticed an increase in short-term hospital stays for patients who had been admitted through the ER. Prior to that, short-term stays from the ER were rare, but after TeamHealth took over, it was common for Dr. Doghramji and the other hospitalists to come in and discharge a number of patients who had been admitted the night before. During this period of time, very few, if any, patients who came into the Chestnut Hill ER were assigned to outpatient observation status.

150. A few months after TeamHealth took over, in the spring of 2007, Dr. Doghramji, who was on call as a hospitalist, received a call from Dr. Dan Farber, one of the ER doctors, recommending that a patient who was screaming that she was having a seizure be admitted for a seizure. Dr. Doghramji listened to the summary of the patient's situation and, recognizing that a person who is actually having a seizure could not scream that she was having a seizure, he told

56

Dr. Farber, "We both know this person shouldn't be admitted." Dr. Farber agreed but insisted that "We are supposed to be admitting everyone."

151. During the spring and summer of 2007, Dr. Gilbert Palley, another TeamHealth ER doctor, called Dr. Doghramji numerous times about admitting patients with chest pain. In explaining why he believed the patients should be admitted, Dr. Palley would tell Dr. Doghramji that the patients met the hospital's admissions criteria and they could make some money for the hospital by admitting them.

152. On another occasion in the fall of 2007, Dr. Palley called Dr. Doghramji about admitting a female patient in her 30s for a deep vein thrombosis ("DVT") in her leg. Because Dr. Palley represented that the woman had a DVT, Dr. Doghramji agreed to the admission. However, when Dr. Doghramji saw the patient the next morning, he discovered that she did not actually have a DVT and had instead had a much less serious condition called superficial phlebitis, which is typically treated at home with elevation, over-the-counter drugs, and warm compresses. When Dr. Doghramji spoke with Dr. Lucas, the ER director for the TeamHealth group, about the case, he defended Dr. Palley's decision.

153. Dr. Lucas himself routinely called Dr. Doghramji to recommend admission for patients when it was not medically necessary. When Dr. Doghramji disagreed and said he was going to discharge the patients, Dr. Lucas argued with him. On one occasion in 2007, Dr. Lucas wanted Dr. Doghramji to admit a patient with bursitis in his elbow. Dr. Lucas told Dr. Doghramji that the patient's primary care doctor, who did not admit patients to the hospital, wanted him to be admitted. When Dr. Doghramji called the patient's primary care doctor to talk to him about the patient, he learned that Dr. Lucas had misrepresented the patient's situation. Dr. Lucas had told

57

the primary care doctor that the patient possibly had cellulitis or an abscess and therefore needed to be admitted. When Dr. Doghramji explained to the primary care doctor that the patient simply had bursitis in his elbow, the primary care doctor agreed the patient did not need to be admitted. Dr. Doghramji refused to admit the patient and instead drained the patient's elbow, gave him some anti-inflammatory drugs, and sent him home, which is the standard treatment for such a condition. Dr. Lucas' response was to ask Dr. Doghramji why he couldn't just admit.

154. In May 2008, Dr. Lucas sent all of the ER doctors at Chestnut Hill an email endorsing the approach of a TeamHealth doctor at another hospital who recommended that ER physicians give admitting physicians as little information as possible in order to push the admission through.

155. During his time at Chestnut Hill, Dr. Doghramji also occasionally served as a utilization review physician. In that capacity, he acted as a liaison between the hospital and private insurance companies and reviewed claims to help determine whether the services insurers had been billed for were medically necessary. After TeamHealth began running the emergency room, Dr. Doghramji noticed an increase in the number of inpatient admissions claims that insurers rejected or downgraded to outpatient observations.

156. A top administrator in the case management department noticed the large number of one- and two-day stays upon arriving at Chestnut Hill in 2007. The administrator explained to Brooks Turkel that many of those admissions should have been outpatient observations instead and that they were going to cause the hospital to be audited and have to refund money to Medicare. Turkel approached corporate headquarters in Tennessee about the issue and was told that the doctors at Chestnut Hill needed to document the charts better in order to support the

58

admissions. Upon information and belief, Chestnut Hill's one-day stays were audited by CMS later in 2007, and Chestnut Hill did have to refund some money.

157.    Shortly after the audit, CHS case managers began appearing in the ER and telling doctors that certain admissions did not meet "criteria" and advising doctors on what they should document or what tests they should run in order to justify admissions.

158.    Around the same time, Chestnut Hill began posting instructions requiring residents to order treatments for certain types of patients to demonstrate that the patients should be admitted regardless of whether the patients actually needed the treatments. These admissions justifications focus on the types of "soft" diagnoses Highmark advises are appropriate for observation status. *See supra* paragraph 102. For example, on its "Quick Guide to Basic Admissions," Chestnut Hill instructs its residents that all asthma/COPD patients need nebulizer breathing treatments every four hours for at least 24 hours and IV steroids. The guide specifically instructs the residents to ensure that this is documented on the patient's chart. The guide also instructs residents to order IV diuretics twice a day for all congestive heart failure patients, and a clear liquid diet, Protonix IV, and IV fluids for all abdominal pain patients – regardless of whether such treatment is medically needed.

### b.    Medically Unnecessary Admissions at Chestnut Hill

159.    As a result of CHS' corporate scheme to increase admissions, Chestnut Hill Hospital routinely submitted Medicare claims for inpatient admissions when a less intensive treatment setting, such as outpatient observation, would have been appropriate. These inpatient admissions were not supported by the evidence-based InterQual criteria, and in many cases, were not supported by the information in the patient's medical record.

59

160.     Dr. Doghramji collected a small sample of eight such records during a review of one- and two-day stays admitted by his former hospitalist group from 2006, when Chestnut Hill's medical records became electronic, through the end of 2007. All of these examples were Medicare inpatient admissions that were not medically necessary because they were not supported by InterQual criteria and/or reasonable clinical judgment based on the documented medical record.

161.     In order to meet the InterQual criteria for inpatient admission from the ER, a patient must meet both the InterQual Severity of Illness and Intensity of Service criteria.

162.     Intensity of Service requirements mean that a patient needs services that can only be provided at a hospital. For example, if a chest pain patient is stable and does not have a dangerous cardiac problem that is ongoing which requires continuous monitoring or IV infusions, or a syncope patient does not have a condition that requires frequent neurological exams by a doctor or nurse to document progression of an acute, serious neurological impairment, but instead, in either case, the patient's problem should resolve satisfactorily with pills he can take at home, then he does not need hospital-level intensity of services, and can safely be observed or sent home with outpatient follow-up.

### i.     Chest Pain Patients

163.     To meet the 2009 Severity of Illness InterQual criteria for inpatient admission to a critical care unit, a patient who presents with chest pain must have at least one of the following: an acute myocardial infarction confirmed by an electrocardiogram ("EKG"), aortic stenosis, congestive heart failure ("CHF") that appears on imaging, a new Left Bundle Branch Block on an EKG, newly diagnosed mitral regurgitation, a new Q wave on an EKG, ST elevation or

60

depression on an EKG, systolic blood pressure of less than 90 or a decrease in the baseline blood pressure, unstable angina, or ventricular tachycardia or atrial fibrillation on an EKG.

164.    If a chest pain patient has stable blood pressure, no congestive heart failure or arrhythmias, a normal, non-diagnostic, or pacer rhythm on EKG, the patient may still qualify for inpatient admission to telemetry if the results of his/her blood tests for troponin or other cardiac enzymes are positive for heart muscle damage. Of course, all these patients must also need the intensity of service (continuous cardiac monitoring, repeated vital signs observations, round-the-clock nursing presence) provided in a telemetry unit.

165.    According to the InterQual criteria, a patient who presents with chest pain with a suspected cardiac etiology but has all of the following does not require inpatient admission and is appropriately kept in outpatient observation status: negative lab values for CK-MB, Troponin I, or Troponin T; a normal, unchanged, or non-diagnostic EKG; hemodynamic stability (systolic blood pressure of greater than 100); and resolved chest pain.

166.    In a 2007 case at Chestnut Hill, an 81-year-old female patient[31] presented with chest pain that came on immediately after a meal. Her pain resolved in the ER and her cardiac enzymes, EKG, and blood pressure were all within normal limits. She met none of the InterQual criteria for admission. In addition, the ER doctor indicated on the patient's chart that her chest wall was not tender. This finding conflicted with the history and physical taken by a hospital resident two hours later and with the discharging doctor's notes, both of which noted that the patient's chest was tender. This is significant because chest tenderness is consistent with chest

---

[31]  In accordance with HIPAA regulations, specific identifying information has been excluded from this Complaint. The information has been provided to the Department of Justice and the U.S. Attorney for the Middle District of Tennessee in accordance with 45 CFR § 164.502(j).

61

pain that is caused by muscle strain or injury, not by a cardiac event. Despite all this and despite the guidance from the Pennsylvania MAC described in paragraph 102 above, the patient was admitted to the hospital's telemetry unit on an inpatient basis in order to rule out myocardial infarction (heart attack). After a two-day stay, the patient's discharge diagnosis was atypical chest pain consistent with costochondritis (sore ribs).

167.    In another 2007 case, a 72-year-old female patient presented with chest pain. The patient's history and physical states that her pain occurred after eating ice cream and was relieved after she burped repeatedly. The patient's serial cardiac enzymes, EKG, and blood pressure were normal, and she did not meet any of the InterQual criteria for inpatient admission. She was admitted to a telemetry unit on an inpatient basis for further evaluation and to rule out myocardial infarction and was discharged less than 24 hours later with a discharge diagnosis of atypical chest pain.

168.    Also in 2007, an 86-year-old female patient came to the Chestnut Hill ER reporting that she had dinner and then developed a "woozy" feeling (dizzy with headache). She stated that she had had the feeling before and then never found out what it was. Nonetheless, a history of chest pain was elicited, and the patient was admitted to the telemetry unit of the hospital to rule out a myocardial infarction (heart attack). The patient had no risk factors for coronary disease other than age, but did have a history of GERD (gastroesophageal reflux disease—heartburn) for which she took Prevacid. She took no other medications. In the ER her cardiac enzymes, blood pressure and EKG were normal. She did not meet any InterQual criteria for admission and was discharged less than 24 hours later with a diagnosis of "chest pain" (no etiology noted).

62

## ii.    Syncope Patients

169.    According to the cardiac Severity of Illness InterQual criteria, a patient who presents with syncope (fainting) and stable blood pressure should be admitted to a telemetry unit only if the patient has one of the following: a second degree heart block, a non-sustained accelerated idioventricular rhythm, a documented pause of at least three seconds, a heart rate of less than 60 beats per minute, ischemia, or a junctional escape rhythm and a heart rate of less than 60 beats per minute.

170.    Under the InterQual criteria, a patient who presents with syncope or presyncope of unknown etiology is appropriately kept on observation status.

171.    In a 2006 case, an 83-year-old female patient came to the ER after feeling dizzy and then collapsing in her kitchen for a few seconds. She had no risk factors for coronary disease other than age and hypertension.  Her EKG and neurological exam were normal, and she did not meet the InterQual criteria for admission to a telemetry unit.  Rather than keep her on outpatient observation, however, she was admitted to the hospital telemetry unit and was discharged the next day with a diagnosis of syncope.

172.    In another 2006 case, an 86-year-old female came to the ER after fainting briefly while toileting.  She had had an episode of diarrhea and vomiting.  She had no history of cardiac disease and was on no cardiac medications.  She was taking several sedating medications.  There was no reason to think this episode was related to her heart and good reason to think that she passed out either from fluid loss (hypovolemia) and/or toileting (vasovagal).  She did not meet any of the InterQual criteria for admission to inpatient telemetry.  She was admitted anyway to rule out arrhythmia and was discharged the next day with the diagnosis of syncope.

63

### iii. Other Patients

173.    According to the InterQual criteria for admitting a patient to an acute care setting

for a central nervous system or musculoskeletal issue, a patient who suffered a head trauma must

have one of the following: ataxia (uncoordinated muscle movement); blindness or visual field

loss; dysphagia (problems swallowing), aphasia (language impairment), or dysarthria (speech

impairment); or paresis (weakness) or paralysis of extremities.

174.    In a 2007 case, a 76-year-old male patient from an assisted living facility came to

the ER after he fell out of his wheelchair and hit his head. He needed the wheelchair because he

had chronic ambulatory dysfunction. The patient was on significant doses of at least four

psychoactive medications. The patient's head CT scan showed no acute problems (i.e., no

hemorrhage or other brain injury), and his skeletal films were negative for fracture or other acute

findings. Nevertheless, the ER physician recommended that the patient be admitted for

confusion/altered mental status and weakness, even though there was no finding that the patient's

condition had changed in any way from his baseline. Although the patient did not meet the

InterQual criteria and his record did not support admission, he was admitted as an inpatient and

discharged the next day. His principal diagnosis at discharge was acute ambulatory dysfunction.

There was no mention among the discharge diagnoses or in the discharge summary of any

weakness or mental status changes.

175.    In another 2007 case, a 79-year old male patient came to the ER with an episode of

dizziness and some shortness of breath lasting about 25 minutes. He was not having chest pain in

the ER, but he had told his nephew earlier that day that he was having chest pain. His physical

exam and a blood count done in the ER were completely normal. No EKG was done in the ER.

64

The patient was taking medications for anxiety as well as Coumadin to prevent blood clots. The ER doctor did not document chest pain or any other reason for admission. Even though the medical record did not support admission and the patient met none of the InterQual criteria for admission to a telemetry unit, he was admitted to inpatient telemetry, monitored for 24 hours, then released. His discharge diagnoses (listed in order of importance) consisted of four chronic conditions (which were unchanged) and fifth, "dizziness and giddiness."

176.     Finally, in a 2006 case, an 81-year-old male patient presented with a one-year history of increasing imbalance and a feeling he might fall when going up or down steps. For three weeks prior to admission, he thought he noticed a left foot drop. The morning of admission, he thought his left leg was weak. In the ER, his neurological exam (including a check of strength of each leg) was normal, his blood tests were normal, and a CT scan of his head ruled out tumor or stroke. Nonetheless he was admitted for evaluation. Physical therapists found no abnormalities. Carotid ultrasound and echocardiogram were performed and were normal. Patient was discharged to home with a diagnosis of lower left leg weakness, cause undetermined, and was instructed to follow up with primary care and neurology, and to undergo other tests, such as an MRI, as an outpatient.

### c.     Data Analysis of Overall ER Inpatient Medicare Admissions at Chestnut Hill

177.     SEIU's data analysis of ER inpatient admissions at Chestnut Hill clearly shows that the above examples represent the pattern and practice at the hospital since CHS acquired it. The charts show a dramatic increase in the percent above expected admissions for two of the "soft" diagnostic groups Dr. Doghramji came across in his examples – nonspecific chest pain and syncope – and a substantial increase in percent above expected admissions across all diagnostic

65

categories. They also clearly show that the percent above expected ER inpatient admissions is closely associated with how long CHS has owned Chestnut Hill.





**Chestnut Hill Hospital**
**Percent Above Expected ER Admissions - Nonspecific Chest Pain**
Acquired by CHS in FFY 2005

- - - Before CHS Acq.  —— After CHS Acq.

67



Chestnut Hill Hospital
Percent Above Expected ER Admissions - Syncope
Acquired by CHS in FFY 2005

178.    These changes in admissions patterns cause Chestnut Hill to rise among the top in

the country for percent above expected admissions. In the following chart, the national

percentiles for both all diagnosis groups and chest pain[32] based on the percent above expected

show a clear change following the CHS acquisition.

---

[32] Relators are including only percentiles based on all diagnosis groups and chest pain in the
national comparison because those are the criteria used to assign outlier status as described in
paragraph 122.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 80 of 177 PageID #: 80



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Chestnut Hill Hospital, Acquired by CHS in FFY 2005

—— All Diagnosis Groups (After CHS Acq.)

—— Nonspecific Chest Pain (After CHS Acq.)

- - - All Diagnosis Groups (Before CHS Acq.)

- - - Nonspecific Chest Pain (Before CHS Acq.)

    2.    **Dyersburg Regional Medical Center**

    a.    **CHS Practices at Dyersburg Regional Medical Center**

179.    Dyersburg Regional Medical Center was acquired by CHS in January 2003. When Relator Bryant worked there as a night-shift nurse on the hospital's largest medical/surgical unit from January 2009 through February 2011, more than half of the admissions she saw on each shift were medically unnecessary admissions. These patients were admitted to the hospital through the ER for "soft" diagnostic categories such as chest pain or abdominal pain.

69

180.    Most of these patients were admitted at night by a hospitalist and discharged between 12 and 36 hours later, depending on what the census was on the medical/surgical unit where she worked. If the census was high, these unnecessary admissions would be discharged quickly to make room for more patients. If the census was low, the patients would be kept up to two or three days for additional testing.

181.    When Relator Bryant started at Dyersburg, the hospital was admitting almost every patient who came to the ER with chest pain. The vast majority of these patients had normal cardiac enzymes and EKGs, but despite this, they were automatically given morphine and admitted to a telemetry bed on an inpatient basis for further monitoring pursuant to the hospital's core measures checklist for chest pain. Relator Bryant believes that approximately two or three of the admissions she saw each shift were medically unnecessary admissions for chest pain.

182.    Most of the patients admitted for chest pain were also sent for a cardiac consultation by either the ER physician or the admitting physician. The cardiologist then sent many of these patients for stress tests and for testing at the cardiac catheterization lab,[33] which opened shortly after Bryant began working at Dyersburg. If the census in the medical/surgical unit was low, these patients would be kept for testing for two to three days. If the census was high, they would be discharged after approximately 12-24 hours.

183.    During the summer of 2010, Dyersburg stopped using the core measures checklist for chest pain. In approximately July or August 2010, the nursing staff met with one of the hospital's case managers, who told the nurses that Medicare had changed its policy: Unless a

---

[33] Cardiac catheterization is an invasive procedure that is only appropriate in cases of acute coronary syndrome and symptomatic angina. The procedure puts patients at risk for heart attacks, arterial puncture, cardiac arrhythmia, bleeding, and infection. It is certainly not a procedure that should be performed without medical justification.

70

patient has a positive indication that he or she needs to be admitted, such as abnormal cardiac enzymes or an abnormal EKG, the hospital's policy would be to keep the patient on outpatient observation status.

184. Despite this announced change, many chest pain patients were still admitted based on their previous diagnoses, which the admitting doctors would include in their admitting diagnoses. For example, if a patient presented with chest pain but had previously diagnosed with hypertension and diabetes, the admitting doctor would list chest pain, hypertension, and diabetes as the admitting diagnoses.

185. Relator Bryant also saw approximately two or three medically unnecessary admissions per night for abdominal pain. These patients had normal lab results and x-rays but were admitted to the medical/surgical unit to rule out pancreatitis, gallbladder problems, or other possible causes.

186. Relator Bryant believes that many of the patients who were admitted for generalized complaints of chest pain or abdominal pain came to the hospital to receive pain medication. She recalls the names of at least two female patients in their 20s and 30s who qualified for Medicare as a result of disabilities who were repeatedly admitted for chest pain, for abdominal pain, or to rule out pancreatitis. Both of these women would come in about once a month during Relator Bryant's tenure at Dyersburg. They would have normal lab results, EKGs, and x-rays, but they were admitted anyway.

187. During cold and flu season, from approximately October through March, approximately five patients per night were admitted through the emergency room on an inpatient basis in order to "rule out pneumonia" or "rule out influenza." These patients had clear chest x-

rays, which generally indicates the patient does not have pneumonia, and tested negative for the flu. These tests would typically be performed while the patient was in the ER, and even though they came back negative, the patient would be admitted anyway.

188.    The nursing supervisors for the evening and night shifts, Theresa Robitelle, Juanita King, Theresa Lawson, and a nursing supervisor named Connie, would go down to the ER looking for patients to admit to the medical/surgical unit. Upon information and belief, they were being pressured by the hospital's administration to increase admissions. The hospital administration installed a tracking board in the ER as part of the ProMed system that contained general information about patients who came to the ER, such as the patient's initials, age, and what tests were being run.

189.    When Relator Bryant and the other nurses would inquire about the excess admissions, they were told that the hospital had to have patients so that they could have jobs. One of the case managers who was assigned to her floor told Relator Bryant that a lot of the admissions were "bogus."

190.    During Relator Bryant's tenure at Dyersburg, she attended a staff meeting on her floor during which the nursing floor manager showed the staff charts about increasing admissions. The manager stated that she had obtained the charts from a management meeting she attended with the hospital's CEO, Russell Pigg. In referencing the charts, the manager told the staff that they were lucky to have enough patients so that they could avoid layoffs like other hospitals.

191.    A Dyersburg ER doctor who was interviewed by an SEIU staff member on January 26, 2011, confirmed that there was pressure from hospital administration to admit more patients

72

and said that he was worried about his admissions rate – 23 percent – because it was the lowest of all the ER doctors.

### b. Data Analysis of ER Inpatient Admissions at Dyersburg

192.    SEIU's data analysis confirms what these employees observed at Dyersburg. The following charts[34] show Dyersburg's percentage above expected admissions across all diagnostic groups, as well as their percentage above expected admissions for patients with discharge diagnoses of nonspecific chest pain and syncope, respectively.

---

[34] When line segments are missing, it is because the hospital had too few admissions to meet the data use agreements in at least one year.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 85 of 177 PageID #: 85



Dyersburg Regional Medical Center
Percent Above Expected ER Admissions - All Diagnosis Groups
Acquired by CHS in FFY 2003

74

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 86 of 177 PageID #: 86



**Dyersburg Regional Medical Center**
**Percent Above Expected ER Admissions - Nonspecific Chest Pain**
Acquired by CHS in FFY 2003

— After CHS Acq.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 87 of 177 PageID #: 87



Dyersburg Regional Medical Center
Percent Above Expected ER Admissions - Syncope
Acquired by CHS in FFY 2003

193. Once again, looking at a national comparison shows the same trend:

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 88 of 177 PageID #: 88



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Dyersburg Regional Medical Center, Acquired by CHS in FFY 2003

—— All Diagnosis Groups (After CHS Acq.)    —— Nonspecific Chest Pain (After CHS Acq.)

### 3.    Heritage Medical Center

#### a.    CHS Practices at Heritage Medical Center

194.    Heritage Medical Center was acquired by CHS in June 2005. When Relator Cook worked there as a night-shift Staff RN and Charge Nurse from May 2008 through October 2009, approximately half of the admissions she saw on each shift were medically unnecessary admissions. These patients were admitted to the hospital through the ER for generalized chief complaints such as chest pain or abdominal pain and for minor conditions such as nasal congestion, constipation, or a single incident of vomiting. Most of these patients would be

77

admitted at night by a hospitalist, and when their primary care physicians saw them the next morning, they would immediately discharge them.

195. Relator Cook routinely saw patients with nasal congestion and a cough admitted for pneumonia before the results of their chest x-rays were received. In the majority of these cases, the chest x-rays would come back clear, which meant the patient did not have pneumonia, and the patient would be discharged the next day.

196. Approximately 10-12 times per week, Relator Cook saw patients admitted for chest pain even though their EKGs and cardiac enzymes were normal, and there was no other indication in their record that would warrant inpatient admission.

197. Also about 10-12 times per week, Relator Cook saw patients admitted for abdominal pain even though all of their lab tests and x-rays were normal. Relator Cook believes that many of the patients who were admitted for generalized complaints of "pain" came to the hospital to receive pain medication.

198. According to Relator Cook, one of the ER physicians at Heritage, Dr. Mohammed Faour, would come up to her medical/surgical unit during his shifts to count the number of empty patient beds on the unit. If he saw there were empty beds, he would immediately admit more patients from the ER.

199. Dr. Faour would often keep admitting patients even when there were no more beds on the medical/surgical unit, and the hospital would send patients to beds in the closed obstetrical unit. A nurse from the medical/surgical unit would accompany these patients, further stretching the already thin nursing staff.

78

200.    Because Dr. Faour had his own private medical practice in addition to working in the ER at Heritage, he would often serve as both the ER doctor and the admitting doctor for patients he admitted if the patients did not already have a primary care doctor who could see them in the hospital.

201.    Because she was working the night shift when there was no unit secretary on duty, Relator Cook and the other nurses on her shift were responsible for processing paperwork for all of the admissions from the ER.  She and the other nurses felt that processing these unnecessary admissions gave them less time with patients who actually needed their assistance.

202.    When nurses complained to nurse management about the excess admissions, they were told, "This is money for your paycheck.  We need all the admissions we can get!  It's not your call to admit or not.  This is what keeps the doors open."

203.    When Relator Cook asked one of the hospitalists, Dr. Lana Beavers, about the excess admissions, she was told that the ER doctors were getting pressure to admit more patients whether the patients needed to be there or not.

204.    A former nursing supervisor who was interviewed by agents of Relators on May 3, 2011, reported that ER doctors also told her that they were being pressured by hospital administration to admit more patients.  She stated that the administrators mandated that a certain percentage of ER patients over the age of 65 were supposed to be admitted.  She did not recall the exact percentage but reported that the target was well over half of the patients 65 and older.  Hospital administrators would have monthly meetings with the ER doctors to, among other things, monitor admissions rates.  She knew of at least two ER doctors who left Heritage, in part, as a result of the corporate pressure to admit patients.

79

205. The former nursing supervisor also reported that the ER doctors were unhappy with the computer system that was installed in the ER shortly after CHS acquired the hospital because they were required to input a patient's symptoms, and the program would tell them what to do. As part of the computer program, CHS also installed an electronic tracking board in the Heritage ER that kept track of, among other things, what patients were in the ER, their chief complaints, and what procedures or labs had been ordered. There was an identical board located in the administrative offices at Heritage, where the CEO, CFO, and Director of Nursing's offices were located. The administrators would come down to the ER during the day to ask why patients were not being moved through.

206. In addition, the former nursing supervisor stated that when CHS first acquired Heritage, chest pain patients were routinely kept on observation status, but around 2007, the nursing supervisors had a meeting with the Director of Nursing, Pat Sweeten, in which she told them that chest pain patients would no longer be kept on observation status and instead would need to be admitted on an inpatient basis because the hospital was not making enough money off of observation stays.

      **b.**     **Data Analysis of ER Inpatient Admissions at Heritage**

207. SEIU's data analysis corroborates what the Heritage nurses witnessed. The following charts show Heritage's percentage above expected admissions across all diagnostic groups, their percentage above expected admissions for patients with discharge diagnoses of nonspecific chest pain and syncope, respectively, and the national comparison using percentiles for all diagnostic groups and chest pain:



**Heritage Medical Center**
**Percent Above Expected ER Admissions - All Diagnosis Groups**
Acquired by CHS in FFY 2005



Heritage Medical Center
Percent Above Expected ER Admissions - Nonspecific Chest Pain
Acquired by CHS in FFY 2005

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 94 of 177 PageID #: 94



Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 95 of 177 PageID #: 95



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Heritage Medical Center, Acquired by CHS in FFY 2005

Legend:
— All Diagnosis Groups (After CHS Acq.)
— Nonspecific Chest Pain (After CHS Acq.)
- - - All Diagnosis Groups (Before CHS Acq.)
- - - Nonspecific Chest Pain (Before CHS Acq.)

### D.   CHS Scheme at Other Defendant Hospitals

208.    SEIU's statistical analysis indicates that 74 CHS hospitals – including Chestnut Hill, Dyersburg, and Heritage – are at or above the 80th percentile nationally based on the percent above expected admissions either for all diagnosis groups collectively or for nonspecific chest pain. As noted in paragraph 122 above, PEPPER considers hospitals at or above the 80th percentile to be outliers that warrant further investigation. Based on the statistical analysis and the first-hand experiences of Relators, it is clear that these CHS hospitals, at the direction of CHS corporate headquarters, submitted false claims to Medicare and received reimbursement for such

claims with reckless disregard and/or deliberate ignorance of the medical necessity of the claimed services.

209. After SEIU's data analysis revealed much higher than expected ER inpatient admissions rates at CHS hospitals, SEIU staff contacted approximately 100 current and former doctors and nurses who work or previously worked at about 20 CHS facilities in 7 different states.

210. More than 2/3 of the doctors and nurses who currently work or previously worked in a CHS emergency room reported that they had direct knowledge or evidence of hospital administrators pressuring ER staff to admit more patients. These interviews, which were not limited to Defendant hospitals, clearly indicate a system-wide scheme.

211. The system-wide nature of CHS' scheme was also corroborated by an executive for a physicians' group that contracts with numerous CHS facilities, including many non-Defendant hospitals. The executive reported frequently receiving complaints from CHS doctors who say that CHS calls them and pushes them to admit more patients from the ER.

212. SEIU's statistical analysis of the ER admissions at the 74 Defendant hospitals (excluding Chestnut Hill, Dyersburg, and Heritage) and statements from current and former employees of these hospitals who were interviewed by either an SEIU staff member or an agent of the other Relators are outlined below:[35]

### 1. Weatherford Regional Medical Center

#### a. CHS Practices at Weatherford Regional Medical Center

213. ER physicians at Weatherford Regional Medical Center ("WRMC") in Weatherford, Texas, were also pressured by management to increase ER admissions. After CHS

---

[35] To protect the employees SEIU staff spoke with from retaliation, Relators have not included their names or specific identifying information in this Complaint.

85

leased WRMC in 2006, the hospital administration began tracking admissions rates in the ER. According to two former WRMC ER physicians, at least one hospital administrator – typically WRMC CEO Donnie Romine or Assistant CEO Corey Countryman – began attending the ER doctors' monthly meetings. At these meetings, Romine and/or Countryman would tell the ER doctors that they needed to increase the ER admissions rate from approximately 8-10 percent to 20 percent. According to one of the former WRMC doctors, Romine would point to a nearby Fort Worth hospital that had a very high admissions rate of approximately 40 percent as an example of what the doctors at WRMC should strive for.

214. A few months after CHS began operating WRMC, they installed an electronic tracking board, which contained information about patients in the ER, such as the patient's age, chief complaint, and how long he or she had been in the ER. The hospital's administration had access to this board from their offices. According to one former ER doctor, Romine and Countryman would frequently review the board and come down to the ER to ask the ER doctors why they were not admitting certain patients who appeared on the board. Romine and Countryman primarily inquired about older, Medicare-eligible patients who came to the ER with generalized chief complaints such as weakness, chest pain, dizziness, or abdominal pain.

215. Despite this constant pressure from hospital administration, Emergency Medical Consultants ("EMC"), the group that had provided ER physician services to WRMC for 13 years, refused to admit patients unless it was medically necessary, and WRMC terminated their three-year contract after only 9 months pursuant to the contract's termination provision.

86

216.    After EMC's contract was terminated, WRMC administration held a meeting for the nursing staff, and according to a participant in that meeting, the administrators told the nurses EMC was terminated because it did not admit enough patients.

217.    EmCare, the new ER group, provided ER physicians at WRMC for approximately one year, after which WRMC entered into a contract with Questcare, the same ER group that worked at the Fort Worth hospital with high admission rates.

### b.    Data Analysis of ER Inpatient Admissions at Weatherford

218.    Data analysis[36] at Weatherford Regional Medical Center shows that prior to the CHS acquisition, Weatherford was near the bottom of the country in above expected ER admissions. In the short time that Weatherford has been owned by CHS, there has been a clear and dramatic change. The change is particularly evident for chest pain patients, as Weatherford shifts from around the 30th percentile in 2006 to above the 90th percentile in 2009.[37]

---

[36] In the following charts, when chest pain line segments are missing, it is because the hospital had too few admissions to meet the data use agreements in at least one year. When no chest pain line is present, it is because there were at least four years for that facility where it had too few admissions to meet the data use agreements.

[37] For the facilities discussed that are not associated with a Relator, the national percentiles for both all diagnosis groups and chest pain are shown in order to show trends over time for both conditions with common scaling.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 99 of 177 PageID #: 99



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Weatherford Regional Medical Center, Acquired by CHS in FFY 2007

Legend:
— All Diagnosis Groups (After CHS Acq.)   — Nonspecific Chest Pain (After CHS Acq.)
- - All Diagnosis Groups (Before CHS Acq.)   - - Nonspecific Chest Pain (Before CHS Acq.)

### 2.   Heartland Regional Medical Center in Illinois

219.   In an interview with an SEIU member on March 5, 2011, a doctor at Heartland Regional Medical Center in Galesburg, Illinois reported that the ER doctors were pressured to admit patients for at least a day and to push for unnecessary procedures for patients who had Medicare or other insurance. The doctor stated that the doctors at Heartland would often order cardiac tests because any sort of chest pain issue fell into an admissions gray area.

220.   Another March 5, 2011, interview revealed that a former employee who worked in health information management at Heartland in the early 2000s was repeatedly told to recode patient charts to make it look as though the services rendered had been medically necessary so

88

that the hospital could be reimbursed through Medicare. The employee was terminated within a few months of refusing to recode the charts. The former employee's supervisor had daily meetings with the CEO and would frequently take charts home, change them, and bring them back to the hospital.

221. The admissions statistics from Heartland confirm the upward trend in ER admissions during this time period, particularly for chest pain patients.



Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 101 of 177 PageID #: 101

### 3. Lock Haven Hospital in Pennsylvania

222. In interviews with an agent of the individual Relators conducted on April 29 and May 2, a former executive from Lock Haven Hospital in Lock Haven, Pennsylvania, reported that the ER staff at the hospital would meet with hospital administrators, including the CEO, CNO, CFO, and ER nursing director every morning to discuss ER visit and admissions statistics.

223. The former executive also reported that Lock Haven used ProMed software in its ER to track the status of patients and admissions. The executive stated that CHS' Blue Book guidelines were installed in the ProMed system. ER staff would enter an ER patient's symptoms into ProMed and then the software would provide a standard of care, tests, or other procedures for the ER staff to perform based on the symptoms. The Blue Book was also used by Lock Haven's case managers and the physician advisers who worked with case management to determine whether admissions were medically justified. CHS headquarters periodically provided trainings for the case managers and physician advisers on using the Blue Book.

224. The statistics for Lock Haven show that CHS pressure to admit resulted in much higher than normal expected admissions rates, particularly for nonspecific chest pain:



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Lock Haven Hospital, Acquired by CHS in FFY 2002

Legend: All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

#### 4. Pottstown Memorial Medical Center in Pennsylvania

225. In interviews on March 15, 2011, and March 18, 2011, two former ER doctors from Pottstown Memorial Medical Center in Pottstown, Pennsylvania reported that they were pressured to admit more patients. The doctor interviewed on March 15 left CHS because the doctor was "tired of being yelled at" by hospital administration for not admitting enough patients. This doctor felt that CHS valued profits above ensuring that admissions were medically necessary and that doctors' professional judgment was being undermined at Pottstown.

91

226. The ER doctor interviewed on March 18 similarly felt that clinical judgment was undermined at Pottstown because the ER group constantly worried about being replaced by hospital administration if they did anything that might result in a patient complaint. This resulted in doctors admitting patients who wanted to be admitted even if their medical condition did not warrant it. That ER doctor also reported that the ER doctors were instructed by the hospital's billing department to fill out temporary disability forms for patients who did not have insurance so that the hospital could be reimbursed. The vast majority of these patients did not have disabilities and had come to the ER for conditions like hives or intoxication. After the ER doctors' group's attorney spoke with CHS headquarters about this practice, it temporarily stopped, only to resume a few months later.

227. Another Pottstown doctor reported that the hospital offered financial incentives to its Director of Utilization Review to persuade doctors to discharge patients earlier in order to achieve an annual average patient stay of one to two days, as that was a "sweet spot" for hospital profits.

228. Though Pottstown was already in the top quarter of all hospitals nationwide in its first year of CHS ownership based on the percent above expected admissions, data analysis shows a steady increase in ER admissions at Pottstown that clearly illustrates the results of the pressure placed on the ER doctors there as soon as CHS took over:



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Pottstown Memorial Medical Center, Acquired by CHS in FFY 2003

All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

### 5. The Memorial Hospital of Salem in New Jersey

229. In an interview with an SEIU staff member on March 22, 2011, a doctor at The Memorial Hospital of Salem County in Salem, New Jersey reported that admitting physicians have admissions quotas they must meet and that they are subject to reprimand for not meeting them. The doctor knew of at least two ER physicians who left Memorial because of the pressure to increase admissions. The doctor also reported that CHS hand-picks doctors who will admit those patients CHS wants them to admit.

93

230.    The statistics for The Memorial Hospital of Salem County confirm that admissions were far above expected, particularly for the "soft" diagnostic category of nonspecific chest pain:



### 6.    Gateway Regional Medical Center in Illinois

231.    In an interview with an SEIU staff member on February 4, 2011, one doctor who worked at Gateway Regional Medical Center in Granite City, Illinois reported that management pressured the ER staff to admit more patients and that the CEO demanded that the ER doctors order as many tests as possible regardless of their medical necessity. The doctor stated that as a result, patients would walk into the ER with a cough, and the doctors would order an EKG.

94

232. Data analysis for Gateway (Illinois) shows a sharp increase immediately following the year of acquisition:



### National Percentiles Based on the Percent of ER Admissions Above Expected
Gateway Regional Medical Center, Acquired by CHS in FFY 2002

7. **Henderson County Community Hospital in Tennessee**

233. In an interview with an SEIU staff member on January 20, 2011, a doctor at Henderson County Community Hospital in Lexington, Tennessee reported pressure to admit more patients and stated that it appeared anyone over 65 who came to the ER would be admitted. If patients who could have been admitted were not admitted, hospital management would complain about it to the group that staffed the ER. The doctor noted that CHS was particularly concerned

95

about admitting chest pain patients. The doctor had "never seen anyone so worried about chest pain."

234.    Once again, the ER admissions statistics corroborate the doctor's report. In the year CHS acquired Henderson, it was among the lowest-ranked of all hospitals in the country, as ranked by its percent above or below expected ER admissions. Its rank steadily increased after CHS acquired it and is now near the top of the country:



## 8. Gateway Medical Center in Tennessee

235. In an interview conducted on February 16, 2011, a former ER doctor at Gateway Medical Center in Clarksville, Tennessee, reported that Gateway administrators would come down to the ER and question why more patients were not being admitted. The administrators said they had received calls from CHS corporate headquarters asking what was going on in the Gateway ER. The doctor also stated that CHS headquarters set target admissions rates for individual CHS hospitals and doctors. CHS told the ER physicians' group at Gateway to terminate the doctor because the doctor was not meeting the admissions target.

236. In several interviews conducted in October 2010, three current and former ER nurses from Gateway in Tennessee confirmed that hospital management closely monitored the ER doctors' admissions rates. One of the nurses reported in an interview on October 13, 2010, that if the doctors did not maintain certain admissions rates, they would lose their privileges at Gateway. The nurse saw this happen on several occasions.

237. One of the ER nurses noted that one of the doctors he works with admits everyone to a telemetry unit regardless of whether they need the monitoring, and another nurse who worked on the telemetry unit confirmed in an October 13, 2010 interview that many patients who come to the Gateway ER with chest pain are admitted to the telemetry unit even when all of their tests are completely normal.

238. Data analysis at Gateway Medical Center shows a dramatic increase in admission patterns relative to other facilities. The following chart shows the national percentile for Gateway and demonstrates the impact of CHS ownership.



National Percentiles Based on the Percent of ER Admissions Above Expected
Gateway Medical Center, Acquired by CHS in FFY 2007

### E. Statistical Results for Other Defendant Hospitals at or above 80th Percentile for Overall ER Admissions

239.    Statistics for the remaining Defendant hospitals showing the percentage above expected ER inpatient admissions for FFY 2003-2009 are below.  The charts show the national percentiles based upon the percent by which hospitals are above or below their expected ER admission rates.  For each hospital, the chart shows the percentile in which it falls for each FFY, and it does so both for nonspecific chest pain admissions and for overall admissions as well.  In almost all cases, the charts show a dramatic increase in national percentile ranks was closely

associated with the length of CHS ownership. In all cases, the hospital was at or above the 80th

percentile for either overall admissions or nonspecific chest pain admissions.

1. Berwick Hospital Center



National Percentiles Based on the Percent of ER
Admissions Above Expected
Berwick Hospital Center, Acquired by CHS in FFY 1999

2. Brandywine Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Brandywine Hospital, Acquired by CHS in FFY 2001

All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

100

3. Brownwood Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Brownwood Regional Medical Center, Acquired by CHS in FFY 2007

101

4. Byrd Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Byrd Regional Hospital, Acquired by CHS in FFY 1995

Percent Above Expected ER Admissions Percentile

—— All Diagnosis Groups (After CHS Acq.) —— Nonspecific Chest Pain (After CHS Acq.)

102

5. Chesterfield General Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Chesterfield General Hospital, Acquired by CHS in FFY 1996

— All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

103

6. Crossroads Community Hospital



104

7. DeKalb Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

DeKalb Regional Medical Center, Acquired by CHS in FFY 2006

105

8. Easton Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Easton Hospital, Acquired by CHS in FFY 2002

*Legend:* All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

106

9. Fallbrook Hospital



National Percentiles Based on the Percent of ER Admissions Above Expected
Fallbrook Hospital, Acquired by CHS in FFY 1999

107

10. Flowers Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Flowers Hospital, Acquired by CHS in FFY 2007

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 120 of 177 PageID #: 120



National Percentiles Based on the Percent of ER Admissions Above Expected

Galesburg Cottage Hospital, Acquired by CHS in FFY 2004

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 121 of 177 PageID #: 121

12. Harris Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Harris Hospital, Acquired by CHS in FFY 1995

All Diagnosis Groups (After CHS Acq.)

110

13. Haywood Park Community Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Haywood Park Community Hospital, Acquired by CHS in FFY 2003

All Diagnosis Groups (After CHS Acq.)    Nonspecific Chest Pain (After CHS Acq.)

111

14.  Jennersville Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Jennersville Regional Hospital, Acquired by CHS in FFY 2002

112

15. Kentucky River Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Kentucky River Medical Center, Acquired by CHS in FFY 1995

— All Diagnosis Groups (After CHS Acq.) —— Nonspecific Chest Pain (After CHS Acq.)

113

16. Kosciusko Community Hospital



National Percentiles Based on the Percent of ER Admissions
Above Expected

Kosciusko Community Hospital, Acquired by CHS in FFY 2007

114

17. Lake Wales Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Lake Wales Medical Center, Acquired by CHS in FFY 2003

All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

115

18. Lakeway Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Lakeway Regional Hospital, Acquired by CHS in FFY 1993

All Diagnosis Groups (After CHS Acq.) —— Nonspecific Chest Pain (After CHS Acq.)

116

19. LV Stabler Memorial Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

LV Stabler Memorial Hospital, Acquired by CHS in FFY 1995

—— All Diagnosis Groups (After CHS Acq.)  —— Nonspecific Chest Pain (After CHS Acq.)

117

20.  Martin General Hospital



National Percentiles Based on the Percent of ER Admissions Above Expected

Martin General Hospital, Acquired by CHS in FFY 1999

118

21. McKenzie Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

McKenzie Regional Hospital, Acquired by CHS in FFY 2003

All Diagnosis Groups (After CHS Acq.)

119

22. McNairy Regional Hospital



120

23. Navarro Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Navarro Regional Hospital, Acquired by CHS in 2007

——— All Diagnosis Groups (After CHS Acq.)    ——— Nonspecific Chest Pain (After CHS Acq.)

– – – All Diagnosis Groups (Before CHS Acq.)    – – – Nonspecific Chest Pain (Before CHS Acq.)

121

24. North Okaloosa Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

North Okaloosa Medical Center, Acquired by CHS in FFY 1996

— All Diagnosis Groups (After CHS Acq.) —— Nonspecific Chest Pain (After CHS Acq.)

122



National Percentiles Based on the Percent of ER Admissions Above Expected

Northern Louisiana Medical Center, Acquired by CHS in FFY 2007

123

26. Northwest Medical Center[38]



National Percentiles Based on the Percent of ER Admissions Above Expected

Northwest Medical Center - Springdale, Acquired by CHS in FFY 2007

Legend:
- All Diagnosis Groups (After CHS Acq.)
- Nonspecific Chest Pain (After CHS Acq.)
- All Diagnosis Groups (Before CHS Acq.)
- Nonspecific Chest Pain (Before CHS Acq.)

---

[38] Northwest Medical Center – Springdale consolidates its Medicare claims reports with two other CHS facilities in the area, Northwest Medical Center – Bentonville and Willow Creek Women's Hospital. This consolidated reporting appears to have begun at some point between FFY 2007 and FFY 2008.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 136 of 177 PageID #: 136

27. Parkway Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Parkway Regional Hospital, Acquired by CHS in FFY 1992

125

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 137 of 177 PageID #: 137

28. Phoenixville Hospital



National Percentiles Based on the Percent of ER Admissions
Above Expected

Phoenixville Hospital, Acquired by CHS in FFY 2004

126

29. Regional Hospital of Jackson



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Regional Hospital of Jackson, Acquired by CHS in FFY 2003

All Diagnosis Groups (After CHS Acq.) ——— Nonspecific Chest Pain (After CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 139 of 177 PageID #: 139

30. River Region Medical Center



31.  South Baldwin Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

South Baldwin Regional Medical Center, Acquired by CHS in FFY 2000

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 141 of 177 PageID #: 141

32.  SouthCrest Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**
SouthCrest Hospital, Acquired by CHS in FFY 2007

130

33. Southern Virginia Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Southern Virginia Regional Medical Center, Acquired by CHS in FFY 1999

All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 143 of 177 PageID #: 143

34. Springs Memorial Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**
Springs Memorial Hospital, Acquired by CHS in FFY 1995

All Diagnosis Groups (After CHS Acq.)    Nonspecific Chest Pain (After CHS Acq.)

132

35. Sunbury Community Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Sunbury Community Hospital, Acquired by CHS in FFY 2006

Percent Above Expected ER Admissions Percentile

—— All Diagnosis Groups (After CHS Acq.)    —— Nonspecific Chest Pain (After CHS Acq.)

- - - All Diagnosis Groups (Before CHS Acq.)    - - - Nonspecific Chest Pain (Before CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 145 of 177 PageID #: 145

36. Three Rivers Medical Center



134

37.  Vista Medical Center East[39]



**National Percentiles Based on the Percent of ER Admissions Above Expected**
Vista Medical Center East, Acquired by CHS in FFY 2006

Legend:
All Diagnosis Groups (After CHS Acq.)    Nonspecific Chest Pain (After CHS Acq.)
All Diagnosis Groups (Before CHS Acq.)    Nonspecific Chest Pain (Before CHS Acq.)

---

[39] Vista Medical Center East and Vista Medical Center West are both in Waukegan, Illinois, and they retain separate Medicare provider numbers.  However, it appears that they may have combined emergency services at Vista Medical Center East at least within FFY 2006 and perhaps for longer.

135

38. Volunteer Community Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Volunteer Community Hospital, Acquired by CHS in FFY 2003

All Diagnosis Groups (After CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 148 of 177 PageID #: 148

39. Woodland Heights Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Woodland Heights Medical Center, Acquired by CHS in FFY 2007

Y-axis: Percent Above Expected ER Admissions Percentile

— All Diagnosis Groups (After CHS Acq.)    — Nonspecific Chest Pain (After CHS Acq.)
- - - All Diagnosis Groups (Before CHS Acq.)    - - - Nonspecific Chest Pain (Before CHS Acq.)

F. **Statistical Results for Defendant Hospitals at or above 80th Percentile for Chest Pain Admission, but Not Overall**

240.  The following hospitals are not at the 80th national percentile or above based on their percent above expected ER admissions for all patients of all diagnoses, but they are at the 80th national percentile or above based on their percent above expected ER admissions for chest pain patients.

137

1. Alta Vista Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Alta Vista Regional Hospital, Acquired by CHS in FFY 2000

— All Diagnosis Groups (After CHS Acq.) —— Nonspecific Chest Pain (After CHS Acq.)

138

2.  Bluffton Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Bluffton Regional Medical Center, Acquired by CHS in FFY 2007

All Diagnosis Groups (After CHS Acq.) ——— Nonspecific Chest Pain (After CHS Acq.)

- - - All Diagnosis Groups (Before CHS Acq.) - - - Nonspecific Chest Pain (Before CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 151 of 177 PageID #: 151

3. Carlsbad Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Carlsbad Medical Center, Acquired by CHS in FFY 2007

Legend:
- All Diagnosis Groups (After CHS Acq.)
- All Diagnosis Groups (Before CHS Acq.)
- Nonspecific Chest Pain (After CHS Acq.)
- Nonspecific Chest Pain (Before CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 152 of 177 PageID #: 152

4. Carolinas Hospital System



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Carolinas Hospital System, Acquired by CHS in FFY 2007

141

5. Cedar Park Regional Medical Center



National Percentiles Based on the Percent of ER Admissions
Above Expected
Cedar Park Regional Medical Center, Acquired by CHS in FFY 2008

142

6. Claremore Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Claremore Regional Hospital, Acquired by CHS in FFY 2007

Legend:
— All Diagnosis Groups (After CHS Acq.) —— Nonspecific Chest Pain (After CHS Acq.)
- - - All Diagnosis Groups (Before CHS Acq.) - - - Nonspecific Chest Pain (Before CHS Acq.)

143

7. Cleveland Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Cleveland Regional Medical Center, Acquired by CHS in FFY 1996

144

8. Eastern New Mexico Medical Center



145

9. Fannin Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Fannin Regional Hospital, Acquired by CHS in FFY 1986

All Diagnosis Groups (After CHS Acq.) ——— Nonspecific Chest Pain (After CHS Acq.)

146

10.  Helena Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Helena Regional Medical Center, Acquired by CHS in FFY 2002

*(y-axis)* Percent Above Expected ER Admissions Percentile

*(legend)* ——All Diagnosis Groups (After CHS Acq.)  ——Nonspecific Chest Pain (After CHS Acq.)

147

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 159 of 177 PageID #: 159

11. Hill Regional Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Hill Regional Hospital, Acquired by CHS in FFY 1995

148

12. Laredo Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Laredo Medical Center, Acquired by CHS in FFY 2004

149

13. Longview Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Longview Regional Medical Center, Acquired by CHS in FFY 2007

All Diagnosis Groups (After CHS Acq.)    Nonspecific Chest Pain (After CHS Acq.)

All Diagnosis Groups (Before CHS Acq.)    Nonspecific Chest Pain (Before CHS Acq.)

150

14. Mary Black Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Mary Black Hospital, Acquired by CHS in FFY 2007

Percent Above Expected ER Admissions Percentile

—— All Diagnosis Groups (After CHS Acq.)  —— Nonspecific Chest Pain (After CHS Acq.)
- - - All Diagnosis Groups (Before CHS Acq.)  - - - Nonspecific Chest Pain (Before CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 163 of 177 PageID #: 163

15. Porter Valparaiso Hospital Campus



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Porter Valparaiso Hospital Campus, Acquired by CHS in FFY 2007

All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

All Diagnosis Groups (Before CHS Acq.) - - - Nonspecific Chest Pain (Before CHS Acq.)

152

16. San Angelo Community Medical Center



National Percentiles Based on the Percent of ER Admissions
Above Expected

San Angelo Community Medical Center, Acquired by CHS in FFY 2007

153

17. Scenic Mountain Medical Center



154

18. Sky Ridge Medical Center[40]



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Skyridge Medical Center, Acquired by CHS in FFY 1995

All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

---

[40] Sky Ridge Medical Center consists of two hospital campuses. One of these campuses—the former Cleveland Community Hospital—was acquired by CHS in October 1994. The other campus—the former Bradley Memorial Hospital—was acquired by CHS in October 2005. These campuses combined under one Medicare provider number at some point between FFY 2006 and FFY 2007.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 167 of 177 PageID #: 167

19. Southampton Memorial Hospital



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Southampton Memorial Hospital, Acquired by CHS in FFY 2000

— All Diagnosis Groups (After CHS Acq.) — Nonspecific Chest Pain (After CHS Acq.)

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 168 of 177 PageID #: 168

20. Southside Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Southside Regional Medical Center, Acquired by CHS in FFY 2003

157

21. Trinity Hospital of Augusta



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Trinity Hospital of Augusta, Acquired by CHS in FFY 2007

— All Diagnosis Groups (After CHS Acq.)    — Nonspecific Chest Pain (After CHS Acq.)
--- All Diagnosis Groups (Before CHS Acq.)    ● Nonspecific Chest Pain (Before CHS Acq.)

158



National Percentiles Based on the Percent of ER Admissions Above Expected
Wesley Medical Center, Acquired by CHS in FFY 2007

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 171 of 177 PageID #: 171

23. Western Arizona Regional Medical Center



**National Percentiles Based on the Percent of ER Admissions Above Expected**

Western Arizona Regional Medical Center, Acquired by CHS in FFY 2000

160

24.  Woodward Regional Hospital



### National Percentiles Based on the Percent of ER Admissions Above Expected
#### Woodward Regional Hospital, Acquired by CHS in FFY 2007

—— All Diagnosis Groups (After CHS Acq.)
--- All Diagnosis Groups (Before CHS Acq.)
● Nonspecific Chest Pain (After CHS Acq.)
● Nonspecific Chest Pain (Before CHS Acq.)

## V.       CONCLUSION

241.       The facts alleged herein overwhelmingly show that CHS has engaged in a system-wide scheme to increase its revenues through making false claims to Medicare.  The scheme was not limited to the Defendant hospitals.  The scheme was not limited to Medicare.   Given the loose protocols CHS implemented throughout its system and the extreme pressure CHS exerted on its subsidiaries, it is highly likely that similar false claims were made to Medicaid, TriCare and other third-party government payors as well.

242.       Only in the last few weeks, as CHS reacted to challenges from investors and the glare of publicity from a lawsuit by Tenet, has it abandoned the loosened admission protocols of

161

the "Blue Book."[41] But CHS has been perpetrating its scheme for years, and the false claims from those years have already been paid by a struggling Medicare system funded by American taxpayers. Moreover, the increased revenue to CHS from such claims continues to be a critical component of CHS' plans to service its debts and secure financing for aggressive acquisitions it is pursuing even today. CHS' fraud will stop only with effective government action. Accordingly, Relators make the following claims on behalf of the government.

## VI.    CLAIMS

### First Cause of Action
### False Claims Act – 31 U.S.C. §§ 3729(a)(1)(A)

243.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

244.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

245.    Defendants knowingly presented, or caused to be presented false or fraudulent claims for improper payment or approval.

246.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

247.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

---

[41] *See supra* note 1.

Case 3:11-cv-00442   Document 1   Filed 05/10/11   Page 174 of 177 PageID #: 174

## Second Cause of Action
### False Claims Act – 31 U.S.C. § 3729(a)(1)(B)

1.     Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

2.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

3.     By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

4.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

5.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## Third Cause of Action
### False Claims Act – 31 U.S.C. § 3729(a)(1)(C)

1.     Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

2.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

3.     By virtue of the acts described above, Defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid.

4.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

5. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## VII.     REQUEST FOR RELIEF

WHEREFORE, Relators request that judgment be entered in their favor against Defendants as follows:

a. Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

b. Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

c. Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

d. Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

e. The United States and Relators recover such other relief as the Court deems just and proper.

### Request for Trial by Jury

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: May 10, 2011

Respectfully Submitted,

George E. Barrett, Esq. (TN Bar No. 2672)
David W. Garrison, Esq. (TN Bar No. 24968)
Scott Tift, Esq. (TN Bar No. 27592)

164

BARRETT JOHNSTON, LLC
217 Second Avenue North,
Nashville TN 37201
Phone: (615) 244-2202
Facsimile: (615) 252-3798
gbarrett@barrettjohnston.com
dgarrison@barrettjohnston.com

David P Dean, Esq.
Emilie S. Kraft, Esq.
JAMES & HOFFMAN, P.C.
1130 Connecticut Ave., NW, Suite 950
Washington, DC 20036
Phone: (202) 496-0500
Facsimile: (202) 496-0555
dpdean@jamhoff.com
eskraft@jamhoff.com

*Counsel for Relators*

Kit Pierson, Esq.
David Young, Esq.
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Phone: (202) 408 4600
Facsimile: (202) 408 4699
kpierson@cohenmilstein.com
dyoung@cohenmilstein.com

Judith Scott, Esq.
Dora Chen, Esq.
SERVICE EMPLOYEES
 INTERNATIONAL UNION
1800 Massachusetts Ave., NW
Washington, DC 20036
Phone: (202) 730-7469
Facsimile: (202) 429-5565
judy.scott@seiu.org
dora.chen@seiu.org

*Counsel for Relator SEIU*

Reuben Guttman, Esq.
Traci L. Buschner, Esq.
GRANT & EISENHOFER, P.A.
1920 L Street, N.W., Suite 400
Washington, DC 20036
Phone: (202)386-9500
Facsimile: (202) 386-9505

*Counsel for Relators Doghramji, Cook, and Bryant*