# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff, | : |
| | : |
| *ex rel.* | : **CASE NO. 3:11-cv-0442** |
| | : |
| JAMES DOGHRAMJI; SHEREE COOK; | : |
| and RACHEL BRYANT | : **JUDGE SHARP** |
| | : **MAGISTRATE JUDGE GRIFFIN** |
| Relators, | : |
| v. | : **JURY DEMAND** |
| | : |
| COMMUNITY HEALTH SYSTEMS, INC. | : |
| *et al.* | : |
| Defendants. | : |
| | : |
| | : |
| | : |

## MEMORANDUM IN SUPPORT OF RELATORS' MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS, AND EXPENSES

Relators Dr. James Doghramji, Sheree Cook, and Rachel Bryant ("Relators" or the "Doghramji Relators") seek the statutory fees, costs, and expenses associated with their three-year effort to expose an illegal scheme instituted by Defendant Community Health Services, Inc. ("Defendant" or "CHS") at 74 of its hospitals (collectively with CHS, "Defendants") in 29 states that cost the government millions of dollars and needlessly put patients at risk. Each hospital is a separate corporation, which was acquired through buyouts that added debt service to CHS – the cost of which was passed on to the government through unlawful billing practices. The United States and various states intervened in this action and entered into a settlement agreement with Defendants and Relators that resulted in the return of more than $98 million to the federal and

state governments; the execution of a Corporate Integrity Agreement foreclosing such conduct in the future; and the dismissal of Relators' claims with prejudice.

In 2011, the Relators, former CHS healthcare professionals, risked their jobs and their professional reputations in the medical field to expose CHS's illegal conduct.  They filed this *qui tam* action pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, (the "*Doghramji* Action"), alleging, *inter alia*, unlawful emergency room admission practices at hospitals nationwide owned or operated by CHS.  These unnecessary admissions caused monetary injury to the government while placing patients at risk for treatment-resistant infection and medical errors.  No other complaint alleging False Claims Act violations was filed in Tennessee.

The United States Department of Justice ("DOJ") spent the next three years investigating Relators' allegations, enlisting considerable assistance from Relators' counsel and from counsel to relators in six other *qui tam* actions filed against CHS in other district courts throughout the country.[1]  On August 4, 2014, DOJ announced that the parties had settled all pending civil claims, including those brought by the Relators, and that CHS would pay the government $98 million, including over $88 million to settle the allegations of nationwide unnecessary ER admissions that were at the heart of Relators' complaint.  *See* contemporaneously filed Declaration of Traci L. Buschner (hereinafter "Buschner Decl."), Ex. F.  The next day, the United States Attorney for the Middle District of Tennessee made a similar announcement,

---

[1]     As noted by former U.S. Assistant Attorney General, Frank W. Hunger, "a public-private partnership between the federal government, whistleblowers, and their counsel is a critical component of ensuring that the False Claims Act is enforced," due to the limited resources appropriated by the Government for investigating these cases.  *See* contemporaneously filed Declaration of Frank W. Hunger (hereinafter "Hunger Decl.") at ¶ 7.  Mr. Hunger, who supervised the enforcement of the False Claims Act for the U.S. Department of Justice from 1993 to 1999, states in his declaration that a "dramatic increase" in recoveries by the Government under the False Claims Act has been brought about, in part, by the work of relators and their counsel.  *Id.* at ¶¶ 2, 6.

noting that this is the largest False Claims Act settlement in the Middle District of Tennessee to date. *Id.,* Ex. G. The Relators are therefore prevailing parties who are entitled to recover all reasonable attorneys' fees, costs, and expenses pursuant to the False Claims Act, 31 U.S.C. § 3730(d).[2] *See* contemporaneously filed Declaration of Arthur R. Miller In Support Of Relators Doghramji, Bryant And Cooks' Motion For Award Of Attorneys' Fees And Expenses Pursuant To 31 U.S.C. § 3730(d) (hereinafter "Miller Decl.") at ¶ 20. In addition to realizing the substantial penalty that Defendants have paid to resolve this matter, the Relators' comprehensive Amended Complaint lends transparency to, and creates a much needed public record of, the scope and magnitude of CHS's derelictions.[3]

In or about May 2014, shortly after a settlement had been reached in principle, counsel for CHS requested the Relators' counsel and counsel in other *qui tam* actions against CHS send them their fee requests. At the Government's urging, Relators' counsel complied in an attempt to negotiate attorneys' fees without involving this Court. Buschner Decl. at ¶ 16. Notwithstanding attempts to engage CHS to resolve the issue, Defendants have made no offer to settle the fee issue in this case. *Id.* at ¶ 20. The matter of fees and costs thus remains unresolved.

In light of the failure to resolve this matter extrajudicially, and pursuant to the mandatory fee-shifting provisions of the False Claims Act, 31 U.S.C. § 3730(d)(1), Relators, by and through

---

[2] Pursuant to 31 U.S.C. § 3730(d), successful relators "shall . . . receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant."

[3] Justice Brandeis once noted that "sunlight is said to be the best of disinfectants." *See* Brandeis, Louis D*., What Publicity Can Do*, Harper's Weekly, December 20, 1913 (*republished* at http://www.law.louisville.edu/library/collections/brandeis/node/196).

3

their undersigned counsel, now submit this Motion for the attorneys' fees, costs, and expenses they incurred in litigating this case.[4]

Relators' counsel represented the Relators from the inception of the case in 2011 on a contingent basis. They expended significant time and resources—notably, at the Government's express request. Counsel are well-respected local and national firms that specialize in False Claims Act litigation and have a remarkable record of recovering funds stolen from the Government. *See* Miller Decl. at ¶ 31-35. In all, Relators' counsel expended more than[5] 7,030 attorney and paralegal hours and incurred $61,840.54 in expenses on this matter. *See* Ex. C to Buschner Decl.; Ex. B to contemporaneously filed Declaration of Kit A. Pierson (hereinafter "Pierson Decl."); Ex. A to contemporaneously filed Declaration of David P. Dean (hereinafter "Dean Decl."); Ex. A to contemporaneously filed Declaration of David W. Garrison (hereinafter "Garrison Decl."). Pursuant to 31 U.S.C. § 3730(d), Relators seek reimbursement of these fees, costs, and expenses.

These attorneys' fees, costs, and expenses will not reduce the Government's recovery or the relators' share whatsoever. *See* Miller Decl. at ¶ 21. Rather, Defendants will pay this mandatory award over and above the $98 million won by the government. See 31 U.S.C. § 3730(d) ("All such expenses, fees, and costs shall be awarded against the defendant."); Miller Decl. at ¶ 21.

---

[4] Although Relators do not presently seek fees in connection with the preparation of this Motion, they reserve their right to do so should this proceeding become protracted. "A party entitled to an award of attorneys' fees is also entitled to reimbursement for the time spent litigating its fee application." *Planned Parenthood v. Att'y Gen. of N.J.*, 297 F.3d 253, 268 (3d Cir. 2002); *see also Coulter v. Tennessee*, 805 F.2d 146 (6th Cir. 1986).

[5] Relators are not seeking reimbursement for time spent negotiating matters with the Government and relators from the six other actions or, currently, for the time spent preparing and litigating this Motion. *See supra*, note 4.

4

After knowingly exposing countless patients to risk through a calculated effort that took a statistical analysis, countless hours of document review, and the input of at least one medical expert to unravel, Defendants now seek to challenge the bill to uncover their wrongdoing.

## FACTUAL BACKGROUND

CHS is the nation's largest operator of acute care hospitals. Buschner Decl., Ex. F. Relators are each former employees of CHS. First Amended Complaint [Dkt. 52] at ¶¶ 12-14 (hereinafter "Compl."). Relator Dr. Doghramji is a board-certified physician specializing in internal medicine and has almost twenty years of experience in his field. *Id*. at ¶ 12. From 1994 to 2010, Dr. Doghramji served as an attending physician in CHS's Chestnut Hill Hospital Department of Emergency Medicine in Philadelphia, Pennsylvania. *Id*. at ¶¶ 12, 66. Relator Cook was a staff Registered Nurse ("RN") and charge nurse at CHS's Heritage Medical Center in Shelbyville, Tennessee, from May 2008 to October 2009. *Id* at ¶¶ 13, 28. Relator Bryant was employed as a staff nurse by CHS's Dyersburg Regional Medical Center in Dyersburg, Tennessee, from January 2009 through February 2011. *Id.* at ¶¶ 14, 21.

On May 10, 2011, Relators filed a 165-page Complaint alleging that CHS, motivated by a need to service its mounting debts, devised a scheme to grow revenues by increasing the admission of patients who presented themselves to CHS hospital emergency rooms ("ERs"). *Id.* at ¶¶ 1, 107-113. CHS, however, knew that the growth of such admissions was constrained by the limited number of sick people who could potentially need its services, and as a result, it needed to be aggressive in finding ways to admit more patients. For that reason, CHS's executives decided to centralize their control of ER operations at CHS facilities across the nation. *Id.* at ¶¶ 3, 116. CHS used this control to implement practices that were geared towards increasing ER admission rates. *Id.* at ¶¶ 3; 118. These policies (1) set and constantly monitored

admissions quotas at each hospital; (2) required the use of CHS-developed lenient admission criteria contained in what was called the "Blue Book"; (3) required the use of standardized software called ProMed that would direct physicians in making diagnoses and determining treatments; and (4) maintained strong controls over hospital physician contracts. *Id.* at ¶ 4.

In addition, CHS executives and their hospital-specific counterparts worked to increase ER admission rates by (1) encouraging the admission of Medicare patients who fell into certain "soft" diagnostic categories (*e.g.*, chest pain, abdominal pain, and syncope) regardless of medical necessity; (2) pressuring ER physicians to increase admissions rates regardless of medical necessity; (3) terminating the contract of physicians and physicians' groups that failed to meet the arbitrary admission quotas; and (4) directing case managers to justify admissions or decisions not to admit using the Blue Book's lax standards. *Id.* at ¶ 4, 118.

As proof that CHS's scheme was carried out across the nation, and led to the filing of numerous false claims, the *Doghramji* Complaint describes substantially similar conduct at eleven CHS hospitals in Illinois, Missouri, New Jersey, Oklahoma, Pennsylvania, and Tennessee, and the impact of this conduct on admission rates. The Complaint also contains a detailed statistical analysis developed for Relators by the Service Employees International Union ("SEIU") (at the time also a relator in this action), which revealed that CHS's pattern of aggressive admission practices caused the unnecessary admission of Medicare beneficiaries at each of the 74 hospitals named in Relators' complaint. *Id.* at ¶¶ 136-48. In fact, 42.5% of CHS hospitals have admission rates so high that they are classified as outliers that warrant further investigation for Medicare fraud. *Id.* at ¶ 139. The statistical data also showed that these substantially elevated admission rates were the result of CHS's scheme; the admission rates at various hospitals grew exponentially almost immediately after being acquired by CHS. *Id.* at ¶

144.  Finally, the *Doghramji* Complaint includes particularized allegations, based on first-hand experience, describing CHS's wrongful conduct at each of the Doghramji Relators' hospitals.  *Id.* at ¶¶ 157-224.

Prior to filing their Complaint, Relators' counsel (a) investigated Relators' claims; (b) developed and reviewed Relators' statistical analysis; and (c) prepared the disclosure statement and drafted a 165-page Complaint.  In addition, certain of Relators' counsel met with attorneys at DOJ and the U.S. Attorney's Office for the Eastern District of Pennsylvania.  Buschner Decl. at ¶ 5; *see also* Dean Decl. at ¶ 10.

In or about May 9, 2011, Relators filed a detailed and extensive disclosure, as required by the FCA, with the U.S. Attorney's Office for the Middle District of Tennessee ("USA's Office").  Buschner Decl. at ¶¶ 4-6; Dean Decl. at ¶¶ 10-12.  The disclosure identified physicians and former CHS employees who could be potential witnesses in the Government's investigation.  As part of the disclosure, Realtors' counsel also provided critical documents from the individual Relators and a robust statistical analysis evidencing a nationwide scheme to bill Medicare for medically unnecessary admissions.  Attached to the disclosure were additional key documents supporting Relators' claims and a road map for the Government to investigate the case.  Buschner Decl. at ¶ 6; Dean Decl. at ¶¶ 12-13.

After the lawsuit was filed, the law firms and the Relators met multiple times with lawyers and other representatives from DOJ and the USA's Office (collectively the "Government").  Buschner Decl. at ¶ 7.  Relators, which then also included the SEIU, were able to provide statistical evidence of medically unnecessary admissions for 74 hospitals and eye witness testimony for the three hospitals in which the Relators had worked.  *Id*.  The Government provided Relators and their counsel with copies of complaints in six other FCA cases (filed in

other jurisdictions) that were all settled, together with the instant case, on August 4, 2014 in this Court. [Dkt. 75] Prior to the disclosure of the other six complaints, Relators were not aware of the other cases because they were still "under seal" in multiple federal courts. *Id.* at ¶ 8.

In or about the fall of 2011, the Government requested that counsel for the Doghramji Relators—as well as counsel in the six other *qui tam* actions—actively participate in its investigation, which was led by the USA's Office in Nashville, on an on-going basis. *Id.* at ¶ 9. The Government lawyers mapped out the investigation and assigned work to all relators' counsel in an organized manner so that work was not duplicated by any of the firms involved. *Id*. at ¶ 10. In response to the Government's specific requests, counsel for the Doghramji Relators performed the following work over the years preceding the settlement:

- Organized and analyzed thousands of documents produced, pursuant to Civil Investigative Demands ("CIDs"), to the Government by CHS;

- Drafted letters and memoranda analyzing relevant documents;

- Created lists of potential witnesses;

- Drafted a detailed memorandum comparing CHS's Blue Book (CHS's own lenient admission criteria) to Interqual (industry-recognized admission criteria);

- Compared CHS's treatment of observation stays to its use of inpatient admission;

- Conducted legal and factual research on a number of topics including, but not limited to: (1) bonuses/incentives offered to individuals for increasing admissions; (2) CHS's acquisition strategy; (3) CHS's transition from the Blue Book to Interqual; (4) CHS's financial stability; and (5) CHS's acquisition of Triad Healthcare;

- Drafted detailed outlines for the Government's use in questioning several key witnesses, including Dr. Lynn Simon; and

- Drafted CID requests to assist the investigation.

*Id*. at ¶ 9.

Counsel for the Doghramji Relators also consulted with their non-testifying medical expert, Dr. Caroline Poplin, on behalf of the Government. *Id.* at ¶ 11. Dr. Poplin, who is a physician and previously served as legal counsel for the U.S. Food and Drug Administration, aided the Government's understanding and investigation, including assisting with the selection of data for the Government's audit of CHS, which was performed incident to the investigation of the seven cases. *Id.* Dr. Poplin met with the Government on a number of occasions to provide expert medical analysis and opinions. *Id.* She assisted with the formulation of questions and an outline for the Government's deposition of CHS's Dr. Lynn Simon, who had critical knowledge about CHS's decision to use certain hospital admission criteria, including the Blue Book, which lay at the core of the case. *Id.* Dr. Poplin also assisted with analysis of CHS's Blue Book and the medical necessity standard. *Id.* Additionally, she participated in drafting the initial and amended Complaints in the Doghramji case. *Id.*

All relators' counsel for the seven actions, including counsel for the Doghramji Relators, participated in bi-monthly calls organized and led by the Government to discuss the case, strategy, discovery, and other tasks incident to the investigation. *Id.* at ¶ 10. The investigation, though led by the Government, was a collaborative effort among the counsel for the seven actions. *Id.* The vast majority of the work done by Relators' counsel in the Doghramji case was done at the direction of the Government and in support of its investigation of a nationwide case against Defendants. *Id.* Though the Government sometimes gave assignments to certain of the relators' counsel based upon allegations of their specific complaints, the majority of the assignments were made without regard to the individual complaint. *Id.*

A First Amended Complaint was drafted and filed in or about August 2013, and was provided to CHS (redacted only to shield identifying information regarding the Relators)

9

pursuant to this Court's November 28, 2011 Order allowing a "partial lift" of the seal. *Id.* at ¶ 13. CHS was provided with copies of all seven complaints in or about late August 2013. *Id.* CHS and the Government had already entered into discussions to resolve the case in the spring of 2013. *Id.* Counsel for the Doghramji Relators were tasked by the Government with performing legal research and analysis pertaining to certain defenses that CHS raised during its discussions with the Government. *Id.*

The Government and all of the relators' counsel, including counsel for the Doghramji Relators, were in frequent contact over the course of the investigation and subsequent settlement of the claims against CHS. *Id.* at ¶ 14.

In the spring of 2014, the Government notified all of the relators' counsel of a "handshake" deal between CHS and the Government. *Id.* Before the settlement papers were finalized, the Government urged relators in all seven cases to reach agreement regarding their respective shares of the bounty resulting from the Government's settlement with CHS. *Id.* at ¶ 15. In early May 2014, the relators' counsel in all seven cases engaged the services of two private mediators, including a former federal judge, and participated in an in-person mediation to resolve the share issue. *Id.* After substantial negotiations, the relators from all cases agreed what each party's share should be. *Id.* The relators agreed that the Doghramji Relators would receive 14% of the bounty relating to the nationwide over-admissions claims, demonstrating that they provided significant value to the case. *Id.* As part of the deal, the relators agreed that the relator in the *Plantz* case, filed in federal court in Chicago, would receive the bounty from the Government and then distribute the proceeds pursuant to the relator share agreement. *Id.* The decision to assign the money to Plantz was arbitrary, as the terms of the agreement set forth a

10

share for each of the seven cases regardless of which relator received the money from the Government. *Id*. The Government was told to pay Plantz as part of the relator share deal. *Id*.

About the time the relator share deal was reached, Government lawyers also told counsel in all seven cases that they should submit their fees and costs to CHS pursuant to CHS's request. *Id*. at ¶ 16. On or about June 6, 2014, the Doghramji Relators' counsel submitted their fees and costs to Defendants' counsel. *Id*. Upon information and belief, counsel on the six other cases also provided their fees and costs to Defendants' counsel. *Id*.

The Government ultimately awarded a bounty of 19% of the total recovery, demonstrating that it believed all relators contributed substantially to the case. *Id*. at ¶ 17.

On July 24, 2014, the Government intervened in the *Doghramji* case. [Dkt. 72] The Government also intervened in the other six cases in their respective federal courts. Buschner Decl. at ¶ 18. On or about August 4, 2014, the Government filed its Settlement [Dkt. 75], which was approved by this Court on August 14, 2014. [Dkt. 77] The Settlement expressly resolves all seven cases. *Id*. The Doghramji Relators, like the relators in the other six cases, agreed to dismiss their claims against the Defendants and signed the settlement as well. [Dkt. 75 at ¶ 3, p. 7] In exchange for the relators' dismissals, Defendants agreed not to bring any actions against Relators or their counsel related to claims resolved by the Settlement. [*Id*. at ¶ 8, p.10] As part of the Settlement, Defendants agreed to enter a Corporate Integrity Agreement ("CIA") or Consent Decree with the U.S. Department of Health and Human Services, which sets forth certain injunctive relief. [*Id*. at ¶ 4, p.7-8]

In the settlement, Relators expressly reserved their right to seek their statutory fees and costs pursuant to 31 U.S.C. § 3730(d), the fee-shifting provision of the federal False Claims Act. [*Id*. at ¶ 8, p.10]; Buschner Decl. at ¶ 19. Defendants, similarly, reserved their right to object and

11

oppose those fees pursuant to 31 U.S.C. § 3730(d). [*Id.* at ¶ 8, p. 10] Nothing in the Settlement expressly reserved the right of CHS to claim that any party to the agreement did not have standing to bring claims or that this Court lacked subject matter jurisdiction over the Settlement or the cases that were settled by it. Buschner Decl. at ¶ 19.

## ARGUMENT[6]

### I.     The Doghramji Relators are prevailing parties

The federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, contains a *qui tam* provision to encourage "whistleblowers" to reveal fraud on the government. 31 U.S.C. § 3730. A *qui tam* plaintiff (or "relator") may bring a private civil action on behalf of himself and on behalf of the United States government against a defendant who, in violation of 31 U.S.C. § 3729, has submitted false claims to the government for payment. *Id.* § 3730(b)(1); *see United States ex rel. Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005). The *qui tam* action is filed under court seal, and the relator must supply the government with a copy of the complaint and with a written disclosure of substantially all material evidence and information that the relator possesses supporting the charges. 31 U.S.C. § 3730(b)(2). DOJ has sixty days to review the claims and may move the court to extend that period; during that time, the proposed defendant is generally not notified of the claim. *Id.* § 3730(b)(2), (3). If the government chooses to intervene in the action, it assumes the role of lead prosecutor. *Id.* § 3730(b)(4)(A), (c)(1). In the alternative, it may decline to join the action, leaving the *qui tam* plaintiff as the sole prosecutor. *Id.* § 3730(b)(4)(B).

---

[6]     Defendants raise a host of issues in support of their recent motion for a stay (Dkt. 83), seeking to litigate issues that have been resolved by the Settlement. Relators will address the merits of these arguments in response to that motion.

The *qui tam* provisions seek to encourage "whistleblowers to act as private attorneys-general" in bringing suits for the common good. *See United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041-42 (6th Cir. 1994) (internal quotation marks omitted). But the "provisions [also] seek to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud." *Walburn*, 431 F.3d at 970 (citing *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 335 (6th Cir.1998)).

Section 3730(d)(1) of the FCA provides that

> **[i]f the Government proceeds with an action brought by a person under subsection (*b*)**, such person shall . . . receive [a percentage] of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. . . . ***Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.***

31 U.S.C. § 3730(d)(1) (emphasis added).[7] Relators are entitled to attorneys' fees and costs under this provision. The Government *did* "proceed" with the *Doghramji* case—it thoroughly

---

[7] Defendants offer a strained reading of the FCA's relator's fee provision in support of their recent motion for a stay [Dkt. 83] to suggest that because the Doghramji Relators were not paid a bounty by the Government directly they are not entitled to attorneys' fees. They are wrong. While the Doghramji Relators were not paid a bounty directly by the Government, they did receive 14% of the bounty with the Government's knowledge. *See* Buschner Decl. at 15. Indeed, the Government's lawyers urged Relators to enter a relator's share agreement, and the parties engaged in mediation to do so. *Id.* Nothing in the statute makes payment of attorneys' fees contingent on direct payment of a bounty by the government. Rather, the only express contingency is that the "government proceed[]" with the action. The full text of the provision reads:

> **(d) Award to qui tam plaintiff.**--(1) If the Government proceeds with an action brought by a person under subsection (b), ***such person shall***, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or

13

investigated the case with the substantial assistance of the Doghramji Relators' counsel, intervened in part of the case, and then settled that part of the case. Further, the government paid a bounty of 19% to all of the relators in recognition of their "substantial[] contribut[ions]" to the case. Accordingly, by a straightforward reading of the statute, the Doghramji Relators are entitled to attorneys' fees, costs, and expenses.

Some courts have concluded that only successful—or "prevailing"—plaintiffs may recover. The district court in *United States ex rel. Miller v. Holzmann*, construing the FCA's provision as a matter of "first impression," held that the "FCA's fee-shifting scheme as appl[ies] only] to '*prevailing qui tam* relators.'" 575 F. Supp. 2d 2, 5-7 (D.D.C. 2008) (quoting S. Rep. No. 99–345, at 29 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5294) (amended in part, vacated in part, by *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 786 F. Supp. 2d 110 (D.D.C. 2011)).[8]

---

administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. **Any such person shall also** receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

31 U.S.C. § 3730(d)(1) (footnote omitted) (emphasis added). Notably, nothing in the provision mandates that "such person shall also receive attorney fees" **only** if the government pays a bounty to the relator **directly**.

[8] While the *Miller* court held that the defendant as to whom the relator's claims were dismissed as time-barred could not be held liable for fees, it granted fees on claims on which relator prevailed. 575 F. Supp. 2d at 5, 13-14. Indeed, the court acknowledged that "a prevailing party is one who 'succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Id*. at 5 n.8 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

14

But even under this reading, the Doghramji Relators are prevailing parties. "The law is settled that a party need not obtain favorable outcomes on every claim or argument to be considered a 'prevailing party' for these purposes; instead, ***a prevailing party need only 'succeed on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit.'*** *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 786 F. Supp. 2d 110, 116 (D.D.C. 2011) (quoting *Raton Gas Transmission Co. v. FERC*, 891 F.2d 323, 327 (D.C. Cir. 1989) (which quoted *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983))). Here, three benefits the Relators' sought in bringing suit were attained: the Government recouped $88 million for CHS's unnecessary nationwide ER admissions (*see* Ex. F to Buschner Decl.), CHS entered a Corporate Integrity Agreement requiring it to cease its wrongful conduct (*Id.* at ¶ 18), and the Doghramji Relators received a portion of the bounty paid by the Government (*Id.* at ¶15).

Further, the Doghramji Relators settled their remaining claims against CHS, which the Court approved in dismissing the complaint [Dkt. 77]. "A . . . settlement . . . is sufficient to consider plaintiff a 'prevailing plaintiff.'" John. T. Boese, *Civil False Claims and Qui Tam Actions*, § 4.09[A], at 4-313 (4th ed.); *see also United States ex rel. ATC Distrib. Grp., Inc. v. Ready–Built Transmissions, Inc*., No. 03 Civ. 2150, 2007 WL 2522638, at *1, *9 (S.D.N.Y. Sept. 7, 2007) (awarding attorney's fees to relator who was party to settlement between defendants and United States). Thus, the Relators are entitled to statutory fees as prevailing parties.

## II.     Relators' request for $3,137,779.50 in total fees is reasonable.

In the Sixth Circuit, the "primary concern in an attorney fee case is that the fee awarded be reasonable, that is, one that is adequately compensatory to attract competent counsel yet

which avoids producing a windfall for lawyers." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004) (internal quotation marks omitted).[9]

In calculating a reasonable attorney's fee, the first step is to determine the value of the "lodestar" — the number of hours reasonably expended by counsel, multiplied by a reasonable hourly rate. *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005); *see also,* Miller Decl. at ¶¶ 29-30. While the district court retains discretion to adjust this value up or down to account for unusual circumstances, a "strong presumption" exists that prevailing counsel is entitled to this lodestar amount. *See Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). A "reduction in attorney fees is to be applied ***only in rare and exceptional cases*** where specific evidence in the record requires it." *Isabel*, 404 F.3d at 416 (emphasis added).

Here, Relators petition the Court to award attorneys' fees totaling $3,137,779.50. As the following analysis will show, this total is the product of (1) reasonable billing rates — ranging from $140.00 to $850.00 an hour — that are consistent with what attorneys and professional legal staff of comparable skill and experience charge in False Claims Act and complex civil litigation; (2) 7,033.60 hours reasonably expended by counsel, (3) a reduction for all work performed mediating and negotiating settlement; and (4) efficient staffing of this litigation.

### a. Relators' counsel's hourly rates are reasonable and appropriate.

In nationwide False Claims Act litigation, the Sixth Circuit provides for reimbursement of a relator's reasonable attorney's fees at prevailing in-district hourly rates for a relator's in-

---

[9]     In determining the reasonableness of fees and costs under the False Claims Act, courts are permitted to look at cases outside of the FCA context. *See, e.g.*, *United States ex rel. Lefan v. Gen. Elec. Co.*, 397 F. App'x 144, 147-48 (6th Cir. 2010) (applying Section 1988 case law to fee awards under FCA); *see also Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005) (noting that "we rely on precedents involving attorney fees without regard to whether they involved Title VII or some other federal statute").

district counsel and at prevailing national hourly rates for a relator's national counsel. *See United States ex rel. Lefan v. Gen. Elec. Co.*, 397 F. App'x 144, 147-48 (6th Cir. 2010).

In determining the prevailing market rates within a given market, a range of hourly rates will "prevail," depending upon the quality of counsel and the complexity of the case. Accordingly, the Supreme Court has explained that district courts should look not only to regional norms, but also to the services performed and the "skill, experience and reputation" of the attorneys. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *see also Cummings Inc. v. BP Prods. N. Am., Inc.*, Nos. 3:06-0890, 3:07-0834, 2010 WL 796825, at *3 (M.D. Tenn. Mar. 3, 2010) ("A reasonable hourly rate is determined by considering the skill, experience, and reputation of the attorneys involved and the market in which they practice.").

In the instant nationwide False Claims Act lawsuit, Relators engaged counsel from the Middle District of Tennessee – Barrett Johnston Martin & Garrison, LLC – as well as national counsel who specialize in False Claims Act litigation and other complex litigation – Grant & Eisenhofer, P.A.; Cohen Milstein Sellers & Toll PLLC; and James & Hoffman, P.C. Relators are entitled to an award of reasonable fees incurred at hourly rates prevailing within the Middle District of Tennessee for Relators' Middle Tennessee counsel, and at hourly rates prevailing nationally for Relators' national counsel. *See Lefan*, 397 F. App'x at 147-48.

### i. Barrett Johnston Martin & Garrison's hourly rates are reasonable and appropriate for complex civil litigation pursued within the Nashville, Tennessee legal market.

In determining the appropriate hourly rate for attorneys who regularly practice within the venue of the court of record, the Sixth Circuit has determined that courts should "use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and

17

experience can reasonably expect to command within the venue of the court of record." *Geier*, 372 F.3d at 791.

During the course of this litigation, the law firm of Barrett Johnston Martin & Garrison, LLC ("BJMG") represented Relators at hourly rates ranging from $550.00 to $150.00. *See* contemporaneously filed Declaration of David W. Garrison (hereinafter "Garrison Decl."), Ex. A.

The rates listed above are within the range of hourly rates that attorneys in this region typically charge for such matters, and these reasonable rates properly reflect the skills and experience of the attorneys and professional staff at BJMG. In support of the reasonableness of these hourly rates, Relators are contemporaneously filing the declarations of three prominent local attorneys who handle complex civil litigation — a form of proof explicitly favored by the Sixth Circuit. *See, e.g.*, *B & G Mining, Inc. v Dir., Office of Workers' Comp. Programs*, 522 F.3d 657, 666 (6th Cir. 2008) ("[C]laimant's attorney would have been well served by submitting an affidavit from an experienced attorney in the same or similar field attesting to that attorney's customary rate and the rates prevalent in the market[.]"). This type of evidence is also specifically the contemplated by Local Rule 54.01(b)(3) of this Court.

Frank W. Hunger, W. Michael Hamilton, and Michael L. Russell are each experienced, respected attorneys who practice in the Nashville legal market, and who focus their practices on complex litigation. In their sworn declarations, Mr. Hunger, Mr. Hamilton, and Mr. Russell each attest that the above-listed hourly rates are within the current prevailing range for Nashville-area attorneys and professional staff with comparable skill and experience. Thus, these attorneys' declarations support the reasonableness of the rates charged by Relators' local counsel in representing Relators. *See* Hunger Decl. at ¶ 12; contemporaneously filed Declaration of W.

18

Michael Hamilton (hereinafter "Hamilton Decl.") at ¶ 14; contemporaneously filed Declaration of Michael L. Russell (hereinafter "Russell Decl.") at ¶ 9.

In further support of the reasonableness of Relators' counsel's hourly rates, Relators note that nearly three years ago Middle District of Tennessee Judge Aleta A. Trauger approved the hourly rate requested herein for Mr. Barrett (*i.e.*, $550.00 per hour) and approved hourly rates for Mr. Garrison and Mr. Tift that were only modestly lower than the rates sought for these two attorneys today.[10] In the nearly three years since Judge Trauger approved those rates, Mr. Garrison and Mr. Tift have gained additional years of experience; Mr. Garrison has become a named partner; and Mr. Tift has become a partner. A copy of Judge Trauger's Order is attached hereto as Exhibit A.

Finally, Relators respectfully submit that the experience and competence of the lawyers at BJMG, as detailed in the contemporaneously filed firm resume, warrants compensation for the work they have performed at the requested prevailing market rates. *See* BJMG Firm Resume, Exhibit B to Garrison Decl. BJMG charges these hourly rates to hourly paying clients of the firm for similar services. *Id.* at ¶ 6. For all of these reasons, Relators respectfully ask the Court to approve the hourly rates charged by BJMG in this litigation.

> **ii. Relators' national counsel's hourly rates are reasonable and appropriate for attorneys who specialize in representing *qui tam* relators in nationwide False Claims Act litigation and other complex civil litigation.**

When parties engage experienced and specialized out-of-town counsel to pursue complicated nationwide claims, as is the case here, district courts "are free to look to a national

---

[10] In 2011, Judge Trauger approved hourly rates of $350.00 and $250.00 for Mr. Garrison and Mr. Tift, respectively. Today, Mr. Garrison and Mr. Tift seek approval of hourly rates of $400.00 and $300.00, respectively.

19

market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases." *Louisville Black Police Officers Org. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir. 1983). In such cases, district courts are "justified in looking to [the attorney's] standard rate in the community where that attorney normally practices as a reflection of that attorney's training, background, expertise and skill." *Id.* at 277; *see also Lefan*, 397 F. App'x at 147-48 (awarding out-of-state rates to out-of-state attorney who specializes in *qui tam* litigation).

Here, Relators engaged national specialists in False Claims Act litigation and complex litigation to represent them in pursuing their claims that the Defendants had violated the federal False Claims Act in hospitals across more than half of the states in the country. Ultimately, the United States Government settled these nationwide claims for more than $88 million, representing the lion's share of the largest False Claims Act settlement in the history of the Middle District of Tennessee. *See* July 30, 2014 Press Release of the United States Attorney, Middle District of Tennessee, attached as Exhibit 1 to contemporaneously filed Declaration of W. Michael Hamilton. Relators' national counsel's experience, described below and in contemporaneously filed declarations, as well as the extraordinary results, justify awarding the requested national hourly rates.

Relators' national counsel include lawyers and professional staff from the law firm of Grant & Eisenhofer, P.A. ("G&E"), based in Washington, D.C. G&E is a national litigation boutique that specializes in False Claims Act cases, as well as complex civil litigation involving shareholder and derivative securities cases, corporate governance, consumer protection, bankruptcy, and antitrust.[11] *See* www.gelaw.com. For the last eight years, G&E has been named

---

[11]     *See* G&E Biographical Information, Exhibit A to Buschner Decl.

one of the nation's "Top Ten Plaintiff's Firms" by the National Law Journal.  *Id*.  Mr. Guttman, Ms. Buschner, and the other attorneys at G&E that worked on this case have substantial, nationwide experience in False Claims Act litigation and complex class action litigation.  Mr. Guttman, who is the head of G&E's False Claims Act practice, has approximately 28 years of experience as a litigator and has served as counsel in some of the largest government recoveries under the False Claims Act.  *See* Exhibit A to Buschner Decl. at pp. 12-13.  Most recently, Mr. Guttman was lead counsel in *United States ex rel. Sandler v. Wyeth Pharmaceuticals, Inc*., Case No. 5:10-cv-01317-M (W.D. Okla.), which resulted in a $490 million recovery for the government in July 2013.

In 2012, Mr. Guttman and Ms. Buschner served as lead counsel for the lead whistleblower, Meredith McCoyd, in *United States ex rel. Meredith McCoyd v. Abbott Laboratories*, Case No. 07-cv-81 (W.D. Va.), which resulted in a $1.6 billion recovery for the government.  Also in 2012, Mr. Guttman and Ms. Buschner represented one of the four main whistleblowers in a case against GlaxoSmithKline that returned more than $3 billion to the government.  *United States ex rel. Lois Graydon v. GlaxoSmithKline*, Case No. 11-cv-10741 (D. Mass.).  They represented one of the six main whistleblowers in litigation resulting in the government's September 2009 $2.3 billion settlement with Pfizer Pharmaceutical.  *United States ex rel. Glenn Demott v. Pfizer*, Case No. 05-cv-12040 (D. Mass.).

Ms. Buschner is Senior Counsel at G&E and has nearly twenty years of experience litigating primarily False Claims Act cases.  *See* Exhibit A to Buschner Decl. at pp. 26-27.  She is a former state prosecutor who has worked closely with Mr. Guttman on numerous False Claims Act cases, including each of those detailed above.  She has extensive experience as well in scientifically oriented litigation, including representing plaintiffs in mesothelioma cases and

the National Resource Defense Council in environmental litigation. According to Arthur Miller, Ms. Buschner and Mr. Guttman's "broad experiences litigating *qui tam* cases made them eminently suitable counsel for this case." Miller Decl. at ¶ 34.

G&E represented Relators at hourly rates ranging from $850.00 to $140.00. *See* Exhibit C to Buschner Decl. These rates are consistent with the hourly rates of other firms in Washington, D.C. that represent clients in nationwide complex litigation. *Id.* at ¶ 21; *see also* National Law Journal's Billing Survey, Vol. 36, No. 2 (January 13, 2014) attached as Ex. D to Buschner Decl.

Relators' national counsel also include lawyers and professional staff from the law firm of Cohen Milstein Sellers & Toll PLLC ("CMST"), based in Washington, D.C. The primary CMST attorneys representing Relators, Kit Pierson and David Young, have substantial False Claims Act litigation experience.[12] Most significantly, they previously tried a case involving the use of statistical sampling to establish False Claims Act liability. This experience bears on Relator's original statistical analysis and the national audit conducted by the Government. In that action, *United States ex rel. Loughren v. UnumProvident* (D. Mass.), Mr. Pierson was lead trial counsel (and Mr. Young part of the trial team); they alleged that the nation's largest disability carrier violated the False Claims Act by causing the submission of numerous false claims for social security disability benefits to the United States. After a lengthy trial, the jury returned a verdict finding that UnumProvident had violated the False Claims Act. The legal theory was later upheld on appeal but the case was remanded due to the trial court's exclusion of certain evidence. Mr. Pierson and Mr. Young have also represented other *qui tam* Relators, as well as clients in significant antitrust class action cases and other complex civil litigation.

---

[12]     *See* CMST Biographical Information, Exhibit A to Pierson Decl.; Miller Decl. at ¶ 35.

22

CMST represented Relators at hourly rates ranging from $820.00 to $240.00. *See* Pierson Decl., Exhibit B.

In support of G&E and CMST's expertise in representing Relators in False Claims Act litigation, Relators are contemporaneously filing the declaration of Sam S. Sheldon, who served in the United Stated Department of Justice as the Deputy Chief of the Criminal Fraud Division and as head of the Health Care Fraud Unit from 2011 through 2013. *See* contemporaneously filed Declaration of Sam S. Sheldon (hereinafter "Sheldon Decl.") at ¶ 2. In this capacity, Mr. Sheldon was responsible for overseeing the prosecution of health care fraud for the entire United States. *Id.* In his declaration, Mr. Sheldon states:

> I consider the lawyers from Grant & Eisenhofer, P.A. and Cohen Milstein Sellers & Toll, PLLC who represent the Relators in this matter to be highly skilled specialists, who specialize in the practice of complex civil litigation, and especially in the practice of representing *qui tam* relators in litigation brought under the False Claims Act. I am particularly familiar with Reuben Guttman and Traci Buschner, of Grant & Eisenhofer, P.A., and their work. I consider them to be among the most accomplished lawyers in the relators' bar. I am aware that they have handled some of the most significant *qui tam* actions in the nation.

*Id.* at ¶ 5.

Relators' national counsel also included lawyers and professional staff from the law firm of James & Hoffman (J&H), based in Washington, D.C. For over a decade, J&H and David P. Dean have served as counsel to the Health Care Division of the SEIU. *See* Dean Decl. at ¶ 2. J&H and Mr. Dean have also conducted complex litigation in the health care field, including, for example, initiating and serving as co-lead counsel in five antitrust class actions against hospitals in five cities for collusion to suppress nurse wages, resulting so far in approximately $60 million in settlements for registered nurses in Detroit and Albany. *Id.* J&H worked closely with the SEIU research department to develop the statistical analysis of CHS hospital admissions that revealed the Medicare fraud at the heart of this *qui tam* case, and on the outreach effort that

identified the individual relators and witnesses with first-hand evidence of the CHS practices resulting in the fraudulent admission practices. In general, J&H specializes in labor and employment law and its members serve as General Counsel to both the SEIU and the American Airlines pilots' union. It also regularly and successfully prosecutes large class actions on behalf of employees under federal wage and hour laws, and has conducted a wide range of litigations on behalf of unions in courts across the country.

J&H represented Relators at hourly rates ranging from $771.00 to $175.00. *See* Exhibit A to Dean Decl.

In addition, Relators' counsel and the Government consulted with Relators' medical expert, Dr. Caroline Poplin, a graduate of Yale Law School and a medical doctor with a degree from the University of Rochester Medical School, who formerly was legal counsel for the U.S. Food and Drug Administration. *See* Resume of Dr. Caroline Poplin, Exhibit B to Buschner Decl. Her time spent on the case was at an hourly rate of $850.

The rates listed above for Relators' national counsel are within the range of hourly rates of attorneys who specialize in representing relators in nationwide False Claims Act litigation as well as representing plaintiffs in nationwide complex litigation, and these reasonable rates properly reflect the skills and experience of the attorneys and professional staff at G&E, CMST, and J&H. *See* Ex. D to Buschner Decl. In support of the reasonableness of these hourly rates, Relators are contemporaneously filing the declarations of three prominent attorneys with national experience and expertise — a form of proof explicitly favored by the Sixth Circuit.

Arthur R. Miller, Sam S. Sheldon, and W. Michael Hamilton are each experienced, respected attorneys, who have experience and expertise concerning nationwide litigation like the instant case. Arthur R. Miller is one of the nation's preeminent scholars in the areas of complex

24

litigation, class actions, copyright, and civil procedure, who taught for more than thirty years at Harvard Law School and who currently teaches at the New York University School of Law. *See* Miller Decl. at ¶ 1. Sam S. Sheldon served in the United Stated Department of Justice as Deputy Chief of the Criminal Fraud Division and as head of the Health Care Fraud Unit from 2011 through 2013, and he now represents relators and defendants in False Claims Act litigation as a partner in the Washington, D.C. office of Quinn Emanuel Urquhart & Sullivan, LLP. *See* Sheldon Decl. at ¶¶ 1-2. W. Michael Hamilton is a partner in the Nashville, Tennessee office of Provost Umphrey Law Firm, LLC, where he has represented relators in False Claims Act litigation, as well as clients in other complex litigation, for more than fifteen years. *See* Hamilton Decl. at ¶ 4.

In their sworn declarations, Mr. Miller, Mr. Sheldon, and Mr. Hamilton each attest to the fact that the above-listed hourly rates are within the current prevailing range for national specialists representing relators in pursuit of nationwide claims under the False Claims Act. *See* Miller Decl. at ¶31; Sheldon Decl. at ¶ 8; Hamilton Decl. at ¶ 13. Thus, these attorneys' declarations support the reasonableness of the rates charged by Relators' national counsel in representing Relators.

In addition to these three declarations, Relators are contemporaneously filing the declarations of Mark A. Griffin, Leon Dayan, and Charles R. Both, each of whom are experienced and respected attorneys from around the country. *See* contemporaneously filed declarations of Mark A. Griffin (hereinafter "Griffin Decl."), Leon Dayan (hereinafter "Dayan Decl."), Charles R. Both (hereinafter "Both Decl."). In their declarations, each of these attorneys testifies that the hourly rates charged by J&H in this litigation are reasonable. Griffin Decl. at ¶ 6; Dayan Decl. at ¶ 6; Both Decl. at ¶ 9.

Finally, any attempt by CHS to argue that the hourly rates of Relators' national counsel are unreasonable is belied by the fact that CHS's counsel sought similar or higher rates in the Southern District of Florida in 2013. In that case, one of the named partners of the law firm representing CHS in this nationwide litigation, Lawrence S. Robbins, submitted an affidavit showing that partners with significant experience were billed at $700.00 to $850.00 per hour; associates with only 2 to 4 years of experience were billed at $410.00 to $485.00 per hour, and paralegals were billed at $250.00 per hour. *See* Exhibit B, a true and correct copy of a March 2013 Interim Fee Application with Affidavit of Lawrence S. Robbins.

Similarly, in 2012, CHS sought reimbursement of its own counsel's national rates as part of a sanctions petition in a *qui tam* case pending in New Mexico. *See* Exhibit C, CHS Fee Petition Dated November 19, 2012. There, CHS sought rates as high as $968.00 per hour for attorneys from Skadden Arps. *Id.* at 20. In so doing, CHS contended that, "in complex cases, the proper market for assessing the reasonableness of an hourly rate is often the national or specialized legal market." *Id.* at 15. Here, as in both cases where CHS, or its current lawyers, requested national rates for litigation carried out in Florida and New Mexico, the complexity and national scope of Relators' claims justified engaging national specialists, and those specialists, like CHS's lawyers, should properly be reimbursed at national hourly rates that are equivalent to, or lower than, the rates previously sought by CHS or its lawyers in other litigation.

For all of these reasons, the Court should determine that the hourly rates sought by Relators' national counsel are reasonable.

**b. Relators' counsel performed a reasonable and necessary amount of work representing Relators in this matter.**

Once the Court establishes reasonable hourly rates for the prevailing party's counsel, the second half of the lodestar calculation requires determining the number of hours reasonably

26

expended. *Isabel*, 404 F.3d at 415. To establish that the hours expended were reasonable, the prevailing party must submit documentation "of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984), *see also Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991) ("Plaintiff has the burden of providing for the court's perusal a particularized billing record."). However, the Sixth Circuit has emphasized that these records need not record in great detail each minute the attorney spent on an item. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008). Once the prevailing party provides such records, the burden shifts to the opposing party to show that particular entries should not be compensated. *Perotti*, 935 F.2d at 764.

Here, Relators' counsel have submitted detailed records for all 7,033.60 hours worked, demonstrating that these hours were reasonably expended. Specifically, BJMG's billing records are attached to Mr. Garrison's contemporaneously filed declaration; G&E's billing records are attached to Ms. Buschner's contemporaneously filed declaration; CMST's billing records are attached to Mr. Pierson's contemporaneously filed declaration; and J&H's billing records are attached to Mr. Dean's contemporaneously filed declaration.

In addition to Relators' detailed billing reports, Relators are contemporaneously submitting the declarations of Traci L. Buschner, David W. Garrison, and Arthur R. Miller, which provide a summary of the significant tasks performed by Relators' counsel during this litigation. Buschner Decl. at ¶¶ 9-14; Miller Decl. at ¶¶ 22-28; Garrison Decl. at ¶ 5. Combined, these declarations and Relators' counsel's billing records amply demonstrate that the amount of

work performed by Relators' counsel during the course of this litigation was both reasonable and necessary. *See* Miller Decl. at ¶ 21 ("Relators' application for this fee is eminently reasonable and should be approved by this Court."). Moreover, pursuant to the Sixth Circuit precedent described above, Relators' production of such records places the burden on Defendants to show that particular hours billed by Relators' counsel should not be compensated. *See Perotti*, 935 F.2d at 764.

Furthermore, Relators' counsel performed the lion's share of the work they performed in this litigation in coordination with and at the direction of the United States Department of Justice. *See* Buschner Decl. at ¶¶ 7-12, and Garrison Decl. at ¶ 5. This work included conducting a document review of thousands of pages of documents, drafting factual and legal memoranda, preparing government attorneys for depositions, and assisting the government in conducting a national audit. These tasks were integral to the Department's successful investigation of the Defendants, and ultimately led to the settlement of the nationwide claims alleged by Relators for more than $88 million. Frank W. Hunger, the Assistant Attorney General over the Civil Division of the U.S. Department of Justice in the Clinton Administration, explained in his declaration that such "a public-private partnership between the federal government, whistleblowers, and their counsel is a critical component in ensuring that the False Claims Act is enforced." *See* Hunger Decl. at ¶ 7. Indeed, Mr. Hunger testified that this type of work is "exactly the type of collaborative work that is integral to the Department of Justice's successful pursuit of healthcare fraud." *Id.* at ¶¶ 8, 9. While Mr. Hunger is currently engaged in private practice, he supervised the False Claims Act section of the Department of Justice from 1993 to 1999. *Id.* at ¶ 2.

### c. Relators are not seeking an award of fees, costs, or expenses for time spent in mediation and in settlement negotiations.

Relators have exercised sound billing judgment by significantly limiting the type of work for which they are now seeking an award of fees, costs, and expenses. Specifically, Relators' Counsel spent hundreds of hours working with the Government and with other relators informally and in formal mediation to resolve issues concerning the allocation of the government's share among all of the realtors, as well as participating in settlement negotiations.

Moreover, Relators' counsel have carefully reviewed and revised their time records at the time of their entry and in preparing for this Motion, in the exercise of sound business judgment, to ensure that they only charge for reasonable and necessary work and expenses.

### d. There are no facts in this case justifying a reduction of lodestar

The strong presumption in this circuit is that parties entitled to a fee recovery recover their full lodestar amount. In *Isabel v. City of Memphis*, for example, the court noted that "a reduction in attorney fees is to be applied only in rare and exceptional cases where specific evidence in the record requires it." 404 F.3d at 416; *see also*, *Adcock-Ladd*, 227 F.3d at 350 ("Generally, a 'strong presumption' favors the prevailing lawyer's entitlement to his lodestar fee.").

Rare and exceptional cases typically arise when the prevailing party wins only nominal relief relative to what was sought. The Sixth Circuit has emphasized, however, that "a court should not reduce attorney fees based on a simple ratio of successful claims to claims raised." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996). This holding is consistent with the Supreme Court's statement that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain

29

grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

Here, Relators received the relief they sought by obtaining approximately $88 million for the United States Government. Accordingly, Relators are entitled to recover their full lodestar amount. *Id.* ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.").

### III. Relators are entitled to an award for costs/expenses totaling $61,840.54.

In addition to reasonable attorneys' fees, the Relators are also entitled to recover reasonable costs and expenses from the Defendants of $61,840.54 (representing expenses incurred by all four law firms) pursuant to 31 U.S.C. § 3730(d)(1). Recoverable expenses under the False Claims Act includes "those reasonable out-of-pocket expenses incurred by attorneys and normally charged to their [fee-paying] clients," including "expenses for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, facsimiles, and courier services[.]" *United States ex rel. LeFan v. Gen. Elec. Co.*, No. 4:00-cv-222, 2008 WL 152091, at *6 (W.D. Ky. Jan. 15, 2008) (citations omitted).[13]

Buschner Decl. Exhibit C, Pierson Decl. Exhibit B, Garrison Decl. Exhibit A, and Dean Decl. Exhibit A itemize the quite reasonable costs and expenses incurred by Relators' counsel during the course of this litigation. Relators' expenses and costs are of the type attorneys would normally charge their fee-paying clients, and can be categorized as court fees, photocopying, telephone charges, legal research, postage/courier, travel (including food, transportation, and lodging), and investigators. They were incidental and necessary to furnishing effective and

---

[13] *See also* Fed. R. Civ. Proc. 54(d)(1) (providing that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party"); 28 U.S.C. § 1920 (detailing the type of costs that may be taxed).

competent representation, including counsel's meetings with Relators, counsel's and Relators'
meetings with the Government, legal research, and factual investigation. Relators are
accordingly entitled to receive them from CHS under 31 U.S.C. § 3730(d)(1), as well as 28
U.S.C. § 1920.

CONCLUSION

For the reasons stated above, Relators are entitled to an award of reasonable attorney's
fees totaling $3,137,779.50 and litigation expenses totaling $61,840.54. Thus, Relators
respectfully request that the Court grant Relators' Motion for an Award of Attorney's Fees,
Costs, and Expenses.

Date: September 29, 2014

Respectfully submitted,

/s/ David W. Garrison
David W. Garrison
Scott P. Tift
**BARRETT JOHNSTON MARTIN
    & GARRISON, LLC**
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2202
Fax: (615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

Reuben A. Guttman
Traci L. Buschner
**GRANT & EISENHOFER P.A.**
1747 Pennsylvania Ave., NW, Suite 875
Washington, DC 20006
Tel: (202) 386-9500
Fax: (202) 386-9505
rguttman@gelaw.com
tbuschner@gelaw.com

Kit A. Pierson

31

David A. Young
**COHEN MILSTEIN SELLERS**
**& TOLL PLLC**
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 4084699
kpierson@cohenmilstein.com
dyoung@cohenmilstein.com

*Attorneys for Relators*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2014, a copy of the foregoing *Memorandum in Support of Relators' Motion for Award of Attorneys' Fees, Costs, and Expenses* was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to the counsel of record listed below.

John R. Jacobson
William M. Outhier
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203

John-David H. Thomas
Assistant United States Attorney
Office of the United States Attorney
Middle District of Tennessee
110 Ninth Avenue, S
Suite A961
Nashville, TN 37203

/s/ David W. Garrison
**DAVID W. GARRISON**
**BARRETT JOHNSTON**