# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JAMES DOGHRAMJI, SHERRE COOK, and RACHEL BRYANT, | ) ) ) ) ) ) ) |
| Plaintiffs, | )     **No. 3:11-cv-0442 (Sharp, J.)** ) |
| v. | ) ) |
| COMMUNITY HEALTH SYSTEMS, INC., *et al.*, | ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO RELATORS' MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES

John Jacobson, BPR #14365
William Outhier, BPR #15609
RILEY WARNOCK & JACOBSON, PLC
1906 West End Ave.
Nashville, TN 37203
Tel: (615) 320-3700
wouthier@rwjplc.com

*Of counsel*
Richard A. Sauber
Michael L. Waldman
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
Tel: (202) 775-4500
rsauber@robbinsrussell.com
mwaldman@robbinsrussell.com

*Counsel for Defendants*
*(see Exhibit A for list)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

PROCEDURAL BACKGROUND.................................................................................. 2

    A.   Relators' Complaint And The Previous Six *Qui Tam* Actions Filed
        Against Defendants.................................................................................. 2

    B.   The Public Disclosures Preceding The Filing Of Relators' Complaint................ 3

    C.   The Settlement Agreement ....................................................................... 4

    D.   The Relator's Share Awards ..................................................................... 5

    E.   Attorneys' Fee Demands And Motions To Transfer ........................................ 5

    F.   The Instant Petition For Fees And Costs ..................................................... 6

ARGUMENT ............................................................................................................ 7

  I.   FOR THREE INDEPENDENT REASONS, RELATORS ARE LEGALLY
      BARRED FROM RECOVERING ATTORNEYS' FEES AND EXPENSES ............ 7

    A.   Relators Are Barred From Recovering Fees Under Section 3730(b)(5)
        Because They Were Not The First To File .................................................... 7

        1.   A Relator Cannot Recover Attorneys' Fees When The First To File
            Bar Applies................................................................................... 7

        2.   Relators Were Not The First To File......................................................... 10

        3.   There Are No Exceptions To The First To File Bar ................................... 12

    B.   Relators Are Barred From Recovering Fees Under 31 U.S.C. § 3730(d)
        Because They Were Not Awarded A Relator's Share....................................... 14

    C.   Relators Are Barred From Recovering Fees Under 31 U.S.C. § 3730(e)(4)
        Because Their Lawsuit Was Based Upon Publicly Disclosed Allegations ......... 16

        1.   A Relator Cannot Recover Attorney's Fees When The Public
            Disclosure Bar Applies.................................................................... 16

        2.   There Were Multiple Public Allegations Of Fraud Relating To
            CHS's Inpatient Admissions Practices Prior To This Lawsuit ................... 18

            a.   *Tenet* Lawsuit .................................................................... 18

i

# TABLE OF CONTENTS

      b.    Widespread Press Coverage About The *Tenet* Lawsuit ...................... 19

      c.    The Reuille *Qui Tam* Action ............................................................ 21

      d.    CHS's SEC Filings ............................................................ 21

      e.    Individually As Well As Collectively, These Other Sources Brought About A "Public Disclosure" Of The Fraud Alleged By Relators .......................................................................................... 22

   3.   Relators' Allegations Are "Based Upon" The Public Allegations Of Fraud Against CHS .................................................................... 23

   4.   Relators Are Not "Original Sources" Of The Information On Which Their Allegations Are Based .................................................... 26

II.   IF THE COURT AWARDS ATTORNEYS' FEES, RELATORS' REQUESTED FEES ARE EXCESSIVE AND UNREASONABLE AND SHOULD BE SUBSTANTIALLY REDUCED ........................................ 30

   A.   An Across-The-Board Reduction To The Hours Claimed Is Needed To Account For Overstaffing And Duplicative, Inefficient Billing ......................... 30

   B.   Further Reductions Are Also Warranted ............................................. 32

CONCLUSION .................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Auto Alliance Intern., Inc. v. U.S. Customs Service*,
   155 Fed. Appx. 226 (6th Cir. 2005) ............................................................................ 31

*Carroll v. Sanderson Farms, Inc.*,
   2014 WL 549380 (S.D. Tex. Feb. 11, 2014) ............................................................... 33

*Dingle v. Bioport Corp.*,
   388 F.3d 209 (6th Cir. 2004) ...................................................................................... 25

*Federal Recovery Servs., Inc. v. United States*,
   72 F.3d 447 (5th Cir. 1995) .......................................................................................... 9

*Gratz v. Bollinger*,
   353 F. Supp. 2d 929 (E.D. Mich. 2005) ..................................................................... 31

*Grynberg v. Koch Gateway Pipeline Co.*,
   390 F.3d 1276 (10th Cir. 2004) .............................................................................. 8, 29

*Harkless v. Husted*,
   2011 WL 2149179 (N.D. Ohio Mar. 31, 2011) .......................................................... 31

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) .................................................................................................... 30

*Hisel v. City of Clarksville*,
   2007 WL 2822031 (M.D. Tenn. Sept. 26, 2007) ........................................................ 31

*In re Natural Gas Royalties*,
   562 F.3d 1032 (10th Cir. 2009) ............................................................. 25, 27, 28, 29

*Miller v. Holzmann*,
   575 F. Supp. 2d 2 (D.D.C. 2008) ............................................................................ 9, 14

*Muldrow v. Re-Direct, Inc.*,
   397 F. Supp. 2d 1 (D.C. Cir. 2005) ............................................................................ 33

*Tenet Healthcare Corp. v. Community Health Sys., Inc.*,
   No. 3:11-cv-00732-M (N.D. Tex.) ............................................................................... 3

*U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*,
   933 F. Supp. 2d 825 (E.D. Va. 2013) .......................................................................... 8

*U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*,
   560 F.3d 371 (5th Cir. 2009) .................................................................................. 8, 10

iii

*U.S. ex rel. Bryant v. Cmty. Health Sys., Inc., et al.,*
4:10-cv-02695 (S.D. Tex. July 29, 2010) ................................................................. 3

*U.S. ex rel. Carnithan v. Cmty. Health Sys., Inc., et al.,*
No. 3:11-cv-00312 (S.D. Ill. Apr. 14, 2011) .......................................................... 3

*U.S. ex rel. Carter v. Halliburton Co.,*
710 F.3d 171 (4th Cir. 2013) ................................................................................. 8

*U.S. ex rel. Cook-Reska v. Cmty. Health Sys., Inc., et al.,*
No. 4:09-cv-01565 (S.D. Tex. May 22, 2009) ....................................................... 3

*U.S. ex rel. Findley v. FPC-Boron Employees' Club,*
105 F.3d 675 (D.C. Cir. 1997) ......................................................................... 25, 28

*U.S. ex rel. Gadbois v. Pharmerica Corp.,*
C.A. No. 10-471-ML, DE 53 (D.R.I. Oct. 3, 2014) ............................................... 13

*U.S. ex rel. Johnson v. Planned Parenthood of Houston,*
2014 WL 2498504 (5th Cir. June 4, 2014) ....................................... 8, 10, 11, 13

*U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.,*
469 Fed. Appx. 244 (4th Cir. 2012) .................................................................. 22

*U.S. ex rel. Jones v. Horizon Healthcare Corp.,*
160 F.3d 326 (6th Cir. 1998) ....................................................... 23, 26, 27

*U.S. ex rel. Krahel v. Regents of Univ. of California,*
2001 WL 1548786 (N.D. Cal. Sept. 13, 2001) ................................................... 26

*U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.,*
149 F.3d 227 (3d Cir. 1998) ............................................................................... 10

*U.S. ex rel. Lefan v. General Elec. Co.,*
397 Fed. Appx. 144 (6th Cir. 2010) .................................................................. 32

*U.S. ex rel. Lujan v. Hughes Aircraft Co.,*
243 F.3d 1181 (9th Cir. 2001) ............................................................................. 8

*U.S. ex rel. Mason v. Cmty. Health Sys., Inc.,*
No. 3:12-cv-00817 (W.D.N.C. Apr. 18, 2011) ................................................... 3

*U.S. ex rel. May v. Purdue Pharma L.P.,*
737 F.3d 908 (4th Cir. 2013) ............................................................................. 17

iv

TABLE OF AUTHORITIES—Cont'd

Page(s)

*U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*,
123 F.3d 935 (6th Cir. 1997) ................................................................ 23

*U.S. ex rel. Merena v. SmithKline Beecham Corp.*,
205 F.3d 97 (3d Cir. 2000) ................................................................... 13

*U.S. ex rel. Ondis v. City of Woonsocket*,
587 F.3d 49 (1st Cir. 2009) .................................................................. 27

*U.S. ex rel. Osheroff v. Health Springs, Inc.*,
938 F. Supp. 2d 724 (M.D. Tenn. 2013) ...................................... 22, 25, 29

*U.S. ex rel. Plantz v. Health Mgmt. Assocs., Inc., et al.*,
No. 1:10-cv-00959 (N.D. Ill. Feb. 11, 2010) .................................... passim

*U.S. ex rel. Poteet v. Medtronic, Inc.*,
552 F.3d 503 (6th Cir. 2009) ......................................................... passim

*U.S. ex rel.  Reuille v. Cmty. Health Sys. Prof'l Servs., Corp., et al.*,
No. 1:09-cv-00007 (N.D. Ind. Jan. 7, 2009) ................................... passim

*U.S. ex rel. Ryan v. Endo Pharm., Inc.*,
2014 WL 2813103 (E.D. Pa. June 23, 2014) ............................. 8, 13, 23

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
906 F. Supp. 2d 1264 (N.D. Ga. 2012) ........................................... 17, 23

*U.S. ex rel. Simring v. Univ. Physician Assocs.*,
2012 WL 10033888 (D.N.J. Oct. 2, 2012) ........................................... 33

*U.S. ex rel. Smith v. Yale New Haven Hosp.*,
2006 WL 387297 (D. Conn. Feb. 14, 2006) ........................................ 14

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*,
944 F.2d 1149 (3d Cir. 1991) ............................................................. 28

*U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
41 F.3d 1032 (6th Cir. 1994) .......................................................... 13, 17

*U.S. ex rel. Ward v. Peck*,
7:07-CV-134-D, 2013 WL 4511634 (E.D.N.C. Aug. 23, 2013) .............. 26

*U.S. v. Chattanooga-Hamilton Cnty. Hosp. Auth.*,
958 F. Supp. 2d 846 (E.D. Tenn. 2013) ...................................... 17, 25, 28

*U.S. v. NextCare, Inc.*,
   2013 WL 431828 (W.D.N.C. Feb. 4, 2013) ................................................. 8, 14, 16

*United States of America et al v. Halifax Hospital Medical Ctr.*,
   No. 6:09-cv-01002 (M.D. Fla. Apr. 5, 2014)............................................... 32

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers*
   *Int'l Union, AFL-CIO-CLC v. Kelsey-Hayes Co.*,
   2013 WL 2634815 (E.D. Mich. June 12, 2013) ........................................... 33

*Walburn v. Lockheed Martin Corp.*,
   431 F.3d 966 (6th Cir. 2005) .................................................... passim

*Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.*,
   2013 WL 4510801 (M.D. Tenn. Aug. 26, 2013) ......................................... 27, 28

**Statutes & Rules**

31 U.S.C. § 3729 ..................................................................................... 1

31 U.S.C. § 3730(b) ................................................................................ 7

31 U.S.C. § 3730(b)(2) ........................................................................... 3

31 U.S.C. § 3730(b)(3) ........................................................................... 3

31 U.S.C. § 3730(b)(5) ..................................................................... 1, 6, 7, 9

31 U.S.C. § 3730(d) ......................................................................... *passim*

31 U.S.C. § 3730(d)(1) ...................................................................... *passim*

31 U.S.C. § 3730(e)(4) ............................................................................ 9

31 U.S.C. § 3730(e)(4)(A) (2006) ..................................................... 1, 17, 22

31 U.S.C. § 3730(e)(4)(B) (2006)................................................ 17, 18, 26, 27

Fed. R. Civ. P. 12(h)(3).......................................................................... 12

Pub. L. 111–148, § 10104(j)(2) (2010)..................................................... 17

**Other Authorities**

Chris Anderson, HEALTHCARE FINANCE NEWS, "Community Health Systems:
   Tenet lawsuit is 'contrived and biased'" (Apr. 29, 2011)....................................... 20

*Becker's Hospital Review*, "Tenet Sues CHS: New Battle Lines in Healthcare Takeovers
  – Whistleblowing" (Apr. 12, 2011) ............................................................................. 20

Community Health Systems, Inc., Form 8-Ks (Apr. 15, 2011) ................................. 4, 22

Community Health Systems, Inc., Form 8-Ks (April 22, 2011) .......................... 4, 21, 22

Community Health Systems, Inc., Form 8-Ks (April 25, 2011) ............................... 4, 22

Susan Kelly, Reuters, "Tenet sues Community Health for Medicare abuse"
  (Apr. 11, 2011) .......................................................................................................... 20

Erin Lawley, *Nashville Post*, "CHS gives lengthy rebuttal to Tenet lawsuit"
  (Apr. 28, 2011) .......................................................................................................... 20

Michael J. de la Merced, *The New York Times*, "Tenet Accuses Community Health of
  Overbilling Medicare" (Apr. 11, 2011) ..................................................................... 20

Leigh Page, *Becker's Hospital Review*, "Tenet Lawsuit Against CHS Alleges Misuse of
  Observation Status" (Apr. 11, 2011) ........................................................................ 20

Alan Rappeport, *Financial Times*, "Tenet launches lawsuit against CHS"
  (Apr. 12, 2011) .......................................................................................................... 20

Jason Roberson, *The Dallas Morning News*, "Tenet Healthcare suit alleges Medicare
  fraud by bidder Community Health Systems" (Apr. 11, 2011) ................................. 20

Avik Roy, "Healthcare Bombshell: Tenet Lawsuit Alleges Community Healthcare Cheats
  Medicare," *Forbes*, Apr. 12, 2011 ......................................................................... 4, 20

Defendants Community Health Systems Professional Service Corporation ("CHSPSC") and the hospital companies named in the complaint[1] (collectively, "Defendants") respectfully submit this memorandum in opposition to Relators' Motion For Award Of Attorneys' Fees, Costs, and Expenses ("Motion" or "Relators' fee petition") [Docket Entry ("DE") 86].

Relators' fee request should be denied *as a matter of law* because they are not entitled to attorneys' fees under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, for at least three independent, threshold reasons. *First*, Relators were not the first to file the claims which the government settled with Defendants, and so their complaint is jurisdictionally barred (*see* 31 U.S.C. § 3730(b)(5)). In fact, Relators were not even remotely close to being the first to file: theirs was the *seventh qui tam* lawsuit and it was filed months and even years after other relators made the same basic allegations. *Second*, Relators did not receive a relator's share from the government, and so failed to satisfy a statutory prerequisite to the recovery of fees (*see* 31 U.S.C. § 3730(d)). The United States awarded the relator's shares for the Emergency Department ("ED") inpatient admissions claims to relator Scott Plantz, who had filed a detailed *qui tam* complaint more than one year before Relators. *Third*, Relators' claims are based on information that had already been publicly disclosed, and thus were also jurisdictionally barred by the public-disclosure bar (*see* 31 U.S.C. § 3730(e)(4)(A) (2006)). Before Relators filed their complaint, their allegations concerning ED inpatient admissions had already been publicly disclosed in a securities lawsuit filed by Tenet Healthcare, an unsealed *qui tam* lawsuit in Indiana, filings made by Community Health Systems, Inc. ("CHSI") with the Securities and Exchange Commission ("SEC"), and widespread press coverage of the various lawsuits and the government investigation of CHSI.

_____

[1] A full listing of the Defendants joining this memorandum in opposition is set out at Exhibit A.

1

Finally, even if Relators were able to overcome these legal barriers (and they cannot) and this Court were to award attorneys' fees, the fee request is excessive and unreasonable and accordingly should be substantially reduced.

## PROCEDURAL BACKGROUND

### A. Relators' Complaint And The Previous Six *Qui Tam* Actions Filed Against Defendants

For purposes of Relators' fee petition, May 10, 2011 is a highly significant date. It was on that day that Relators filed this *qui tam* action under seal, alleging that Defendants improperly admitted patients who presented themselves to the Emergency Departments at CHSI-affiliated hospitals (together with CHSI, "CHS") in violation of the FCA. More specifically, Relators alleged that Defendants engaged in "a nationwide scheme" to admit patients who did not require inpatient treatment in order to reap greater financial reimbursement from Medicare and other government payors. Cplt. ¶ 1 [DE 1]. According to Relators, CHS increased its admissions at 74 of its hospitals by using admissions criteria set forth in CHS's own "Blue Book" rather than using independently vetted, evidence-based criteria. *Id.* ¶ 4.a. In addition, CHS allegedly increased admissions at these hospitals by "centrally setting and enforcing goals for hospital-level [Emergency Department] admissions" and terminating the contracts of those ED physician groups who did not comply with these alleged goals. *Id.* ¶ 4.b-f. Relators' complaint included a "statistical analysis" purporting to show that the 74 CHS hospitals admitted more patients than other hospitals. *Id.* ¶ 5.

Relators' complaint was chronologically the seventh *qui tam* action filed against CHSI and its affiliates between 2009 and 2011 in which a relator has claimed to have advanced the ED admissions claim. In order of filing, those seven *qui tam* actions were:

- *U.S. ex rel. Reuille v. Cmty. Health Sys. Prof'l Servs., Corp., et al.*, No. 1:09-cv-00007 (N.D. Ind. Jan. 7, 2009) ("*Reuille*") (Exhibit B);

2

- *U.S. ex rel. Cook-Reska v. Cmty. Health Sys., Inc., et al.*, No. 4:09-cv-01565 (S.D. Tex. May 22, 2009) ("*Cook-Reska*") (Exhibit C);

- *U.S. ex rel. Plantz v. Health Mgmt. Assocs., Inc., et al.*, No. 1:10-cv-00959 (N.D. Ill. Feb. 11, 2010) ("*Plantz*") (Exhibit D);

- *U.S. ex rel. Bryant v. Cmty. Health Sys., Inc., et al.*, 4:10-cv-02695 (S.D. Tex. July 29, 2010) ("*Bryant*") (Exhibit E);

- *U.S. ex rel. Carnithan v. Cmty. Health Sys., Inc., et al.*, No. 3:11-cv-00312 (S.D. Ill. Apr. 14, 2011) ("*Carnithan*") (Exhibit F);

- *U.S. ex rel. Mason v. Cmty. Health Sys., Inc.*, No. 3:12-cv-00817 (W.D.N.C. Apr. 18, 2011) ("*Mason*") (Exhibit G); and

- *U.S. ex rel. Serv. Employees Int'l Union, et al. v. Cmty. Health Sys., Inc., et al.*, No. 3:11-cv-00442 (M.D. Tenn. May 10, 2011) [DE 1] ("*Doghramji*").

Pursuant to the FCA's statutory scheme, all of these *qui tam* complaints initially remained under seal while the government conducted an investigation. *See* 31 U.S.C. § 3730(b)(2)–(3).

### B.    The Public Disclosures Preceding The Filing Of Relators' Complaint

Before Relators filed their complaint on May 11, 2011, the same allegations already had been made against CHS publicly through at least four sources.

*First*, on April 11, 2011, Tenet Healthcare Corporation ("Tenet") filed a securities fraud lawsuit alleging that CHS misled investors by concealing a purported scheme "to systematically steer medically unnecessary inpatient admissions at CHS hospitals" in order to "receiv[e] substantially higher and unwarranted payments from Medicare and other sources." *See* Complaint, *Tenet Healthcare Corp. v. Community Health Sys., Inc.*, No. 3:11-cv-00732-M, DE 1 (N.D. Tex.) (Exhibit H) ("Tenet Cplt.") ¶ 3. Tenet's complaint was not filed under seal. As in Relators' complaint, Tenet alleged that CHS improperly relied on the "Blue Book," set inpatient admissions quotas for its emergency room visitors, and placed administrative pressure on

3

physicians to admit patients. Like Relators, Tenet also included a quantitative analysis purporting to show that CHS hospitals admitted more inpatients than its peers.

*Second*, the news media widely publicized Tenet's allegations in articles published prior to the filing of Relators' complaint. These articles appeared in national media outlets such as the *New York Times*, *Forbes*, the *Financial Times*, and Reuters, among others. *See, e.g.*, Avik Roy, "Healthcare Bombshell: Tenet Lawsuit Alleges Community Healthcare Cheats Medicare," *Forbes*, Apr. 12, 2011; *see also* page 20 & n.10, *infra* (citing and discussing numerous articles). *Third*, even before Tenet filed its complaint, relator Nancy Reuille had filed her *qui tam* complaint against CHS and one of its hospitals in the U.S. District Court for the Northern District of Indiana. *See* page 2, *supra*. The Reuille complaint was unsealed on December 27, 2010. *See Reuille*, No. 1: 09-cv-00007-RL-RBC, DE 18 (N.D. Ind. Dec. 27, 2010) (Exhibit I) ("*Reuille* Unsealing Order"). Like Relators here, Reuille alleged that CHS had improperly relied on its "Blue Book" criteria and engaged in a scheme to "fraudulently receive inpatient reimbursement on cases that clearly [did] not meet 'inpatient' intensity of service or severity of illness, per established Medicare criteria." *Reuille* Cplt. ¶¶ 10.b, 24. *Fourth*, before Relators filed their complaint, CHS had acknowledged and described the allegations made by both Tenet and Reuille, as well as the existence of a government investigation into those allegations, in its financial statements filed publicly with the SEC. *See* Community Health Systems, Inc., Form 8-Ks (Apr. 15, 2011; April 22, 2011; and April 25, 2011) (Exhibits J, K and L).

### C. The Settlement Agreement

On July 29, 2014, Defendants entered into a settlement with the United States. CHSI and its affiliates denied wrongdoing but agreed to pay the United States approximately $97 million to resolve the national ED admissions claim and a claim at Laredo Medical Center. *See* DE 75,

Settlement Agreement, ¶ 1.  The Agreement reserved the issue of which relator (if any) was entitled to recover attorneys' fees under 31 U.S.C. § 3730(d) and reserved all of the settling parties' arguments relating to fees.  *Id.* ¶¶ 8 & 15(1).  Pursuant to the Settlement Agreement, the United States moved to unseal, intervene in, and dismiss all seven *qui tam* actions.  *See id.* ¶ 15.  On August 14, 2014, pursuant to the Settlement Agreement, this Court dismissed Relators' action.  *See* DE 77.

### D.     The Relator's Share Awards

Following the Settlement Agreement, the United States made its determination regarding which relators were entitled to the relator's share of the government's recovery.  The government approved payment of a relator's share to only two relators:  Scott Plantz and Amy Cook-Reska.  Mr. Plantz received a relator's share of $16,427,740.96 (exclusive of interest) for the national ED claim. *See* Settlement Agreement between the United States and Scott Plantz (Exhibit M).  Ms. Cook-Reska received a relator's share of $2,141,184.04 (exclusive of interest) for unrelated claims involving billing and referral practices at Laredo Medical Center ("Laredo"), and for ED admissions at Laredo. *See* Settlement Agreement between the United States and Amy Cook-Reska (Exhibit N).  Relators in the instant case were not awarded any portion of the relator's share by the United States.

### E.     Attorneys' Fee Demands And Motions To Transfer

Following the settlement, Relators informed Defendants that they intended to file a petition seeking attorneys' fees and costs.  Similarly, relators in the other six *qui tam* actions informed Defendants that they were planning to file attorneys' fee petitions in the near future.  Some have already done so.  See, *e.g.*, *U.S. et al. ex rel. Cook-Reska v. Cmty. Health Sys., Inc.*, *et al.*, No. 4:09-cv-01565 (S.D. Tex.), DE 73.  In total, CHSI and its affiliates received informal

5

demands from ten different law firms—some of whom claim to represent multiple relators—seeking more than $10 million in fees.

In seeking attorneys' fees, each of these relators has maintained that his or her *qui tam* action was the first filed. Rather than have multiple courts around the country address the exact same issue and possibly reach different results, Defendants filed motions to transfer to the Middle District of Tennessee in the following *qui tam* actions: *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), DE 76; *Bryant*, 4:10-cv-02695 (S.D. Tex.), DE 42; *Carnithan*, No. 11-CV-312WDS/DGW (S.D. Ill.), DE 51. These motions to transfer have been fully briefed.[2]

## F. The Instant Petition For Fees And Costs

Relators filed their fee petition on September 29, 2014, after rejecting Defendants' suggestion that they agree to jointly seek a stay of the fee proceedings in this case pending action on Defendants' various transfer and consolidation motions. DE 86. Despite being on notice of Defendants' position that their fee request is precluded by the first-to-file doctrine, 31 U.S.C. § 3730(b)(5), Relators have submitted a lengthy fee petition, including numerous exhibits and declarations, which is focused almost entirely on the issue of the number of hours and the rates claimed, contains only a summary discussion of their entitlement to attorneys' fees, and makes no mention at all of the first-to-file rule. DE 87.

Defendants have moved for a stay of further activity in this case pending the transfer and consolidation of the other *qui tam* cases with this case. DE 109. Such consolidation would promote judicial efficiency and avoid the possibility of inconsistent judgments. Relators have

---

[2] Defendants also have entered into an agreement with relators Plantz and Mason resolving their attorneys' fees requests. No attorneys' fees petition has been filed by relator Nancy Reuille; if she files a fee petition, Defendants intend to file a motion to transfer and consolidate before this Court as well.

6

opposed Defendants' motion to stay pending transfer and consolidation. DE 112. The stay motion is currently pending.

**ARGUMENT**

**I.     FOR THREE INDEPENDENT REASONS, RELATORS ARE LEGALLY BARRED FROM RECOVERING ATTORNEYS' FEES AND EXPENSES**

    **A.     Relators Are Barred From Recovering Fees Under Section 3730(b)(5) Because They Were Not The First To File**

        **1.     A Relator Cannot Recover Attorneys' Fees When The First To File Bar Applies**

Relators have moved for an award of fees, costs, and expenses under 31 U.S.C. § 3730(d), the provision of the FCA that authorizes such awards under specified circumstances. Section 3730(d) provides in relevant part:

> If the Government proceeds with an action brought *by a person under subsection (b), such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim . . . .* Any payment to a person under . . . this paragraph shall be made from the proceeds. *Any such person shall also receive* an amount for reasonable expenses which the court finds to have been necessarily incurred, plus *reasonable* attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

31 U.S.C. § 3730(d)(1) (emphasis added). Although completely ignored by Relators, section 3730(b)'s reference to "a person under subsection (b)" is significant because subsection (b)(5) includes the first-to-file bar, which limits recovery to a single relator (the first relator to bring suit), bars successive *qui tam* suits arising from the same essential facts or material elements, and forbids subsequent relators from sharing in the government's recovery or being awarded their attorneys' fees.

Section 3730(b)(5) provides: "When a person brings an action under this subsection, *no person* other than the Government *may* intervene or *bring a related action based on the facts underlying the pending action*." 31 U.S.C. § 3730(b)(5). This first-to-file rule is jurisdictional; it

7

strips courts of the power to adjudicate a *qui tam* action that is preempted by an earlier-filed suit. *U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*, 933 F. Supp. 2d 825, 835 (E.D. Va. 2013) ("The FCA's first-to-file bar deprives courts of subject matter jurisdiction over later-filed FCA actions while an earlier-filed action based on the same material elements of fraud remains pending."); *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 515-16 (6th Cir. 2009); *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009).[3]

A court has jurisdiction over a later-filed *qui tam* suit only to the extent that it (i) is based on facts different from those alleged in a prior suit; and (ii) gives rise to separate and distinct recovery by the government. A *qui tam* action that fails either prong is subject to dismissal. *See Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005); *Branch Consultants*, 560 F.3d at 378; *Lujan*, 243 F.3d at 1187. This first-to-file bar "furthers the policies animating the FCA by ensuring that the government has notice of the essential facts of an allegedly fraudulent scheme while, at the same time, preventing 'opportunistic plaintiffs from bringing parasitic lawsuits.'" *Poteet*, 552 F.3d at 516.

Critically, a relator whose claims are barred on first-to-file grounds may *not* recover attorneys' fees for those claims under 31 U.S.C. § 3730(d). *See U.S. ex rel. Ryan v. Endo Pharm., Inc*., 2014 WL 2813103, at *11 (E.D. Pa. June 23, 2014) ("The logical conclusion from the FCA's inclusion of the first-to-file rule is that Congress intended only one relator to prevail for each claim."); *U.S. v. NextCare, Inc*., 2013 WL 431828, at *2–3 (W.D.N.C. Feb. 4, 2013); *see also U.S. ex rel. Johnson v. Planned Parenthood of Houston*, 2014 WL 2498504, at *2–3 (5th Cir. June 4, 2014); *Lujan*, 243 F.3d at 188–89; *Beauchamp*, 933 F. Supp. 2d at 835. Put

---

[3] *Accord U.S. ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 (10th Cir. 2004); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1183 (9th Cir. 2001).

differently, a "person under subsection (b)" cannot include any relator who is jurisdictionally barred under section 3730(b)(5) by virtue of the first-to-file doctrine.[4]

This conclusion finds support not only in the statutory text and numerous authorities cited above but also in common sense. There is no reason – none – why Congress would have intended to strip federal courts of jurisdiction over a relator's claim that founders on the first-to-file barrier while at the same time empowering those same courts to award attorneys' fees, costs, and expenses to such relators. Even assuming such fee-granting authority could survive in the absence of jurisdiction over the underlying claim (which it cannot), there is no sensible reason why Congress would have intended that result. A relator whose claim is barred by the first-to-file rule *cannot* be a proper relator entitled to an award of attorneys' fees. Relators' contention to the contrary is nothing less than an end-run around the jurisdictional first-to-file and public-disclosure bars that Congress included in the statute and should not be countenanced by this Court.

These principles operate in this case to preclude Relators, as a matter of law, from receiving any award of attorneys' fees with respect to work done by their counsel on "the allegations of nationwide unnecessary ER admissions that were at the heart of Relators' complaint" (Mot. 2), unless they can first demonstrate that they were the first to file this national ER admissions claim. This they cannot do.

---

[4] Not surprisingly, courts have also held that a relator may not recover attorneys' fees under section 3730(d)(1) without meeting the requirements delineated in other subsections of section 3730, including another jurisdictional bar – the so-called "public disclosure rule" of section 3730(e)(4), which is discussed in greater detail below. *See, e.g.*, *Federal Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995) (relators' attorneys "are not statutorily entitled to attorneys' fees and expenses" because relators' lawsuit is blocked by the public disclosure bar); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 7 (D.D.C. 2008) ("Logically, having erected a jurisdictional bar to these relators' claims, Congress could not have intended them to receive attorneys' fees."), *amended and vacated in part on other grounds sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 786 F. Supp. 2d 110 (D.D.C. 2011).

9

## 2. Relators Were Not The First To File

Here, Relators fail both prongs of the first-to-file bar. *See Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005); *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009). *First*, Relators' complaint is *not* based on facts that are materially different from those alleged in prior lawsuits. Significantly, "[t]he first-to-file bar is a relatively broad bar to later-filed actions," and its focus is "whether an investigation into the first claim would uncover the same fraudulent activity alleged in the second claim." *Planned Parenthood*, 2014 WL 2498504, at *2; *see U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998) (claims need not be identical to trigger first-to-file bar, because "[o]nce the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds").

Applying those principles, it is clear that Relators were *not* the first to file with respect to the national ED claim. The "allegations of nationwide unnecessary ER admissions" that Relators admit "were at the heart of" their complaint (Mot. 2) (*see* Cplt. ¶ 1), merely echoed the allegations and claims made in the complaint in *Plantz* (as well as allegations made in other, earlier-filed complaints). Thus, in *Plantz*, the relator, a physician specializing in emergency medicine, alleged "intentional over billing of the Medicare and Medicaid health insurance programs" by Community Health Services, Inc. and its subsidiaries, *see* Exhibit D ("*Plantz* Cplt.") ¶ 1, named nearly 120 CHSI-affiliated entities as defendants, *id.* ¶¶ 74–190, and specifically charged a scheme to overbill the government through improper ED admissions across facilities, *see, e.g.*, *id.* ¶¶ 246-56, 262-66. Similarly, in this case Relators alleged that Defendants engaged in "a nationwide scheme" to admit patients through its emergency rooms who did not require inpatient treatment in order to reap greater financial reimbursement from Medicare, Medicaid, and other government payors. Cplt. ¶ 1. Relators here also named 74

CHSI-affiliated hospitals, almost all of which were also named as defendants in *Plantz*. Given the close similarity in these core allegations, there can be little doubt that "an investigation into" Plantz's allegations would have "uncovered the same fraudulent activity alleged" by Relators here. *Planned Parenthood*, 2014 WL 2498504, at *2.

Relators' complaint also echoed many of the particular means that Plantz (or others) had previously alleged were part of this same overall scheme to overbill Medicare and Medicaid by encouraging unnecessary ER admissions. For example, Relators alleged that CHS officials carefully monitored ED admissions rates and pressured and threatened hospital administrators and physicians to increase those rates. *Compare* Cplt. ¶¶ 110-115, 210-11 *with* Exhibit D (*Plantz* Cplt.) ¶¶ 248-252, 256, 262-265. Both complaints also alleged that CHS established benchmarks or quotas for ED admission rates that were about the national averages. *Compare* Cplt. ¶ 110, 218 *with Plantz* Cplt. ¶¶ 250-252, 256, 262. And both complaints included statistical analyses of the allegedly inflated rates of ED admissions at CHS facilities compared with all hospitals in the United States. *Compare* Cplt. ¶¶ 239-240 *with Plantz* Cplt. ¶¶ 250-252, 262, 264.[5] Not surprisingly, then, the Government had no difficulty recognizing that it was relator Plantz (and not Relators here) who was entitled to the relator's share payment.

---

[5] The same can also be said for several of the other *qui tam* actions filed against Defendants before Relators' complaint was filed. Like Plantz, many of these other relators clearly alleged that CHSI-affiliated hospitals around the country had improperly admitted patients who presented themselves to the hospitals' EDs. *See, e.g.*, Exhibit F (*Carnithan* Cplt.) ¶ 53 (Defendants "required its Emergency Department physicians and other employees to attempt to admit all Medicare beneficiaries presenting for emergency medical services to Heartland Regional medical Center as a hospital inpatient regardless of whether such admissions were reasonable or necessary for their diagnosis or treatment"); Exhibit G (*Mason* Cplt.) ¶¶ 1, 415-419 ("This *qui tam* action alleges violation of the [FCA] related to emergency room ("ER") care," including "ED Benchmarks: Illegally Generating Revenues Through Medicare Patients."). *See also* Exhibit X (documenting similarities in allegations in *Reuille* and here). And many of these other relators also alleged the same particular means that Relators claimed were part of Defendants' scheme concerning ER admissions. See, *e.g.*, *Reuille* Cplt. ¶ 24 (use of Blue Book); Exhibit E (*Bryant* Cplt.) ¶ 44 (same).

11

*Second*, Relators' claim did not give rise to any separate and distinct recovery by the Government. As the Government acknowledged in granting Plantz the relator's share, it was on the basis of his complaint that the government received a settlement for the national ED claim.

### 3.     There Are No Exceptions To The First To File Bar

Relators suggest (Mot. 11-12) that the Settlement Agreement might not have preserved Defendants' ability to challenge Relators' attorneys' fee claims based on the first-to-file doctrine or on other arguments advanced in this opposition. That is simply untrue. The Settlement Agreement expressly does not resolve "[a]ny claims Relators may have" for attorneys' fees, costs, or expenses. DE 64, Settlement Agreement, ¶ 15(c)(1). It also explicitly provides: "All Parties agree that nothing in this Paragraph or this Agreement shall be construed *in any way to release, waive or otherwise affect* the ability of CHS to *challenge or object* to Relators' claims for attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)." *Id.* ¶ 8 (emphasis added). A clearer reservation of Defendants' right to object to Relators' fee petition on any and all grounds is difficult to imagine.[6]

Relator's reliance on Defendants' having entered into a settlement also is squarely at odds with settled law. On numerous occasions, courts have rejected the argument that relators are entitled to recover anything pursuant to a settlement agreement that does not specifically resolve whether – and to what extent – the participating relators are entitled to share in the

---

[6] Moreover, Defendants cannot be faulted for not raising the first-to-file argument prior to settlement. The *qui tam* complaints in the seven actions, including Relators' complaint, were not unsealed until the Agreement had been executed. Defendants were not served with the *qui tam* complaints prior to settlement and thus had no opportunity to raise the issue. And even if Defendants had been given an opportunity to respond, it is doubtful that failure to raise the issue could have waived the defect because the first-to-file rule is jurisdictional. *See* pages 7-8 & n.3, *supra* (citing authority). Subject matter jurisdiction cannot be waived – a defendant may challenge jurisdiction at any time as may the court on its own initiative. *See* Fed. R. Civ. P. 12(h)(3).

12

government's recovery. In *U.S. ex rel. Ryan v. Endo Pharm., Inc*., for example, the district court rejected the argument that a settlement agreement entitled the signing relators to any specific recovery and held that the relator share issue would have to be resolved as to each individual relator in post-settlement litigation. 2014 WL 2813103, at *11. The court held that "[t]he logical conclusion from the FCA's inclusion of the first-to-file rule is that Congress intended only one relator to prevail for each claim" and that the relators' "unfounded perception of the Settlement Agreement contradict[ed] the express provisions and purpose of the FCA." *Id.*; *see also Planned Parenthood*, 2014 WL 2498504, at *3 ("[A] settlement is irrelevant to the first-to-file analysis because the first-to-file analysis requires comparison of the two original complaints."); *U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 107 (3d Cir. 2000) (rejecting argument that government waived its right to contest relators' share issue where, like here, the agreement reserved the issue). In fact, the government and Defendants alike frequently argue, post-settlement, that certain relators are not entitled to a relator's share or attorneys' fees for various reasons, including jurisdictional limitations. *See, e.g.*, *Merena*, 205 F.3d at 102; *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1045 (6th Cir. 1994).

Finally, it is no answer to say, as Relators do repeatedly, that they should receive a fee award because they have provided valuable assistance to the United States or acted in response to requests made by the government's attorneys. Putting aside the fact that any right to recover attorneys' fees belongs to a successful relator (not her attorneys), there is no "assisted the government" exception to the first-to-file bar or the requirements of 31 U.S.C. § 3730(d)(1). *See U.S. ex rel. Gadbois v. Pharmerica Corp.*, C.A. No. 10-471-ML, DE 53 at 17 (D.R.I. Oct. 3, 2014) ("The prohibition against later filed related actions is 'exception-free.'") (citations

13

omitted); *U.S. ex rel. Smith v. Yale New Haven Hosp.*, 2006 WL 387297, at *2 (D. Conn. Feb. 14, 2006) (same). The drafters of the FCA could have allowed relators, witnesses, good samaritans, law firms, or others who help the Government to be compensated with a relator's share and/or attorneys' fees regardless of whether they are the first-to-file relator, but the drafters did not. To the extent that Relators have concerns about the unfairness of the FCA's statutory bars, these arguments are properly directed to Congress.[7]

### B. Relators Are Barred From Recovering Fees Under 31 U.S.C. § 3730(d) Because They Were Not Awarded A Relator's Share

Not only does Section 3730(d) make clear that a qui tam relator must be successful in order to be entitled to recover fees, costs, and expenses, it also specifies *what qualifies as success* in this setting. *See* 31 U.S.C. § 3730(d)(1) ("[A] person under subsection (b), . . . shall . . . receive *at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim*. . . . *Any such person* shall also receive an amount for reasonable expenses . . . plus reasonable attorneys' fees and costs.") (emphasis added). As other courts have recognized, "[t]he plain language of the FCA demonstrates that a relator is only entitled to attorneys' fees if that relator also obtained a relator's share following a court award or settlement." *NextCare*, 2013 WL 431828, at *2; *see also Miller v. Holzmann*, 575 F. Supp. 2d 2, 6 (D.C.C. 2008) ("In light of the immediately preceding sentence, 'any such person' must mean

---

[7] It should be noted that Relators are receiving ample compensation here, including by their own account 14% of the total relator's share of $16,427,740.96 (exclusive of interest) for the national ED claim. *See* Buschner Decl. [DE 89] ¶ 15. That amounts to at least $2.3 million. Some significant portion of that recovery will go to Relators' counsel under the contingency arrangement they negotiated with their clients.

Furthermore, Relators undertook the vast majority of their work *after* they were aware that they were not the first to file. Soon after Relators filed their complaint, the Government provided them with copies of the complaints in the six previously filed actions. *Id.* ¶ 8. Yet, Relators claim to have performed thousands of hours of work after that date, knowing full well that this work was not recoverable in light of the first-to-file bar.

14

any person who receives payment under the statute's first or second sentences."), *amended and vacated in part on other grounds sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 786 F. Supp. 2d 110 (D.D.C. 2011).

In this case, it is undisputed that the United States approved payment of a relator's share to only two relators: Scott Plantz and Amy Cook-Reska. Mr. Plantz received a relator's share of $16,427,740.96 (exclusive of interest) for the national ED claim. *See* Exhibit M. Ms. Cook-Reska received a relator's share of $2,141,184.04 (exclusive of interest) for unrelated claims involving billing and referral practices at Laredo Medical Center ("Laredo"), and for ED admissions at Laredo. *See* Exhibit N. Both of these amounts fell within the required range for a relator's share specified in the statute. Relators in this case, however, were not awarded any portion of the relator's share by the United States. Because they were not awarded a relator's share, Relators are not entitled to fees, costs, or expenses under Section 3730(d).

Relators admit that they "were not paid a bounty directly by the Government," but they contend that it is enough that, by virtue of private agreements they negotiated with other relators' counsel, they "receive[d] 14% of" the relator's share and did so "with the Government's knowledge." (Mot. 13 n.7.) "Nothing in the statute," Relators maintain, "makes payment of attorneys' fees contingent on direct payment of a bounty by the government." *Id.* Here again, Relators are mistaken. By its plain terms, Section 3730(d) imposes on the Government an obligation to pay the relator's share to the "person under subsection (b)" whose claim was settled or resulted in a judgment in the United States' favor. The statute states that the relator's bounty shall be "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim," and of course those proceeds are paid by Defendants to the United States after the latter intervenes in the action and agrees to settle it. Here, the United States made

15

that relator's share payment for the ED admissions claim to relator Plantz, and, accordingly, only Plantz is entitled to attorneys' fees under the plain statutory language.[8]

Not surprisingly, other courts have rejected the suggestion that private sharing agreements could eviscerate the plain language of the FCA or somehow authorize the recovery of fees by a relator whose claim, for example, is jurisdictionally barred by the first-to-file principle (which is the necessary implication of Relators' argument). The relator in *U.S. v. NextCare, Inc.*, for example, argued that because he and another relator "had entered into a separate private agreement between themselves to share any proceeds that resulted from the litigation . . . he should be considered a successful Relator who has 'received' a Relator's share." 2013 WL 431828, at *3. The Court squarely rejected this argument, holding that relator's "separate private agreement" did not change the fact that he did not secure a relator's share, and thus was not entitled to fees. *Id.* Relators here likewise cannot invoke their private agreement to trump the first-to-file (or the public-disclosure) bars (or create jurisdiction where none exists). If they could, those jurisdictional barriers would become meaningless: innumerable relators could agree to share in the proceeds of every FCA investigation, run up their bills, and then seek attorneys' fees. That cannot be the law.

### C. Relators Are Barred From Recovering Fees Under 31 U.S.C. § 3730(e)(4) Because Their Lawsuit Was Based Upon Publicly Disclosed Allegations

#### 1. A Relator Cannot Recover Attorney's Fees When The Public Disclosure Bar Applies

The public disclosure bar prevents "opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud." *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005). The statute provides:

---

[8] Defendants have settled with relator Plantz for the approximately 3500 hours that his counsel billed to this matter.

16

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006). An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Id.* § 3730(e)(4)(B) (2006).[9]

Like the first-to-file bar, the public disclosure bar is jurisdictional: When it applies, the court lacks authority to hear the *qui tam* action and must dismiss the case. *Poteet*, 552 F.3d at 511 (public disclosure bar "limits the subject matter jurisdiction of federal courts"). And if a relator's action is blocked by the public disclosure bar, the relator cannot, as a matter of law, recover attorney's fees under 31 U.S.C. § 3730(d)(1). *See, e.g.*, *U.S. ex rel. Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032, 1044 (6th Cir. 1994) (counsel for relator who lacks standing is not entitled to fees under §3730(d)(1)); note 4, *supra* (citing additional authorities).

To determine whether the public disclosure bar applies, "a court must consider 'first whether there has been any public disclosure of fraud, and second whether the allegations in the

---

[9] Congress amended the public disclosure bar in 2010 as part of the Patient Protection & Affordable Care Act ("ACA"). *See* Pub. L. 111–148, § 10104(j)(2), 124 Stat. 119, 901–02. The amendments, however, are not retroactive and therefore do not apply to conduct occurring before the ACA's passage. *See, e.g.*, *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 915 (4th Cir. 2013) (applying pre-amended public disclosure bar to conduct occurring before March 23, 2010, even though relators filed their complaint after that date; "The retroactivity inquiry looks to when the underlying conduct occurred, not when the complaint was filed.")); *U.S. v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 958 F. Supp. 2d 846, 856 (E.D. Tenn. 2013) ("[T]he amended language would only apply to conduct that occurred after March 23, 2010."); *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1271 n.2 (N.D. Ga. 2012) (same). Here, virtually all of Relators' allegations relate to conduct occurring before 2010, and therefore do not implicate the amended statute. *See, e.g.*, Cplt. ¶ 120 (examining patient admissions data from 2003 through 2009).

17

instant case are 'based upon' the previously disclosed fraud." *Poteet*, 552 F.3d at 511 (internal quotation marks and citations omitted). "If the answer is 'no' to [either] of these questions, the inquiry ends, and the *qui tam* action may proceed; however, if the answer to each of the above questions is 'yes,' then [the court] must determine whether the relator nonetheless qualifies as an 'original source' under § 3730(e)(4)(B), in which case the suit may proceed." *Id.* As shown below, this case is a textbook example of the public disclosure bar.

### 2. There Were Multiple Public Allegations Of Fraud Relating To CHS's Inpatient Admissions Practices Prior To This Lawsuit

As explained above (at page 3), Relators filed their Complaint on May 11, 2011, alleging that CHS and certain of its hospitals violated the False Claims Act by receiving Medicare reimbursement at the inpatient rate for patients who did not meet the Medicare criteria for inpatient status. Before Relators filed this action, however, virtually identical allegations against CHS and its affiliated hospitals had already been disclosed through at least four different sources, each of which qualified as a "public disclosure of fraud." *Poteet*, 552 F.3d at 511. Thus, far from "expos[ing]" CHS's allegedly improper conduct (Mot. 2), Relators were merely echoing allegations that had already been made publicly by others.

### a. *Tenet* Lawsuit

On April 11, 2011, Tenet Healthcare Corporation ("Tenet") filed suit in the Northern District of Texas alleging that CHS misrepresented its financial health to shareholders during its attempted acquisition of Tenet, in violation of the Securities and Exchange Act of 1934. *See* Complaint, *Tenet Healthcare Corp. v. Community Health Sys., Inc.*, No. 3:11-cv-00732-M, DE 1 (N.D. Tex.) (Exhibit H) ("Tenet Cplt"). In a 70-page complaint, Tenet claimed that CHS's profits were the result of a scheme "to systematically steer medically unnecessary inpatient

18

admissions at CHS hospitals" and "artificially increase[] inpatient admissions." *Id.* ¶ 3. Tenet

alleged that CHS pursued this improper strategy through various means, including:

- *Emergency Room Admissions*: CHS "sets targets for its hospitals for converting emergency room visitors into admitted patients." *Id.* ¶ 90. "CHS physicians and Emergency Department ('ED') doctors working in CHS hospitals also receive bonuses based in part on the number of patients admitted to the hospital." *See also id.* ¶¶ 61-63, 92-93.

- *Blue Book*: To determine whether patients should be admitted as inpatients rather than treated in outpatient observation status or discharged, CHS implemented a home-grown set of patient admission criteria called the Blue Book, which "were demonstrably more lenient, general, and subjective than the evidence-based criteria used throughout the rest of the industry." *Id.* ¶¶ 10, 54.

- *Inpatient Admission Quotas And Administrative Pressure*: "CHS has adopted a strategy of setting [inpatient] admission targets, incentivizing physicians to meet admission targets, and holding physicians and hospitals accountable for failure to meet those targets." *Id.* ¶¶ 90, 91.

- *One-Day Stays*: CHS allegedly had large numbers of unwarranted "one-day stays"—*i.e.*, patients admitted as inpatients but released within 24 hours. *Id.* ¶ 114.

Tenet coupled these allegations with a quantitative "analysis of publicly available

information on hospital observation rates." *Id.* ¶ 19. Tenet alleged that this data showed that

CHS's "the observation rate" was substantially below the national average and other comparable

hospital systems. *Id.* ¶ 20. Tenet claimed that this analysis proved that "patients whose medical

needs likely required treatment in outpatient observation status were systematically admitted for

higher-paying treatment at CHS hospitals." *Id.* ¶ 22. Based on CHS's alleged conduct, Tenet

claimed that "CHS likely will be subject to significant damages," including "[u]nder the federal

False Claims Act." *Id.* ¶ 23.

### b. Widespread Press Coverage About The *Tenet* Lawsuit

Tenet's allegations were highly publicized by the news media before Relators filed this

action, including through the following sources:

- A *New York Times* article stating that: (1) Tenet alleges that CHS had a "practice of regularly and improperly admitting patients instead of putting them in a less-profitable 'observation' status"; (2) "Tenet said that [CHS's] percentage of patients treated on an observation basis was as much as 60 percent lower than that of its peers"; and (3) "[b]y bolstering the number of admitted patients in its hospitals, [CHS] can draw more money from Medicare." *See* Michael J. de la Merced, *The New York Times*, "Tenet Accuses Community Health of Overbilling Medicare" (Apr. 11, 2011) (Exhibit O).

- A *Forbes* article stating that: (1) CHS allegedly "billed Medicare . . . by taking patients with less-severe conditions, ordinarily unworthy of an expensive hospital admission, and admitting them to the hospital anyway, reaping substantially higher Medicare reimbursements for doing so"; (2) instead of using InterQual, CHS "developed its own, 40-page guidebook called the 'Blue Book,' which . . . contains substantially more liberal guidelines for admitting patients into the hospital; and (3) allegedly, in contrast to the Blue Book, "more standard admissions guidelines would not consider a 'recent visit to the hospital' as evidence that a patient's chest pain is sufficiently severe to warrant a hospital admission." Avik Roy, *Forbes*, "Healthcare Bombshell: Tenet Lawsuit Alleges Community Healthcare Cheats Medicare" (Apr. 12, 2011) (Exhibit P).

- A *Financial Times* article stating that: (1) Tenet accused CHS of "systematically admitting, rather than observing, patients in CHS hospitals for financial, rather than clinical purposes"; (2) Tenet's quantitative analysis allegedly "showed CHS placing half as many patients under observation than hospitals in the same markets"; (3) "additional revenues [allegedly] were generated by cutting the use of observation at the hospitals [CHS] acquired by more than 50 per cent and admitting more patients to 'needless hospital stays'"; and (4) as a result, CHS allegedly "wrongfully bill[ed] insurers for unnecessary patient stays." Alan Rappeport, *Financial Times*, "Tenet launches lawsuit against CHS" (Apr. 12, 2011) (Exhibit Q).

In addition to these three articles, many others were published prior to Relators' lawsuit that similarly recited Tenet's allegations of health-care fraud against CHS.[10]

---

[10] *See, e.g.*, Susan Kelly, Reuters, "Tenet sues Community Health for Medicare abuse" (Apr. 11, 2011) (Exhibit R); Jason Roberson, *The Dallas Morning News*, "Tenet Healthcare suit alleges Medicare fraud by bidder Community Health Systems" (Apr. 11, 2011) (Exhibit S); Leigh Page, *Becker's Hospital Review*, "Tenet Lawsuit Against CHS Alleges Misuse of Observation Status" (Apr. 11, 2011) (Exhibit T); *Becker's Hospital Review*, "Tenet Sues CHS: New Battle Lines in Healthcare Takeovers – Whistleblowing" (Apr. 12, 2011) (Exhibit U); Erin Lawley, *Nashville Post*, "CHS gives lengthy rebuttal to Tenet lawsuit" (Apr. 28, 2011) (Exhibit V); Chris Anderson, HEALTHCARE FINANCE NEWS, "Community Health Systems: Tenet lawsuit is 'contrived and biased'" (Apr. 29, 2011) (Exhibit W).

### c. Reuille *Qui Tam* Action

On December 27, 2010, more than four months before Relators filed their complaint here, the U.S. District Court for the Northern District of Indiana unsealed a *qui tam* complaint filed by relator Nancy Reuille against CHS and one of its hospitals, Lutheran Hospital, where Reuille had been employed. *See* Exhibit B (*Reuille* Cplt.), Exhibit I (*Reuille* Unsealing Order). Reuille alleged that CHS had engaged in a scheme to "fraudulently receive 'inpatient' reimbursement on cases that clearly [did] not meet 'inpatient' intensity of service or severity of illness, per established Medicare criteria." *Reuille* Cplt. ¶ 10.b. Reuille claimed that, rather than use common industry metrics to determine whether to admit a patient, CHS mandated use of the Blue Book, which Reuille alleged was "exceptionally simplistic and nonspecific" and would justify admitting "virtually any" patient. *Id.* ¶¶ 21, 24. Reuille further alleged that after CHS acquired Lutheran Hospital, she witnessed a significant increase in inpatient admissions – especially so-called "one day stays" – and that this increase was due to instructions from CHS management. *Id.* ¶ 27; *see also* ¶¶ 23-26. Reuille alleged that CHS's practices violate the False Claims Act. *Id.* ¶¶ 36-44.

### d. CHS's SEC Filings

Finally, prior to the filing of Relators' complaint, CHS itself publicly disclosed in its SEC filings the allegations that had been made in the *Tenet* and *Reuille* complaints. In its Form 8-K dated April 22, 2011, CHS stated that the *Reuille* lawsuit is "brought under the False Claims Act and alleges that Lutheran Hospital of Indiana billed the Medicare program for . . . intentional assignment of inpatient status to one-day stays for cases that do not meet Medicare criteria for inpatient intensity of service or severity of illness." Community Health Systems, Inc., Form 8-K (Apr. 22, 2011) (Exhibit J). The Form 8-K further disclosed that CHS was the subject of a

pending federal investigation related to the *Reuille* lawsuit and of another investigation into potentially improper claims submitted to Medicare. *Id.*; *see also* Community Health Systems, Inc., Form 8-K (Apr. 15, 2011) (describing the government investigation) (Exhibit K). Three days later, on April 25, 2011, still more than two weeks before Relators filed their complaint, CHS filed another Form 8-K stating that the government and Reuille had filed a joint motion describing how the government "intends to proceed with an investigation regarding 'allegations of improper billing for inpatient care at other hospitals associated with [CHS] . . . asserted in other *qui tam* complaints in other jurisdictions.'" Community Health Systems, Inc., Form 8-K (Apr. 25, 2011) (Exhibit L).

> ### e. Individually As Well As Collectively, These Other Sources Brought About A "Public Disclosure" Of The Fraud Alleged By Relators

"For a relator's *qui tam* action to be barred by a prior 'public disclosure' of the underlying fraud, the disclosure must have (1) been public, and (2) revealed the same kind of fraudulent activity against the government as alleged by the relator." *Poteet*, 552 F.3d at 511. The statute expressly identifies "the news media" as a qualifying public disclosure.[11] The *Tenet* and *Reuille* complaints also qualify,[12] as do the Form 8-Ks that CHS filed publicly with the SEC.[13]

---

[11] *See* 31 U.S.C. § 3730(e)(4)(A) (2006); *see also Poteet*, 552 F.3d at 511; *U.S. ex rel. Osheroff v. Health Springs, Inc.*, 938 F. Supp. 2d 724, 732-33 (M.D. Tenn. 2013) ("[M]any court[s] have held that information on readily accessible public websites constitutes public disclosure.").

[12] *See Poteet*, 552 F.3d at 511 ("'Public disclosure' also includes documents that have been filed with a court, such as . . . a plaintiff's complaint."); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 974 (6th Cir. 2005) (same). As noted above, although the *Reuille qui tam* complaint initially was filed under seal, it was unsealed and became a public disclosure on December 27, 2010, several months before Relators filed this action.

[13] *See U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.*, 469 Fed. Appx 244, 257 (4th Cir. 2012) (Form 8-K filings "are administrative reports for the purposes of the public disclosure

As to the second requirement, "if there has been a direct allegation of fraud, we will find a public disclosure because such an allegation, regardless of its specificity, is sufficient to put the government on notice of the potential existence of fraud." *Id.* at 513. Here, as shown above, each of the four disclosures was highly specific (and mirrored by the allegations later made by Relators) and each unquestionably contained "direct allegation[s] of fraud" against CHS (because they each expressly allege that CHS improperly obtained Medicare reimbursement at the inpatient rate). *See, e.g.*, *U.S. ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332-33 (6th Cir. 1998); *Poteet*, 552 F.3d at 513.[14]

### 3. Relators' Allegations Are "Based Upon" The Public Allegations Of Fraud Against CHS

"After finding a public disclosure of fraud, the next step in the public disclosure analysis is to determine whether the relator's *qui tam* complaint is 'based upon' this disclosed fraud." *Poteet*, 552 F.3d at 513-14. This is a lax test: "[A] relator's entire complaint will be jurisdictionally barred if it is based *even partly* upon public disclosures." *Id.* at 515 n.7 (emphasis in original); *see also Walburn*, 431 F.3d at 975 ("[O]ur broad construction of the public disclosure bar . . . precludes individuals who base *any part* of their allegations on publicly disclosed information from bringing a later *qui tam* action" (emphasis in original)); *U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 940 (6th Cir. 1997) (same).

---

bar"); *U.S. ex rel. Ryan v. Endo Pharm., Inc.*, 2014 WL 2813103, at *9 n.16 (E.D. Pa. June 23, 2014) (same); *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1273 (N.D. Ga. 2012) (same).

[14] Indeed, even if the four disclosures in this case did not contain express allegations of fraud—and they each do—they still would satisfy the public disclosure bar because they "presen[t] enough facts to create an inference of wrongdoing . . . sufficient to put the government on notice of the possibility of fraud." *Poteet*, 552 F.3d at 513. In fact, not only was the government "on notice" (*id.*) of the possibility of fraud, but, as the disclosures state, the government actually *had* commenced an investigation of CHS well before Relators filed this lawsuit.

23

Here, Relators' allegations are not just "partly" based upon the public disclosures above, but almost entirely upon them. Relators allege "essentially the same" fraud (*Poteet*, 552 F.3d at 514) as do the public disclosures: That "CHS embarked on a scheme to increase inpatient admissions from its [emergency rooms] absent any corresponding change in the medical needs of CHS's potential patient populations." Cplt. ¶ 1; *Compare with, e.g.,* Exhibit H (*Tenet* Cplt.) ¶ 3 (CHS "systematically steer[ed] medically unnecessary inpatient admissions at CHS hospitals" and "artificially increase[d] inpatient admissions."); Exhibit P (*Forbes* article) (CHS allegedly "bilked Medicare . . . by taking patients with less-severe conditions, ordinarily unworthy of an expensive hospital admission, and admitting them to the hospital anyway, reaping substantially higher Medicare reimbursements for doing so"). Relators also alleged virtually the same details of the purported fraud as the public disclosures:

- *Blue Book*: Both allege that CHS improperly used its home-grown "Blue Book" criteria for determining admissions. *Compare* Cplt. ¶¶ 4.a, 105 *with, e.g., Tenet* Cplt. ¶¶ 10, 54; Exhibit B (*Reuille* Cplt.) ¶¶ 21, 24; *Forbes* article.

- *Inpatient Admissions Quotas And Administrative Pressure*: CHS improperly set admissions quotas and pressured physicians to comply with the quotas. *Compare* Cplt. ¶¶ 4.b, 4.e *with, e.g., Tenet* Cplt. ¶ 90.

- *One-Day Stays*: CHS had a disproportionately large number of one-day stays, which are likely to be unnecessary admissions. *Compare* Cplt. ¶ 129 *with, e.g., Tenet* Cplt. ¶ 114; *Reuille* Cplt. ¶ 27.

In addition, the Tenet complaint contains a lengthy statistical analysis to support its allegations of improper admissions by CHS, *See Tenet* Cplt. ¶¶ 19-21, 98-106, while the Relators' complaint relies heavily on a similar statistical analysis that purports to identify CHS hospitals whose inpatient admission allegedly exceeded national norms. Cplt. ¶¶ 5, 119-240.

We have included as Exhibit X a chart comparing Relators' allegations with those contained in the *Tenet* and *Reuille* complaints. As even a brief glance at the chart shows, Relators' Complaint is a virtual carbon copy of *Tenet*'s complaint (and of the myriad news media

24

articles summarizing Tenet's allegations), and substantially overlaps as well with the *Reuille* complaint and the disclosures in CHS's SEC filings.[15]

Although Relators may contend (as relators often do) that their allegations are not identical to those that were publicly disclosed, this is irrelevant. Merely alleging "additional details [is] insufficient to avoid [the Sixth Circuit's] broad construction of the public disclosure bar." *Walburn*, 431 F.3d at 975; *see also Poteet*, 552 F.3d at 514-15; *Osheroff*, 938 F. Supp. 2d at 733. "So long as the government is put on notice to the potential presence of fraud, even if the fraud is slightly different than the one alleged in the [relator's] complaint, the qui tam action is not needed." *Dingle v. Bioport Corp.*, 388 F.3d 209, 214-15 (6th Cir. 2004).[16] Here, Relators allege the same fraud as in the public disclosures, and not only did those disclosures put the government "on notice" of potential fraud, but they actually caused the government to commence an investigation—all before Relators ever filed this action. Accordingly, Relators'

---

[15] Indeed, Relators grudgingly acknowledge that Tenet had made the same allegations about CHS's inpatient admissions practices before Relators filed their Complaint. Cplt. ¶ 4.a n.1 ("On April 11, 2011, Tenet Healthcare Corp. sued CHS to force disclosure of its 'practice of systematically admitting, rather than observing, patients for financial rather than clinical reasons.'"); *id.* ¶ 132 (Tenet alleged "inappropriate [emergency room] admissions practices in [CHS's] hospitals"); *id.* ¶ 242 (acknowledging the "glare of publicity from a lawsuit by Tenet"). And while Tenet's allegations span from 2001 through 2011 (*see Tenet* Cplt. ¶ 3), Relators focus mainly on just a subset of that period. *See* Cplt. ¶ 120 (examining patient admission data from 2003 through 2009).

[16] *See also In re Natural Gas Royalties*, 562 F.3d 1032, 1043 (10th Cir. 2009) (public disclosure bar applies where "allegations of industry wide gas mismeasurement disclosed [in the public disclosures] were sufficient to set the government on the trail of the fraud as to all Defendants,"); *U.S. ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997) (relator's allegations "substantially repeat what the public already knows and add only the identity of particular [defendants]."); *U.S. v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 958 F. Supp. 2d 846, 862 (E.D. Tenn. 2013) ("As explained in *Poteet*, however, the fact that some allegations or parties may be different does not mean the [relator's] complaint is not 'based upon' the disclosures, especially where as here the fraudulent schemes . . . substantially resemble the allegations and transactions discussed in the public disclosures.").

25

allegations plainly are "based upon" public disclosures, and the public disclosure bar applies unless Relators are "original sources."[17]

### 4. Relators Are Not "Original Sources" Of The Information On Which Their Allegations Are Based

An "original source" is "an individual who [1] has direct and independent knowledge of the information on which the allegations are based and [2] has voluntarily provided the information to the Government before *filing an action* under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (2006) (emphasis added). Significantly, the Sixth Circuit requires relators to "have provided the government with the information *prior to any public disclosure* to qualify as an 'original source.'" *Walburn*, 431 F.3d at 975 (emphasis in original); *see also U.S. ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 334 (6th Cir. 1998) ("The [Sixth Circuit] reasoned that this rule is necessary because one is not a true whistleblower unless she is responsible for alerting the government to the alleged fraud before such information is in the public domain."). Relators flunk both of these requirements.

Taking the second requirement first, Relators concede they did not provide the government with the information underlying their allegations prior to the public disclosures. The Complaint alleges that "Relators voluntarily disclosed the information upon which [their] allegations are based to the [government] in *February 2011*." Cplt. ¶ 11 (emphasis added). Yet the *Reuille* complaint was unsealed—thus constituting a public disclosure (*see supra* note 12)— on December 27, 2010. *See* Exhibits B and I. Thus, by Relators' own admission, they are not original sources. *See Poteet*, 552 F.3d at 515 ("[Relator] undisputedly failed to provide [the

---

[17] "The public disclosure bar applies even after the government intervenes in a case." *U.S. ex rel. Ward v. Peck*, 7:07-CV-134-D, 2013 WL 4511634, at *3 (E.D.N.C. Aug. 23, 2013); *U.S. ex rel. Krahel v. Regents of Univ. of California*, 2001 WL 1548786 (N.D. Cal. Sept. 13, 2001), at *3 *aff'd sub nom. Donald v. Univ. of California Bd. of Regents*, 329 F.3d 1040 (9th Cir. 2003) (same).

required] information to the government . . . before the [public disclosure]. Thus, [relator] cannot qualify as an original source under the FCA."); *Walburn*, 431 F.3d at 975-76 (same). The Court's analysis can and should end here.

In any event, Relators are not original sources for the separate reason that they lack "direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B) (2006). "The word 'direct' requires knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others. The relator's knowledge is considered 'independent' if it is not derived from the public disclosure." *Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 2013 WL 4510801, at *7 (M.D. Tenn. Aug. 26, 2013) (citing cases). Further, because Relators seek to invoke the Court's jurisdiction, they bear the burden of proving that they are original sources. *Jones*, 160 F.3d at 329; *In re Natural Gas Royalties*, 562 F.3d at 1045.

Relators have not even attempted to carry their burden (nor could they). Most of their complaint is a "statistical analysis" of publicly available Medicare data that purports to identify CHS hospitals whose emergency rooms admitted more patients than their peers. Cplt. ¶¶ 5, 119-39, 177-78, 192-93, 207, 218, 221, 224, 228, 230, 232, 234, 238-40; *see also id.* ¶ 120 (describing data set).[18] But for at least two reasons, Relators are not original sources of the information underlying these allegations. *First*, as a matter of law, merely analyzing information that already exists in the public domain, and asserting fraud based on that analysis, does not make a relator an original source. *See, e.g.*, *U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 59 (1st Cir. 2009) ("Knowledge that is based on research into public records, review of

---

[18] The data that Relators analyzed is available on the CMS website: http://www.cms.gov/Research-Statistics-Data-and-Systems/Files-for-Order/LimitedDataSets/ index.html.

publicly disclosed materials, or some combination of these techniques is not direct").[19]  *Second*, even assuming incorrectly that Relators' statistical analysis could, in theory, qualify them as original sources, here Tenet had *already conducted materially the same analysis*.  *See Tenet* Cplt. ¶ 22 ("The statistical analysis and evaluation of CHS's business practices lead to a single, inescapable conclusion: patients whose medical needs likely required treatment in outpatient observation status were systematically admitted for higher-paying treatment at CHS hospitals.").  Relators' derivative work is, on its face, not original.

The balance of Relators' complaint alleges that CHS, both on a "system-wide" basis and at certain individual hospitals, improperly admitted patients through use of the Blue Book, by setting inpatient admission quotas, and through other means that already had been asserted in the public disclosures.  Yet for virtually all of these allegations, Relators do not even try to claim they are original sources, but instead acknowledge that their allegations are based on second- or third-hand information.  Relators' system-wide allegations rely on interviews with third parties and on publicly-available information like CHS's SEC filings—none of which constitutes "direct and independent knowledge" under the statute.  *See* Cplt. ¶¶ 110-18; *Natural Gas Royalties*, 562 F.3d at 1045-46 ("secondhand knowledge from employees of various Defendants does not constitute 'direct and independent' knowledge"); *Chattanooga-Hamilton*, 958 F. Supp. 2d at 864 (relator not original source where her information came from her husband); *see also supra* 27 & n. 19 (citing cases showing that relators are not original sources where their allegations are based

---

[19] *See also, e.g.*, *In re Natural Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009) ("Secondhand information, speculation, background information, or collateral research do not satisfy a relator's burden of establishing the requisite knowledge."); *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991) (fact that relator has background information or unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is insufficient); *Findley*, 105 F.3d at 688 (same); *Whipple*, 2013 WL 4510801, at *7-*8 (same).

on analysis of publicly disclosed information). Likewise, Relators' allegations about individual CHS hospitals also are based primarily on interviews with third parties, and not on any direct and independent information that Relators possess. *See* Cplt. ¶¶ 209 (explaining that Relators' allegations are based on alleged interviews with current or former CHS employees), 213-17, 219-20, 222-23, 225-27, 229, 231, 233, 235-37.

Indeed, of the 74 individual CHS hospitals referred to in the complaint, Relators allege direct and independent knowledge only as to the *three* hospitals where they were employed. *Id.* ¶¶ 140, 179, 194. But virtually every allegation they make as to these hospitals—*e.g.*, that hospital administrators pushed for greater inpatient admissions, used admissions quotas and incentive compensation, failed to adhere to InterQual Criteria, *etc.*—already was detailed at length in the numerous public disclosures. Relators add nothing of substance to the previously disclosed allegations and therefore are not original sources. *See, e.g.*, *Natural Gas Royalties*, 562 F.3d at 1046 (relator not original source where his "limited direct and independent information . . . is minimal in comparison to the broad scope of his allegations"); *Osheroff*, 938 F. Supp. 2d at 735 (same). To give Relators original source status where, as here, the government already was investigating CHS's inpatient admissions practices as a result of the public disclosures would stand the purpose of the public-disclosure bar on its head. *See Poteet*, 552 F.3d at 507 (FCA "seeks to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud"); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 (10th Cir. 2004) ("Once the government is put on notice of its potential fraud claim, the purpose behind allowing qui tam litigation is satisfied."). Accordingly, Relators are not original sources.

\*　　　\*　　　\*

29

For these reasons, the public disclosure bar applies, and the Court lacks jurisdiction over Relators' *qui tam* action and their request for attorney's fees should be denied.

## II.     IF THE COURT AWARDS ATTORNEYS' FEES, RELATORS' REQUESTED FEES ARE EXCESSIVE AND UNREASONABLE AND SHOULD BE SUBSTANTIALLY REDUCED

As set forth in the prior section, Relators are not entitled to recover attorneys' fees under the FCA.  However, if the Court were to disagree and choose to award attorneys' fees to Relators, it should significantly reduce the $3,137,799.50 they have requested.

### A.     An Across-The-Board Reduction To The Hours Claimed Is Needed To Account For Overstaffing And Duplicative, Inefficient Billing

Relators request fees for the work done by their local counsel, Barrett Johnston Martin & Garrison, LLC (BJMG), as well as by three different law firms that purport to specialize in FCA and complex litigation: Grant & Eisenhofer, P.A. (G&E), Cohen Milstein Sellers & Toll PLLC (CMST), and James & Hoffman, P.C. (J&H).  Yet Relators offer no explanation for why more than one – let alone *four* – law firms were needed to successfully handle this action, in particular three national firms claiming rates at the high end of the national market.  All told, *27 lawyers and 13 paralegals, assistants, and consultants billed time to this case*, and these four firms together seek reimbursement for over *7000 hours of work*.  This is a staggering sum, considering that the case was only investigated by the Government and never unsealed or actually litigated – *i.e.*, no motions practice, discovery disputes, court hearings, etc.  The numbers of lawyers and hours expended by Relators becomes even more stunning when one considers that counsel for six other relators also claim to have worked more than 10,000 hours on similar tasks.

A percentage cut to the hours claimed is warranted when billing records indicate duplicative or inefficient billing – including due to overstaffing. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). The invoices submitted by Relators' counsel indicate just that.  Relators'

counsel "spent an incredible amount of time emailing, conferencing, meeting, consulting and developing strategy." *Harkless v. Husted*, 2011 WL 2149179, at *21 (N.D. Ohio Mar. 31, 2011) *report and recommendation adopted sub nom. Harkless v. Brunner*, 2011 WL 2149138 (N.D. Ohio May 31, 2011) (reducing award by 50% due to over-lawyering, excessive meetings, and other inefficiencies). Counsel from all four firms (not to mention counsel for six other relators who all seek fees) billed for attendance at the same bi-weekly calls with the Government. They also billed *hundreds* of hours to conferences among themselves − unnecessary work that was a direct result of the excessive number of firms and lawyers involved in representing the Relators. *See Gratz v. Bollinger*, 353 F. Supp. 2d 929, 942 (E.D. Mich. 2005) (reduction for overstaffing where "Plaintiffs were represented by at least sixteen lawyers in three different cities" and claimed many hours for conference and meetings between attorneys).

Indeed, the declaration of Professor Arthur Miller confirms that overstaffing resulted in duplicative billing here. As Professor Miller explains, both G&E and CMST attorneys not only participated in the same conference calls but also worked on many of the very same tasks: both firms drafted the complaints; both reviewed the statistical analysis prepared by Relators; and both considered CHS's treatment of observation stays compared to impatient stays. *Compare* Miller Decl. ¶ 24 to ¶ 27.[20] Under Sixth Circuit precedent, this Court should apply a 25% reduction to the hours claimed by Relators to account for this overstaffing, duplicative work, and excessive billing. *See Hisel v. City of Clarksville*, 2007 WL 2822031, *4-6 (M.D. Tenn. Sept. 26, 2007) (25% reduction) (citing *Auto Alliance Intern., Inc. v. U.S. Customs Service*, 155 Fed. Appx. 226, 228 (6th Cir. 2005)).

---

[20] That counsel was assisting the Government does not automatically render the hours claimed reasonable, as the Government's decision to "assign" tasks to Relators' counsel has no bearing on the reasonableness of the *number of hours* spent on those tasks, the time spent on conference calls among firms, or the number of attorneys who participated in those calls.

31

## B. **Further Reductions Are Also Warranted**

Relators purport to seek "national" hourly rates for the hours billed by DC-based firms G&E, CMST, and J&H.[21] But the fees sought by Relators are excessive by any standard.[22] Given the nature of this case (which was never unsealed, never litigated, and all dealings with defendants were handled by the Government) and the tasks performed by the attorneys (mostly document review, research, and conference calls), the following additional reductions are warranted:

- Relators seek $850 per hour for the work billed by G&E partner Reuben Guttman. But they provide no evidence of any client actually paying fees to Mr. Guttman at this rate. Nor do they provide any evidence of any court ever awarding him fees at this rate. Indeed, Relators have cited no examples (and Defendants are aware of none) where *any* attorney in *any* FCA case has been awarded $850 per hour – let alone one that was not litigated.[23] An hourly rate of $600 per hour is more appropriate for Mr. Guttman, in particular because a review of his invoices indicates that his time was spent primarily on tasks like "research," "file review," and "teleconference with co-counsel," which do not require the sort of specialized skills that might command the nation's highest hourly rates. *Reducing Mr. Guttman's hourly rate to $600 results in a reduction of $54,725 to the fees claimed.*

- A similar 30% rate reduction should be applied to the $660 hourly rate sought by G&S senior counsel Traci Buschman who, like Mr. Guttman, largely spent her time on

[21] Aside from the 25% reduction for overstaffing and duplication, Defendants do not otherwise dispute the fees and expenses sought by Relators for the work done by their local counsel BJMG counsel.

[22] In *U.S. ex rel. Lefan v. General Elec. Co.*, cited by Relators (Mot. 17), the Sixth Circuit affirmed the district court's holding that out-of-town rates are justified only where a relator establishes the "need to hire non-local *qui tam* specialists." 397 Fed. Appx. 144, 148 (6th Cir. 2010), Relators here have not explained why it needed to hire *three* out of town law firms, and Defendants respectfully submit that they have thus not met their burden of establishing that all these law firms should be compensated at out-of-town rates, rather than the local rates sought by BJMG.

[23] By contrast, earlier this year, one of the preeminent FCA specialists in the country, Marlan Wilbanks, requested attorneys' fees at a rate of only $650 per in a case that, like this one, was based on allegations of improper patient admission practices, but which, unlike this case, was vigorously litigated through discovery, summary judgment through to jury selection before resulting in an $85 million settlement. *See* Exhibit Y, Wilbanks Dec., *United States of America et al v. Halifax Hospital Medical Ctr.*, No. 6:09-cv-01002, Dkt. 596-1 (M.D. Fla. Apr. 5, 2014).

document review and conference calls. *Reducing Ms. Buschman's hourly rate to $462 results in a reduction of $54,331.20 to the fees claimed.*

▪ The hourly rates of J&H partner David Dean ($771) and Emilie Kraft ($567) should also be reduced by 30%. Their proposed rates are based on the Adjusted *Laffey* Matrix, which may sometimes be a useful starting point for determining rates in the D.C. and national market, but are subject to adjustment. *See Muldrow v. Re-Direct, Inc.*, 397 F. Supp. 2d 1, 4 (D.C. Cir. 2005) (reducing *Laffey* rates by 25% in relatively straightforward civil rights suit). Several considerations counsel in favor of lower rates here. *First*, Mr. Dean seeks the highest rates on the matrix, but J&H is a 12-attorney law firm (the matrix lumps together lawyers from firms of all sizes).[24] *Second*, Ms. Kraft is nowhere mentioned on J&H's firm profile and no effort is made to explain why she commands such a high hourly rate. *Third*, like the attorneys from G&E, many of the hours billed by J&H appear to be for research, emails, and conference calls, tasks which do not command the nation's highest rates. *Fourth*, these two attorneys billed 882 of the 930.75 hours claimed by this firm (95%) at these high hourly rates, and do not appear to have allocated associate-level tasks to attorneys with lower rates.[25] *Applying hourly rates of $540 and $397 for Mr. Dean's and Ms. Kraft's hours, respectively, results in reductions of $122,661.00 and $59,670.00, respectively, to the fees claimed by Relators.*

▪ Relators boast of CMST's expertise in FCA litigation. But 1,050 of the 1,882 hours claimed by CMST (over 50%) were billed by contract attorney Glen Capers, who does not even appear in the firm's biography. Mr. Capers billed the majority of these hours to "document review" at $420 hours per hour, but another contract attorney who worked on this case, Ms. Calvin, billed document review hours at $260. *See* Dkt. 95, at 9. Mr. Capers' hourly rate should be reduced to $260 per hour, and his hours should be reduced by 10% because the vague task description "document review" – without any additional detail – does not permit meaningful review of the reasonableness of his 1000+ hours. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Kelsey-Hayes Co.*, 2013 WL 2634815, at *4 (E.D. Mich. June 12, 2013) *aff'd*, 750 F.3d 546 (6th Cir. 2014) (reducing attorney hours by 10% to account for inadequate record including entries for "review documents"). *These modifications result in a $195,318.60 reduction to the fees claimed.*

▪ G&E contract attorney Oderah Nwezze similarly billed 1,111.30 hours primarily to "document review" at $360 per hour. Like Mr. Capers, her hourly rate should be reduced to $260 and her hours reduced by 10% to account for the lack of detail in her task descriptions. *These modifications result in a $140,023.80 reduction to the fees claimed.*

---

[24] *Carroll v. Sanderson Farms, Inc.*, 2014 WL 549380 (S.D. Tex. Feb. 11, 2014) ("courts recognize that rates at larger firms tend to be higher than those at smaller firms") (collecting cases).

[25] *U.S. ex rel. Simring v. Univ. Physician Assocs.*, 2012 WL 10033888, at *6 (D.N.J. Oct. 2, 2012) ("[T]asks which can be delegated to associates and/or paralegals should not be performed by partners. To the extent it is not always feasible to delegate tasks in smaller firms or solo practices, such scenarios do not justify billing at partner level rates.").

33

Altogether, these specific reductions total $626,730.00, reducing the amount claimed to $2,511,069.90. Applying a 25% reduction to account for overstaffing and duplication reduces that amount to $1,883,302.43. (*See* Exhibit Z showing all of Defendants' reductions to Relators' proposed fee request.) If Relators were entitled to attorneys' fees at all – which they are not – they should receive an award no greater than this amount.

## CONCLUSION

For the foregoing reasons, this Court should deny Relators' fee petition. However, should this Court choose to award attorneys' fees to Relators, it should be in the amount of $1,883,302.43.

34

Dated:  October 27, 2014

Respectfully submitted,

/s/ William M. Outhier
John Jacobson, BPR #14365
William Outhier, BPR #15609
RILEY WARNOCK & JACOBSON, PLC
1906 West End Ave.
Nashville, TN 37203
Tel: (615) 320-3700
wouthier@rwjplc.com

and


*Of counsel*
Richard A. Sauber
Michael L. Waldman
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
Tel: (202) 775-4500
rsauber@robbinsrussell.com
mwaldman@robbinsrussell.com


*Counsel for Defendants*
*(see Exhibit A for list)*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following via the Court's ECF filing system:

David W. Garrison
Scott P. Tift
Barrett Johnston Martin & Garrison, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219

Reuben A. Guttman
Traci L. Buschner
Grant & Eisenhofer, P.A.
1747 Pennsylvania Avenue, N.W., Suite 875
Washington, D.C. 20006

John-David H. Thomas
Assistant U.S. Attorney
110 Ninth Avenue South, Suite A-961
Nashville, TN 37203

Kit Pierson
David Young
Cohen Milstein Sellers & Toll, PLLC
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005

David Rivera
Assistant U.S. Attorney
110 Ninth Avenue South, Suite A-961
Nashville, TN 37203

Michael D. Granston
Daniel R. Anderson
Robert McAuliffe
Commercial Litigation Branch
U.S. Department of Justice, Civil Division
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044

on this the 27th day of October, 2014.

/s/ William M. Outhier