# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSE
## NASHVILLE DIVISION

UNITED STATES OF AMERICA,　　　　：

　　　　　　　　　　Plaintiff,　　　：

*ex rel.*,　　　　　　　　　　　　：

JAMES DOGHRAMJI; SHEREE COOK;　：　CASE NO. 3:11-cv-0442 (Sharp, J.)
and RACHEL BRYANT,　　　　　　　：

　　　　　　　　　　Relators,　　　：
　　　　　　　v.　　　　　　　　　：

COMMUNITY HEALTH SYSTEMS, INC.　：
*et al.*　　　　　　　　　　　　　：
　　　　　　　　　　Defendants.　　：

## REPLY MEMORANDUM IN SUPPORT OF RELATORS' MOTION
## FOR AWARD OF ATTORNEYS' FEES, COSTS AND EXPENSES

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

I. INTRODUCTION ....................................................................................... 1

II. THE COURT IS NOT REQUIRED TO ENGAGE IN ANALYSIS OF THE
FIRST-TO-FILE AND PUBLIC DISCLOSURE RULES TO DETERMINE
WHETHER RELATORS ARE ENTITLED TO REIMBURSEMENT FOR THEIR
ATTORNEYS' FEES AND COSTS ................................................................. 4

    A. DEFENDANTS FAILED TO EXPRESSLY RESERVE THE FIRST-TO-FILE AND PUBLIC
DISCLOSURE CHALLENGES ................................................................. 4

    B. DEFENDANTS FAIL TO CITE ANY AUTHORITY THAT REQUIRES THIS COURT TO
ENGAGE IN AN ANALYSIS OF THE FIRST-TO-FILE AND PUBLIC DISCLOSURE RULES ....... 6

    C. RELATORS ARE PREVAILING PARTIES .......................................................... 10

III. RELATORS' CLAIMS WERE NOT BARRED BY THE FIRST-TO-FILE RULE
PRIOR TO THE SETTLEMENT AND DISMISSAL OF THE CASE ........................... 11

IV. RELATORS' CLAIMS WERE NOT BARRED BY THE PUBLIC DISCLOSURE
RULE PRIOR TO THE SETTLEMENT AND DISMISSAL OF THE CASE ................... 15

    A. THE PUBLIC DISCLOSURE BAR AND THE 2010 ACA AMENDMENTS ........................ 16

    B. RELATORS' CLAIMS ARE NOT SUBSTANTIALLY SIMILAR OR BASED UPON ANY
QUALIFYING DISCLOSURE .................................................................... 19

        1. *Reuille* Complaint ...................................................................... 20

        2. The *Tenet* Lawsuit and News Stories ................................................ 22

        3. SEC Filings ............................................................................... 25

    C. RELATORS ARE ORIGINAL SOURCES .......................................................... 27

V. RELATORS' ATTORNEYS' FEES AND COSTS ARE REASONABLE AND NOT
DUPLICATIVE ........................................................................................ 30

VI. CONCLUSION ......................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Wilson*,
357 F. Supp. 2d 991 (E.D. Ky. 2005) ...................................................................................35

*Cooper v. Blue Cross and Blue Shield of Florida, Inc.*,
19 F. 3d 562 (11th Cir. 1994) ..............................................................................................29

*Dingle v. Bioport Corp.*,
388 F. 3d 209 (6th Cir. 2004) ........................................................................................20, 25

*Erickson ex rel. United States v. Am. Inst. of Biological Sci.*,
716 F. Supp. 908 (E.D. Va. 1989) ......................................................................................11

*Falana v. Kent State Univ.*,
No. 5:08-CV-720, 2012 WL 6084630 (N.D. Ohio Dec. 6, 2012) .........................................34

*Federal Recovery Services, Inc. v. U.S.*,
72 F.3d 447 (5th Cir. 1995) ..............................................................................................7, 8

*Harkless v. Husted*,
No. 06-cv-2284, 2011 WL 2149179 (N.D. Ohio Mar. 31, 2011) ...........................................33

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ...........................................................................................................34

*Hughes Aircraft Co. v. United States ex rel. Shumer*,
520 U.S. 939 (1997) ...........................................................................................................18

*Koch v. Koch Industries, Inc.*,
1995 WL 812134 (N.D. Okla. Oct. 6, 1995) .......................................................................29

*McCombs v. Meijer, Inc.*,
395 F.3d 346 (6th Cir. 2005) ..............................................................................................35

*Miller v. Holzmann*,
575 F. Supp. 2d 2 (D.D.C. 2008) ......................................................................................8, 10

*In re Natural Gas Royalties*,
562 F. 3d 1032 (10th Cir. 2009) .........................................................................................25

*Ohio Nat'l Life Ins. Co. v. United States*,
922 F.2d 320 (6th Cir. 1990) ..............................................................................................19

*Sandin v. Conner*,
515 U.S. 472 (1995) ...........................................................................................................10

Case 3:11-cv-00442   Document 125   Filed 11/24/14   Page 3 of 44 PageID #: 3070

*SEC v. Medical Committee for Human Rights*,
404 U.S. 403 (1972) .................................................................................................1

*Texas State Teachers Assn. v. Garland Independent School Dist*,
489 U.S. 782 (1989) ...............................................................................................10

*U.S. ex. rel. Allen v. Guidant Corp.*,
2012 WL 878023 (D. Minn., Mar. 14, 2012) ...............................................28, 29

*U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*,
255 F. Supp. 2d 351 (E.D. Pa. 2002) .....................................................................27

*U.S. ex rel. Beauchamp v. Academi Training Center, Inc.*,
933 F. Supp. 2d 825 (E.D. Va. 2013) ......................................................................8

*U.S. ex rel. Booker v. Pfizer, Inc.*,
9 F. Supp.3d 34, *44 at n. 3. (D. Mass 2014) ...........................................18, 22, 27

*U.S. ex. rel. Branch Consultants v. Allstate Ins. Co.*,
560 F.3d 371 (5th Cir. 2009) ..................................................................................16

*U.S. ex rel. Capella v. United Techs. Corp.*,
No. 3:94-CV02063 (EBB), 1999 WL 464536 (D. Conn. June 3, 1999) ...................11, 12, 15

*U.S. ex rel. Davis v. Prince*,
753 F. Supp. 2d 569 (E.D. Va. 2011) ................................................19, 20, 22, 26

*U.S. ex rel. Dingle v. Bioport Corp.*,
270 F. Supp. 2d 968 (W.D. Mich. 2003) ...............................................................25

*U.S. ex rel. Findlay v. FPC-Boron Employees' Club*,
105 F.3d 675 (D.C. Cir. 1997) ...............................................................................25

*U.S. ex rel. Johnson v. Planned Parenthood of Houston*,
570 Fed. Appx. 386 (5th Cir. 2014) .........................................................................7

*U.S. ex rel. Liotine v. CDW Government, Inc.*,
No. 05-33-DRH, 2009 WL 3156704 (S.D. Ill.,Sept. 29, 2009) .............................26

*U.S. ex rel. Lujan v. Hughes Aircraft Co.*,
243 F. 3d 1181 (9th Cir. 2001) ................................................................................8

*U.S. ex rel. Marena v. SmithKline Beecham Cor*p.,
205 F.3d 97 (3rd Cir. 2000) ......................................................................................6

*U.S. ex rel. May v. Purdue Pharma L.P.*,
737 F.3d 908 (4th Cir. 2013) ..................................................................................17

iii

*U.S. ex rel. Ortega v. Columba Healthcare, Inc.*,
   240 F. Supp. 2d 8 (D.D.C. 2003) ........................................................11

*U.S. ex rel. Osheroff v. HealthSpring, Inc.*,
   938 F. Supp. 2d 724 (M.D. Tenn. 2013) ...........................................25

*U.S. ex rel. Poteet v. Medtronic*,
   552 F. 3d 503 (6th Cir. 2009) ...............................................9, 24, 26

*U.S. ex rel. Rosner v. WB/Stellar IP Owner*,
   739 F. Supp. 2d 396, 407 (S.D.N.Y. 2010)........................................29

*U.S. ex rel. Ryan v. Endo Pharmaceuticals, Inc.*,
   No. 05-3450, 2014 WL 2813103 (E.D. Pa. June 23, 2014)....................7

*U.S. ex rel. Saidiani v. Nextcare, Inc.*,
   No. 3-11CV141, 2013 WL 431828 (W.D.N.C. Feb. 4, 2013)................8

*U.S. ex rel. Springfield Terminal Railway Co. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ..........................................................15, 20

*U.S. ex rel. Taxpayers Against Fraud v. General Electric Co.*,
   41 F.3d 1032 (6th Cir. 1994) ..............................................................7, 9

*U.S. v. Chattanooga-Hamilton County Hosp. Authority*,
   958 F. Supp. 2d 846 (E.D. Tenn. 2013)...........................................18, 24

*United States ex rel. ATC Distrib. Group, Inc. v. Ready–Built Transmissions, Inc.*,
   No. 03 Civ 2150, 2007 WL 2522638 (S.D.N.Y. Sept. 7, 2007)..............6

*United States ex rel. Baker v. Community Health Systems*,
   No. 05-279 (D.N.M. Aug. 9, 2013) .....................................................33

*United States ex rel. Carter v. Halliburton Co.*,
   No. 1:11CV602, 2011 WL 6178878 (E.D. Va. Dec. 12, 2011), *rev'd on other
   grounds*, *U.S. ex rel. Carter v. Haliburton*, 710 F.3d 171 (4th Cir. 2013) .............11

*United States ex rel. Fry v. Guidant Corp.*,
   No. 3:03-0842. 2006 WL 1102397 (M.D. Tenn. Apr. 25, 2006) ...........12

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
   694 F. Supp. 2d 48, 58-59 (D. Mass. 2010) *rev'd on other grounds*, 647 F.3d 377,
   *cert. denied*, 132 S. Ct. 815........................................................12

*United States ex rel. Lefan v. General Elec. Co.*,
   397 Fed. Appx. 144 (6th Cir. 2010).....................................................30

iv

*United States v. Solinger*,
 457 F. Supp. 2d 743 (W.D. Ky. 2006) ..................................................................26

*Walburn v. Lockheed Martin Corp.*,
 431 F.3d 966 (6th Cir. 2005) ..............................................................................24

*Whipple v. Chattanooga-Hamilton County Hospital*,
 No. 3-11-0206, 2013 WL 4510801 (M.D. Tenn. August 26, 2013) (Campbell, J.) ...............18

STATUTES

31 U.S.C. § 3730(a) ..........................................................................................2

31 U.S.C. § 3730(b)(1) ......................................................................................2

31 U.S.C. § 3730(b)(5) ...............................................................................5, 11, 12

31 U.S.C. § 3730(d) .......................................................................................5, 9

31 U.S.C. § 3730 (e)(4) ......................................................................................5

31 U.S.C. § 3730(e)(4)(A) ........................................................................15, 16, 17, 20

31 U.S.C. § 3730(e)(4)(B) (2009) ........................................................................16, 17

ACA ...........................................................................................................17

ACA Amendments ...................................................................................... passim

Equal Access to Justice Act, 5 U.S.C. § 504(a)(1) ......................................................10

False Claims Amendments Act of 1986 ...................................................................4

Individuals with Disabilities Education Act, 20 U.S.C. § 1315(i)(30(B)(i)(I) ...........................10

PPACA.........................................................................................................18

Patient Protection and Affordable Care Act of 2010, Pub. L. 111–148, § 10104(j)(2), 124
 Stat. 119, 901–02 ("ACA").............................................................................16

OTHER AUTHORITIES

132 Cong. Rec. H9388...........................................................................................4

F.R.E. 408 ......................................................................................................9

Fed. R. Civ. P. 12(b)(1)................................................................................1, 2, 19

v

John T. Boese, *Civil False Claims and Qui Tam Actions*, § 4.03[C][2] at 4-189 (4th ed. 2014) ....................................................................................................................................12

Case 3:11-cv-00442   Document 125   Filed 11/24/14   Page 7 of 44 PageID #: 3074

# I.    INTRODUCTION

Having executed a global settlement with all Relators, the United States Government and multiple States paying the Government(s) $98 million and securing a release from Relators with the exception of their right to secure attorney's fees and costs,  Defendants now seek to evade responsibility for  attorney's fees and costs incurred by the team of private lawyers who, at the express and routine direction of Government lawyers, did substantial work in furtherance of securing the very settlement that caused the payment of $98 million.  It is noteworthy that Defendants do not seek dismissal of Relators' claims. They cannot; there is no basis to turn back the clock and open up for litigation a settled – and in this case a closed – matter.  At best, Defendants seek an Advisory Opinion on whether the case would have been subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(1) had they challenged the right of the relators to bring their action(s).  But now that the case has been settled, the matter of the relator's ability to litigate is moot and Article III Courts cannot adjudicate matters that are moot; nor can they issue advisory opinions.[1]  It has long been established that parties who secure benefits through settlement are prevailing parties entitled to fees and costs. Defendants seek to turn well established law on its head with the argument that parties should be able to litigate defenses that were forgone through settlement.

As Defendants do not seek dismissal of the Relators themselves; their grievance is limited to contention over the fees and costs incurred by counsel in securing this global resolution involving over 100 separate corporations and seven cases – each of which – merited

---

[1] "[I]t is well settled that federal courts may act only in the context of a justifiable case or controversy."  *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 407 (1972), *citing Benton v. Maryland*, 395 U.S. 784, 788 (1969).  Taking Defendants' argument to a logical extension, their real relief is to re-open and seek dismissal of a case that has been settled.  Yet they have not and cannot file a motion to dismiss.  In *Medical Committee for Human Rights*, review of an SEC Rule was deemed moot where the petitioner actually secured the relief sought.

intervention (and was intervened in) by the government(s). While Defendants presumably seek to parse out which case or cases might have been subject to challenge had Defendants not entered a global resolution, even if Defendants could turn back time and raise these issues, the reality is that all counsel worked in coordination with the Government(s) to perform the work necessary for resolution. Defendants executed their agreement lodged in this Court under the heading of this case without a whimper of a claim – or even reservation of a claim – that any Relator signing the settlement agreement had claims subject to dismissal under Fed. R. Civ. P 12(b)(1).

While Defendants may not be pleased that the Government needed to enlist the services of multiple counsel, conduct regular conferences and issue assignments, the hard fact is that Defendants took great pains to dodge the law. Their scheme of using facially neutral practices designed to drive unnecessary admissions was designed to evade detection. When a corporation – albeit over 100 corporations – band(s) together through a ring master to break the law, detection is complex, requires manpower and is not inexpensive. It is prerogative of the Government(s) to tap the private counsel in these types of cases. Indeed, the False Claims Act was amended in 1986 to encourage it.

Defendants neglect to cite any controlling authority, applying the first-to-file and public disclosure rules to an award of attorneys' fees where defendants have settled with relators who are "prevailing parties." In this case, the Government did not file its' own False Claims Act[2]

---

[2] False Claims Act violations may be initiated in two ways: (1) by the "Attorney General" investigating violations, pursuant to 31 U.S.C. § 3730(a); or (2) by "private persons" who "may bring a civil action for a violation of Section 3729 for the person and for the United States Government," pursuant to 31 U.S.C. § 3730(b)(1). In the second scenario, which is applicable to this case, the False Claims Act case is called a *qui tam* case denoting that it was initiated by a whistleblower rather than the Government. In this case, the Government did not file its own

2

case but instead chose to intervene in the claims of Relators here (and others) and settle all of the *qui tam* claims in a global settlement filed exclusively in this Court. Relators also gave up claims that the Government did not intervene in and changed the position of the parties. In addition, the Government encouraged the Relators to reach an agreement apportioning the bounty from the case and, after the relators reached a deal, the Government paid the parties specified by the agreement. Moreover, Defendants misconstrue the remedies that are available to them at this juncture in the case. Here, the case has already been settled and dismissed. The docket indicates that the case is closed. Despite the posture of the case, Defendants appear to seek dismissal of a case that has already been dismissed and/or an advisory opinion from the Court regarding which relator(s) would have been barred by the public disclosure and first-to-file rules if the Defendants had not agreed to settle their claims. For example, while Defendants request that this Court analyze the nationwide emergency room admission claims in each complaint, none of the claims are still pending as they were settled by the global agreement. For these reasons, the Court should not overturn the global settlement to allow the Defendants to belatedly manufacture statutory challenges, which were written for the benefit of the Government, not defendants.

Denying Relators' award of their fees and costs also undermines the policies underpinning the *qui tam* provisions of the FCA, strengthened substantially by Congress in 1986 to provide incentives to insiders or whistleblowers and their lawyers to ferret out and prosecute fraud on the Government. In Congressional hearings held before the passage of the 1986 amendments, Representative Howard Berman ("Rep. Berman") maintained that the purpose of the amendments was to "encourage a working partnership between both the Government and the

---

False Claims Act complaint but used the *qui tam* cases as the vehicle to prosecute the False Claims Act violations.

3

*qui tam* plaintiff" so that the "public will be well served by having more legal resources brought to bear against those who defraud the Government." *See*, Statement of Rep. Berman. *See* 132 Cong. Rec. H9388, daily ed. (October 7, 1986) (re False Claims Amendments Act of 1986). Rep. Berman went on to point out that the amendments sought to address Government shortfalls without appropriating more taxpayer dollars:

> [e]ven the United States Government is not without financial limitations. It is not uncommon for Government attorneys to be overworked and underpaid given the demanding tasks and frequently overwhelming caseloads they maintain … *If the government can pass a law that will increase the resources available to confront fraud against the government without paying for it with taxpayers' money*, we are all better off. This is precisely what [the False Claims Act] is intended to do: *deputize ready and able people who have knowledge of fraud against the government to play an active and constructive role through their counsel* to bring to just those contractors who overcharge the government.

*Id*. at pg. H 16. Emphasis Added.

Even if the Court choses to engage in an analysis of the first-to-file and public disclosure rules encouraged by Defendants, Relators' claims for attorneys' fees and costs should not be barred, as Relators satisfied the requirements of the public disclosure and first-to-file rules. For these reasons and those stated below, the Court should award Relators the fees and costs submitted by the undersigned, including the fees and cost associated with the litigation of the fee issue.

## II. THE COURT IS NOT REQUIRED TO ENGAGE IN ANALYSIS OF THE FIRST-TO-FILE AND PUBLIC DISCLOSURE RULES TO DETERMINE WHETHER RELATORS ARE ENTITLED TO REIMBURSEMENT FOR THEIR ATTORNEYS' FEES AND COSTS

### A. DEFENDANTS FAILED TO EXPRESSLY RESERVE THE FIRST-TO-FILE AND PUBLIC DISCLOSURE CHALLENGES

Defendants incorrectly claim that the "[a]greement reserved the issue of which relator (if any) was entitled to recover attorneys' fees." Def. Br. at p. 5. The Settlement Agreement simply

4

does not contemplate opening up a settled matter for the purpose of raising issues – *i.e.*, the standing of the Relators that could have been, but were not, raised. And while the vast majority of Defendants' brief belabors the first-to-file rule, 31 U.S.C. § 3730(b)(5), and the public disclosure rule, 31 U.S.C. § 3730 (e)(4), neither of those provisions are mentioned in any portion of the Settlement Agreement. There is also no mention of "first-to-file," "public disclosure," "standing" or "subject matter jurisdiction" in the sixteen page settlement document, which was the result of months of negotiation. The actual language of the attorneys' fee carve out states, "[a]ll parties agree that nothing in this Paragraph or this Agreement shall be construed in any way to release, waive or otherwise affect the ability of CHS to challenge or object to Relators' claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d)." *See* Agreement ¶¶ 8 & 15-16 [Dkt. 75-1].

Alternatively, Defendants' argue that the wording of Section 3730(d) itself – which references Section 3730(b) – somehow put Relators on notice of its plans to litigate a settled claim; but that argument is also without merit. Def. Br. at 7. The reference to Section 3730(b) (entitled "Actions by private persons") contained in Section 3730(d)(1) simply makes clear that when a private party brings an action under Section 3730(b) and prevails, he or she is entitled to a bounty as well as reasonable expenses and attorneys' fees. As discussed further below, there can be no dispute that this case involves Section 3730(b) cases brought by prevailing *qui tam* relators. The Government did not initiate the case and did not file its own complaint in intervention. Instead, it intervened in part of the Doghramji Relators' complaint (Dkt. 72), and Defendants settled the *entire* Doghramji complaint, including those claims not intervened in by the Government. *See* John. T. Boese, Civil False Claims and Qui Tam Actions, § 4.09[A], at 4-313 (4th ed. 2014) ("A . . . settlement . . . is sufficient to consider plaintiff a 'prevailing

5

plaintiff.'"); *United States ex rel. ATC Distrib. Group, Inc. v. Ready–Built Transmissions, Inc.*, No. 03 Civ. 2150, 2007 WL 2522638, at \*1, \*9, (S.D.N.Y. Sept. 7, 2007) (awarding attorney's fees to relator who was party to settlement between defendants and United States).

The failure to expressly reserve the challenges is fatal. Specifically, in *U.S. ex rel. Marena v. SmithKline Beecham Cor*p., 205 F.3d 97, 107 (3rd Cir. 2000), the Third Circuit held that the Government would have waived its claims that some of relators' claims were barred by the public disclosure rule, if the Government had failed to unambiguously request that the court retain jurisdiction of these claims in the settlement.

Finally, while Defendants argue that they had no notice of the claims in Relators' complaint and, thus, should not be "faulted for not raising the first-to-file argument prior to settlement,"[3] the truth is that the Defendants were provided with copies of all the complaints (redacted only with respect to the identities of the relators) in all seven settled actions about a year prior to the Settlement. *See*, Dkts. 73, 75, 89 (Buschner Decl. at ¶13). To now claim that they were somehow prejudiced by the date of unsealing of Relators' complaint is disingenuous and certainly does not merit the extraordinary relief they seek.

### B. DEFENDANTS FAIL TO CITE ANY AUTHORITY THAT REQUIRES THIS COURT TO ENGAGE IN AN ANALYSIS OF THE FIRST-TO-FILE AND PUBLIC DISCLOSURE RULES

Another theory advanced by Defendants is that – even absent reservation in the Settlement Agreement – this Court must engage in post-settlement/post-dismissal review of the first-to-file and public disclosure as "a matter of law" before awarding Relator's attorneys' fees because the case could have been dismissed (before it was settled) by Defendants. Defs. Br. at 9, 17 ("[t]here [a]re [n]o [e]xceptions [t]o [t]he [f]irst-[t]o-[f]ile [b]ar"). Under Defendants' theory,

---

[3] Defs. Br. at p. 12, n.6.

there could never be any finality in any settlement, let alone a *qui tam* settlement, where defendants could have raised any one of a number of defenses. Defs. Br. at 12. Such a result is at odds with common sense and, likewise, is not supported by any of the authority cited by Defendants.

For example, *U.S. ex rel. Ryan v. Endo Pharmaceuticals, Inc.*, No. 05-3450, 2014 WL 2813103, at *3 (E.D. Pa. June 23, 2014) does not involve a fee petition. It involves a situation analogous to the *Marena* case where the Government and the relators "[s]pecifically reserved at the time of settlement" the issue of which relator(s) should share in the bounty obtained by the settlement. *Id.* In the case at bar, the Government and the Relators have agreed on the relators share, including the apportionment of the bounty to each relator. Importantly, in *Ryan*, the defendant had no role in the briefing of the first-to-file issues because defendants have "no legal standing or right to participate in the proceedings" between the relator and the government concerning the relator's share. *U.S. ex rel. Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032, 1046 (6th Cir. 1994). In *Ryan*, the court specifically engaged an analysis to determine whether the claims were expressly reserved by the *Government* and, after finding no merit in a relator's assertion that the Government had not reserved the challenges, went on to decide which relator should share in the bounty. *Ryan,* 2014 WL 2813103 at *11. Emphasis added.

*U.S. ex rel. Johnson v. Planned Parenthood of Houston*, 570 Fed. Appx. 386 (5th Cir. 2014) is also inapplicable because it involved a post-dismissal appeal brought by a relator whose claims had already been dismissed under the first-to-file rule. Though Johnson had hoped to be a part of a settlement reached by the Government and Planned Parenthood, Johnson's claims were dismissed before the settlement was reached and she was not included. Likewise, in *Federal*

7

*Recovery Services, Inc. v. U.S.*, 72 F.3d 447, 449 (5th Cir. 1995), the relators sought to appeal the district court's decision to dismiss their claims and deny their attorneys' fees. In that case, the relators' claims were dismissed long before the Government resolved the case with the defendants and entered into a settlement agreement. *Id*. The same holds true for *Miller v. Holzmann*, 575 F. Supp. 2d 2, 9 (D.D.C. 2008), where the court denied the relator's requests for fees and costs related to claims (against one of several defendants) that were dismissed, based on the statute of limitations, before a jury returned a verdict on behalf of the Government and relators against a number of defendants.

Additionally, *U.S. ex rel. Beauchamp v. Academi Training Center, Inc.*, 933 F. Supp. 2d 825 (E.D. Va. 2013) is inapplicable as it involves defendant's motion to dismiss, not a post-settlement challenge to attorneys' fees. *See also, U.S. ex. rel. Lujan v. Hughes Aircraft Co.*, 243 F. 3d 1181 (9th Cir. 2001) (appeal of dismissal of relator's claims on the first-to-file rule not involving a post-settlement challenge to attorneys' fees).

The unreported case, *U.S. ex rel. Saidani v. Nextcare, Inc.*, No. 3-11CV141, 2013 WL 431828, at *3 (W.D.N.C. Feb. 4, 2013), also offers little support to Defendants' bid to escape responsibility for fees because the court's decision to deny a relator's fee petition was based upon the federal and state agreements that referenced another relator, Granger, "as receiving a Relator's share of the settlement proceeds." In the case at bar, the Settlement makes no reference to the payment of any one relator. And while Defendants make much of the Government's payment to Plantz, their assertion that "the Government had no difficulty recognizing that it was relator Plantz (and not Relators here) who was entitled to the relator's payment,"[4] is not

---

[4] Defendants attach a Settlement Agreement between Relator Plantz and the United States as Exhibit M to their brief. Nothing in the agreement supports Defendants contention that the United States believed Plantz was the only relator entitled to the bounty.

8

supported by anything in the record.  Defs. Br. at 11.[5]  To the contrary, before the settlement was lodged, the relators in all seven cases reached an agreement regarding the division of the bounty and informed the Government that they sought to have Plantz take the bounty assigned to the nationwide emergency department admission claims and distribute it.  Dkt. 89  (Buschner Decl. at ¶ 15).  Transmission to Plantz was a result of an offer in compromise.  *See* F.R.E. 408.

Finally, the *Taxpayers Against Fraud* case cited by Defendants fails to provide any basis to litigate the first-to-file and public disclosure rules post-settlement and post-dismissal.  The relators in *Taxpayers Against Fraud* were not parties to the settlement agreement between the United States and the defendant General Electric and, as such, their claims against the defendant (or the Government for that matter) had not been resolved.  41 F.3d at 1036; *see,* 1992 Settlement Agreement, Ex. A to Decl. of Traci L. Buschner (November 24, 2014)(in support of this Reply); *accord, U.S. ex rel. Poteet v. Medtronic*, 552 F. 3d 503, 509-510 (6th Cir. 2009) (government settled with defendant and then sought dismissal of relator's claims based upon the public disclosure bar).  In *Taxpayers Against Fraud*, the relators litigated the issue of whether they were entitled to a bounty with the Government.  *Id*. at 1036.  After the relators were awarded a share of the bounty, the Government appealed the award and lost.  It was only after the litigation with the Government concluded that relators sought statutory fees from the defendant pursuant to 31 U.S.C. § 3730(d).  *Id*.

---

[5] Without any citation to the Settlement or otherwise, Defendants also surmise that just because the Government paid Plantz,"the Government acknowledged in granting *Plantz* the relator's share, it was on the basis of his complaint that the *government received a settlement [from CHS] for the national ED claim*."  Emphasis added.  Defs. Br. at 12.  While it is certainly convenient for Defendants now to offer that they paid the Government based solely upon the *Plantz* case, it has no bearing on the fee petition or even the first-to-file or public disclosure challenges they now seek to bootstrap onto the Settlement Agreement.  It is worth noting that in the Settlement Agreement Defendants deny liability on all the claims.  Dkt. 75-1 at p. 5, ¶ F.

9

## C.     RELATORS ARE PREVAILING PARTIES

Defendants' challenges also ignore that Relators are prevailing parties.  In *Miller*, the district court held that while the fee-shifting provision of the FCA wasn't "exactly a model of clarity," it should be interpreted to mean that attorneys' fees and costs should be awarded to "prevailing *qui tam* relators" in a manner that is consistent with other fee-shifting schemes such as those in the Equal Access to Justice Act, 5 U.S.C. § 504(a)(1), the Individuals with Disabilities Education Act, 20 U.S.C. § 1315(i)(30(B)(i)(I), and various civil rights statutes.  575 F. Supp. 2d at *5-*9.  Specifically, with regard to the fee-shifting provision in the FCA, the court held:

> "[h]appily, here, Congress left an additional, unambiguous clue to its intent in drafting the FCA attorneys' fees provision.  In its report accompanying the 1986 amendments, the Senate Judiciary Committee characterized the FCA's fee-shifting scheme as applying to 'prevailing qui tam relators.' As explained above, the qualifier 'prevailing' appears in numerous other federal fee-shifting provisions, and its meaning is well-established."

*Id*. at *7.  Internal citations omitted.   The court explained that for a plaintiff to qualify as a prevailing party, he "[should] receive at least some relief on the merits of his claim.'"  *Id*. at *8, citing *Hewitt v. Helms*, 482 U.S. 755, 760 (1987), overruled in part on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995).  Here, Relators materially altered the legal relationship between the Relators and the Defendants, entitling Relators to an award of attorneys' fees and costs.  *See*, *Texas State Teachers Assn. v. Garland Independent School Dist*, 489 U.S. 782, 792 (1989).  Specifically, the Relators attained three benefits sought in bringing suit:  the Government recouped $88 million for Defendants unnecessary emergency department admissions, the Defendants entered into a Corporate Integrity Agreement requiring them to cease their wrongful conduct, and the Doghramji Relators received a portion of the bounty paid by the Government.

10

In addition, the Defendants agreed to settle the Doghramji Relators' remaining claims, which the Court approved in dismissing the complaint.[6]

## III. RELATORS' CLAIMS WERE NOT BARRED BY THE FIRST-TO-FILE RULE PRIOR TO THE SETTLEMENT AND DISMISSAL OF THE CASE

Even if the Court analyzes the applicability of the first-to-file rule, however, it will find that Relators' claims were not barred. As Defendants concede, a court has jurisdiction over a later-filed *qui tam* suit where it (i) is based on facts different from those alleged in a prior suit; and (ii) gives rise to separate and distinct recovery by the government. Although, as Defendants contend, a *qui tam* action that fails either prong is subject to dismissal, *see* Def. Br. at p. 8 (citing *U.S. ex. rel. Branch Consultants v. Allstate Ins. Co*., 560 F.3d 371, 378 (5th Cir. 2009); *Walburn v. Lockheed Martin Corp*., 431 F.3d 966, 970 (6th Cir. 2005); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001)), the present case satisfies both prongs.

In *U.S. ex rel. Ortega v. Columba Healthcare, Inc*., 240 F. Supp. 2d 8, 13 (D.D.C. 2003), the court held that the first-to-file bar is inapplicable where the later complaint alleges "a different type of wrongdoing on new and different material facts" and gives rise to a separate recovery by the government. *See also U.S. ex rel. Capella v. United Techs. Corp*., No. 3:94-CV02063 (EBB), 1999 WL 464536, *9-11 (D. Conn. June 3, 1999) (concluding that Section 3730(b)(5) bars a later claim unless it is based on different material facts and a separate recovery of actual damages by the government); *Erickson ex rel. United States v. Am. Inst. of Biological Sci*., 716 F. Supp. 908, 918 (E.D. Va. 1989) (holding later action barred unless based on different facts and gives rise to a separate and distinct recovery); *United States ex rel. Carter v. Halliburton Co*., No. 1:11CV602 (JCC/JFA), 2011 WL 6178878 (E.D. Va. Dec. 12, 2011)

---

[6] *See* Relators' Brief in Support of their Motion for Award of Attorneys' Fees and Costs, Dkt. 87 at p. 15.

11

(finding that both prongs of *Erickson* were satisfied, but noting that first element was the crucial one), *rev'd on other grounds*, *U.S. ex rel. Carter v. Haliburton*, 710 F.3d 171 (4th Cir. 2013); John T. Boese, *Civil False Claims and Qui Tam Actions*, § 4.03[C][2] at 4-189 (4th ed. 2014) (discussing two-prong test).

Further, as explained by the *Capella* court, when performing this two-prong inquiry, the court should consider whether there is a parasitic relationship between the earlier and later actions, "such that the subsequent suit receives support or advantage without offering any useful or proper return." 1999 WL 464536 at *9-11. This accords with "a central purpose of Section 3730(b)(5) [which is] the preclusion of plaintiffs with merely duplicative claims." *United States ex rel. Fry v. Guidant Corp.*, No. 3:03-0842. 2006 WL 1102397, at *6 (M.D. Tenn. Apr. 25, 2006). Applying this standard to the facts before it, the *Capella* court ruled that the actions involved similar, but different, facts and did not provide a double recovery.

Here, the Doghramji Complaint alleged new, material facts that had not been alleged in any prior-filed cases. In fact, it was the first complaint to allege a company-wide scheme affecting CHS hospitals across the country. In *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, the district court held that the relator's later-filed complaint, which described essentially the same fraudulent conduct as the first-filed pleading, was not jurisdictionally barred because, unlike the first-filed complaint, it alleged a nationwide scheme. 694 F. Supp. 2d 48, 58-59 (D. Mass. 2010) *rev'd on other grounds*, 647 F.3d 377, *cert. denied*, 132 S. Ct. 815.

Moreover, the Doghramji complaint provided the statistical analysis that permitted the Government to establish this nationwide conspiracy. While the allegations in each of the other complaints focused on conduct at only one CHS facility or made general, conclusory claims regarding a nationwide scheme, the Doghramji Complaint contained particularized allegations

12

that CHS used ProMed, the Blue Book, financial incentives, and the threat of termination (and or incentives) to encourage physicians to increase Emergency Room ("ER") admissions regardless of medical necessity. The Doghramji Relators alleged that, motivated by a need to service its mounting debts, CHS devised a scheme to grow revenues by increasing inpatient ER admissions. Cmplt. at ¶ 1,[7] First Amended Cmplt. ("FAC") at ¶¶ 1, 107-113.[8] CHS, however, knew that its ER growth was constrained by the limited number of sick people who could potentially need its services and, as a result, it needed to be creative in finding ways to admit more patients. For that reason, CHS's executives decided to standardize and centralize ER operations at CHS facilities, giving the executives exclusive control. Cmplt. at ¶ 1; FAC at ¶¶ 3, 116. CHS used this control to implement practices that were geared towards increasing ER admission rates. Cmplt. at ¶ 3; FAC at ¶¶ 3; 118. These policies (1) set and constantly monitored admissions quotas at each hospital; (2) required the use of a CHS-developed admission criteria (the Blue Book); (3) required the use of standardized software that would direct physicians in making diagnoses and determining treatments (ProMed); and (4) maintained strong controls over hospital physician contracts. Cmplt. at ¶4; FAC ¶ 4. In addition, CHS executives and their hospital-specific counterparts worked to increase ER admission rates by (1) encouraging the admission of Medicare patients who fell into certain "soft" diagnostic categories (chest pain, abdominal pain, syncope, etc.) regardless of medical necessity; (2) pressuring ER physicians to increase admissions rates regardless of medical necessity; (3) terminating the contract of physicians and physicians' groups that failed to meet the arbitrary admission quotas; and (4) directing case managers to justify admissions or decisions not to admit using the Blue Book's lax standards. Cmplt. at ¶¶4; FAC ¶ 4, 118.

---

[7] Dkt. No. 1.

[8] Dkt. No. 52.

As proof that CHS's nationwide scheme was both carried out and led to the filing of false claims, the Doghramji Complaint described identical conduct at CHS hospitals in Illinois, Missouri, New Jersey, Oklahoma, Pennsylvania, and Tennessee, and the impact this conduct had on admission rates.

The Doghramji Complaint also contained a detailed statistical analysis performed by the Service Employees International Union, which revealed that CHS's pattern of aggressive admission practices caused the unnecessary admission of Medicare beneficiaries. Cmplt. at ¶¶ 119-139; FAC ¶¶ 136-148. The analysis further demonstrated that after CHS began using ProMed and the Blue Book, and began its wrongful conduct, the ER admission percentage at a vast majority of its facilities ballooned to rates far in excess of the national average. In fact, 42.5% of CHS hospitals had admission rates so high that they are classified as outliers that warranted further investigation for Medicare fraud. Cmplt. at ¶ 122; FAC ¶ 139. The statistical data also showed that shortly after being acquired by CHS, the admission rates at various hospitals grew exponentially, suggesting that the Company's efforts to manufacture admissions were successful. Cmplt. at ¶ 127; FAC at ¶ 144.

The Doghramji Complaint also included particularized allegations describing CHS's wrongful conduct at each of the Doghramji Relators' hospitals. Cmplt. at ¶¶ 140-207; FAC at ¶¶ 157-224. None of the complaints filed prior to the Doghramji Complaint adequately alleged that CHS orchestrated a nationwide scheme to increase revenue by manufacturing admissions, and none of the related complaints alleged any claims with regard to the following hospitals. Moreover, to the extent the prior-filed complaints contained allegations concerning hospitals cited in the Doghramji Complaint, those prior pleadings did not adequately allege violations of the FCA for all hospitals. In some complaints, there were no detailed allegations of FCA

14

violations for each hospital. As a result, the Doghramji Complaint did not allege the same material facts as the prior-filed complaints and, therefore, is not subject to §3730(b)(5)'s first-to-file bar.

More important, perhaps, and in keeping with the *Capella* court's mandate that a "subsequent suit . . . offer[] a[] useful or proper return," 1999 WL 464536 at *9-11, the Doghramji counsel did not simply duplicate work by other counsel. They expended considerable resources to assist in the Government's investigation — at the Government's direction. Thus, the Doghramji Relators' counsel offered "useful and proper" support to the case.

Finally, because the government settled all seven cases as one, there is no possibility of a double recovery. *See Id.*

## IV. RELATORS' CLAIMS WERE NOT BARRED BY THE PUBLIC DISCLOSURE RULE PRIOR TO THE SETTLEMENT AND DISMISSAL OF THE CASE

There is no merit to Defendants' argument that the Court lacked subject-matter jurisdiction over this case pursuant to the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A) before the case was settled and dismissed or even now.

The public disclosure bar was created as a limited mechanism, "[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *U.S. ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994), citing *Marcus v. Hess*, 317 U.S. 537 (1943) (relator copied his *qui tam* case from a criminal indictment). Defendants' papers simply ignore this fact while attempting to

15

use a bar written for the benefit of the Government[9] as a shield to protect them from accountability.

## A.    THE PUBLIC DISCLOSURE BAR AND THE 2010 ACA AMENDMENTS

The FAC was recently amended to narrow the scope of the public disclosure rule.  Prior to March 2010, Section 3730(e)(4)(A) of the FCA provided that

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2009).

An "original source," in turn, was defined as:

> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B) (2009).  Thus, public disclosure, as defined in the prior statute, stripped a court of subject-matter jurisdiction to hear a relator's case.

The Patient Protection and Affordable Care Act of 2010, Pub. L. 111–148, § 10104(j)(2), 124 Stat. 119, 901–02 ("ACA"), amended the FCA's public disclosure bar, effective March 23, 2010.  It now reads:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

---

[9] *See United States ex rel. Branch Consultants v. Allstate Ins. Co*., 560 F.3d 371, 381 (5th Cir. 2009).

16

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

The ACA also amended the definition of "original source." 31 U.S.C. § 3730(e)(4)(B) now provides:

For purposes of this paragraph, 'original source' means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

The effect of these amendments was to, *inter alia*,

- eliminate the jurisdiction-stripping effect of the public disclosure bar;

- further limit the sources of information that could be considered "public disclosures" under the rule;

- expand the definition of "original source"; and

- permit the government to waive public disclosure as a bar to a relator's suit.

*See, e.g., U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 914-18 (4th Cir. 2013) (describing effect of the amendments).

While the Fourth Circuit held that the ACA amendments applied only to conduct occurring after its passage, March 23, 2010, it is the only court of appeals to opine on the retroactivity of the amendments. *Id*. at 918-19. Though Defendants cite *May* and two district

17

court cases, including one from the U.S. District Court for the Eastern District of Tennessee,[10] to support the application of pre-2010 public disclosure rule to cases filed after the amendments, a district court's opinion from this judicial district in *Whipple v. Chattanooga-Hamilton County Hospital*, No. 3-11-0206, 2013 WL 4510801, at *2 (M.D. Tenn. August 26, 2013) (Campbell, J.) supports the opposite conclusion.  In *Whipple*, the district court held that the "*jurisdiction[11]* of the Court should be determined under the statute as it existed at the time this action was filed" and applied the 2010 ACA amendments to a case filed after the effective date of the statute, but concerning some allegations of misconduct before the amendments.  *Emphasis added*.  Making a distinction between adjudicating jurisdictional issues, on the one hand, and the merits of the case on the other the court held that challenges to the merits would be "judged under the statute as it existed at the time of that alleged misconduct."  *Id*., *citing Graham County Soil and Water Conservation District v. United States ex rel. Wilson*, 559 U.S. 280 (2010) and *Hughes Aircraft Co. v. United States ex rel. Shumer*, 520 U.S. 939 (1997).

Similarly, in *U.S. ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp.3d 34, *44 at n.3. (D. Mass 2014), the court applied the 2010 public disclosure rule to a case filed after effective date of the amendments, finding that the Supreme Court's ruling in *Wilson* was not applicable to Booker's case because "*Wilson* merely concluded that this provision of the PPACA was not retroactive, and thus refused to apply the amended statute to an action pending as of March 23, 2010."  *Id*.

---

[10] *U.S. v. Chattanooga-Hamilton County Hosp. Authority*, 958 F. Supp. 2d 846 (E.D. Tenn. 2013) (applying the pre-2010 amendments to a case filed after enactment but concerning solely claims pre-dating the amendments).  This case is also readily distinguished from the at bar; here, both the Relators' claims the Settlement reach address Defendants illegal conduct after enactment of the 2010 amendments.  *See* FAC at ¶¶ 12, 14; Doghramji Decl. at ¶ 37; Bryant Decl. at ¶ 3.

18

While the law is not fully settled, there is no reason to apply the pre-2010 FCA here where (1) Relators' original complaint was filed on May 10, 2011 over a year after the 2010 Amendments, qualifying it for treatment consistent with *Whipple*; and (2) the claims in Relators' complaint extended beyond March 23, 2010, consistent with the terms of the Settlement. Dkt. No. 75-1 at p. 3, ¶ D.1 (Defendants submitted false claims from January 1, 2005 to December 31, 2010); *See* Dkt. 52, FAC at ¶ 12, 14 (Relators Doghramji and Bryant had knowledge of unlawful conduct occurring at CHS hospitals after the ACA amendments); Doghramji Decl. at ¶ 37; Bryant Decl. at ¶ 3.[12]

Nonetheless, as explained below, Relator's claims are not barred — jurisdictionally or otherwise — by either the pre- or the post-2010 version of the public disclosure bar.

### B.   RELATORS' CLAIMS ARE NOT SUBSTANTIALLY SIMILAR OR BASED UPON ANY QUALIFYING DISCLOSURE

When determining whether public disclosure rule bars a complaint, the Court must first identify the relator's claims and then apply the rules on a "claim-by-claim basis." *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 579 (E.D. Va. 2011); citing *Rockwell Int'l Corp v. United States*, 549 U.S. 457, 477 (2007). Specifically, the court must "review the substance of the relator's complaint and identify the allegations that give rise to 'a discrete and independent cause of action for fraud.'" *Davis*, 753 F. Supp. 3d at 583 (court found six discrete claims of fraud), *quoting U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.,* 496 F. 3d 1169, 1177 (10th Cir.

---

[12] While the Relators have concluded that any analysis of the public disclosure bar is not warranted under the circumstances here, the rules pertaining to a Rule 12(b)(1) motion to dismiss should apply if the Court determines that it is required to engage in the public disclosure analysis urged by the Defendants. Defendants have asked this Court to suspend time and turn back the clocks to engage in this challenge and, therefore, there is no reason that the procedural rules that would have existed pre-dismissal should not apply. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts.

19

2007). Here, the *Doghramji* complaint alleges a nationwide pattern and practice of unlawful ED admissions occurring at 74 different independent hospitals operated by CHS.

The Relators disclosed the allegations in their complaint to the Government in early February 2011, prior to both the Tenet Complaint and the SEC filings.[13] While Relators do not dispute that the sources of information identified by Defendants brief could qualify as "public disclosures," pursuant to the FCA's limited definition of that term, none of the information in those sources – (1) the *Reuille* case; (2) the Tenet lawsuit and press coverage about the lawsuit; and (3) SEC filings – are "substantially similar"[14] to the nationwide ED admissions claims regarding 74 hospitals alleged in Relators' complaint. For the same reasons, Relators' Complaint cannot possibly be "based upon"[15] the sources of information identified by Defendants either. *See Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994) (disclosure must reveal allegations and transactions, rather than mere information); *Dingle v. Bioport Corp.*, 388 F. 3d 209, 213-14 (6th Cir. 2004) (same); *Davis*, 753 F. Supp. 2d at 579-80 (same).

### 1. *Reuille* Complaint

Though Defendants argue that the *Doghramji* case was based upon the *Reuille* complaint – which was unsealed in late 2010 – they are wrong for a number of reasons. In particular,

---

[13] See, Dkt. 91, Decl. of David Dean at ¶ 10; Dkt. 89, Decl. of Traci Buschner, and Decl. of Brian Gillis at ¶16, (Relators Counsel met with the Department of Justice on February 14, 2011 prior to filing their complaint).

[14] The amended FCA public disclosure rule, 31 U.S.C. §3730(e)(4)(A), (2010) states that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed…."

[15] The pre-2010 FCA statute bars claims that are based upon the public disclosure of "allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."

Defendants argue that "Reuille alleged that *CHS*[16] had engaged in a scheme to "fraudulently receive 'inpatient' reimbursement," but a close reading of Reuille's complaint at ¶10.b reveals that Reuille blames "Lutheran" hospital in Zanesville, Indiana (where Ms. Reuille was employed) for improper admissions not CHS. *Cf*. Defs. Br. at p. 21 and *Reuille* Cmplt. at ¶10.b, attached to Defs. Br. at Exhibit B. This is significant because the Doghramji relators did not sue Lutheran Hospital in Zanesville but, instead alleged a nationwide pattern and practice by Defendants at 74 other hospitals relating to false ED admissions.

While Defendants submit that their "chart," identified as Exhibit X, conclusively proves the *Reuille* complaint "substantially overlaps" the claims made by Relators, in reality it does nothing more than compare similar words and phrases in both complaints without any regard for context, location, timing or the nature of the Doghramji claims involving 74 individual hospitals engaged in illegal ED admissions. For this reason, it is about as probative as the computer software program that allows for comparison of two Microsoft word documents. For example, Defendants chart fails to take into account that Ms. Reuille's knowledge of the submission of unlawful claims is limited to time periods *prior* to CHSPSC's acquisition of Lutheran Hospital in December 2007. Defs. Br. at Ex. B at ¶22, 32-34. Specifically, in September 2006 – a year and a half before CHSPSC purchased the hospital – Ms. Reuille, who was a billing manager, was reassigned to another job where she was precluded from auditing charts and excluded from attending "departmental supervisor meetings." *Id*. at ¶¶ 32-33. While she stayed on at Lutheran after her reassignment for approximately two years, it was not until December 2007 that CHSPSC acquired the hospital. *Id*. at 22, 34. In short, the allegations regarding "one day stays"

---

[16] Reuille's complaint is against Lutheran Musculoskeletal Center, LLC d/b/a Lutheran Hospital (Lutheran Hospital") and Community Health Systems Professional Services Corporation ("CHSPSC").

derived through Ms. Reuille's audits (occurring until 2006) involved Lutheran's wrongdoing before it became associated with CHSPSC, not after.  *Id.*

In *Davis*, the district court rejected a similar effort by the defendant to lump relator's claims together without regard for context, location or timing and held that public disclosures of claims related to the "WPPS II contract [for security services in the middle east] cannot serve to prevent relators from prosecuting claims relating to the Hurricane Katrina contract [for security services in Louisiana]," especially when the allegations concerned two different time periods. 753 F. Supp. 2d at 585-6; *see also U.S. ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 45 (D. Mass. 2014) ("government's awareness of fraud that occurred entirely in the past, may not alert the government to future fraud" and does not bar claims "bringing additional instances of fraud to light.") *quoting*, *U.S. ex rel. Hogett v. Univ. of Phoenix*, 2012 WL 2681817, *5 (E.D. Cal. July 6, 2012).

Finally, to the extent that her complaint mentions the blue book and an uptick in inpatient admissions after CHSPSC acquired Lutheran, the allegations did not put anyone, including the Government, on notice the nationwide ED admission claims relating to 74 other hospitals contained in the *Doghramji* complaint and settled by the Government.  Specifically, when the *Reuille* case was unsealed, it was initially declined by the Government and appears to have received no press coverage.  Even by their own lights, Defendants do not contend that Reuille alleged a nationwide ED admissions scheme.  To the contrary, all of their papers urge the Court to bestow this status on *Plantz* alone.  *See*, Defs. Br. at pp. 10-11.  Similarly, chart X fails to take Defendants' own position into account.

### 2.    The *Tenet* Lawsuit and News Stories

Defendants are wrong that Relators' complaint should be barred by the *Tenet* lawsuit and the resulting news stories.  As Defendants acknowledge the Tenet lawsuit was not a False Claims

Act action, but a lawsuit alleging that CHS had made false and misleading statements to investors. Defs. Br. at pp. 3-4. Tenet brought the lawsuit to fight off a bid by CHS to acquire it. Though Tenet alleges that CHS violated the False Claims Act, the lawsuit fails to contain any specific information from anyone with inside knowledge of CHS hospitals (as the *Doghramji* complaint does) and argues almost exclusively that CHS's Blue Book was the source of over admissions. *See, e.g.*, Defs. Br. at Exhibit H, ¶¶10-18, 37-97, 103. And while Defendants make much of the statistical analysis in the *Tenet* complaint, it is obvious that that the Tenet analysis is *not* the same statistical analysis contained in Relators complaint. *Id.* at ¶¶ 98-104. Even a cursory review of the *Tenet* complaint shows its statistical analysis only concerns CHS's admissions and observation rates *as opposed to other hospital chains*, such as Triad, not an analysis of 74 of Defendants' hospitals that is contained in Relators' complaint. *Id.* For the same reason the news stories quoted by Defendants also do not bar Relators' claims. The news stories merely echo the Tenet allegations. Even the passages of the news stories quoted by Defendants on pages 19-20 confirm that the Blue Book and data comparing other hospitals to CHS was the import of the news stories. *See* Defs. Br. at 19-20.

Moreover, nothing in the Tenet complaint covers many of the core facts or claims made by the Doghramji Relators, including, but not limited to allegations that CHS:

- centrally set and enforced goals for hospital-level ER admissions without regard to medical necessity and then requiring monthly reports to corporate headquarters on compliance;

- installed an electronic tracking system in the ER, linked to corporate headquarters as well as hospital administration, to monitor the status of ER patients in real time and facilitate corporate intervention in ER decision-making;

- interjected hospital administrators into medical decision-making in the ER in order to promote the admission of identified Medicare patients who fall into certain "soft" diagnostic categories – such as chest pain, abdominal pain, and syncope (fainting) – who did not meet established criteria for medically necessary admission;

23

●       forced hospital administrators to set admissions quotas for the ER and for individual doctors, monitoring doctors' individual and physician group admission rates through electronic tracking, and attending physicians' meetings to pressure doctors to comply with the quotas; and

●       terminated the contracts of those ER physician groups refusing to comply with CHS's unlawful goals.

*See* Dkt. 1, Complt. at ¶4, p. 3. To claim that the Doghramji complaint is a "carbon copy" of the Tenet complaint – as Defendants do – strains credulity. Defs. Br. at 24. The facts show that the Relators offered an original analysis, prepared by the SEIU (now no longer in the case) and not based upon any information from Tenet. Decl. of Brian Gillis at ¶14. Additionally, with the exception of some information about the Blue Book, none of the facts alleged by the individual Relators is duplicative of anything in the Tenet complaint.

Likewise, Defendants' argument that Relators' complaint should be barred because it merely added "slightly different" details is without merit. Defs. Br. at 24-25. While Defendants cite to *Poteet* to support application of the public disclosure rule, the case is distinguishable because both relators were sales managers from the same company who alleged that their employer paid kickbacks to doctors. The Sixth Circuit held Poteet's claims were barred by the public disclosure of the prior complaint because Poteet's complaint alleged the same scheme as the prior complaint, differing only by adding the names of certain doctors. 552 F. 3d 503, 514. In *Walburn*, the relator had filed a previous law suit alleging the same false claims and the court of appeals precluded the second law suit making the same allegations. 431 F.3d 966, 974; *Accord*, U.S. v. *Chattanooga-Hamilton Cnty. Hosp. Authority*, 958 F. Supp. 2d 846, 864 (E.D. Tenn. 2013) (relator's claims based upon allegations and transactions disclosed in husband's prior lawsuit and news stories).

24

Other cases cited by Defendants are distinguishable because the relator had no independent knowledge of the public disclosure. While "direct and independent knowledge" is an element of the "original source" exception under the pre-ACA amendments, the facts pertaining to the source of the information are also pertinent when determining whether a complaint is "based upon" or substantially similar to a prior disclosure. Here, the SEIU Relator and the other *Doghramji* Relators had direct and independent knowledge of the fraud; it was not derived from the Tenet lawsuit.

In *U.S. ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 735 (M.D. Tenn. 2013), the court determined that the relator had no independent information of his own aside from the disclosure in the newspaper. *See also*, *Dingle*, 388 F. 3d at 211-12(relators sought different standard for the "based upon" prong and did not challenge "original source" determination by district court)[17]; *In re Natural Gas Royalties*, 562 F. 3d 1032, 1046 (10th Cir. 2009) (relator provided no information regarding any named defendant, in many case, and handwritten notes of briefly describing telephonic interviews or attempted telephonic interviews of other defendants); *U.S. ex rel. Findlay v. FPC-Boron Employees' Club*, 105 F.3d 675, 691 (D.C. Cir. 1997) (no knowledge prior to disclosure).

### 3.    SEC Filings

All of the SEC filings cited by Defendants[18] were filed after the *Tenet* complaint in mid to late April 2011 just weeks prior to the filing of the *Doghramji* Complaint and two months after Relators disclosed the information in their complaint to the Government. The SEC filings

---

[17] See *U.S. ex rel. Dingle v. Bioport Corp.*, 270 F. Supp. 2d 968, 978-980 (W.D. Mich. 2003) (district court held that relators did not qualify as original sources).

[18] Exhibits J, K, and L.

25

also fail to bar Relators' claims for many of the same reasons that the *Reuille* complaint cannot bar their claims.

First, to the extent the filings mimic allegations made in the *Reuille* complaint, as the April 22, 2011 8-K does, it cannot serve to bar the nationwide ED admissions alleged by the *Doghramji* Complaint. Moreover, the mere mention of the Government's investigation of "improper billing for inpatient care at other hospitals associated with [CHS],"[19] hardly reveals sufficient "allegations and transactions" to adduce that CHS hospitals nationwide engaged in fraud related to admitting patients to the hospital that did not require such care. Improper billing could relate to thousands of different scenarios having nothing to do with improper emergency room admissions. *See United States v. Solinger*, 457 F. Supp. 2d 743, 754 (W.D. Ky. 2006) (disclosure did not the state the "type of impropriety or how they [*sic*] could be found"). For that reason, the SEC filings simply do not reveal "allegations or transactions" of the nationwide ED admissions claims at 74 hospitals or the "critical elements" of such claim "from which fraud can be inferred." *Davis*, 753 F. Supp. 2d at 591, *citing Springfield*, 14 F. 3d at 654; *see also*, *U.S. ex rel. Poteet v. Medtronic, Inc.,* 552 F. 3d 503, 511 (6th Cir. 2009) (public disclosure must reveal the "same kind of fraudulent activity against the government alleged by the relator"); *U.S. ex rel. Liotine v. CDW Government, Inc.*, No. 05-33-DRH, 2009 WL 3156704 (S.D. Ill.,Sept. 29, 2009) (publication did not  reveal critical elements of an "overall practice by defendant or industry scheme to overcharge the government" and was not deemed to be public disclosure).

---

[19] Defs. Br. at p. 22

## C.  RELATORS ARE ORIGINAL SOURCES

Even if the Court finds that that one or more of the sources cited by Defendants qualifies as a public disclosure, the Relators here qualify as original sources of the information under the either the pre-ACA or post-ACA public disclosure rule.[20]

Under the pre-ACA amendments, Relators qualify as an original source because they disclosed their information to the Government prior to the *Tenet* complaint and they collectively have direct and independent knowledge of the allegations of fraudulent emergency room admissions by 74 of CHS's hospitals, including the nationwide coordination of these efforts by CHSI and CHSPCS.[21]  The individual relators worked at hospitals operated by CHS collectively from at least 2005 to 2011 and have direct and independent knowledge of the Chestnut Hill, Dyersburg and Heritage hospitals in Pennsylvania and Tennessee as well as information about the nationwide policies and practices that led to the excessive emergency room admissions in CHS hospitals.  See, Decl. of Rachel Bryant at ¶ 3, Decl. of Sheree Cook, and Dr. James Doghramji at ¶3-5.  SEIU also gathered information from employees working at CHS hospitals nationwide and developed a statistical analysis that demonstrated excessive emergency room admissions in 74 hospitals.  Gillis Decl. at ¶ 15.

Defendants are incorrect that the sum total of this information cannot confer "original source" status on Relators.  *Atkinson,* 255 F. Supp. 2d at 363 (each relator brought different

---

[20] That the SEIU is no longer a relator in the case is of no consequence.  See, *U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, 255 F. Supp. 2d 351, 376 (E.D. Pa. 2002) (withdrawal of one relator cannot deprive the other relator of original source status); *Booker*, 9 F. Supp. 34 at *24-5 (that one relator obtained his knowledge indirectly through another relator poses no obstacle to the "original source" exception).

[21] Moreover, to the extent that the court finds *Reuille* to qualify as a public disclosure, SEIU's agent, Change To Win Investment Group, had disclosed the violations to the U.S. Department of Health and Human Services in September 2010, including the statistical analysis prepared by SEIU.  See, CHS 8-K (April 18, 2011), Ex. 99.1, attached Decl. of Traci Buschner (November 24, 2014) at Ex. B; Gillis Decl. at ¶¶ 12-13.

27

information to the government and qualified as original sources). The declaration of Brian Gillis, a Research Coordinator at SEIU, indicates that he and another research analyst for SEIU "spent approximately one year developing, designing, programming, and completing a comprehensive statistical analysis of emergency room admissions at CHS facilities." Gills Decl. at ¶1, 5. Gillis' declaration also discusses the detailed processes and modeling he performed for SEIU, which is described in the complaint. Dkt 1, Cmplt. at ¶¶ 119-131. Gillis discussed the SEIU's findings with Relator Doghramji prior to filing the case "further confirming our [SEIU's] results and the situation at Chestnut Hill." Gillis Decl. at ¶ 15. In addition, Gillis testified that SEIU researchers contacted and spoke to approximately 100 doctors and nurses who work or previously worked at 20 CHS facilities in 7 different states. *Id.* The information gathered in these interviews also confirmed the statistical analysis performed by the SEIU. *Id.* Gillis also testified that SEIU "did not obtain or receive information, statistical evidence, or assistance from Tenet Healthcare Corporation prior to the Complaint filed in this lawsuit." *Id.* at 14.

Defendants argue that "merely analyzing information that already exists in the public domain, and asserting fraud based on that analysis, does not make a relator an original source," but their argument misses the mark. Defs. Br. at p. 27. Relator's original source information is not limited to merely analyzing data, it includes information from over 100 witnesses, information from Relators Doghramji, Cook, and Bryant who all worked for CHS hospitals, and a detailed statistical analysis by SEIU that took over a year to complete. Just because some of the information relied upon in the complaint is in the public domain, it does not preclude Relators from being original sources. A relator "need not … have personal knowledge of all of the elements of a claim … to qualify as an original source." *U.S. ex. rel. Allen v. Guidant Corp.*, 2012 WL 878023, *8 (D. Minn., Mar. 14, 2012). In *Allen*, the court held that the "FCA 'seeks to

encourage person with first-hand knowledge of fraudulent misconduct … or those who are either close observers … to come forward." *Id.*, *quoting U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995).

Moreover, nothing about the SEIU's investigation or development of the statistical analysis precludes them from demonstrating the direct and independent knowledge requirement. In *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F. 3d 562, 568 (11th Cir. 1994), the Eleventh Circuit held that a relator who acquired knowledge though "three years of his own claims processing, research and correspondence with members of Congress and HCFA [now CMS]" was an original source. *See also, Koch v. Koch Industries, Inc.*, 1995 WL 812134, * 12 (N.D. Okla. Oct. 6, 1995) (relator may qualify as an original source where the core information underlying the relator's complaint resulted from his own investigation); citing, *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Prudential Insurance Co.*, 944 F. 2d 1149, 1161 (3rd Cir. 1991). As discussed above, in Section IV.B.(2) "Tenet Lawsuit and News Stories," the authority cited by Defendants is not germane to this case because those cases involved parties who had no information of their own. Additionally to the extent that the Defendant claims that the CMS data underlying the SEIU's statistical analysis itself is a public disclosure, they are incorrect. Even under the pre-ACA public disclosure rule, raw unanalyzed data does not qualify as a public disclosure. *See U.S. ex rel. Rosner v. WB/Stellar IP Owner*, L.L.C., 739 F. Supp. 2d 396, 407 (S.D.N.Y. 2010).

For the same reasons articulated above, Relators are also "original sources" under the public disclosure rule in place following the 2010 ACA amendments, which Relators submit applies here. Specifically, Relators meet the first prong of Section (e)(4)(B) because they voluntarily disclosed their information to the Government prior to any qualifying public

disclosure *or* – to the extent the Court finds they did not disclose prior to a qualifying public disclosure – they "have information that is independent of and materially adds to the publicly disclosed allegations" and "voluntarily provided the information to the Government before filing" their action. Indeed, the Relators all had knowledge "independent" of the disclosures: SEIU began its statistical analysis in 2009; SEIU also conducted its interviews of 100 doctors and nurses prior to filing; and the individual Relators all worked for CHS hospitals where they became aware of Defendants' over admissions to the emergency room. Moreover, Relators' information materially added to the public disclosures as the Government intervened in their claims, requested that they assist in the Government's investigation, and used their statistical evidence to help guide the national audit of Defendants. As discussed, the Relators were also part of the settlement agreement and were paid part of the bounty.

For these reasons, Relators claims should not be barred by the public disclosure rule as Defendants contend.

## V.    RELATORS' ATTORNEYS' FEES AND COSTS ARE REASONABLE AND NOT DUPLICATIVE

CHS argues that even if Relators were entitled to recover attorneys' fees, the Court should award Relators less than the amount requested. *See* Defs. Br. at pp. 30-34. CHS' challenge to the reasonableness of Relators' fees misconstrues Relators' work in the case and mischaracterizes the description of Relators' work in their billing records. Relators' fees are reasonable and should be awarded in full.

CHS does not challenge the propriety of hiring out-of-town *qui tam* specialists, which under Sixth Circuit precedence justifies Relators' request for out-of-town rates for their non-Nashville counsel. *See United States ex rel. Lefan v. General Elec. Co.*, 397 Fed. Appx. 144, 147-48 (6th Cir. 2010). It also does not challenge the reasonableness of Relators' requested

expenses. Instead, it quibbles with the number of firms the Relators retained. In so doing, CHS tries to ignore the fundamental nature of the vast majority of the work for which Relators seek fees: factual investigation, document review, and analysis done at the direction of and for the benefit of the Government in its investigation of CHS. This substantial amount of work was divided up between the attorneys involved, and did not result in duplicative billing because different attorneys worked on different projects. Had this work been performed by attorneys at one firm, it would have little to no effect on the hours expended, which are a function of the amount of material to be reviewed and analyzed, not the number of firms employing those doing the review and analysis.

Likewise, CHS' emphasis on the number of hours billed demonstrates the scope of the investigation, not duplication of work. Relators named 74 different hospitals in their Complaint, plus Community Health Systems, Inc. and Community Health Systems Professional Services Corporation. CHS produced, at the very least, tens of thousands of documents to the Government, and Government attorneys interviewed over 40 witnesses. Counsel for Relators reviewed documents from multiple custodians, drafted multiple deposition and interview outlines, prepared several topical research memoranda synthesizing evidence in the case, and assisted the Government in putting together a statistical analysis of CHS' emergency department admissions that drew heavily from the statistical analysis that Relators offered in their complaint. CHS' description of the case as one "only investigated by the Government and never unsealed or actually litigated," Defs. Br. at p. 30 tries to ignore this important context. Work performed by

31

Relators' counsel was an essential part of the Government's investigation, and in that circumstance 7,000 hours is not a surprising amount of time.[22]

CHS cites only two other examples in support of its contention that Relators overstaffed the case. Both are without merit. First, CHS complains that Relators' counsel participated in conference calls held approximately every two weeks and organized by the Government. Yet the very purpose of these calls was *to reduce duplication and increase efficiency*. Given the volume of documents produced, it was not possible for a single attorney to review the entirety of the production. The calls ensured that attorneys did not review overlapping sets of documents, and increased efficiency by permitting attorneys to share information they had learned in their review so that it could be applied by other attorneys in their work. Indeed, had the Government *not* coordinated discovery efforts in this way, CHS would no doubt cite the lack of such calls as evidence of duplicative work. Second, CHS contends that overstaffing resulted from having more than one attorney involved in preparation and review of the 165-page complaint, the 164-page disclosure statement, and the complex statistical analysis at the core of Relators' complaint. CHS also appears to believe that *any* time spent developing strategy or discussing the development of the case is "unnecessary work." CHS offers no explanation for this position, and does not even attempt to quantify the amount of time spent on these projects, which it would need to do to show that it was excessive. Common sense and sound professional judgment dictate that more than one attorney should be involved in these important tasks.

While Relators' respectfully submit that they did not overstaff the case, even if there was some limited duplication of work it would not justify the 25% reduction in fees that CHS seeks. As CHS begrudgingly acknowledges, *see* Defs. Br. at p. 31 n.20, Relators' work was done at the

---

[22] A review of Relators' billing records also makes clear that a core group of 13 professionals performed the vast majority of the work on the case, many fewer than the 40 cited by CHS.

direction of the Government and to benefit the Government's prosecution of CHS.  CHS makes

no real challenge to the core of the work for which Relators seek fees – review of documents and

preparation of work product to assist the Government.  Nor is this the kind of work likely to

result in duplication, since different attorneys are assigned different documents and projects.

Given that most of the work Relators' counsel performed was of this nature, a 25% reduction in

fees would be excessive.[23]

   CHS' challenge to the rates charged by specific attorneys is also without merit, and does

not justify a reduction in fees.  As a starting point, CHS has no objection to hourly rates of the

range requested here when seeking reimbursement of its *own* fees.[24]  However, in an unrelated

*qui tam* proceeding in New Mexico, CHS sought sanctions against the United States for alleged

discovery abuse, including reasonable attorneys' fees and expenses incurred by CHS.  CHS

requested recovery for rates as high as $968 per hour due to the resources of the Department of

Justice, the "national law firms" representing relators in that case, and the "complex cases."

Magistrate Judge's Proposed Findings and Recommended Disposition, at pp. 5, 37, *United States*

*ex rel. Baker v. Community Health Systems*, No. 05-279 (D.N.M. Aug. 9, 2013).  While the

Magistrate Judge did not approve sanctions at CHS' requested rates, it did utilize the adjusted

*Laffey* Matrix to approve rates as high as $753 per hour.

---

[23] CHS does not even attempt to quantify the amount of overstaffing that it contends justifies a
25% reduction in fees.  Even its vague claim that Relators' counsel spent "hundreds" of hours on
"unnecessary" conferences does not come close to reaching a quarter of the total hours included
in the fee petition.  And it is also a much smaller percentage than that at issue in the cases CHS
cites.  *See*, *e.g.*, *Harkless v. Husted*, No. 06-cv-2284, 2011 WL 2149179, at *21 (N.D. Ohio Mar.
31, 2011) (the challenged time spent meeting, conferring, and developing strategy represented
22% of the fees billed).

[24] Recently, Relators sought, through a letter and formal discovery request, the production of
Defendants' counsels' billing records in this matter, including the hourly rates charged to CHS
and the hours billed. So far, CHS has not responded to this request.  The discovery request is
attached to this Reply.

Regarding the challenges to specific attorneys, the rates for Reuben Guttman, Traci Buschner, David Dean, and Emilie Kraft[25] should not be reduced by 30 percent. As explained above, these attorneys' rates are lower than those requested by CHS for its attorneys in national *qui tam* litigation, and the rates that CHS paid its attorneys is relevant in light of its challenge to reasonableness of Relators' attorneys' fees. *See*, *e.g.*, *Falana v. Kent State Univ.*, No. 5:08-CV-720, 2012 WL 6084630, at *4 (N.D. Ohio Dec. 6, 2012). And as explained in Relators' opening brief, these attorneys have substantial experience in national *qui tam* and complex litigation that justifies their rates. In arguing that Mr. Guttman's rate should be reduced, CHS also makes much of the $650 per hour rate sought by Marlan Wilbanks in unrelated *qui tam* litigation. Defs. Br. at p. 32 n.23. However, Mr. Wilbanks practices in Georgia, not Washington, D.C. Moreover, Mr. Wilbanks has been paid rates *exceeding* $650 per hour, but chose to use a discounted billing rate for the fee petition cited by CHS. *See* Defs. Br. Exhibit Y, Wilbanks Dec., ¶ 13.

Similarly, the rates for Oderah Nwaeze and Glen Capers are appropriate. Mr. Nwaeze and Mr. Capers graduated from law school in 2011 and 2002, respectively, and their greater experience justifies higher rates than for Ms. Calvin, the 2010 graduate whose $260 per hour rate CHS cites. Additionally, Defs. Br. Exhibit Z, CHS incorrectly characterizes Mr. Nwaeze as a contract attorney; he was an associate with Grant and Eisenhofer P.A. from 2011 to 2014. CHS is likewise incorrect that some time entries for "document review" are insufficiently detailed. Counsel is "not required to record in great detail how each minute of his time was expended" so long as their records "identify the general subject matter of his time expenditures." *Hensley v. Eckerhart*, 461 U.S. 424, 437 n.12 (1983). In the context of this case and the document review

---

[25] Ms. Kraft graduated from law school in 2005 and worked for James & Hoffman for over 4 years, leaving in August 2012.

done at the direction of the Government, entries such as "document review" are sufficiently detailed to identify the subject matter of the work. *See also McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005) (affirming the district court where it "found that the entries made by McCombs's counsel were sufficient even if the description for each entry was not explicitly detailed"); *Anderson v. Wilson*, 357 F. Supp. 2d 991, 998-99 (E.D. Ky. 2005) (time records that provide "the subject matter, the attorney, the time allotment, and the charge for all work done on Plaintiffs' case" are sufficient). CHS also cherry picks a subset of entries: Mr. Nwaeze and Mr. Capers provided more detail in many of their entries, and contemporaneous entries by other attorneys provide additional context. *See*, *e.g.*, Nwaeze 2/1/12 ("Create timeline of relevant documents regarding observational stays"); Nwaeze 7/9/13 ("Draft deposition outline for Lynn Simon"); Nwaeze 10/2/13 ("Draft deposition outline for Michael Miserocchi"); Young 4/6/12 (indicating that Mr. Capers was reviewing Cothern documents); Young 4/12/12 (indicating that Mr. Capers was reviewed Marty Smith documents)

## VI.    CONCLUSION

For the reasons articulated herein, the Court should award the Relators the attorneys' fees and costs, including sums expended to support their award for fees and cost and to oppose the numerous procedural motions Defendants have filed post-settlement.

Date: November 24, 2014                    Respectfully submitted,

/s/ Reuben A. Guttman
Reuben A. Guttman
Traci L. Buschner
**GRANT & EISENHOFER P.A.**
Suite 875
1747 Pennsylvania Ave., NW
Washington, DC 20006
Tel: (202) 386-9500
Fax: (202) 386-9505
rguttman@gelaw.com
tbuschner@gelaw.com

35

David W. Garrison
Scott P. Tift
**BARRETT JOHNSON**
**MARTIN & GARRISON, LLC**
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel:  (615) 244-2202
Fax: (615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

Kit A. Pierson
David A. Young
**COHEN MILSTEIN SELLERS**
      **& TOLL PLLC**
Suite 500 West
1100 New York Ave NW
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 4084699
kpierson@cohenmilstein.com
dyoung@cohenmilstein.com

*Attorneys for Relators*

36

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2014, a copy of the foregoing *Relators' Reply Memorandum in Support of Relators' Motion for Award of Attorneys' Fees, Costs and Expenses* was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to the counsel of record listed below.

John R. Jacobson
William M. Outhier
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203

John-David H. Thomas
Assistant United States Attorney
Office of the United States Attorney
Middle District of Tennessee
110 Ninth Avenue, S
Suite A961
Nashville, TN 37203

/s/ David W. Garrison
**DAVID W. GARRISON**
**BARRETT JOHNSTON**