IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

UNITED STATES OF AMERICA,      )
ex rel.                        )
                               )
vs.                            )    Case No.
                               )    3:11-cv-442
COMMUNITY HEALTH SYSTEMS,      )
INC., et al.                   )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE JULIET E. GRIFFIN, MAGISTRATE JUDGE

TRANSCRIPT OF

**ELECTRONIC RECORDING**

OF PROCEEDINGS

April 7, 2015

Status Conference

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
APPEARANCES:

        For the Relators:    Mr. David W. Garrison
                             Ms. Traci L. Buschner
                             Attorneys at Law
                             1747 Pennsylvania Ave. N.W.
                             Suite 875
                             Washington, DC 20006

                             Ms. Jan Soifer
                             Mr. Patrick J. O'Connell
                             Attorneys at Law
                             98 San Jacinto Boulevard
                             Suite 540
                             Austin, TX 78701

PREPARED BY:

                     CATHY B. LEIGH, RDR, CRR
                      Official Court Reporter
                     801 Broadway, Room A839
                       Nashville, TN 37203
                        (615) 512-7544

1    APPEARANCES (Continued):

2                                    Mr. Stephen G. Young
                                     Attorney at Law
3                                    446 James Robertson Parkway
                                     Suite 200
4                                    Nashville, TN 37219

5                                    Mr. Mitchell Reed Kreindler
                                     Attorney at Law
6                                    9219 Katy Freeway, Suite 206
                                     Houston, TX 77024

7
             For Defendants:        Mr. John R. Jacobson
8                                    Attorney at Law
                                     1906 West End Avenue
9                                    Nashville, TN 37203

10                                   Mr. Michael L. Waldman
                                     Attorney at Law
11                                   1801 K Street N.W.
                                     Suite 411L
12                                   Washington, DC 20006

13

14

15

16

17

18

19

20

21

22

23

24

25

1    The above-styled cause came on to be heard on

2  April 7, 2015, before the Honorable Juliet E. Griffin,

3  Magistrate Judge, when the following proceedings were had,

4  to-wit:

5    THE COURT:  This is the case of *United States of*

6  *America, ex rel., James Doghramji versus Community Health*

7  *Systems, Inc., et al.*  The Case Number is 3:11-0442.

8  Consolidated into that case are the cases of Number

9  3:14-2160, 3:14-2195 and 3:15-0110.

10    This is an interesting situation actually.  It

11  probably has no relevance to you all at all, but the first

12  listed first named case, which is the oldest case into which

13  the other cases have been consolidated, is in fact listed as

14  closed because there is a final judgment, and all we have got

15  is the attorney's fees.  So we've got a closed case, and then

16  we've got these other cases that came in and have now been

17  consolidated with a closed case.  That's not your problem.

18  To the extent it is anybody's problem, it is mine or

19  administratively it is a problem.  It is just an odd

20  situation.

21    Tell me what you all want to do.  Have you

22  talked?  Do you have a joint proposal?  What is the

23  status?  Or any kind of proposal?  Yes, sir.

24    MR. GARRISON:  Your Honor, David Garrison, along

25  with Ms. Buschner, who will come up in a second.  We don't

have a joint proposal.  We, as you know, Ms. Buschner and

myself represent the relator in the case that was filed here

in Nashville and have asked for status conference a couple of

times, and then most recently asked for this status

conference with CHS.

        But would like to introduce Ms. Buschner, who is

prepared to kind of give some background, at least explain

what the relators -- and I know the other realtors' counsel

will speak for themselves, but to propose how we see an

efficient way of proceeding.

        THE COURT:  All right.  Thank you.  Ms. Buschner.

        MS. BUSCHNER:  Thank you, Your Honor.  As Mr.

Garrison said, amongst the relators we talked a little bit

about how to deal with the order that we got from Judge

Sharp.  And I want to address that, but first I would like if

you could indulge me, if I could give you a little background

about the case that I thought might be very helpful to you in

helping us try to reach some sort of schedule here that the

judge has asked us to do.

        Where we are now is, as you noted, we have at

least three cases that are consolidated here.  The *Doghramji*

case, which is the case that Mr. Garrison and I are here

today about is the case that was filed in Nashville.  It was

part of a settlement that was reached with the United States

Government and 29 states and over a hundred separate

1  corporations affiliated with CHS.  In that settlement, it
2  resolved the claims of seven different cases, relator cases
3  that were brought in various parts of the country, including
4  Texas, Illinois, and here, Your Honor, in Nashville.

5         The settlement was a result of a multi-year
6  investigation by the United States Government and the states
7  in which the relators participated hand in hand with the
8  government to help reach the settlement.  For many years, we
9  worked on reviewing documents that they had gotten from CHS
10 and its affiliates.

11        They issued CIDs, or civil investigative demands.
12 I don't know if you have heard of those before.  I am sure
13 you have.  But subpoenas essentially where thousands and
14 thousands of documents were produced.  We worked hand in hand
15 with the government to do CID depositions of high-level folks
16 in CHS and its over a hundred affiliates.  And that all
17 resulted in a settlement of about $98 million.

18        And in that case, in those seven cases, the United
19 States and the states intervened on the seven cases here.  At
20 least the United States did on the seven cases here.  The
21 states intervened in a smaller subset.

22        But the Government intervened, and then, you know,
23 CHS, the government, and the relators, all seven agreed to
24 settle these claims.  And in the settlement, the relators,
25 all seven groups of relators gave up claims that they had

1  against CHS under the False Claims Act.

2           In some cases, I think that there are remaining

3  claims of retaliation for some of the relators.  That's not

4  the case in the *Doghramji* case.  So not all of the claims

5  were settled, but in some respects the cases that were

6  intervened on by the Government, those cases were settled.

7           Under the False Claims Act, as you probably are

8  aware -- I know Mr. Garrison has told me that you worked on

9  some of those cases -- there is a fee shifting provision not

10 unlike the civil rights statutes which allow the litigants to

11 recover fees and costs in a case where they are the

12 prevailing party.  And in this case, all seven of the

13 relators were prevailing parties because CHS entered the

14 settlement agreement by which the seven relators received

15 relief from the government in terms of a bounty from that $98

16 million.

17          Also, CHS and its a hundred affiliates entered

18 into corporate integrity agreement with the HHS, the U.S.

19 Government, to curtail the practices that the complaints

20 alleged that they are involved in.  And the settlement

21 outlines many of those claims.  Some of the relief, the

22 largest relief that the Government got were for claims that

23 CHS unnecessarily admitted Medicare and Medicaid patients

24 into their hospital for overnight stays where they were not

25 needed.

1        As I said, all of the seven sets of cases, there

2   is multiple layers in some of the cases.  In our case, for

3   example, there is three relators.  They were able to achieve

4   a result and change the position of the parties, not unlike

5   other civil rights cases.

6        In the settlement agreement, the parties agreed

7   that this issue of the relators' fees would be left open or

8   reserved so that the relators could file fee petitions.

9        When we entered the agreement, the defendants

10  claimed or said that they would like to reserve certain

11  challenges to the settlement.  And when we ended up -- and

12  just so that you sort of know the procedure in the cases that

13  around spring of 2014, the Government had a handshake deal

14  with the defendants, and then we negotiated the settlement

15  that we have before you.  And I think that took several

16  months, to my recollection maybe four or five months.  At no

17  time during that time did they raise the issue that which

18  they are raising here which is that they would like to

19  challenge the jurisdiction or the standing of the seven

20  relators that were going to be involved in the settlement.

21        And so when, Your Honor, when you moved -- I think

22  we gave our actual hours to them I think back in May or June

23  of last year, 2014.  There really wasn't much discussion

24  about the fees, and so we basically learned that they weren't

25  really willing to compromise on the fees.  And so that was

1 after the settlement agreement was reached in August 4, 2014
2 that left us with filing a fee petition, and we did so in
3 late September of 2014.
4         Now, some of the other relators can give you --
5 their counsel can give you more information about what's
6 happened in their cases, but it is my understanding at least
7 with respect to one of the Texas cases, counsel who are
8 sitting here at this table, Ms. Soifer and Mr. O'Connell, had
9 filed a fee petition in that case as well.
10        I think -- and like I said, I don't want to step
11 on anyone's toes.  Mr. O'Connell represents another relator,
12 and I am not sure that a fee petition has been filed in that
13 case, but that's where we are.
14        And so about September we realized for the first
15 time, CHS had never raised this, that essentially they want
16 to raise an issue that really should have been brought at the
17 motion to dismiss phase.
18        Now the issue that we're talking about is a
19 provision of the False Claims Act called the first to file
20 provision, a standing provision that was essentially passed
21 by Congress in order to provide some comfort to the
22 government who were getting multiple filings on the same
23 issue.  And so in that case, the government can dismiss a
24 second filed case if it adds no value or is what is noted as
25 maybe a parasitic lawsuit.

1          In this case, the government didn't dismiss the
2     seven cases for the first to file bar, and they in fact
3     intervened in the cases.  And at the time of intervention, or
4     slightly before the time of intervention, they asked the
5     relators to work together to come up with a way to divide the
6     bounty that would come from this $98 million settlement.  And
7     the relators entered into an agreement whereby they divvied
8     up the money.

9          They asked the government to pay one relator, a
10    relator that's in Chicago that was in the Northern District
11    of Illinois, and the Government ended up paying that relator.
12    And that relator paid a portion of the bounty to all seven
13    relators that are encompassed by the settlement agreement.

14         And so going back to the time at which we filed
15    the fee petition, you know, we first hear about this first to
16    file rule, which is, you know, the case has been closed, as
17    Your Honor noted, at least in the *Doghramji* case.  And the
18    case has been settled.

19         Essentially what we understand is that the
20    defendants are seeking some sort of advisory opinion perhaps
21    about what would have happened or should have happened had
22    they filed a motion to dismiss way back when before they
23    settled the case, or perhaps they are asking this court maybe
24    to like entertain a motion to dismiss post settlement.  It is
25    unclear to me.  The settlement itself -- we have some copies.

1  Your Honor.  May I may I approach?

2             THE COURT:  Sure.

3             MS. BUSCHNER:  I think it is the first tab.

4             MR. GARRISON:  It is actually the defendants.

5             MS. BUSCHNER:  Oh, it is.  Okay.

6             So, Your Honor, we had portions of the settlement

7  agreement, and on page 10, paragraph 8, at the end of that

8  paragraph it says:  All parties agree that nothing in this

9  paragraph or this agreement shall be construed in any way to

10 release, waive or otherwise affect the ability of CHS to

11 challenge or object to relators' . . .

12            Then it has a statutory provision there, 31 U.S.C.

13 3730(d).  And 3730(d) relates to the ability of prevailing

14 parties to be paid for the work that they did in order to

15 achieve the result, to achieve justice.

16            Nothing in this provision discusses raising issues

17 that would be raised on a motion to dismiss or 3730(b)(5),

18 which is the statutory section that involves the first to

19 file challenge.

20            So and then if you will look at the next tab, this

21 is really where relators reserve their right to get

22 reasonable attorney's fees and costs.  Page 15 at C,

23 paragraph 1.

24            So the parties knew that this issue would confer,

25 but they didn't, at least from our point of view, the

relators' point of view, no one in their farthest imagination
believed that standing, something that's normally brought
before a case is settled or resolved, would be brought to the
forefront.

Having not been able to point to any extensive
point in the settlement agreement, the defendants have made
numerous arguments that somehow the statute allows them to
escape paying fees and costs of relators who brought the
claims and that were settled. But none of the statutory
provisions that they cite in their briefs really say that.
It is they have a strange interpretation of the statute
essentially, which I guess they would say that unless the
Government wrote the relator a check personally to each
relator that they wouldn't be entitled to fees and costs even
though they were a prevailing party.

And they have made numerous arguments in their
briefs about that, and I am not sure that this is the time or
the place to make all these arguments about why they believe
that the first to file bar applies, or if it is encompassed
by the settlement, or whether there should be some analysis.
It does seem that the Court is interested in some kind of
analysis of whether that claim is in fact one that could be
made. And so we understand that, and, you know, we would
work -- we'd like to work, you know, with the Court to
address it, I guess, in the most expeditious manner possible,

1  in part because these issues of first to file have been

2  already raised.  They were raised in October in our case, and

3  they were raised I think about the same time in the case that

4  was in Texas.

5          And so and the other thing is, Your Honor, to be

6  quite honest, I mean CHS and its affiliates had copies of our

7  complaints prior to settlement going back to 2013.  So even

8  though the case was settled in 2014, they had redacted copies

9  of our complaint.  So it is not like this is, you know, it

10  didn't dawn on them at the last minute that there were more

11  than one relator or that there could be some challenge to

12  bring, but yet they basically sat on their rates here.  We

13  would put forth here that they sat on their rates, and now

14  what they really want the relators to do is to go through a

15  long drawn-out process, part of which we have already gone

16  through, to be honest with you, over the last couple of

17  months in briefing these issues.

18          Now, it may be that it would be helpful to have

19  some sort of consolidated briefing, if that's helpful to the

20  Court at least, on the part of the relators, and so I guess

21  what we were -- we had talked amongst ourselves about was

22  possibly a situation where within 21 days we would do a

23  consolidated brief.  And if there were issues that were

24  specific to one party, you know, that they would like to make

25  that are different issues because of the timing of their

1   complaint or the issues, we could do something like that and

2   then have maybe the defendant respond in 21 days and then a

3   seven-day reply time.

4           I mean, we're really getting, you know, to the

5   point where almost at a year since this settlement has been

6   entered, and there has been, you know, hundreds of motions

7   filed to stay and to raise these issues.  But in part, you

8   know, they have been briefed.  And maybe they could be

9   crystallized, and maybe we could do that in order to assist

10  the Court because it seems like that may be where the Court

11  is going.

12          But I guess that's sort of our proposal.  But I

13  don't want to cut off the other relators if they have other

14  ideas or if there is things that I, you know, have missed

15  here.

16          THE COURT:  All right.  Thank you.

17          MR. GARRISON:  Your Honor, I'd like to introduce

18  to the Court Jan Soifer from O'Connell & Soifer assisting Pat

19  O'Connell with her.  She is going to speak with regard to the

20  *Cook-Reska* matter and *Reuille*.

21          MS. SOIFER:  Thank you, Your Honor.  My name is

22  Jan Soifer, and Pat O'Connell and I are here from Austin,

23  Texas.  We represent the first two relators to have filed

24  lawsuits against CHS or any of its affiliates of the seven.

25  Nancy Reuille filed a case January 7th, 2009 in the Northern

1   District of Indiana.  And Amy Cook-Reska filed a case May

2   22nd, 2009 in the Southern District of Texas.  So those two

3   cases are the cases in which we represent relators of these

4   seven cases.  And --

5           THE COURT:  I am sorry, when you say -- can we be

6   clear?  And I think Judge Sharp made reference to there might

7   be another case.  You are just dealing with four cases at

8   this point?

9           MS. SOIFER:  Yes, Your Honor, that's correct.  So

10  what happened is there were seven cases.  Two of them CHS

11  settled without the need for a fee application or a transfer

12  to this court.  So those two cases that were resolved are the

13  third case and the sixth case.  Leaving the first, second,

14  fourth and seventh.  So Mr. O'Connell and I and our law firm,

15  O'Connell & Soifer, represent the relators in the first and

16  second cases.

17          Mitch Kreindler back here represents the relator

18  in the fourth case.

19          And Mr. Garrison and Ms. Buschner represent the

20  relators in the seventh case.

21          And there is one more case out there.

22          THE COURT:  What about the fifth case?

23          MS. SOIFER:  That's the one more case out there.

24  It is pending in the Southern District of Illinois, and it

25  has not been transferred to this court, but neither has it

1   been resolved. I understand that one of the issues is that

2   there is as part of that case a wrongful retaliation claim.

3   And so I don't know why -- I think CHS could speak to why

4   that case hasn't been transferred here yet or whether it in

5   fact will be resolved there or transferred here.

6           But I can speak to the fact that the *Cook-Reska*

7   case is a little bit different from the others in that Ms.

8   *Cook-Reska* filed her case, as I said, in May of 2009 in the

9   Southern District of Texas. She alleged wrongful admissions

10   processes generally both through the emergency department,

11   what we call ED admissions, what the settlement agreement

12   calls ED admissions, and also through other parts of the

13   hospital, direct admissions through the hospital for

14   procedures and that sort of thing.

15           She also alleged some Stark and Anti Kickback

16   violations. The case ended up settling with two separate

17   parts. One part of the settlement was a nine million dollar

18   settlement of Ms. Cook-Reska's claims for Stark,

19   Anti-Kickback, and nonED admissions. And the rest settled

20   with a $88 million settlement of the ED, wrongful E D

21   admissions. And those wrongful ED admissions were alleged by

22   all seven cases.

23           But Ms. Cook-Reska was the first and only relator

24   to raise the ones that were settled for 9 million dollars.

25   Ms. Cook-Reska was allocated and received a direct relator

share or bounty from the court for the $9 million.  CHS
hasn't paid our fees in that either.  And they filed a motion
to sever and transfer our fee claims for the ED claims here
and to keep the fee claims for the nonED claims and the Stark
Anti-Kickback case in Houston.

So we have gone through all sorts of briefing in
Houston, as you might imagine.  We filed a motion, a
consolidated motion to receive our attorney's fees.  They
filed a motion to transfer and sever.  They filed a response.
We filed replies.  They filed sur replies, et cetera, et
cetera, et cetera.

The court stood with that sever and transfer and
ordered us to file an amended fee petition for the nine ED
Stark and Anti-Kickback claims only, which we have done.

We ended up asking that court to just transfer the
whole case here because the problem is, as the Court might
well imagine, as plaintiffs' lawyers when we recorded our
time, there was a lot of time we spent just developing the
case in its entirety, talking to our client, doing legal
research, preparing the complaints that you can't sever
between the two sets of claims that were settled.

We didn't foresee that they'd be settled in that
manner, so there is a lot of time that falls into there.  And
the case law is really clear that you get paid, particularly
in the Fifth Circuit the case law is clear if we had only

settled one set of claims or the other, we would get the time that we spent on all the others.

So we thought it should be all in one place. The Court has not ruled on our motion to transfer the rest of the case here.

THE COURT: So part of that case is still pending in Texas?

MS. SOIFER: That's correct.

THE COURT: So nine ED admissions involved?

MS. SOIFER: That's correct. Ms. Reuille's case had a retaliation piece of it which we ended up resolving, and then we transferred. We agreed to transfer the rest of the case here because all the other cases were being transferred here.

So there are seven cases. This court only has four of them. There is one more that could come here possibly plus the other part of our case of Cook-Reska's case could come here possibly. But overall, the settlement of the seven cases cost CHS almost a hundred million dollars. And the seven different cases we all work together, particularly the lawyers in these four cases. And the relators in these four cases that are before this court, we all worked together with the Government at the Government's direction for many years. In fact, Ms. Cook-Reska has been working with the Government since she filed her case in May of 2009. And then

1   when the other cases were filed, we all started working

2   together.  And despite the more than six years of work that

3   we have done on behalf of Ms. Cook-Reska's case on the first

4   and on behalf of Ms. Reuille's case, despite the government's

5   intervention in all seven cases and despite CHS's requirement

6   in the settlement agreement that all seven relators' cases be

7   dismissed and all of our claims be dismissed, even the ones

8   that were not resolved by settlement and for which CHS knew

9   that the relators were all receiving a portion of the relator

10  share because the government required that we all get

11  together and work out a deal.

12          And CHS knew that we were all going to get

13  together and work out a deal.  We did.  They still haven't

14  paid except for the third and sixth cases.

15          And in fact, they won't even pay Ms. Cook-Reska to

16  whom the government directly allocated relator share in two,

17  on both parts of her case.  The government directly allocated

18  a relator share on the $9 million which is now in Houston,

19  but they also directly allocated a relator share in part of

20  the remaining $88 million.

21          THE COURT:  Why just part?

22          MS. SOIFER:  Well, the government has a

23  convoluted explanation, but essentially they allocated a

24  relator share for the one hospital in which Ms. Cook-Reska

25  focused her efforts and that they paid on behalf of the court

1   reparant.

2           So they did write us a check for both parts of the

3   settlement.  They did write Ms. Cook-Reska a check, and they

4   still won't pay her attorney's fees.  And they are still

5   contending that they don't have to.  And they are -- I will

6   let them explain their arguments.

7           THE COURT:  Well, they are saying they should only

8   be paying attorney's fees on --

9           MS. SOIFER:  In one case.

10          THE COURT:  In case one?

11          MS. SOIFER:  Well, they are saying in case three

12  and they also paid in case six.  And the truth is that's not

13  how the False Claims Act works.  The False Claims Act works

14  based on claims, not on cases.  So of course they have to pay

15  attorney's fees on successful claims.  And they are coming up

16  with this argument that they only pay in one case when in

17  fact the cases may have different claims, which is one of the

18  issues that we all have.

19          But in addition in a case like this where all of

20  the relators worked together to the benefit of all of the

21  relators and to the benefit of the government, it is our

22  contention that the -- and let me add this.  The government

23  allocated the work so that we didn't duplicate effort.  There

24  were several million documents that CHS produced, and the

25  government doled them out to us.  We didn't get to choose

1  which ones we reviewed, but the Government doled them out to
2  us and then had us not only review and tag and summarize
3  those documents, the hot ones, but they also asked us to
4  prepare deposition outlines for them to use, which we all
5  did.

6          And so we did all of this work that all resulted
7  in this almost hundred million dollar settlement, and now CHS
8  wants to say, oh, we only have to pay one relator's counsel.
9  And it is that that we all contend is not only not supported
10 by the statute, not supported by the facts, not supported by
11 anything other than this convoluted argument that they are
12 making.

13          So our interest in all of this, Your Honor, is
14 resolving this as soon as we can.  As the Court can well
15 imagine, having worked on these cases for more than six
16 years, having settled, reaching a handshake settlement almost
17 a year ago and a final resolution last August, we are still
18 out here and we have been forced to file all of these
19 different pleadings in two different -- actually three
20 different courts because we had the case in Indiana as well.
21 And at this point we just want to have this over with, and
22 so the schedule that we all came up with that would have us
23 filing whatever pleading the Court wants in three weeks
24 from -- 21 days from today.  Have CHS file a response 21 days
25 after that.  And then have us file a reply seven days after

1  that, and then let's have a hearing as soon after that as
2  possible which puts us to the beginning of June.
3         So that's the schedule that we are recommending
4  and requesting that makes the most sense.  Of course all of
5  these issues have already been briefed by one or another
6  party and often by multiple parties.  But that's sort of
7  where we are.
8         THE COURT:  Well, do you anticipate -- I mean, I
9  am looking at Judge Sharp's order which basically referred to
10 me the schedule for what you all are going to do next.  Now,
11 the what you all are going to do next may be subject to some
12 disagreement, but it seemed to me that there might be some
13 discovery issues before the briefing.
14        MS. SOIFER:  Well, actually I should let Mr.
15 Garrison and Ms. Buschner talk about that because they do
16 have a discovery request outstanding.
17        MR. GARRISON:  Yes, Your Honor.  The discovery
18 dispute concerns we have been asked to take discovery on
19 CHS's fees, their hourly rates and the amount of work they
20 did on the same case that we were working on.  You know,
21 because of how Judge Sharp has, as we see it, set forth the
22 first issue is really whether we are entitled to fees or not
23 at all, yes, we would like for you to, you know, order CHS to
24 produce those billing records to us because we think the
25 Sixth Circuit law is pretty clear.

1            But that issue could wait until after Judge Sharp
2   says yes, pursuant to the settlement agreement relators are
3   entitled to fees.
4            And then of course, as we see it, CHS is entitled
5   to object to the amount of those fees, and then that's when
6   that discovery issue would be clearly ripe.  We think it is
7   already ripe because we think it is pretty clear that we're
8   entitled to fees, but that's what the discovery issue is.  So
9   I don't think that there is a discovery dispute to be
10  resolved to enter this order about how we proceed.
11           THE COURT:  All right.  So we're talking about --
12           MR. GARRISON:  That you are fine to go ahead and
13  order that discovery be produced.  We would like that, but we
14  can also come back once that determination is made.
15           THE COURT:  So you are talking about scheduling
16  briefing at this point?  That's all we're here for?
17           MS. SOIFER:  Yes, Your Honor.
18           MR. GARRISON:  And a hearing.
19           MS. SOIFER:  And a hearing in front of Judge
20  Sharp.  We'd like to have a date to work towards.
21           THE COURT:  I can --
22           MR. GARRISON:  Your Honor, the order that he
23  entered for us and for you contemplates a hearing.  It uses
24  the plural term *hearings*, but we think one hearing pursuant
25  focused on whether the settlement agreement has entitled

1  relators to recover their fees or not is what is appropriate.
2  It is on I believe the second to last page of the order
3  contemplates it.
4          THE COURT:  I can't set definitively a hearing for
5  you today.  I can look at Judge Sharp's calendar and tell you
6  what might look good, and you all can tell me what your
7  schedules are so I can get with his office and hopefully set
8  a hearing on that date.  And I'd probably like more than one
9  date from you all because sometimes what I have for his
10 calendar may not be the actual calendar that we should be
11 looking at because he might not be -- he might be gone that
12 week, or he might have other things scheduled that I am not
13 aware of.  So that's the best I can do on that issue.
14         MS. SOIFER:  Absolutely.  And with the three
15 weeks, three weeks, one week schedule that we're proposing,
16 it looks like the first or second week of June would be
17 workable for the hearing.
18         THE COURT:  And how long do you think such a
19 hearing will last?
20         MS. SOIFER:  You know, if the Court wants to hear
21 from all of us, my guess would be a couple of hours.
22         THE COURT:  I mean I can look at his calendar just
23 for fun at this point.  Have you mapped out your proposal?
24 What did you say 21, 21?
25         MS. SOIFER:  And seven.  Yes, Your Honor, I have.

And in fact 21 days from today would be April 28, and then 21
days after that would be May 19th. And seven days after that
would be May 27th.

        THE COURT: And who goes first?

        MS. SOIFER: The relators' counsel.

        MR. WALDMAN: We may have something to say about
that, Your Honor.

        THE COURT: About who goes first?

        MR. WALDMAN: Yes, Your Honor.

        MS. SOIFER: Our motion for fees, Your Honor.

        THE COURT: Well, just for your information, it
looks to me as if on Monday, June 13th, might be possible.

        MR. JACOBSON: Your Honor, I think that's a
Saturday.

        THE COURT: I am in 2016. Forgive me. Thank you.
It is where the calendar was. I thought it was pretty
sparse. Doesn't look nearly as good for 2015.

        Well, just a quick look at his calendar indicates
to me that it might be possible to look at June 22nd. I know
that you would probably like to have it earlier, but I am
looking at -- and I have to tell you that what's on the
calendar does not necessarily mean that that's what's going
to be happening. That's just what is scheduled. And a lot
of these cases may go off in the interim. There are -- but
the problem I have is that normally Judge Sharp reserves

Mondays for things like pretrial conferences, sentencings, pleas and hearings. So not necessarily that priority order, but if it were in that priority order, then you have to take that into account because you don't know how long some of these trials may last. They may last -- the trial starts on Tuesday. Could last until Friday, and then he tries to squeeze in some of those things on Friday afternoon. But I think your best bet would be on a Monday.

The problem is June first he's scheduled to have pretrial conferences in Cookeville, which really makes it impossible for him to be two places at once. And my guess is you all do not want to go to Cookeville just to accommodate his calendar. It is like an hour and a half away.

So in looking at his calendar, as best I can glean from it, and some of these trials are carried over into Monday. Your best bet, earliest bet would be June 22nd. I mean, I can certainly try to get an earlier date, and then after that July 20th. But what I think I'd like to do once I hear from all of you is find out what your schedules look like and what would be a -- what dates you could not do it and then get with Judge Sharp's office and say when can you squeeze this in. And we're talking two hours. I think this June 22nd at 11 might be possible. That's just looking at his calendar. He may say absolutely not I have got something else scheduled at exactly that time frame, but that's the

1  closest I can see that will work.  But there may be other
2  options that he can think of, knowing his calendar better
3  than I do just looking on a screen.
4        And I interrupted you.
5        MS. SOIFER:  All I wanted to say is that in two of
6  the four cases that are now consolidated, we have filed
7  motions to recover our fees.  And that's in the *Cook-Reska*
8  case and in the *Doghramji* case.  The idea that defendants
9  might get to file something before us when we have got
10 pending motions, if they had something to file, this
11 settlement happened in August.  Why didn't they file it
12 sometime between August and now?
13       And the fact that we have already filed ours and
14 the fact that the two cases that got transferred in later,
15 which are -- I will let Mr. Kreindler talk about his the
16 *Bryant* case, which is the fourth, and the *Reuille* case, which
17 is the first.  The only reason they didn't get transferred in
18 sooner and that they haven't had fees, motions for fees filed
19 yet is because they have retaliation claims that had to be
20 resolved first.
21       And until the retaliation claims were resolved and
22 dismissed, the fee question wasn't ripe.  And that has just
23 happened in the *Reuille* case.  And I will let Mr. Kreindler
24 talk in particular about the *Bryant* case.  But the bottom
25 line for us, Your Honor, is that we think that the fee issue

1    questions are ripe.  That we think there is -- that it would

2    be completely inappropriate for the defendants to get to rush

3    in and file something before our motion for fees, our

4    entitlement to fees get heard and that we should move forward

5    with this question which the judge has already teed up the

6    entitlement to fees and that we, as the prevailing parties

7    who are seeking our fees, ought to be able to file the first

8    filings.

9              THE COURT:  Well, we're just talking about teeing

10   up for and briefing on the entitlement to fees, not the fees

11   themselves.  The entitlement to fees.  Is that correct?  And

12   that's what the hearing is going to be about; is that

13   correct?

14             MS. SOIFER:  My understanding from the way the

15   judge wrote this order is that that is what he intended.  Of

16   course, we and the *Doghramji* relators have already filed

17   motions that include those issues, our entitlement to fees

18   and the amount of fees.  But if the Court prefers, and it

19   seems from the way he wrote this order that he does, that we

20   do two separate motions.  All the more reason to get this

21   first motion dealt with soon so that we can move forward with

22   the second.

23             THE COURT:  Okay.

24             Yes, sir.

25             MR. YOUNG:  Stephen Young, a member of the

1   Nashville Bar.  I am local counsel on behalf of Kathleen
2   Bryant, who is one of the relators.  I want to introduce you
3   to Mitch Kreindler, who is from Houston, Texas.
4           MR. KREINDLER:  Good morning, Your Honor.
5           THE COURT:  Good morning.
6           MR. KREINDLER:  I don't want to retread all that's
7   been spoken so far, but I do want to talk a little bit about
8   the *Bryant*.  Kathleen Bryant's case was the fourth filed in
9   the series back in July of 2010, so it wasn't a recent filing
10  and obviously stretches back almost five years at this point.
11  It was filed in Houston.  Ms. Bryant, in our mind, first to
12  file is important.  Whether it is relevant to the case or
13  not, we believe she was first to file with respect to the
14  hospital where she worked, at a minimum, which was Heritage
15  Medical here in Tennessee ironically.  But that case was
16  pending since July of 2010 until last summer until the cases
17  were settled.  It was a part of the overall settlement that
18  you have heard about.
19          The tension in the False Claims Act is between
20  3730(d), which is provision that provides a relator share and
21  attorney's fees to relators and the defendants have believed
22  is this first filed provision.  And the problem is that if
23  you look at 3730(d), you will see that it is a mandatory
24  provision.
25          It says that when the government joins your case,

1  the relators are entitled, they shall receive a relator

2  share, and they shall receive attorney's fees.  So it is a

3  mandatory provision.  And it creates this tension that has

4  brought us here today.

5           The facts of the case, I think, favor the

6  relator's position because you heard Ms. Buschner talk about

7  how this issue came about and how the defendants never raised

8  this issue and how the settlement agreement talks only about

9  3730(d) and not the first to file provision, which is (b)(5).

10          During that time, all of the relators, including

11 Ms. Bryant --

12          THE COURT:  I am sorry, the first to file

13 provision is what?

14          MR. KREINDLER:  It is (b)(5), Your Honor.

15          THE COURT:  B as in boy?

16          MR. WALDMAN:  D as in Dan.

17          THE COURT:  Oh, still D, (d)(5).  Okay.  D as in

18 what?

19          MR. KREINDLER:  My brother's name, Dan.

20          THE COURT:  I thought you said something else.

21          MR. KREINDLER:  It is (d)(3), isn't it?  Let me

22 get that for you.  But the point is that the way this

23 settlement occurred, people like Ms. Bryant were asked in

24 order to participate in the case -- the government intervened

25 in her case -- she was asked to release claims, other claims

1   on which the government was not collecting recovery.  Now,

2   under the False Claims Act, she has the right to proceed on

3   those claims on her own.  But she detrimentally relied on

4   this settlement and on the notion that she was going to

5   receive relator share through the agreements that were worked

6   out and that her counsel were going to be receiving

7   attorney's fees based on the provision in the settlement

8   agreement that ties the settlement issue only to (d)(3), to

9   the provision relating to payment of attorney's fees.

10          THE COURT:  But she did get her relator share?

11          MR. KREINDLER:  Yes, Your Honor.  And so we have

12  this situation where she severed her other claims.  And if

13  the defendants are right that this whole thing should be

14  unwrapped, then I am not sure what you do with the procedure

15  because technically maybe her other claims should be

16  reinstated and you unwrap this settlement and say, okay,

17  let's put it back to where it was because this wasn't what

18  she signed on for.

19          And so she gave her broad release.  She

20  detrimentally relied on the language of the settlement

21  agreement that was laid out for you, and so what you have,

22  Your Honor, is a little bit of buyer's remorse from the

23  defendants.  They don't want to pay all the fees.  The total

24  fees from all lawyers' counsel, if you didn't discount any,

25  just pay all of them, it is about ten percent of the total

settlement, which is not exactly an exorbitant amount that
would shock the conscience when you just glance at the
numbers.

So we're interested in getting this quickly
resolved.  I think this schedule Ms. Soifer has described to
you is one that would be workable for the parties, for the
relators.  Thank you.

THE COURT:  Thank you.

MR. GARRISON:  Your Honor, just one more thing to
add.  I want to make a correction on what's been said.  Mr.
Waldman said that the first to file issue is in D as in Dan.
That's not correct.  It is B as in boy.  Five as in the
number five.  I have got that from the statute but also from
the defendant CHS's response on page one says:  The relators
are not the first to file claims which the government settled
with defendants, so their complaint is jurisdictionally
barred.  And they cite 3730(b)(5).

That's just important because the settlement
agreement contemplates D as in Danny which is relates to who
receives the shares.  All the relators received a share.  We
wanted to be sure before we spoke out.  It is the settlement
agreement refers to D.  First to file is in B as in boy.

THE COURT:  Yes, sir.

MR. JACOBSON:  Good morning Your Honor.  I think
the relators counsel have had their peace.  I'd like to

introduce to Your Honor Mr. Michael Waldman.  He is from the
Washington, D.C. bar, the Robbins, Russell firm.

THE COURT:  Thank you.

MR. WALDMAN:  Good morning, Your Honor.

THE COURT:  Good morning.  Can't say that much
longer.  A few minutes where you can still say good morning.

MR. WALDMAN:  I wanted to start by first
confessing that I am not prepared today to argue our entire
first to file motion.  We have set this out in Document
Number 115 in the -- in this case, and you can read it there.

I would note that on the issue of the all of these
cases being consolidated, the chief argument against
consolidation and against transferring to this jurisdiction
was plaintiff saying, oh, there is no real first to file
issue.  This is somehow a, what was the word, contrived
argument or something like that.

And the judge disagreed with that.  Judges around
the country sent the cases here over that objection.  And
this court consolidated them because they believed there was
a legitimate first to file argument, and I think that's
reflected in the consolidation order.

I am also not really prepared to go through long
and torturous history in the Southern District of Texas, I
believe it is, wherever Houston is where we are litigating
with Cook-Reska about her entitlement to fees there.

Actually not her entitlement.  We actually concede her
entitlement in fees there.  It is more about the amount of
the fees.  And we believe that's the proper jurisdiction.  It
is fully briefed.  It is in front of the judge in Texas, and
I don't know why this court needs to involve itself in all of
that.

There is clearly concern on the part of the
relators that they are not entitled under the first to file.
And they have all sorts of arguments as to all the work they
did, et cetera, which we would say this is what Congress
passed, the President signed.  It is the law.  There is a
first to file bar, and you can't have seven different
relators entitled to recover under a first to file bar.

It was intended to encourage relators to come
forward, and here we have an instance where there were
relators who have filed years before, for example, Mr.
Garrison's client had filed their petition and their petition
was filed after the case Tenin (phonetic) case that had been
filed and got a huge splash around the country which raised
the very same issues about ED admissions.  And we believe
there is also a substantial public disclosure bar issue that
their client faces.

So, again, I don't want to argue the merits, but I
do want to discuss a little bit about the background also and
about how this motion to dismiss comes about because -- and a

1  little of the history because I think it will explain why we

2  agree there should be briefing but believe we should be the

3  moving party because that's how this typically comes about.

4          We -- there was a government investigation gone on

5  for a number of years about the admissions.  We negotiated

6  directly with the Justice Department, and at some point in

7  2014 we reached an agreement with the Justice Department.

8  And at that time we were told, well, there are also these qui

9  tam relators out there.  So we have agreement in principle

10 with the Justice Department.  We said, well, as any sensible

11 defendant would say, we need a settlement with everybody.

12 This case should be resolved.  And we --

13          THE COURT:  Are all the qui tam cases sealed up to

14 that time?

15          MR. WALDMAN:  They were sealed.  We did not until

16 2014, we had never seen them.  Never heard of them.

17          MS. SOIFER:  That's not correct, Your Honor.

18 *Cook-Reska* was unsealed I believe in 2012.  Maybe 2011.  And

19 *Reuille* was --

20          MR. WALDMAN:  *Reuille* was the only one that was

21 unsealed.

22          MS. SOIFER:  *Reuille* was unsealed in December of

23 2011.  And I am not sure of the exact, but *Cook-Reska* was

24 partially unsealed and provided to them.

25          MR. WALDMAN:  No.

1          MS. SOIFER:  I will find the exact date.

2          THE COURT:  I didn't think that would be a

3     controversial question.  I was just asking for historical

4     information.

5          MR. WALDMAN:  Historical information is it may

6     have been unsealed.  It was not provided to us, this is

7     *Cook-Reska*, until 2014.

8          MS. SOIFER:  That is completely incorrect, and I

9     will find the docket entry.  I know that we provided it to

10    the Government.  The Government provided to them because we

11    were given information that not only did the Government

12    provide it to them in redacted form, but then were able to

13    unredact it and see our client's name.  So we know that we

14    had a copy of it.  Mr. Waldman himself didn't, but CHS did,

15    and they began negotiating our case in 2012.  I will find the

16    date.

17         THE COURT:  Let's go back to where we were.

18         MR. WALDMAN:  Go back to the important part, Your

19    Honor.  The case was never served.  We were never served

20    with a complaint.  We had never whether *Reuille* was the only

21    one I am aware that was unsealed.  There may if we got a

22    redacted version in 2013 of *Cook-Reska,* I certainly don't

23    remember.  There are seven of them.  I can tell you that we

24    definitely didn't receive a majority of them or all of them

25    until 2014.  Even if we received a version, a redacted

version in 2013, the key point here is, Your Honor, we were
never served -- the cases were not unsealed, and we were
never served with a complaint.

How this case would have proceeded had the case
and we reached a settlement, the settlement clearly I mean
when we reached our settlement and negotiated our settlement,
Your Honor, the settlement clearly carved out attorney's
fees.  And let me read, Your Honor, from paragraph 8 of the
settlement agreement.  It is right at the bottom.  It is the
last sentence on paragraph 8 on page 10.  All parties agree
that nothing in this paragraph or this agreement shall be
construed in any way to release, waive, or otherwise affect
the ability of CHS to challenge or object to relator's claim
for attorney's fees, expenses and costs pursuant to 31 U.S.C.
3730(d).

That is added -- that was special language added
by us.  Part of the agreement.  Clearly we spelled out that
we intended to challenge these attorney's fees.

Had this case gone forward, the first thing -- had
we actually been served with a complaint.  Again it was never
unsealed, never served with a complaint.  We to this day have
never been served with a complaint.  What we would have done
would have been to move for dismiss for failure to satisfy
3730(d).  And that would have been the motion we would have
filed.

1          THE COURT:  Are we into (d) or (b)?

2          MR. WALDMAN:  Under D, they have to receive

3   portion of their share.  Under B, they also have to be the

4   first to file.

5          There is also a public disclosure argument as to

6   some of them, and I can't remember which one that's under.

7   So there would have been a number of grounds to dismiss on

8   those bases.

9          Your Honor, these are considered jurisdictional

10  issues.  I can cite you to the treatises and the cases if

11  Your Honor would like that indicate that these are the

12  procedural -- excuse me, these are jurisdictional issues.  So

13  as with any jurisdictional issue, it is the first thing that

14  has to be addressed, and it would have been a motion to

15  dismiss for lack of jurisdiction because they failed to meet

16  the statutory requirement.

17          So that is how this issue should be raised.  We

18  should file a motion to dismiss.

19          THE COURT:  Motion to dismiss what?

20          MR. WALDMAN:  Motion to dismiss this court's

21  jurisdiction for this fee dispute.

22          THE COURT:  I understand what you are saying, but

23  had you been served with a complaint in the qui tam cases,

24  you would have treated as you would any other case.  You

25  would have looked at it to see if you had grounds,

1  jurisdictional grounds or other grounds to file a motion to

2  dismiss. You are saying we pointed to some jurisdictional

3  issues. We certainly would have raised them early on. But

4  what happened in fact was the case got settled before that

5  point.

6          MR. WALDMAN: Correct, Your Honor. And so we have

7  no opportunity to make that motion. Now we have --

8          THE COURT: But that was your own choice. You

9  would have made those motions should you have declined to

10  enter into a settlement.

11         MR. WALDMAN: We hadn't asserted anything, Your

12  Honor. We entered into a settlement with the Justice

13  Department, and now we would like to make those motions as to

14  the fee petition.

15         THE COURT: Then clearly the settlement agreement

16  included the relators' claims. It refers to the relators in

17  the settlement agreement. It is not just a settlement with

18  the United States. Is it not? Am I wrong about that?

19         MR. WALDMAN: Yes, Your Honor, but put it the

20  other way. How are we to move to dismiss a case that was

21  still under seal and that we had never been served with?

22         THE COURT: Well, I think the answer is you don't

23  settle on behalf of in regard to those claims, and you let

24  the process play out so that you get served. You tell the

25  Government, We're not settling all for the relators' claims.

1   We settle for you, but we're not going to settle on based on
2   the relators' claims.  We want to be served.  We want to
3   dismiss the relators' claims.
4           MR. WALDMAN:  But now what we're saying, Your
5   Honor, there is a fee issue that's before the Court, and we'd
6   like to move to dismiss that fee petition.  Whatever fee
7   petitions that you want to raise.
8           THE COURT:  You don't want to dismiss something
9   that has been filed.  You need to deny that.  I mean, you are
10  seeking to deny it.  They filed a fee petition.
11          MR. GARRISON:  Yes, Your Honor.  It is under tab
12  14.
13          THE COURT:  And where is that right now?  Is that
14  still pending?
15          MR. GARRISON:  It was denied as without prejudice.
16  That order was referred to you.
17          THE COURT:  Pending briefing on this.
18          MR. GARRISON:  Correct.
19          THE COURT:  But I am not sure that it really
20  matters who goes first on this issue, but this issue I think
21  is an issue to dismiss the attorney's fees that at this point
22  aren't even pending.  But I think we're looking at this as a
23  threshold issue.  The threshold issue is does the first to
24  file have applicability in this situation.  Isn't that what
25  we're talking about?

```
 1              MR. GARRISON:  Yes, Your Honor.

 2              MR. WALDMAN:  I don't disagree, Your Honor.

 3              THE COURT:  Not the specific amount of attorney's

 4  fees that it has been requested and will be requested

 5  to -- well, in some form it will be requested.  I mean you

 6  will be paying attorney's fees for at least one case.

 7              MR. WALDMAN:  Your Honor, that's we believe we

 8  have already paid for that.  That was the case we settled.

 9  But that would be the issue before the Court.

10              THE COURT:  You think you have already paid your

11  attorney's fees?

12              MR. WALDMAN:  We believe we have settled with the

13  party that was the first to file.

14              THE COURT:  And who was that?

15              MR. WALDMAN:  That was Dr. Plants.

16              MS. SOIFER:  The third case.

17              THE COURT:  Oh.

18              MR. WALDMAN:  Your Honor, the relator in the

19  sixth case, their fees were resolved as well.  So, Your

20  Honor, let me --

21              THE COURT:  I am getting confused about which is

22  the sixth case now.

23              MR. GARRISON:  Dr. Mason.

24              THE COURT:  That case isn't here either?

25              MR. GARRISON:  Not here, Your Honor.
```

1     THE COURT:  All right.  Yes, sir.

2     MR. WALDMAN:  Let me try a different tack.  They

3 are going to file, you know, they have no petition filed on

4 currently before the Court that was denied by the Court.

5 There is actually nothing before the Court.  So we are going

6 to -- they will propose that their first brief says something

7 that says it's got to say something like defendants are going

8 to try to strike our fee petition for the following reasons,

9 and here is what these reasons are.  And we think that they

10 are going to argue and let us try to respond to them in the

11 first filing.  It doesn't make a lot of practical sense

12 either.  We are going to -- doesn't it make more practical

13 sense for us to say we think that they don't have

14 jurisdiction.  We think they failed to meet the first to

15 file.

16     We think some of these cases fail under the public

17 disclosure bar.  And they then can respond and say no, no,

18 defendants have it all wrong.  And so I guess I have real

19 questions about whether it makes any sort of logical sense to

20 have them go first.

21     THE COURT:  I believe I understand that.  I just

22 reacted to your wanting to dismiss something that's not even

23 there, and I am not sure --

24     MR. WALDMAN:  It is very -- Your Honor, you are

25 absolutely right.  It is a very weird situation, as you said

1   when you first took the bench.  This is a closed case.  So
2   what are we supposed to do?  You know, what are we supposed
3   to do?  It is the motion to dismiss, or the case has been
4   dismissed so we are all sort of --
5           THE COURT:  On a settlement that you reached in
6   all of the cases.
7           MR. GARRISON:  Correct, Your Honor.
8           THE COURT:  All of them.  I do -- and in reading
9   Judge Sharp's order, I didn't realize there was anything
10  about the public disclosure bar.  Did he mention that in his
11  order?
12          MR. WALDMAN:  Judge, if you go to the first
13  paragraph, the end of the first paragraph of the order.
14          THE COURT:  Yes, sir.
15          MR. WALDMAN:  And he says proprietary.
16          THE COURT:  You are right.
17          MR. WALDMAN:  And then, Your Honor, if you go I
18  think later on he says he also references it once or twice.
19  If you look on page 4, the second full paragraph, he mentions
20  we were disinclined to address settlement prior to resolution
21  of the first to file, public disclosure bar.  I could
22  probably find one or two other references throughout.
23          And if you turn to 115, which was our opposition
24  which has now all been mooted, you will see that we were
25  relying on the public disclosure bar.

1          THE COURT:  I am not at all surprised that you
2   raised it.  My questions was what did Judge Sharp intend that
3   we address?
4          MR. WALDMAN:  I think plaintiffs may have a
5   different view, but I think it makes sense to deal -- these
6   are all threshold issues.  Makes sense to deal with them all
7   together.
8          THE COURT:  And I understand that, but then if you
9   look on page five where it says, Accordingly, the Court rules
10  as follows.  In the first paragraph, These four cases are
11  hereby consolidated for the purposes of scheduling, resolving
12  pending motions -- which there are none at this point -- and
13  discovery disputes, and coordinated hearings relating to the
14  first to file determination regarding entitlement to
15  attorney's fees and costs.
16         And I guess I looked at that thinking that that's
17  what we were doing was the first to file issue only.  And you
18  are saying no, no, there are other issues as well, including
19  the public disclosure bar.  And then you talk about no
20  jurisdiction.  I am puzzled about the no jurisdiction issue.
21         MR. WALDMAN:  Also, Your Honor if you look at the
22  bottom of 3, the last paragraph, the beginning first
23  sentence.
24         THE COURT:  Yes.  So what are you talking about
25  when you talk about jurisdiction?  Are you talking about the

1    first to file rule?  Are you talking about the public
2    disclosure bar?  You are not talking about anything else?
3              MR. WALDMAN:  That's correct.
4              THE COURT:  Those are your two issues?
5              MR. WALDMAN:  Yes, Your Honor.
6              THE COURT:  So your whole dispute right now is who
7    goes first?
8              MR. WALDMAN:  I believe so, Your Honor.  We are
9    fine with the plan to address these issues initially.  I
10   think that's the right thing to do.
11             MR. GARRISON:  Your Honor, the issues have been
12   addressed.  I think one of our concerns is that obviously
13   they believe first to file is a defense or an objection,
14   maybe an affirmative motion in defense for standing.  They
15   also raise public disclosure.  They may raise, I guess, other
16   jurisdictional.
17             THE COURT:  He just told me two things, first to
18   file and public disclosure bar.
19             MR. WALDMAN:  But in our response to the fee
20   petition, there are other issues they have raised.  I don't
21   know why they wouldn't raise them again.  Our concern about
22   allowing them to go first is we don't want this whole process
23   framed on, you know, one issue at a time that they raise in
24   the first round of motions.  We have a local rule.  We have a
25   statute that allows relators to petition for fees with a

settlement agreement that allows relators to petition for
fees.  We understand the judge's order, but our concern is if
you read the rest after his order began on page five, yes, he
says first to file determination, but he concludes by saying
that that's regarding entitlement to attorney's fees.  And
our concern is that we -- you could list up next to that
first to file determination every other determination that
they think should be made to deny or entitlement to
attorney's fees.  So if you let the defense go first and a
petition bringing issues that have to be raised by relators
or the plaintiffs, that could result in multiple rounds of
briefing, whereas if the judge determines that we're not
entitled to our fees, then obviously that litigation ends in
the district court.

       THE COURT:  Well, that's why I think this is a
threshold determination.  And I assume that at this hearing
and in your briefing, we're not going to be talking about how
much fees -- what the number is on the fees to which you are
entitled.

       MR. GARRISON:  That's correct.

       THE COURT:  You are just talking about the
threshold issue.  And maybe it does make sense for you
to -- for the defendant then to come back to make the opening
salvo and say as a threshold issue these people should not
get fees at all.  Is that right?  None of these people here

```
 1   should get fees.  That's your position?
 2              MR. WALDMAN:  That is correct.  That is our
 3   position.
 4              THE COURT:  Because first to file.  Because public
 5   disclosure bar.  Because anything else?  Those are your two
 6   things.
 7              MR. WALDMAN:  Those will be the two issues that we
 8   are going to raise, Your Honor.
 9              THE COURT:  And you are not going to raise any
10   other issues any other time.  This is it.
11              MR. WALDMAN:  We agree, Your Honor, although let
12   me just point out Mr. Garrison's concern is that we're going
13   to raise additional issues.  You can just see if they were to
14   go first and we were to raise an additional issue second,
15   they would be screaming bloody murder saying geez, we never
16   anticipated that in our initial brief.  And it makes more
17   sense to us to go first.  That takes care of the concern that
18   Mr. Garrison has raised.
19              MR. GARRISON:  That's not true, Your Honor.  Judge
20   Sharp would ask for replies, and we would address any other
21   issues that we didn't anticipate in the reply.  He allows
22   replies.  Then we would address those issues, and they would
23   be all fully briefed our reasons for getting fees, their
24   reasons for why we shouldn't get fees.
25              MS. BUSCHNER:  The other question I am just
```

wondering, Your Honor, is what is the procedure about where a
defendant -- I mean, what does he filing a motion to dismiss
or a motion for advisory opinion?  I mean, is there any
procedural mechanism for them to file something at this point
in the litigation?  I mean, it seems to me that, you know,
the plaintiffs have put forth their petitions, and the judge
has dismissed with them without prejudice to refile.

            THE COURT:  After the resolution shall issue.  So
how do we tee up that threshold issue.  That's what you are
asking.

            MS. BUSCHNER:  Right.

            THE COURT:  Procedurally, how is that?

            MS. BUSCHNER:  The plaintiff has the burden to
move.  They are a prevailing party, right?  So it seems in
that respect it seems logical for us, and it is not like
we -- I mean, the brief that they have already submitted are
close to a hundred pages long, if I recall.  I mean, there
may be some argument that they going to, you know,
thought up over the last couple of months or whatever, but I
mean, I don't really see what it is -- as Mr. Garrison said,
we could reply to those.

            THE COURT:  You could.

            MS. SOIFER:  In terms of the motion to dismiss,
the case, the claims were settled.  The cases were dismissed.
That allows us to go forward with our motion for fees.  So

```
 1    what are they moving to dismiss?  They -- we already resolved
 2    all the underlying claims.
 3              THE COURT:  I don't think you can call it a motion
 4    to dismiss.  It is not a motion to dismiss.  Motion to
 5    dismiss what?  It is a -- you are saying that procedurally on
 6    behalf of the relators it makes more sense for the plaintiffs
 7    to go first because it is their burden to show that they are
 8    entitled to attorney's fees.  This is a different situation
 9    than you normally have.  You already went first.  You already
10    filed your application for attorney's fees, and then there
11    was a response to it raising a whole bunch of issues.  Some
12    of which I assume if you are not successful on this threshold
13    issue, you are going to raise again in terms of duplication
14    of work, excessive time.
15              MR. WALDMAN:  That the fees are too high.  Yes of
16    course, Your Honor.
17              THE COURT:  Are you going to raise anything else
18    other than normal things you'd raise to an attorney's fee
19    petition?
20              MR. WALDMAN:  I can't think of anything, Your
21    Honor.
22              THE COURT:  Why was there a hundred pages
23    worth -- obviously I have not read a hundred pages.
24              MR. WALDMAN:  There was a fair amount of hyperbole
25    in that, Your Honor.
```

1      MS. SOIFER:  Well, they have filed -- let me just

2  say that in the Southern District of Texas, the number of

3  pages that were filed in our motion for fees and their motion

4  to transfer and the required responses and all of that, it is

5  close to a hundred pages.

6      THE COURT:  That's all together.  Okay.

7      MS. SOIFER:  All together.

8      THE COURT:  But I do think it is --

9      MS. SOIFER:  I don't know how much in Tennessee.

10      MS. BUSCHNER:  May I add one other response?  I

11  have found the emails I was looking for.  So the *Reuille* case

12  was unsealed December 27th, 2010.

13      The *Cook-Reska* case was redacted and provided to

14  Mitch Mitchelson, who was the preceding lawyer to Mr.

15  Waldman.  Maybe that's why he doesn't know about it.  To

16  Mitch Mitchelson, and he was given a copy of our complaint

17  February 2nd, 2011.

18      And the U.S. Attorney's office in Houston met with

19  Mr. Mitchelson and some of his colleagues on February 10th,

20  2011.  And so they have had our complaint since February 2nd,

21  2011, the *Cook-Reska* complaint.

22      So while it is true that they were not formally

23  served, all of these complaints were provided to them before

24  they settled.  The idea that they settled and then, surprise,

25  they learned about all of these cases is not correct, and it

1    is certainly not correct with regard to *Reuille* and
2    *Cook-Reska*.  *Reuille* was unsealed, *Cook-Reska* was partially
3    unsealed.  Mr. Waldman did get a copy of the complaint
4    February 2nd, 2011 so that the sequence is incorrect.  They
5    knew about these cases when they were negotiating them and
6    when they reached the resolution.  And in fact the settlement
7    agreement required that we all dismiss our claims, which we
8    agreed to, and they knew we weren't doing that for free.
9    They knew we were all getting -- our clients were all getting
10   relator shares.

11          And so this is not some new thing that was sprung
12   upon them, so the idea that they should have -- I think the
13   Court is exactly right.  They had a choice.  You either
14   settle against just the Government and go fight the relators
15   filing motions to dismiss, or you settle with everybody as
16   they did, and then you don't get to have this fight.  And
17   that's part of what motivates us to say what should be teed
18   up in front of Judge Sharp is our motion for entitlement to
19   fees and our fees.

20          THE COURT:  What are you going to say in your
21   motion for entitlement to fees?  You would say motion for
22   entitlement to fees.  We were prevailing party.  There is no
23   contest about that; is that right?  Except as to the first to
24   file?

25          MR. WALDMAN:  Yes, we would argue they are not the

1  prevailing party because they are not the first to file.

2          THE COURT:  Okay.

3          MS. SOIFER:  *Reuille* was the first to file, not

4  the first or second.

5          THE COURT:  Okay.  But we're the prevailing party.

6  And we are not, and the first to file rule does not apply.

7          MS. SOIFER:  Well, it is our contention that we

8  were the first and second relators that filed.  The first one

9  filed first as to her hospital in Indiana.  The second filed

10  first as to her hospital in Texas and against CHS, the parent

11  corporation.  And we prevailed in both of those cases.  And,

12  therefore, we are entitled to our fees in both of those

13  cases.  But in addition, it is our contention that as a group

14  of seven cases, we're prevailing.  Of seven cases that were

15  required to be dismissed and settled.  And as a result of

16  seven cases having worked together to get to joint resolution

17  are entitled to fees.

18          THE COURT:  Are you going to be filing you,

19  everybody, all of the relators' counsel one thing, or are you

20  going to be filing three things or four things?

21          MS. SOIFER:  It would be our preference to file at

22  the same time each of us file our own pleading.

23          THE COURT:  Because you have something special to

24  say about yours?

25          MS. SOIFER:  There are some different issues in

1   each instance.

2          MR. WALDMAN:  Your Honor, actually, I think all

3   these arguments were made to Judge Sharp.  And he said I am

4   not going to consolidate them because there was important

5   issues here.  But let me just point out how I think her last

6   comment that we need different briefs actually supports the

7   idea that we should go first.  I would propose that we file a

8   initial brief of 40 days.  They can each file 15- or 20-page

9   briefs, and whatever they file we'll file reply.  That will

10  be half that amount.  So they will actually in total get much

11  more.  They will get 60 pages in total.  We'll only get 40

12  pages in the initial briefing, and our briefing and reply

13  will just be half of whatever.

14         THE COURT:  Why do you need 40 pages?  Why can't

15  you file something that's just 20 pages?

16         MR. WALDMAN:  Well, Your Honor, the False Claims

17  Act has a lot of law.  It is complicated, and we think if

18  Your Honor wants to say 30 pages and they each get ten,

19  that's fine also.

20         THE COURT:  Well, here is my problem on this

21  issue.  Judge Sharp has a policy of limiting parties to 20

22  pages.  I don't know what he's done in previous briefing in

23  this case.

24         MR. GARRISON:  Your Honor, CHS has already filed a

25  response to our entire fee petition that's 34 pages.  This is

1    apparently a brief on one issue or two issues.

2              MR. WALDMAN:  Well, to be fair, about half of that

3    brief was on entitlement, and half of it was on the issues of

4    how much fees -- the normal attorney's fees.

5              THE COURT:  Right.

6              MR. WALDMAN:  And we are now not responding to one

7    party.  We are responding or we're moving to dismiss four

8    parties.  So I think --

9              THE COURT:  No, not moving to dismiss anybody.

10   You that water has -- that bridge has been --

11             MR. GARRISON:  The train has left the station.

12             THE COURT:  I knew there was some analogy that was

13   going to work.  Thank you.

14             You are saying it is inappropriate for the Court

15   to award attorney's fees in under the circumstances of this

16   case, i.e., the applicability of the first to file rule and

17   the public disclosure bar.  That's what you are saying.

18             MR. WALDMAN:  Correct, Your Honor.  The Court

19   doesn't have jurisdiction to do that in light of those two

20   bars.

21             THE COURT:  Yes, ma'am.

22             MS. SOIFER:  A couple of other points I wanted to

23   make that they allege that courts all over the country over

24   our objection transferred this case here.  Our objection in

25   Houston was that it all ought to get heard at once.  It

1  wasn't divisible.  And the court decided to divide it.

2        The other court in Houston followed our case and

3  said, well, if that one is going, we may as well send this

4  one.  We agreed to the transfer in *Reuille*.  So the idea that

5  there are multiple courts all over the country that have made

6  this independent decision, that is not correct.

7        And then the objection to consolidation we asked

8  that the Court coordinate these cases but not consolidate

9  them so that we would each have our own separate appellate

10  rights and procedural rights, and the Court at some point

11  built that into his order.  He calls it consolidation, but he

12  did exactly what we asked.

13        So the idea that we somehow have lost and ended up

14  in this consolidation is not correct either.

15        The bottom line here, Your Honor, is what they are

16  asking for procedurally is that they have their cake and eat

17  it too.  They could settle with all of us and make us all

18  drop our claims and make us all dismiss our cases.  And now

19  they are going to go first and file a motion they want to

20  call a motion to dismiss, but it is essentially a motion to

21  say, yeah, we settled with you.  Yeah, we made you drop all

22  of your claims.  Now we're going to argue that you don't get

23  your fees.

24        The proper procedural step to take right here is

25  that we have to ask for our fees, and they need to tell the

 1  Court why we shouldn't have them.  And that is exactly what

 2  the Court has teed up for the magistrate to schedule is

 3  we say why we're entitled to our fees, which is how the

 4  rule sets it up after the cases are dismissed.  And they

 5  say -- they respond.  I think that's the appropriate

 6  procedural move at this point.  And the idea that somehow

 7  they get their cake and eat it too, not having filed motions

 8  to dismiss, instead they settled with us and made us drop all

 9  of our claims and now they come in again and do what they

10  could have done but chose not to do, is wrong.

11          MR. GARRISON:  Just an additional point, Your

12  Honor, is that the case settled in August.  We filed our fee

13  petitions.  They haven't stated one reason why they haven't

14  filed this motion to dismiss.  I mean, that's what he calls

15  it.  I wouldn't call it.  Whatever the motion is, they have

16  never filed it.  And there is no reason that they couldn't

17  have filed it as soon as this case was intervened and

18  settled.

19          THE COURT:  I have a concern.

20          MR. WALDMAN:  Your Honor, there are no fee

21  petitions currently pending.  If you'd like, we'll file it,

22  and that will be the next filing will be our motion to

23  dismiss if that will make Mr. Garrison happy.

24          MR. GARRISON:  When we filed our fee petition and

25  it was pending for six months, they didn't file that either.

1          THE COURT:  Okay.  It occurs to me that by

2    consolidating, Judge Sharp may have -- and it may not be

3    clear -- may have intended that the briefing be on a

4    consolidated basis.  Now, I understand that there is at

5    least as to two of the cases some separate issues, but there

6    is -- I just hate for there to be multiple relator filings.

7    And I am just trying to figure out if there is any way to

8    address that.

9          I also am really squeamish about this 20-page

10   limitation that you said Mr. Garrison were over 34 pages

11   that's been -- I don't know what to do about that.  Yes, sir.

12         MR. KREINDLER:  Your Honor, I understand you want

13   to avoid multiple relator filings, which is part of the

14   reason we didn't want to be here.  All of these cases are

15   different.  They are in different postures.  Mr. Garrison's

16   case has a public disclosure issue that the other two cases

17   have, Ms. Soifer's case has an actual settlement that was in

18   my case and on Mr. Garrison and Buschner's case.  So we're

19   all kind of in a little bit different place.  So to say now

20   you are stuck with just one briefing really isn't completely

21   fair to the parties.  And we have got to drag where we didn't

22   want to be in the first place, and I just don't know.  We're

23   here, but now limit us and say, okay, now you get to say as

24   much as you want to say, and you get to talk about your case

25   and you are stuck.  We're going to make you do a three-legged

1    race together that seems to be unnecessary way to hamstring

2    us in this process.

3         MS. SOIFER:  And I would refer the Court to the

4    language in Judge Sharp's order.  These four cases are hereby

5    consolidated for purposes of scheduling, resolving pending

6    motions and discovery disputes, and coordinating hearings

7    related to the first to file determination regarding

8    entitlement to attorney's fees and costs.

9         He doesn't suggest that consolidated briefing, and

10   he could have said that if that was what he meant.

11   Coordinated hearing suggests otherwise.  It suggests that

12   there would be more or less separate arguments made by each

13   of the parties, and that's the real question.

14        MR. WALDMAN:  Your Honor, I don't think your order

15   needs to contemplate a number of pages.  Both sides have

16   asked for extension of pages multiple times in this case, and

17   Judge Sharp has granted that request.  So maybe your order

18   doesn't need to address that, and maybe it is our problem.

19        THE COURT:  I agree with that.

20        MS. SOIFER:  And not only that.  If we each file

21   our own motions, they get 20 pages to respond to each of the

22   motions, so I don't understand what their concern is.  They

23   don't have to file one consolidated response and give us

24   three-quarters of their pages.  They could file a separate

25   response to each of our motions.

1    THE COURT:  Well, I think it is -- did you want to

2  say something more?

3    MR. WALDMAN:  No, just the idea of filing separate

4  responses seems a little unwieldy for Judge Sharp.  I would

5  think he would have wanted to have a consolidated opening

6  brief from us, different smaller briefs from the defendants

7  from the plaintiffs, and then a reply brief half the amount

8  of whatever they file in their opposition.

9    THE COURT:  Well, I will grant you this is an odd

10  way of proceeding particularly because the motion for

11  attorney's fees has been denied at this point to be refiled

12  once the threshold issue gets resolved.  And I think

13  procedurally what probably makes sense, although it is not

14  absolutely clearcut, but I think it probably makes sense to

15  let the relators go first.  Let the defendants then and let

16  the relators file their separate briefs as much as I don't

17  like it and I wish it was a different situation, I think you

18  have made a good enough point that at least some of your

19  issues are separate unto yourselves, and you can't mush them

20  all together in one brief because you do have separate

21  issues.

22    And then let the defendant if you choose to,

23  you can certainly choose to respond in one brief, or you

24  can -- one memoranda, or you can respond in four different

25  memoranda should you want to.

1        I would suggest that anybody that wants more than

2  20 pages get permission -- and you can go ahead and do that

3  now -- from Judge Sharp. You may not need that. You may

4  just say you just want to file one brief in response to the

5  relators' memoranda. So you want 40 pages and that's

6  essentially the same as if you had filed ten pages per

7  motion.

8        And then the time frame, I don't think anybody has

9  a problem with the time frame. Do you have a problem with

10  the time frame?

11        MR. WALDMAN: No, Your Honor. But if they are

12  going to be allowed a reply brief due to the unusual

13  circumstances here that you recognize, we would ask for a sur

14  reply, a time for a sur reply brief, you know, a week

15  additional to file a sur reply. This is, as you said, it is

16  a very unusual circumstances. I think it is very odd that

17  they get to go first on something which is really a motion to

18  dismiss their petition. But assuming that's how Your Honor

19  wants to go forward, we ask that we be allowed to sur reply.

20        THE COURT: I am not surprised that you asked for

21  that. And I think that may be reasonable. It may be

22  unnecessary, but I am going to allow you to do that. That

23  can be very short.

24        Now what did we say about -- that still fits into

25  the potential time frame of a hearing before Judge Sharp on

1  June 22nd potentially.

2         Now, when we talked about that date, did anybody

3  have any irreconcilable conflicts?

4         MS. SOIFER:  No, Your Honor.

5         THE COURT:  Okay.

6         MR. WALDMAN:  The 22nd.

7         THE COURT:  Yes, but that's not etched in stone.

8  That's to pencil in in a very light lead.

9         MR. YOUNG:  I have a trial on the 20th of July in

10 Memphis, but my presence is not necessarily mandatory.

11        THE COURT:  This is June.

12        MR. YOUNG:  Oh, alternatively you mentioned July

13 20.

14        THE COURT:  I did.

15        MR. YOUNG:  And I mean I have a trial.  It is not

16 good for me, but if that's better for everybody else, you go

17 ahead.

18        THE COURT:  Okay.  Well then the second question

19 is look at July 20th in the morning.

20        MR. YOUNG:  If it is good for everybody else, then

21 that's fine.  I just won't be there.

22        THE COURT:  Y'all are so accommodating on your

23 schedules.  Nobody has anything else on your schedule for the

24 summer?  All right.

25        MR. WALDMAN:  This is a top priority, Your Honor.

                    MR. O'CONNELL:  We are liable to be out of the
country middle of July but should be back by July 20.

                    THE COURT:  Now, can you tell me -- and this is
going to be the most difficult part of it -- what conflicts
just as you had mentioned, did any of you all have that you
can't rearrange your schedule to have a hearing in front of
Judge Sharp?  You just told me you are out of the country.

                    MR. O'CONNELL:  Your Honor, we don't know yet, but
it is that trip that we normally go on is usually July 18th.

                    MS. SOIFER:  4th through the 16th.

                    MR. O'CONNELL:  It is not finalized yet.

                    THE COURT:  July 4th through the 16th.  You just
tell me what dates to avoid.

                    MR. O'CONNELL:  I think Ms. Soifer is right, 4th
through the 16th.  Usually those two weeks that we likely
would be.

                    MS. SOIFER:  Fourth through the 18th.  That's a
Saturday through Saturday.

                    THE COURT:  Okay.  I was going to ask you could
you come on the 17th, and you are telling me no.

                    Anybody else have conflicts you can't move?

                    MS. SOIFER:  June 5th we're supposed to be in a
wedding in Lexington that afternoon.  You said late
afternoon.  How long it takes to get there, Lexington, so
that's the only other date that I see.

1          THE COURT:  June 5th.

2          MR. KREINDLER:  Your Honor, my kids are off

3    whatever the 7th of that week, and I would prefer --

4          THE COURT:  Of which?

5          MR. KREINDLER:  Of June.  I don't have my calendar

6    in front of me, but I prefer not to be the second week in

7    June.

8          THE COURT:  That would be, yeah, the Sunday -- the

9    7th is Sunday, so not the week of June 8.

10         MR. KREINDLER:  Yes, please, Your Honor.

11         THE COURT:  Anybody else?

12         ATTORNEY:  Your Honor, I have teenagers, and they

13   have no interest in hanging out with me.

14         THE COURT:  It is interesting to see lawyers from

15   when they first came in and they had preschool children, and

16   then they had they are all concerned about school breaks.

17   And then there was this period of time during high school

18   where there was no concern whatsoever.  And then you had the

19   going to college and the coming home from college issues.

20   Yes.  It will be too soon when your children will be in the

21   same situation and not care.

22         Any other conflicts?  All right.  I will get with

23   Judge Sharp's office and see what -- I will get with Judge

24   Sharp and see what he is willing to do and enter an order to

25   that effect.

1          What else can we talk about today?  Anything else
2    we need to hone in on?
3          MR. GARRISON:  One issue we'd like to raise again.
4    We've asked the Court to order this.  We know that CHS has
5    scheduled these claims in two other cases.  These type of
6    claims get resolved all the time.  Your Honor is an excellent
7    mediator, and we think that all sides could benefit from a
8    mediation.  We don't think that should slow down this
9    process, but we think that it insights from a mediator like
10   you for CHS and for the relators, we might all benefit from
11   it, and we could avoid litigating piecemeal a fee petition
12   that was contemplated under settlement.  We would request
13   that that be ordered.
14          CHS has said it opposes it, but CHS didn't oppose
15   settling with the third and the sixth case.  We think all
16   these cases have room for compromise, and so we would renew
17   the court-ordered mediation of the parties but that that
18   mediation not slow down this briefing schedule.
19          THE COURT:  Except for one case that I have, which
20   is the Cloverbottom case which is a monthly settlement
21   conference session for me, I am not doing any more settlement
22   conferences.  Just sort of FYI.
23          I did understand from Judge Sharp's order that you
24   all at this point were not interested in any kind of
25   mediation or settlement conferences.  Is that correct?

1          MR. WALDMAN:  That's correct, Your Honor.  We

2    believe after this decision on entitlement is decided upon,

3    at that point we think mediation may be very fruitful.  But

4    at this point with four different relators seeking millions

5    of dollars on a first to file rule, we don't think that will

6    be helpful.

7          MR. KREINDLER:  Your Honor, I certainly don't want

8    to disagree with my co-counsel relator.  We were ordered to

9    mediation.  It was a waste of time.  We agree with defendant

10   it was a waste of time.

11         THE COURT:  At this stage it is?

12         MR. KREINDLER:  Yes, it may be a waste of time.

13         THE COURT:  Ever?  You said you can raise it again

14   once there has been a ruling on the what we're calling the

15   first to file, but I think it is a little bit more expansive

16   than that.  We are talking about first to file and the public

17   disclosure bar.  That's what we're talking about.

18         MR. KREINDLER:  Correct, Your Honor.

19         THE COURT:  So it seems to me that in the

20   plaintiffs' filings y'all don't need to spend a lot -- I am

21   sorry, in the relators' filings, you don't need to spend a

22   lot of time hashing ground that there is no dispute on or

23   responding to it.

24         MR. GARRISON:  Your Honor understand that the

25   relators, the settlement itself creates the payment to the

```
1   relators, all of them regardless of which relator.  So we're
2   going to be not only limited to just first to file public
3   disclosure, but our argument is going to be we all get paid.
4   And then in alternative because see this is where the
5   defendant wants us to be fighting with each other.  I want to
6   make sure that I heard you say that you aren't limiting us,
7   allowing them to structure our pleading, and that's not going
8   to be -- that is going to be an argument, separate argument
9   which --
10          THE COURT:  I thought you were going to argue all
11  of you were going to argue at least in the alternative that
12  the first file rule is inapplicable.  Is that what you are
13  saying?
14          MR. GARRISON:  Yes.
15          THE COURT:  Clearly I expect that.
16          MR. GARRISON:  Okay.  I was a little worried.  I
17  thought I heard you say, so I wanted to make sure that was
18  correct.
19          THE COURT:  I am just saying like that issues that
20  you would normally, and I am sure did, raise in your -- there
21  are issues that you would raise in a fee app you don't
22  necessarily need to spend a lot of time on if they are not
23  contested or challenged.  And we all know that this is the
24  threshold issue.  That's the issues.
25          MR. GARRISON:  Your Honor, when you talk to Judge
```

1  Sharp, we have been working on this case for six years.

2  Obviously, we want closure on that.

3          THE COURT:  Is it problem that the relator is

4  known?

5          MR. GARRISON:  In some --

6          THE COURT:  Is it?

7          MR. GARRISON:  Some of them at the request of the

8  Government, they have been found out.  But our concern is

9  that this case got handshake deal last May.  I just ask that

10 you let Judge Sharp know we want to move this thing as

11 promptly as possible.

12         MR. WALDMAN:  Your Honor, page five of Docket

13 Entry 115, Mr. Class has received a relator share of

14 $16,427,740.96 plus interest.  And for the Laredo Medical

15 Center claims, Ms. Cook-Reska received a relator share of

16 $2,141,984.

17         MR. WALDMAN:  Your Honor, Ms. Cook-Reska was paid

18 12 percent of the $9 million of nonED claim settlement, and

19 she was paid 19 percent of about $2 million that was the

20 Government determined that she is eligible to receive under

21 the ED claim version.  So, yes, those are public.  What is

22 not public is the relators agreed to share.

23         The Government --

24         MS. SOIFER:  The Government required us, and the

25 defendants waited a time, an agreement among all seven cases

on how the money would be shared because the defendants
wanted us all to dismiss our claims.  Knew we weren't going
to dismiss our claims if we didn't all get paid.  The
Government knew that as well.  There could have been a fight
on first to file among us and with the defendants if we
hadn't worked this out, and so at the Government's insistence
we did.  We had a mediation.  We worked it out.  And that
redistribution of those amounts is not public, and there is a
confidentiality provision on that.

       Suffice it to say that Mr. Plank should not get
the entire $16 million, nor did Ms.  Cook-Reska get all of
that $2 million.  It all got redistributed, which was
defendants and the Government's intention in that we must
work it out amongst ourselves so that we would all get paid.
Who the government paid and which of the defendants paid the
Government is really not an issue.

       THE COURT:  Okay.  Anything else?

       Despite what you just said though it may be
appropriate to raise the issue of ADR after the resolution of
this motion.

       I certainly will relay your concerns about the
amount of time that has expired and how anxious you are all
to get a resolution, i.e., at this point what we're talking
about is a hearing as soon as possible.

       All right.  Anything else?  Thank you.

1                    REPORTER'S CERTIFICATE

2

3          I, Cathy B. Leigh, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Tennessee, with offices at Nashville, do hereby certify:

6          That proceedings were held in open court on April

7  7, 2015, in the matter of UNITED STATES OF AMERICA vs.

8  COMMUNITY HEALTH SYSTEMS, INC., Case No. 3:11-cv-442; that

9  the audio recording of said proceedings in connection with

10 the hearing was reduced to typewritten form by me; and that

11 the foregoing transcript (pages 1 through 67) is a true and

12 accurate record of said proceedings to the best of my

13 ability.

14          This the 9th day of April, 2012.

15

16                              /s/ Cathy B. Leigh
                                Cathy B. Leigh, RDR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25