# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JAMES DOGHRAMJI, SHEREE COOK; and RACHEL BRYANT, | : : : | |
| Plaintiffs, | : | CASE NO. 3:11-00442 (Sharp, J.) |
| v. | : | |
| COMMUNITY HEALTH SYSTEMS, INC. *et al.*, | : : | |
| Defendants. | : | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF TEXAS, *ex rel.* AMY COOK-RESKA, | : : : | |
| Plaintiffs, | : | CASE NO. 3:14-02160 (Sharp, J.) |
| v. | : | |
| COMMUNITY HEALTH SYSTEMS, INC. *et al.*, | : : | |
| Defendants. | : | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* KATHLEEN A. BRYANT, | : : | |
| Plaintiffs, | : | |
| v. | : | CASE NO. 3:14-02195 (Sharp, J.) |
| COMMUNITY HEALTH SYSTEMS, INC. *et al.*, | : : | |
| Defendants. | : | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* NANCY REUILLE, | : : | |
| Plaintiffs, | : | |
| v. | : | CASE NO. 3:15-00110 (Sharp, J.) |
| COMMUNITY HEALTH SYSTEMS, PROFESSIONAL SERVICES CORP., *et al.*, | : : : | |
| Defendants. | : : | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO RELATORS' SUPPLEMENTAL MEMORANDA FOR ENTITLEMENT TO ATTORNEYS' FEES, COSTS, AND EXPENSES

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    I.    The Seven *Qui Tam* Actions Filed Against Defendants ................................. 3

    II.    Settlement Agreement And Post-Settlement Actions ................................... 7

ARGUMENT ............................................................................................................. 8

    I.    A RELATOR SEEKING ATTORNEYS' FEES MUST DEMONSTRATE
        THAT (S)HE WAS FIRST TO FILE AND RECEIVED A RELATOR'S
        SHARE.................................................................................................... 8

    II.    RELATORS ARE BARRED FROM RECOVERING FEES UNDER
        SECTION 3730(b)(5) BECAUSE THEY WERE NOT THE FIRST TO FILE......... 11

        A.    Plantz Was The First To File ............................................... 11

        B.    Reuille Does Not Qualify As First To File The National ED Claim................... 12

        C.    Cook-Reska Was Also Not The First To File..................................... 16

        D.    Bryant Was Also Not First To File.................................................. 19

        E.    Doghramji Was Also Not The First To File ...................................... 20

    III.    RELATORS ARE BARRED FROM RECOVERING FEES UNDER 31
        U.S.C. § 3730(d) BECAUSE THEY WERE NOT AWARDED A
        RELATOR'S SHARE................................................................................ 23

        A.    Plantz Alone Received A Relator's Share From The Government On The
            National ED Claim ............................................................... 24

        B.    None Of The Other Relators Received A Relator's Share From The
            Government On The National ED Claim .......................................... 25

        C.    Relators' Receipt, Pursuant To A Private Agreement They Negotiated
            With Plantz, Of A Portion Of His Recovery Of A Relator's Share, Does
            Not Entitle Them To A Fee Award ...................................... 28

    IV.    DOGHRAMJI IS BARRED FROM RECOVERING FEES UNDER 31 U.S.C.
        § 3730(e)(4) BECAUSE HIS LAWSUIT WAS BASED UPON
        ALLEGATIONS THAT HAD ALREADY BEEN DISCLOSED TO THE
        PUBLIC ................................................................................................ 29

i

A.    There Were Multiple Public Allegations Of Fraud Relating To CHSI's
      Inpatient Admissions Practices Prior To This Lawsuit ...................................... 30

B.    Doghramji's Allegations Are "Based Upon" The Public Allegations Of
      Fraud Against CHSI ........................................................................................ 32

C.    Doghramji Is Not An "Original Source" Of The Information On Which
      His Allegations Are Based.............................................................................. 34

CONCLUSION..................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Dingle v. Bioport Corp.*,
388 F.3d 209 (6th Cir. 2004) ................................................................. 33

*Erickson ex rel. United States v. Am. Inst. of Biological Scis.*,
716 F. Supp. 908 (E.D. Va. 1989) ..................................................... 13, 14

*Fed. Recovery Servs., Inc. v. United States*,
72 F.3d 447 (5th Cir. 1995) ................................................................. 10

*Gen. Acquisition, Inc. v. GenCorp., Inc.*,
23 F.3d 1022 (6th Cir. 1994) ............................................................... 27

*Grynberg v. Koch Gateway Pipeline Co.*,
390 F.3d 1276 (10th Cir. 2004) .......................................................... 16

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ..................................................................... 20, 24

*In re Natural Gas Royalties Qui Tam Litig.*,
566 F.3d 956 (10th Cir. 2009) ............................................................. 9

*In re Natural Gas Royalties*,
562 F.3d 1032 (10th Cir. 2009) ................................................. 34, 35, 36

*Miller v. Holzmann*,
575 F. Supp. 2d 2 (D.C.C. 2008) .............................................. 10, 11, 13

*United States ex rel. Beauchamp v. Academi Training Ctr., Inc.*,
933 F. Supp. 2d 825 (E.D. Va. 2013) ................................................... 10

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
501 F.3d 493 (6th Cir. 2007) ......................................................... 15, 17

*United States ex rel. Branch Consultants v. Allstate Ins. Co.*,
560 F.3d 371 (5th Cir. 2009) ........................................................ 10, 21

*United States ex rel. Capella v. United Technologies Corp.*,
No. 3:94-cv-2063, 1999 WL 464536 (D. Conn. June 3, 1999) .............. 13

*United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*,
318 F.3d 214 (D.C. Cir. 2003) ............................................................. 16

*United States ex rel. Johnson v. Planned Parenthood of Houston*,
570 F. App'x 386 (5th Cir. 2014) ........................................... 10, 20, 22

*United States ex rel. Jones v. Horizon Heathcare Corp.*,
160 F.3d 326 (6th Cir. 1998) ............................................................... 34

*United States ex rel. Lefan v. Gen. Elec. Co.*,
397 F. App'x 144 (6th Cir. 2010) ........................................................ 24

Case 3:11-cv-00442   Document 165   Filed 05/19/15   Page 4 of 44 PageID #: 3854

*United States ex rel. Longhi v. Lithium Power Techs.*,
   575 F.3d 458 (5th Cir. 2009) ......................................................................... 27

*United States ex rel. Lujan v. Hughes Aircraft Co.*,
   243 F.3d 1181 (9th Cir. 2001) ....................................................................... 10

*United States ex rel. May v. Purdue Pharma L.P.*,
   737 F.3d 908 (4th Cir. 2013) ......................................................................... 30

*United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*,
   123 F.3d 935 (6th Cir. 1997) ......................................................................... 32

*United States ex rel. Ondis v. City of Woonsocket*,
   587 F.3d 49 (1st Cir. 2009) ........................................................................... 35

*United States ex rel. Osheroff v. Healthspring*,
   938 F. Supp. 2d 724 (M.D. Tenn. 2013) .................................................. 33, 36

*United States ex rel. Poteet v. Medtronic, Inc.*,
   552 F.3d 503 (6th Cir. 2009) ................................................................... passim

*United States ex rel. Rigsby v. State Farm Fire and Cas. Co.*,
   06CV433, 2014 WL 691500 (S.D. Miss. Feb. 21, 2014) ................................. 27

*United States ex rel. Ryan v. Endo Pharm., Inc.*,
   27 F. Supp. 3d 615 (E.D. Pa. 2014) ............................................................... 10

*United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
   906 F. Supp. 2d 1264 (N.D. Ga. 2012) ........................................................... 30

*United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*,
   944 F.2d 1149 (3d Cir. 1991) ........................................................................ 35

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
   41 F.3d 1032 (6th Cir. 1994) ......................................................................... 30

*United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*,
   958 F. Supp. 2d 846 (E.D. Tenn. 2013) ..................................................... 30, 35

*United States v. NextCare, Inc.*,
   No. 3:11CV141, 2013 WL 431828 (W.D.N.C. Feb. 4, 2013) ..................... passim

*Walburn v. Lockheed Martin Corp.*,
   431 F.3d 966 (6th Cir. 2005) .................................................................... passim

*Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.*,
   2013 WL 4510801 (M.D. Tenn. Aug. 26, 2013) .............................................. 34

iv

# <u>TABLE OF AUTHORITIES—Cont'd</u>

## Statutes

31 U.S.C. § 3729–33 ..................................................................................... 1

31 U.S.C. § 3730(b)(2) ................................................................................. 4

31 U.S.C. § 3730(b)(3) ................................................................................. 4

31 U.S.C. § 3730(b)(5) .................................................................. 2, 9, 10, 15

31 U.S.C. § 3730(d) ............................................................................ passim

31 U.S.C. § 3730(e)(4) ............................................................... 10, 29, 31, 32

31 U.S.C. § 3730(e)(4)(A) (2006) ................................................... 3, 29, 30

31 U.S.C. § 3730(e)(4)(B) (2006) ........................................................ 30, 34

## Other Authorities

Alan Rappeport,
  *Tenet launches lawsuit against CHS*, Fin. Times, Apr. 12, 2011 ............................ 31

Avik Roy,
  *Healthcare Bombshell: Tenet Lawsuit Alleges Community Healthcare Cheats Medicare*,
  Forbes, Apr. 12, 2011 .......................................................................... 31

Cmty. Health Sys., Inc.,
  Form 8-Ks (Apr. 15, 2011; Apr. 22, 2011; and Apr. 25, 2011) ........................... 6, 31

Michael J. de la Merced,
  *Tenet Accuses Community Health of Overbilling Medicare*, N.Y. Times, Apr. 11, 2011 .... 6, 31

Pub. L. 111–148,
  § 10104(j)(2), 124 Stat. 119, 901–02 ......................................................... 30

S. Rep. No. 99-345, at 29 (1986),
  *reprinted in* 1986 U.S.C.C.A.N. 5266 ....................................................... 13

Susan Kelly,
  *Tenet sues Community Health for Medicare Abuse*, Reuters, Apr. 11, 2011 .................. 31

## Rules

Federal Rule of Civil Procedure 9(b) ............................................... 14, 15, 17, 19

Defendants Community Health Systems, Inc. ("CHSI") and the CHSI-affiliated hospital companies named in the complaints[1] (collectively, "Defendants") respectfully submit this memorandum of law in response to the supplemental memoranda filed by each of the relators arguing why he or she is entitled to an award of attorneys' fees, costs, and expenses. Dkts. 152–55.[2] Defendants present in a separate memorandum, filed concurrently, their response to Relators' Joint Memorandum In Support Of Motion to Affirm Their Entitlement to Attorneys' Fees, Costs, and Expenses ("Joint Brief"). Dkt. 151.

## INTRODUCTION

In separate memoranda, each of the relators—Nancy Reuille, Amy Cook-Reska, Kathleen Bryant, and James Doghramji[3] (collectively, "Relators")—argue that he or she in particular satisfies the requirements of 31 U.S.C. § 3730(d), which is the provision of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, that authorizes a court to award fees, costs, and expenses to a qualifying relator under certain circumstances. Relators are mistaken. In early 2010, relator Scott Plantz filed a *qui tam* lawsuit against all CHSI-affiliated hospitals alleging a companywide practice of improper inpatient admissions through the Emergency Department ("ED"). Dr. Plantz was the first to alert the Government to this alleged problem of improper inpatient admissions through the ED at all CHSI-affiliated hospitals (the "national ED claim"). Consequently, following the July 29, 2014 settlement between the Defendants and the United

---

[1] A full listing of the Defendants joining this memorandum in opposition is set out at Exhibit A.

[2] Unless otherwise indicated, docket citations are to *United States ex rel. Doghramji v. Community Health Systems, Inc.*, No. 3:11-cv-00442 (M.D. Tenn.) ("*Doghramji*").

[3] Doghramji's *qui tam* lawsuit also has two other relators, Sherre Cook and Rachel Bryant. For ease of reference, we will refer to the three relators in this *qui tam* action as "Doghramji."

States where Defendants agreed to pay $88 million[4] for this national ED claim, the United States awarded a relator's share of more than $16 million to Dr. Plantz. Dr. Plantz, therefore, is the only relator entitled to attorneys' fees for the national ED claim (and, for that reason, Defendants have resolved Dr. Plantz's attorneys' fee claim, paying him several millions of dollars for the almost 3,500 hours worked by his counsel).

The FCA strictly defines when a relator may—and *may not*—properly recover an attorneys' fee award. Here, the statute plainly prohibits all of the Relators in the four cases before this Court from recovering fees for the following independent reasons.

*First*, each relator is barred from recovering by the first-to-file rule, *see* 31 U.S.C. § 3730(b)(5). Unlike Dr. Plantz, Relators Reuille and Cook-Reska never allege anything about the Emergency Department nor do they allege a companywide problem. While Relators Bryant and Doghramji filed allegations similar to Dr. Plantz, they did so more than a year after Plantz's complaint. Relators strain to evade the first-to-file bar by alleging that they were the first to bring allegations focused specifically at their respective individual hospitals (Reuille—Lutheran; Cook-Reska—Laredo; Bryant—Heritage), but this actually highlights why their complaints were deficient: The July 29, 2014 Settlement was *not* based on improper claims at a few isolated local hospitals, but instead resolved allegedly improper corporate practices that purportedly led to allegedly inappropriate inpatient admissions through the ED at CHSI-affiliated hospitals companywide. At core, the first-to-file rule is defined by claim, not by defendant. Acceptance of Relators' contrary argument would permit circumvention of the first-to-file bar through artful

---

[4] The total amount of the July 29, 2011 settlement was $97 million, with Defendants paying an additional $9 million for unrelated claims involving physician relationships and inpatient procedures at Laredo Medical Center.

pleading in any multi-defendant case. In a case such as this, involving a companywide claim relating to practices at more than a hundred individual hospitals, the results would be absurd.

*Second*, each relator here failed to receive the relator's share from the government for the national ED claim, as is required to recover attorneys' fees. *See* 31 U.S.C. § 3730(d). A relator's share is expressly defined by statute as consisting of between 15% and 25% of the government's award for the claim. Only Dr. Plantz received a relator's share for the national ED claim. Contrary to Relators' wishful thinking, private sharing agreements governing what happens to the relator's share after it is awarded by the United States are irrelevant and do not change the fact that these Relators did not receive the relator's share and therefore are not entitled to fees. *See United States v. NextCare, Inc.*, No. 3:11CV141, 2013 WL 431828, *2–3 (W.D.N.C. Feb. 4, 2013).

*Third*, as to Doghramji, his claim is also foreclosed by the public disclosure bar, *see* 31 U.S.C. § 3730(e)(4)(A) (2006), because he filed his complaint only *after* the same allegations had been publicly disclosed. One month before Doghramji filed his complaint, a lawsuit by a CHSI competitor, Tenet Healthcare Corporation ("Tenet"), was launched with much fanfare and media attention and made the same allegations of companywide improper ED admissions against CHSI. *Tenet Healthcare Corp. v. Cmty. Health Sys., Inc.*, No. 3:11-cv-00732-M (N.D. Tex.) ("*Tenet*"). The Tenet complaint presents virtually the paradigm case of public disclosure, mandating dismissal of Doghramji's fee request.

## BACKGROUND

## I. THE SEVEN *QUI TAM* ACTIONS FILED AGAINST DEFENDANTS

In connection with the July 29, 2014 Settlement entered into between the United States and Defendants, seven *qui tam* relators have come forward claiming to have advanced the national ED claim and seeking attorneys' fees. In order of filing:

3

- *United States ex rel. Reuille v. Cmty. Health Sys. Prof'l Servs., Corp.*, No. 1:09-cv-00007 (N.D. Ind. Jan. 7, 2009) ("*Reuille*");

- *United States ex rel. Cook-Reska v. Cmty. Health Sys., Inc.*, No. 4:09-cv-01565 (S.D. Tex. May 22, 2009) ("*Cook-Reska*");

- *United States ex rel. Plantz v. Health Mgmt. Assocs., Inc.*, No. 1:10-cv-00959 (N.D. Ill. Feb. 11, 2010) ("*Plantz*");

- *United States ex rel. Bryant v. Cmty. Health Sys., Inc.*, 4:10-cv-02695 (S.D. Tex. July 29, 2010) ("*Bryant*");

- *United States ex rel. Carnithan v. Cmty. Health Sys., Inc.*, No. 3:11-cv-00312 (S.D. Ill. Apr. 14, 2011) ("*Carnithan*");

- *United States ex rel. Mason v. Cmty. Health Sys., Inc.*, No. 3:12-cv-00817 (W.D.N.C. Apr. 18, 2011) ("*Mason*"); and

- *United States ex rel. Serv. Emps. Int'l Union v. Cmty. Health Sys., Inc.*, No. 3:11-cv-00442 (M.D. Tenn. May 10, 2011) [Dkt. 1] ("*Doghramji*").

Pursuant to the FCA's statutory scheme, all of these *qui tam* complaints initially remained under seal while the government conducted an investigation. *See* 31 U.S.C. § 3730(b)(2)–(3). Defendants have never been served with—and therefore have never had an opportunity to respond to—any of the *qui tam* complaints.

Chronologically, the first two *qui tam* actions seeking fees were filed by Relators Nancy Reuille (January 7, 2009) and Amy Cook-Reska (May 22, 2009), whose allegations were limited to single CHSI-affiliated hospitals and did not specifically discuss ED admissions. Reuille alleged in general terms that Lutheran Hospital in Indiana admitted patients for one-day stays when it was not medically necessary to do so, but her complaint did not mention ED admissions, identify any specific instances of billing fraud, or reference any other CHSI-affiliated hospital. *See Reuille*, No. 1:09-cv-00007 (N.D. Ind.), Dkt. 1 at ¶¶ 24–29.[5] Likewise, Cook-Reska alleged that Laredo Medical Center ("Laredo") in Texas had improperly billed the government for

---

[5] Not surprisingly, the government's investigation into Reuille's complaint led nowhere: After a two-year investigation, the United States declined to intervene on December 27, 2010, and the complaint was unsealed, *Reuille*, No. 1:09-cv-00007-RL-RBC (N.D. Ind.), Dkts. 17, 18.

4

inpatient procedures, but her complaint did not mention ED admissions or any other CHSI-affiliated hospital. In an amended complaint, Cook-Reska included additional allegations that Laredo engaged in improper financial relationships with local referring physicians, but again she did not allege any facts about any CHSI-affiliated hospital other than Laredo or mention ED admissions (at Laredo or elsewhere). *See Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 24 at ¶ 124(g).

On February 11, 2010, Relator Scott Plantz filed the first *qui tam* action to allege that CHSI-affiliated hospitals billed the government for medically unnecessary ED admissions. He alleged that nearly 120 affiliated hospitals engaged in a corporate-wide scheme to improperly admit patients through hospital EDs to boost government reimbursements. *See Plantz*, No. 1:10-CV-00959 (N.D. Ill.), Dkt. 1 at ¶¶ 1, 74–190, 202–10, 246–56. He detailed numerous methods through which CHSI affiliates executed the alleged scheme, including minimum admissions benchmarks across its hospitals' EDs (with higher benchmarks for patients over the age of 65), *id.* at ¶¶ 250 & 253, and mandatory inpatient admission when a 23-hour observational period would otherwise apply, *id.* at ¶¶ 247–48. Plantz provided detailed examples and internal documents from CHSI affiliates to support his allegations. *See, e.g.*, *id.* at ¶ 248. His allegations prompted the government's national ED investigation and formed the crux of the national ED admissions claim in the Settlement Agreement, *see* Dkt. 75-1 at ¶ D.1.

The fourth relator to file—Relator Kathleen Bryant (on July 29, 2010), who is also now before this Court seeking a fee award—alleged that Heritage Medical Center in Tennessee overbilled the government for medically unnecessary inpatient admissions through the ED. Her allegations were similar in kind to those in Plantz but limited to Heritage. *See Bryant*, 4:10-cv-02695 (S.D. Tex.), Dkt. 1 at ¶¶ 1, 20, 31, 44, 45, 47, 48.

In early 2011, the government shared each of the complaints with all of the relators in the actions that had been filed to date against CHSI and its affiliates. All of the relators—regardless of the scope of their complaints—then began working primarily on the national ED allegations Dr. Plantz had articulated in his complaint: that CHSI and its affiliates had engaged in a corporate-wide scheme to increase medically unnecessary ED admissions across its affiliated hospitals. During this period of Government investigation, the *qui tam* actions remained under seal.

On April 11, 2011, in the midst of a merger battle, Tenet filed a securities fraud action alleging that CHSI "systematically steer[ed] medically unnecessary inpatient admissions at CHS hospitals" by setting target ED admission rates across facilities and restricting 23-hour observational status. *See Tenet*, No. 3:11-cv-00732-M (N.D. Tex.), Dkt. 1 at ¶ 3; *see also id.* at ¶¶ 90, 61–63, 92–93, 144. Those allegations were widely publicized by national media outlets and garnered significant public attention. *See, e.g.*, Michael J. de la Merced, *Tenet Accuses Community Health of Overbilling Medicare*, N.Y. TIMES, Apr. 11, 2011.[6]

After the national ED allegations had been publicly disclosed in *Tenet* and the government's investigation was well underway, three additional relators filed *qui tam* actions parroting the claim. Relator Bryan Carnithan filed on April 14, 2011 (amended August 5, 2011). *Carnithan*, No. 3:11-cv-00312 (S.D. Ill.), Dkts. 2 & 12. Relator Thomas Mason filed on April 18, 2011 (amended January 9, 2013). *See Mason*, No. 3:12-cv-00817 (W.D.N.C.), Dkt. 4 at ¶¶ 369–73, 407–14. Finally, Doghramji, who is also seeking fees in this Court, filed last on May 10, 2011. Dkt. 1 at ¶ 1.

---

[6] Around that same time, CHSI also acknowledged and described the allegations made by Tenet as well as the existence of a government investigation into those and other allegations in its financial statements filed publicly with the SEC. *See* Cmty. Health Sys., Inc., Form 8-Ks (Apr. 15, 2011; Apr. 22, 2011; and Apr. 25, 2011).

In April 2011, the first four relators apparently executed a private agreement to share any recovered proceeds. *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 73 at ¶ 12. In early 2014, those relators reached a second sharing agreement that included the relators in the last three lawsuits. *See id.* at ¶ 18.

## II.    SETTLEMENT AGREEMENT AND POST-SETTLEMENT ACTIONS

Following a lengthy government investigation, on July 29, 2014, Defendants entered into a settlement in which CHSI and its affiliates denied wrongdoing but agreed to pay the United States $97,257,500 million ("Settlement Amount") to resolve two claims. First, it resolved the government's claim regarding "Medically Unnecessary Emergency Department Admissions" (*i.e.*, the national ED claim). The Agreement attributed the lion's share of the Settlement Amount—$88,257,500—to the national ED claim. The Agreement also resolved Cook-Reska's "Laredo Medical Center" claims. Dkt. 75-1 at ¶ D.2. The Agreement attributed $9,000,000 of the Settlement Amount to those Laredo claims. *See id.* at ¶ 1. As discussed in Defendants' Memorandum in Opposition to Relators' Joint Motion at 10–17, the parties declined to settle any of the relators' claims to attorneys' fees.

Following settlement, the United States approved payment of a relator's share to one relator for each claim. Dr. Plantz received the relator's share of $16,427,740.96 (exclusive of interest) for the national ED claim (approximately 19% of the recovery). Dkt. 115-15. Cook-Reska received the relator's share of $2,141,184.04 (exclusive of interest) for her claims against Laredo (approximately 20% of the Laredo recovery). Dkt. 115-16. Both awards fell within the range required by the statute. *See* 31 U.S.C. § 3730(d) (expressly defining relator's share as 15% to 25% of the government's award for the claim).

7

Pursuant to the Settlement Agreement, the government moved to unseal, intervene in, and dismiss all seven *qui tam* actions. *See id*. at ¶ 15. Relators in all seven *qui tam* actions then informed Defendants that they intended to file fee petitions seeking attorneys' fees and costs for work performed in furtherance of the national ED claim. But, as explained below, the False Claims Act permits only one relator—the first-filed relator—to recover for an FCA claim, *see* 31 U.S.C. § 3730(d). Defendants agreed with the United States that Plantz had been the first-filed relator and quickly arranged to pay his reasonable attorneys' fees.[7] *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 95-2.

Defendants successfully moved to transfer *Reuille*, *Cook-Reska*, and *Bryant* to this Court for consolidation with *Doghramji* so that all of the relators' entitlements to attorneys' fees could be considered together.[8] On February 2, 2015, this Court granted Defendants' motion to consolidate *Reuille*, *Cook-Reska*, and *Bryant* with *Doghramji*. Dkt. 143 at p. 3.

## ARGUMENT

### I. A RELATOR SEEKING ATTORNEYS' FEES MUST DEMONSTRATE THAT (S)HE WAS FIRST TO FILE AND RECEIVED A RELATOR'S SHARE

Relators have moved for an award of fees, costs, and expenses under 31 U.S.C. § 3730(d), the provision of the FCA that authorizes such awards under specified circumstances. Section 3730(d) provides in relevant part:

> If the Government proceeds with an action brought *by a person under subsection (b), such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim* . . . . Any payment to a person under . . . this paragraph shall be made from the proceeds. *Any such*

---

[7] Defendants also settled Relator Thomas Mason's claim for attorneys' fees. *See Mason*, No. 3:12-cv-00817 (W.D.N.C.), Dkt. 36.

[8] *See Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 76; *Bryant*, 4:10-cv-02695 (S.D. Tex.), Dkt. 42; *Reuille*, No. 1:09-cv-00007 (N.D. Ind. Jan. 12, 2015), Dkt. 69. Defendants also moved to transfer Carnithan's attorneys' fees claim, but that motion was denied because a separate claim is still pending before that court. *See Carnithan*, No. 3:11-cv-00312 (S.D. Ill.), Dkt. 67.

8

> *person shall also receive* an amount for reasonable expenses which the court finds
> to have been necessarily incurred, plus *reasonable attorneys' fees* and costs. All
> such expenses, fees, and costs shall be awarded against the defendant.

31 U.S.C. § 3730(d)(1) (emphasis added). Section 3730(d)'s reference to "a person under subsection (b)" is significant because subsection (b)(5) includes the first-to-file bar, which limits recovery to a single relator (the first relator to bring suit), bars successive *qui tam* suits arising from the same essential facts or material elements, and forbids subsequent relators from sharing in the government's recovery or being awarded their attorneys' fees.

Section 3730(b)(5) provides: "When a person brings an action under this subsection, *no person* other than the Government *may* intervene or *bring a related action based on the facts underlying the pending action*." 31 U.S.C. § 3730(b)(5) (emphasis added). "[T]he purpose of the FCA's first-to-file provision is to prevent the filing of more qui tam suits once the government already has been made aware of the potential fraud perpetrated against it." *United States ex rel. Poteet v. Medtronic, Inc.,* 552 F.3d 503, 517 (6th Cir. 2009). Once the government has been alerted to the alleged fraud, any additional FCA action alleging the same material elements provides no benefits and serves only to dilute the recovery of the government and the original relator.[9]

Critically, a relator whose claims are barred on first-to-file grounds may *not* recover a relator's share or attorneys' fees for those claims under 31 U.S.C. § 3730(d). *See NextCare*, 2013 WL 431828, at *2–3 ("The plain language of the FCA demonstrates that a relator is only entitled to attorneys' fees if that relator also obtained a relator's share following a court award or

---

[9] *See, e.g, Poteet*, 552 F.3d at 516 (first-to-file bar "furthers the policies animating the FCA by ensuring that the government has notice of the essential facts of an allegedly fraudulent scheme while, at the same time, preventing opportunistic plaintiffs from bringing parasitic lawsuits") (internal quotations omitted); *In re Natural Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 961 (10th Cir. 2009) (first-to-file bar "functions both to eliminate parasitic plaintiffs . . . and to encourage legitimate relators to file quickly by protecting the spoils of the first to bring a claim").

9

settlement."); *United States ex rel. Ryan v. Endo Pharm., Inc*., 27 F. Supp. 3d 615, 630–31 (E.D. Pa. 2014) ("The logical conclusion from the FCA's inclusion of the first-to-file rule is that Congress intended only one relator to prevail for each claim.  Here, Ryan filed first . . . and Ryan is the sole Relator eligible to receive the award."); *see also United States ex rel. Johnson v. Planned Parenthood of Houston*, 570 F. App'x 386, 388–90 (5th Cir. 2014) (per curiam); *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001); *United States ex rel. Beauchamp v. Academi Training Ctr., Inc.*, 933 F. Supp. 2d 825, 835 (E.D. Va. 2013). Put differently, a "person under subsection (b)" cannot include any relator who is barred under section 3730(b)(5) by virtue of the first-to-file doctrine.[10]

Consequently, in order to recover attorneys' fees under the FCA, a relator must be the first-to-file under section 3730(b)(5).  This requires showing for a later-filed *qui tam* suit that it (i) is based on facts different from those alleged in a prior suit; and (ii) gives rise to separate and distinct recovery by the government.   A *qui tam* action that fails either prong is subject to dismissal.  *See United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005); *Lujan*, 243 F.3d at 1187. In addition, a relator must obtain a relator's share in order to be entitled to recover attorneys' fees under section 3730(d)(1).  31 U.S.C. § 3730(d)(1) ( "[A] person under subsection (b), . . . shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim. . . . *Any such person* shall also receive an

---

[10] Not surprisingly, courts have also held that a relator may not recover attorneys' fees under section 3730(d)(1) without meeting the requirements delineated in other subsections of section 3730, including another jurisdictional bar—the so-called "public disclosure rule" of section 3730(e)(4).  *See, e.g., Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 453 (5th Cir. 1995) (relators' attorneys "are not statutorily entitled to attorneys' fees and expenses" because relators' lawsuit is blocked by the public disclosure bar); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 7 (D.D.C. 2008) ("Logically, having erected a jurisdictional bar to these relators' claims, Congress could not have intended them to receive attorneys' fees.").

10

amount for reasonable expenses . . . plus reasonable attorneys' fees and costs.") (emphasis added); *see also NextCare*, 2013 WL 431828, at *2 ("The plain language of the FCA demonstrates that a relator is only entitled to attorneys' fees if that relator also obtained a relator's share following a court award or settlement."); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 6 (D.C.C. 2008) ("In light of the immediately preceding sentence, 'any such person' must mean any person who receives payment under the statute's first or second sentences.")

Here, Relators cannot meet either requirement for an attorneys' fee award.

## II. RELATORS ARE BARRED FROM RECOVERING FEES UNDER SECTION 3730(b)(5) BECAUSE THEY WERE NOT THE FIRST TO FILE

### A. Plantz Was The First To File

Dr. Plantz's complaint preempts all other relators from recovering fees for the national ED claim because he was the first to file that claim in a manner cognizable by the FCA.

In his complaint, Dr. Plantz named 119 CHSI-affiliated entities as defendants (including CHSI and all CHSI-affiliated hospitals) and alleged a "massive" and "intentional" corporate-wide scheme to overbill the government for medically unnecessary ED admissions across facilities. *See Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶ 1. He specifically alleged that CHSI-affiliated hospitals, in order to meet financially-motivated admissions benchmarks, engaged in a scheme to coerce physicians and nurses into improperly admitting patients who came to the ED. *See id.* at ¶¶ 202–10, 246–56. He further alleged that CHSI set minimum benchmarks (exceeding the national average) at every affiliate hospital for the percentage of patients that had to be admitted through the ED, *id.* at ¶ 250, and that higher benchmarks were set for the admission of patients over the age of 65, *id.* at ¶ 253. Dr. Plantz also described techniques hospitals allegedly employed to meet the admissions benchmarks, such as "mandat[ing] that the ED physicians should not use a 23-hour observation of a patient" but

should instead "simply admit the patient to the hospital." *Id.* at ¶ 247. Dr. Plantz supported his allegations with internal documents from CHSI affiliates containing inside information that otherwise would have been unavailable to the government. *See, e.g.*, *id.* at ¶ 248.

Dr. Plantz was the real whistleblower on the claim. All evidence suggests that his complaint alerted the government to the alleged corporate-wide scheme. In early 2011, when the government confidentially shared the first four *qui tam* complaints among those relators as part of its national investigation into medically unnecessary ED admissions, Dr. Plantz was the only relator among them who had articulated allegations against more than one facility, and his was the first of only two complaints in that batch (the other being Bryant's) to discuss ED admissions.

Moreover, Dr. Plantz's allegations appear to have triggered and guided the government's investigation into—and ultimate settlement of—the national ED claim. The Settlement Agreement defined that claim to encompass medical claims that CHSI-affiliated hospitals knowingly submitted to the government for reimbursement (between 2005 and 2010) relating to patients who (a) originally presented to a hospital's ED; (b) were admitted as an inpatient for two days or less; and (c) were 65 years or older. Dkt. 75-1 at ¶ D.1. Dr. Plantz's complaint provides all essential facts of the alleged scheme, including allegations specific to elements in the Settlement Agreement.

## B. <u>Reuille Does Not Qualify As The First To File The National ED Claim</u>

As an initial matter, Reuille is not entitled to fees because she did not prevail on complaint. Her complaint was limited to Lutheran Hospital and, as Reuille concedes, the government recovered zero damages from that facility. Reuille explained in her supplemental brief:

> [I]n the Settlement Agreement, the government only received damages for the ED Claims at those of the 119 hospitals that had been found in the probe audit conducted by the government to have overpaid on the specific handful of DRGs and MS-DRGs that were included in the probe audit for the years audited. . . . After the Settlement Agreement was signed, the government lawyers explained to Reuille's counsel that . . . the probe audit had not shown any damages for the DRGs and MS-DRGs that were subject to the probe audit at Lutheran.

Dkt. 154 at 6; *accord* Dkt. 156-1 at ¶ 5. In general, only successful parties may recover attorneys' fees pursuant to a fee-shifting statute. *See, e.g.*, *Holzmann*, 575 F. Supp. 2d at 6–7. The FCA is no exception—it explicitly articulates that a private individual is entitled to nothing under Section 3730(d) unless (a) the government recovers funds from the defendant in a judgment or settlement of that individual's specific claim; and (b) the government turns around and pays the relator a relator's share. 31 U.S.C. § 3730(d)(1) (providing that "a person under subsection (b) . . . shall . . . receive at least 15 percent but not more than 25 percent *of the proceeds of the action or settlement of the claim*" and that person "shall also" receive "reasonable" attorneys' fees (emphasis added)); S. REP. No. 99-345, at 29 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5294 (characterizing the FCA's fee-shifting scheme as applying to "prevailing *qui tam* relators"). When the government recovers nothing on a claim, the first condition fails.

Here, Reuille alleged improper ED admissions at only one hospital, and the United States concluded there were no damages at that hospital. Consequently, there was no separate and distinct recovery by the government as a result of her allegations. *See, e.g.*, *United States ex rel. Capella v. United Technologies Corp.*, No. 3:94-cv-2063, 1999 WL 464536 (D. Conn. June 3, 1999); *Erickson ex rel. United States v. Am. Inst. of Biological Scis.*, 716 F. Supp. 908, 918 (E.D.

Va. 1989).[11]  This is not a case of the plaintiff obtaining a $1 judgment or injunctive relief—Reuille's allegations concededly resulted in *no recovery for the government*.  Reuille, therefore, was not a successful relator and is not entitled to a fee award.

In any event, Reuille does not qualify for attorneys' fees because her complaint did not alert the government to the national ED claim, as is required to preempt later actions under the first-to-file rule.  Although Reuille alleged that CHSI and Lutheran generally encouraged physicians to utilize "inpatient" status for medically unnecessary one-day stays, *see Reuille*, No. 1:09-cv-00007 (N.D. Ind.), Dkt. 1 at ¶¶ 24–29, she did not discuss ED admissions in her complaint.  Her allegations also were focused narrowly on events at Lutheran, and she did not name other defendants or charge a companywide scheme.  The best evidence that her allegations did not alert the government to the national ED claim was that, after a two-year investigation, the United States declined to intervene in her case.  *Reuille*, No. 1:09-cv-00007-RL-RBC (N.D. Ind.), Dkt. 17.  Only later, after the filing of *Plantz* and *Tenet*, did the government ask for a stay to revisit its intervention decision in *Reuille*.[12]

Furthermore, Reuille also would not qualify as the first to file because her complaint failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).  The Sixth Circuit has recognized "[o]ne important caveat to th[e] first-to-file rule"—a relator may not qualify as the "first" to file a particular claim unless the allegations satisfy other applicable procedural and jurisdictional requirements, including Rule 9(b).  *Poteet*, 552 F.3d at 516.  A

---

[11] This prong serves as an additional safeguard against duplicative claims by preventing multiple relators from recovering for the same essential fraudulent scheme. *See Erickson*, 716 F. Supp. at 918 ("[T]he [first-to-file rule] prevents a double recovery.").

[12] In its motion to stay, the government made clear that it was interested in *Reuille* only as an appendage to its broader ongoing investigation into "allegations of improper billing for inpatient care at other hospitals associated with [CHSI] . . . asserted in other *qui tam* complaints in other jurisdictions." *Reuille*, No. 1:09-cv-00007 (N.D. Ind.), Dkt. 30 at ¶ 3.

14

complaint that fails to meet the pleading requirements of Rule 9(b) is not cognizable under the FCA because it could not have adequately alerted the government "of the essential facts of the fraudulent scheme, and therefore would not enable the government to uncover related frauds." *Walburn*, 431 F.3d at 973.[13]  Here, Reuille's allegations are too vague and incomplete to meet her burden of showing particularity under Rule 9(b).  In particular, she failed to identify a single representative example in which a physician admitted a patient for a one-day stay when it was not medically necessary to do so.[14]  *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) (complaint must include at least some representative examples of the alleged fraudulent conduct to satisfy Rule 9(b), including the specific time, place, content, and actor involved in each example).  While Reuille surmised that the activity "correlates to excessive overbilling of stays for which there was a less expensive level of care available," *Reuille*, No. 1:09-cv-00007 (N.D. Ind.), Dkt. 1 at ¶ 24, she failed to provide even a single example of a false claim submitted to the government pursuant to the alleged fraudulent scheme or any other evidence that Defendants actually overbilled the government.  *See Bledsoe*, 501 F.3d at 509–15 (dismissing claim per Rule 9(b) when complaint failed to identify a single instance of billing fraud).

---

[13] If an earlier-filed complaint fails to satisfy Rule 9(b), then it is irrelevant to the first-to-file analysis— the complaint neither bars subsequent actions based on the same essential facts nor shields the relator from the preclusive effect of a properly-filed claim.  *See Poteet*, 552 F.3d at 516–17 ("[I]f the first complaint is . . . legally incapable of serving as a complaint, then it does not properly qualify as a 'pending action' brought under the FCA." (citing 31 U.S.C. § 3730(b)(5)) (internal citation omitted)).

[14] Instead, Reuille cited statistical data from OIG / HPNP audits between 2001 through 2005. *Reuille*, No. 1:09-cv-00007 (N.D. Ind.), Dkt. 1 at ¶¶ 19–21. This generalized data does not contain any particularized information or representative examples required to satisfy Rule 9(b).  Moreover, the audits predated both CHSI's acquisition of Lutheran (in December 2007) and the designated time period for the national ED claim (2005 to 2010).

15

## C. **Cook-Reska Was Also Not The First To File**

Cook-Reska offers a smattering of arguments as to why she believes that she was first to file the national ED claim. She is wrong. Most fundamentally, Cook-Reska cannot qualify because she *never* advanced that claim. Neither her original nor her amended complaint makes *any* mention of ED admissions. Although Cook-Reska made conclusory allegations that the improper billing and referral practices at Laredo occurred at other CHSI-affiliated hospitals, *see Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 2 at ¶¶ 50–51, 68, she alleged no specific facts about any other facility and did not name any facility besides Laredo.

Nonetheless, Cook-Reska now asserts that the inpatient billing practices described in her complaint were for patients who came in through the ED. Dkt. 155 at 12. Notably, Cook-Reska does not cite her complaint for this assertion. Nor could she: again, neither her original nor her amended complaint mentioned or challenged Defendants' practices on ED admissions—whether at Laredo or elsewhere. *See id.* In an even greater leap of reinvention, Cook-Reska also now insists that her allegations cover ED claims against *all* CHSI-affiliated facilities. *Id.* at 11–13. According to Cook-Reska, she is "clearly the first to file relator on 'Medically Unnecessary Emergency Department Admissions' for all CHS hospitals," other than Lutheran,[15] because her complaint "was the first to name CHS and to allege that the admission fraud was occurring at

---

[15] Because the law firm of O'Connell & Soifer LLP ("O&S") represents both Cook-Reska and Reuille—a fact that they neglect to disclose—their supplemental memoranda coordinate theories to argue that both relators are entitled to recover fees. To accomplish this, they each assert that they alleged the national ED claim sufficiently and then slice the claim by named defendants. As described above, Defendants do not believe either relator stated the national ED claim with sufficiently particularity to preempt subsequent claims. *See, e.g., Walburn*, 431 F.3d at 973. In addition, relators may not divide a claim by corporate affiliate to evade the first-to-file rule. It is irrelevant that a "later action names different or additional defendants . . . as long as the two complaints identify the same general fraudulent scheme" involving "the same general group of actors." *Poteet*, 552 F.3d at 517 (internal quotations omitted); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1280 (10th Cir. 2004) (plaintiff cannot evade first-filed rule by naming corporate affiliates or subsidiaries as parties to same underlying fraud). Differences in named defendants "are not differences in the material elements of the fraud." *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir. 2003).

16

other CHS hospitals." *Id.* at 11–14.  To support the latter assertion, Cook-Reska highlights a clause in her complaint adding "CHS hospitals, including but not limited to LMC." *Id.* at 12.

In fact, Cook-Reska did not allege a corporate-wide scheme to improperly admit patients through CHSI-affiliated hospitals' EDs, let alone with the particularity required under Rule 9(b) and section 3730(b) to secure first-to-file status under the FCA.  Cook-Reska admits she "did not use the words 'Emergency Department' or 'Emergency Room' in her Complaint." Dkt. 155 at 12.  She certainly did not include any specific examples of medically unnecessary ED admissions.  *See Bledsoe*, 501 F.3d at 510.  The catch-all reference  "CHS hospitals, including but not limited to LMC," could not have alerted the government to a company-wide ED admissions scheme under the best of circumstances, and certainly could not have done so unaccompanied by any allegations involving medically unnecessary ED admissions.[16]  *See Walburn*, 431 F.3d at 973.

Indeed, the sequence of events surrounding Cook-Reska's involvement in the national ED investigation confirms that she was not the source of these allegations.  It is only *after* the filing of *Plantz* that, in early 2011, the government obtained a partial unsealing of the first four *qui tam* complaints and confidentially shared each of them with the other relators.[17]  Tellingly, the first thing that Cook-Reska's counsel—O'Connell & Soifer LLP ("O&S")—did was move aggressively to sign up Nancy Reuille as a client, a tacit admission that they had serious first-to-file issues.  *See Reuille*, No. 09-cv-00007 (N.D. Ind.), Dkts. 22 & 23.  And by their own

---

[16] Cook-Reska argues that the complaints filed after her action added details, geographical locations, or defendants "but the factual basis for all the complaints, that patients were being wrongfully admitted so that government healthcare programs such as Medicare could be charged more, is consistent." Dkt. 155 at 14.  Yet, this broad statement of the alleged wrongdoing is so sweeping as to encompass huge swaths of healthcare fraud.  It is exactly why relators are required to satisfy Rule 9(b) in order to qualify under the first-to-file bar, *Poteet*, 552 F.3d at 516–17, and why Cook-Reska fails to do so.  *See Walburn*, 431 F.3d at 973.

[17] *See Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 73 at ¶ 11.

admission, and as recognized by the federal court in Houston, Cook-Reska's counsel did not begin working on the national ED case until after the government shared the other complaints with them. Memorandum & Order, *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 121 ("Exhibit B"), at 31–34; *see, e.g.*, *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 73 at 9; *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 94 at 12–13; *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 109 at 5–6. As Judge Lake found in reviewing the time records of Cook-Reska's counsel in connection with her motion for attorneys' fees for the Laredo claim:

> The court's review of the Baron & Budd and O'Connell & Soifer invoices shows that the shift in direction away from the Non-ED claims related solely to LMC [Laredo Medical Center] to the national ED claim occurred in early 2011. . . Beginning on March 9, 2011 [when Cook-Reska received the other *qui tam* complaints from the United States], Relator's attorneys began to spend the lion's share of the time expended on this case working on matters related to the national ED-claim.

Exhibit B at 31–34. Accordingly, the Court in Houston ordered that Cook-Reska could recover fees on the Laredo claim for all time worked prior to March 9, 2011 but only allowed for a small number of designated Laredo-specific hours incurred after that date.

In a very basic way, the government recognized that Cook-Reska's complaint presented very different allegations when it set out in the Settlement Agreement that there were two civil claims—(1) "Medically Unnecessary Emergency Department Admissions," and (2) "Laredo Medical Center" claims (which included "Medically Unnecessary Inpatient Procedures" and "Improper Financial Relationships"), Dkt. 75-1 at ¶ D—and attributed $88,257,500 of the settlement to ED admissions and $9,000,000 to Laredo claims, *id.* at ¶ 1. Were Cook-Reska correct that she had alleged the national ED claim as well as the Laredo claims, there would have been no need to break out the two separately in the Agreement. Yet, the very structure of the Settlement Agreement demonstrates that these were two distinct claims and Cook-Reska alleged only one of them.

### D. **Bryant Was Also Not First To File**

The next relator who seeks attorneys' fees in this action, Kathleen Bryant, filed her complaint fourth in time. In it, she alleged that CHSI and Heritage Medical Center overbilled the government through improper ED admissions. *Compare Bryant*, 4:10-cv-02695 (S.D. Tex.), Dkt. 1 at ¶¶ 1, 20, 31, 44, 45, 47, 48, *with Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶¶ 246–56, 262–66.

Bryant maintains that she was the first to file an action "containing the specific and detailed allegations of fraud occurring at Defendants' hospital, Heritage Medical Center." Dkt. 153 at 7. She acknowledges that Dr. Plantz also named Heritage in his complaint but insists that his allegations against Heritage are inadequate under Rule 9(b) because his complaint "does not include a single, substantive allegation regarding Heritage." *Id.* at 8. This argument misconstrues the first-to-file rule.[18]

Bryant compares her complaint to Dr. Plantz's complaint only as to specific allegations against Heritage when the first-to-file analysis actually requires a comparison based on all the elements of the underlying fraudulent scheme.[19] The first-to-file rule does not apply on a defendant-by-defendant basis; it preempts all claims related to the fraudulent scheme articulated in the previous action. *See Poteet*, 552 F.3d at 516.

Indeed, Dr. Plantz's complaint would have preempted her action even if he had omitted Heritage from his complaint entirely. It is irrelevant that a "later action names different or

---

[18] In any event, Bryant's reliance on *Walburn* is misplaced. Unlike the earlier-filed action there, Dr. Plantz's complaint alleged specific activities very similar (and in some cases identical) to those Bryant alleged. *See* 431 F.3d at 972–73. Moreover, his complaint actually alerted the government to the alleged scheme and enabled the government to uncover related activities. *See id.*

[19] Notably, Bryant does not contend that Dr. Plantz's entire complaint fails to satisfy Rule 9(b). She implicitly acknowledges that his action adequately states at least some allegations that CHSI engaged in a corporate-wide scheme to overbill the government through improper ED admissions. Any such properly pleaded allegations, however, bar her complaint. *See Poteet*, 552 F.3d at 516–17.

additional defendants . . . so long as the two complaints identify the same general fraudulent scheme." *Poteet*, 552 F.3d at 517 (internal quotations omitted). The alleged fraudulent scheme underlying Bryant's complaint had the same "material elements" of the scheme that Dr. Plantz had alleged nearly six months earlier. *See id.* at 516 (internal quotations omitted) (first-to-file rule bars subsequent actions raising same or a related claim "based in a significant measure on the core facts or general conduct relied upon in the first [] action"). Like Dr. Plantz, Bryant alleged that CHSI engaged in corporate-wide practices to overbill the government through improper ED admissions. *Compare Bryant*, 4:10-cv-02695 (S.D. Tex.), Dkt. 1 at ¶¶ 1, 20, 31, 44, 45, 47, 48, *with Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶¶ 246–56, 262–66. Bryant claimed that CHSI encouraged Heritage to increase medically unnecessary ED admissions through a subset of the general measures that Dr. Plantz had flagged in his earlier complaint. For example, she alleged that CHSI had instructed its affiliate hospitals to place patients on "in-patient" status rather than 23-hour observation, but Dr. Plantz had already raised the same practice. *Compare Bryant*, 4:10-cv-02695 (S.D. Tex.), Dkt. 1 at ¶ 4, *with Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶ 204. An investigation into Dr. Plantz's complaint would have uncovered the same allegedly fraudulent activity claimed by Bryant. *See Planned Parenthood*, 570 F. App'x at 388–90.

### E. Doghramji Was Also Not The First To File

As an initial matter, Doghramji waived any arguments that he was the first to file the national ED claim when he refused to argue the point in a supplemental brief. *See* Dkt. 152 at 1. Doghramji, like the other relators, ultimately bears the burden here of proving entitlement to any fee award. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("[T]he fee applicant bears the burden of establishing entitlement to an award."). This Court ordered that Relators "shall

have until April 28, 2015, to file motions addressing their entitlement to attorney's fees as a threshold issue." Dkt. 147 at ¶ 2. All of the other relators filed memoranda addressing entitlement *except* Doghramji. Instead, he stated his "inten[tion] to respond to the Defendants' arguments in a reply brief, for which [he] will respectfully file a motion to exceed the Court's default 5-page limit." Dkt. 152 at 2 (emphasis added) (footnote omitted). This ploy is particularly inexcusable because, during the status conference before Magistrate Judge Griffin, Doghramji's counsel *insisted* that the Relators should go first in briefing their entitlement to fees—over Defendants' objections. *See* Dkt. 146 at 39–46. There should not be special rules for Doghramji; he should abide by the same court-ordered briefing schedule as the other parties (the schedule he himself urged). Having argued for and secured the right to go first, Doghramji is not permitted to unilaterally rearrange the briefing schedule at this late date and should be deemed estopped from making additional first-to-file arguments.

But even if this Court were to reach the merits, Doghramji's complaint was filed dead last and cannot overcome the first-to-file bar. Doghramji fails both prongs of the first-to-file bar: his complaint is not based on facts different from those alleged in prior suits, and it did not give rise to separate and distinct recovery by the government. *See Walburn*, 431 F.3d at 970; *Allstate Ins. Co.*, 560 F.3d at 378.

*First*, Doghramji's complaint is *not* based on materially different facts from those alleged in prior lawsuits. The "allegations of nationwide unnecessary ER admissions" that Doghramji admits "were at the heart of" his complaint, Dkt. 87 at 2, merely echoed the allegations and claims made in the complaint in *Plantz* (as well as in the complaints filed after *Plantz*). In *Plantz*, the relator alleged "intentional over billing of the Medicare and Medicaid health insurance programs" by CHSI and its subsidiaries, *Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1

at ¶ 1, named nearly 120 CHSI-affiliated entities as defendants, *id.* at ¶¶ 74–190, and specifically charged a scheme to overbill the government through improper ED admissions across facilities, *see, e.g.*, *id.* at ¶¶ 246–56, 262–66. Similarly, Doghramji alleged that Defendants engaged in "a nationwide scheme" to admit patients through CHSI affiliates' emergency rooms who did not require inpatient treatment in order to reap greater financial reimbursement from Medicare, Medicaid, and other government payors. Dkt. 1 at ¶ 1. Doghramji named 74 CHSI-affiliated hospitals, *every one of which* was named as a defendant in *Plantz*. Given the nearly identical core allegations, there can be little doubt that "an investigation into" Plantz's allegations "would have uncovered the same fraudulent activity alleged" by Doghramji. *Planned Parenthood*, 570 F. App'x at 389.

Doghramji's complaint also repeated many of the particular *means* alleged by Dr. Plantz (or other relators) through which the overall scheme to overbill Medicare and Medicaid by encouraging unnecessary ER admissions supposedly had been pursued. For example—like Dr. Plantz—Doghramji alleged that CHSI officials carefully monitored ED admissions rates and pressured and threatened hospital administrators and physicians to increase those rates. *Compare* Dkt. 1 at ¶¶ 110-115, 210–11, *with Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶¶ 248–52, 256, 262–65. Doghramji—like Dr. Plantz—also alleged that CHSI established benchmarks or quotas for ED admission rates that were above the national averages. *Compare* Dkt. 1 at ¶¶ 110, 218, *with Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶¶ 250–52, 256, 262. And Doghramji—like Dr. Plantz—included a statistical analysis of the allegedly inflated rates of ED admissions at CHSI facilities compared with all hospitals in the United States. *Compare* Dkt. 1 at ¶¶ 239–40, *with Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶¶ 250–52, 262, 264.

*Second*, Doghramji's claim did not give rise to any separate and distinct recovery by the government. The Settlement Agreement attributed to the national ED claim all of the covered claims that CHSI-affiliated hospitals had submitted to the government for beneficiaries 65 years or older who were admitted through the EDs as inpatients for two days or less. Dkt. 75-1 at ¶ D.1. The entire scope of that conduct was alleged in Dr. Plantz's complaint. For example, he thoroughly alleged that CHSI engaged in a fraudulent scheme to overbill the government through improper ED admissions across facilities, taking pains to include every CHSI-affiliated hospital in his allegations. *See Plantz*, No. 1:10-cv-00959 (N.D. Ill.), Dkt. 1 at ¶¶ 1, 74–190, 274. Plantz further alleged that CHSI set benchmarks above the industry average at every one of its affiliated hospitals for the percentage of patients admitted to the hospital from the ED and set even higher benchmarks for patients *over the age of 65*. *Id.* at ¶¶ 250, 253. Dr. Plantz also alleged that hospitals were improperly admitting patients to the hospital for short-term stays (less than two days) rather than utilizing 23-hour observation periods in the ED. *Id.* at ¶¶ 247–48. As the government acknowledged in granting Dr. Plantz the relator's share, it was on the basis of his complaint that the government received a settlement for the national ED claim.

## III. RELATORS ARE BARRED FROM RECOVERING FEES UNDER 31 U.S.C. § 3730(d) BECAUSE THEY WERE NOT AWARDED A RELATOR'S SHARE

To recover attorneys' fees, a relator must be a person who "shall" receive a relator's share, which the statute specifies must equal 15% to 25% of the government's recovery on the claim. 31 U.S.C. § 3730(d)(1) (providing that "a person under subsection (b) . . . *shall* . . . receive *at least 15 percent but not more than 25 percent* of the proceeds of the action or settlement of the claim" and that person "*shall also*" receive "reasonable" attorneys' fees) (emphasis added). As other courts have recognized, "[t]he plain language of the FCA demonstrates that a relator is only entitled to attorneys' fees if that relator also obtained a

23

relator's share following a court award or settlement." *NextCare*, 2013 WL 431828, at *2; *see also United States ex rel. Lefan v. Gen. Elec. Co.*, 397 F. App'x 144, 152 (6th Cir. 2010) ("In light of the FCA's mandatory fee-shifting provision, we hold that a final order issued in an FCA case that entitles a relator to a share of the Government's recovery also entitles the relator to attorneys' fees."). This precondition for any fee award codifies the foundational concept that only successful parties may recover attorneys' fees pursuant to a fee-shifting statute. *See Hensley*, 461 U.S. at 434.

Not only does Section 3730(d) make clear that a *qui tam* relator must be successful to be entitled to recover fees, costs, and expenses, it also specifies *what qualifies as success* in this setting. Under the clear language of 31 U.S.C. § 3730(d), a relator has not been successful unless and until the government awards him or her a relator's share. *See, e.g.*, *Lefan*, 397 F. App'x at 152. Section 3730(d) also specifically defines the percent of the proceeds obtained by the government that a relator must receive to qualify as a relator's share for a particular claim, *see* 31 U.S.C. § 3730(d)(1) ("at least 15 percent but not more than 25 percent of the proceeds of the . . . settlement of the [Relator's] claim"). Because none of the relators before this Court received a relator's share for the national ED claim, they do not qualify as relators eligible to recover reasonable fees for that claim.

### A. Plantz Alone Received A Relator's Share From The Government On The National ED Claim

In this case, only one relator—Dr. Plantz—obtained the statutory threshold of success necessary for entitlement to fees on the national ED claim because he alone was the relator for whom the United States approved and paid a relator's share (as defined in the statute). Per his Relator's Share Settlement with this United States, Plantz received $16,427,740.96 of the government's $88,257,500 for the national ED claim. *See* Dkt. 115-15. That sum, which is

24

roughly 19% of the proceeds from the settlement of the national ED claim, falls squarely within the statutory definition of a relator's share, *see* 31 U.S.C. § 3730(d)(1). No other relator received a relator's share for the national ED claim as defined by Section 3730(d)(1) and, accordingly, the relators now before this Court are not entitled to fees, costs, or expenses under Section 3730(d). *See NextCare,* 2013 WL 431828, at *2 ("The plain language of the FCA demonstrates that a relator is only entitled to attorneys' fees if that relator also obtained a relator's share following a court award or settlement."). This Court need go no further in denying relators' requests for fees.

## B. None Of The Other Relators Received A Relator's Share From The Government On The National ED Claim

Relators Reuille, Bryant, and Doghramji concede that they were not "directly" awarded a relator's share by the United States; instead, each asserts entitlement to attorneys' fees because he or she received a portion of the relator's share monies indirectly through a private agreement to allocate the relator's share. *See, e.g.*, Dkt. 87 at 13 n.7 (Doghramji acknowledges that he "w[as] not paid a bounty directly by the Government" but cited to private sharing agreement by which he apparently received 14% of the amount awarded Plantz). As discussed in the next section, such an argument fails as a matter of law. Only Cook-Reska contends that the government paid her directly a relator's share on the national ED claim. But her contention, too, is badly flawed.

Cook-Reska notes that she received a relator's share in the amount of $2,141,184.04 and contends that $1.8 million of her $2.14 million recovery was for her separate claim involving billing and referral practices at Laredo, whereas $341,000 was attributable to ED admissions at Laredo. *See* Dkt. 155 at 10; *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 83-4. Based on these numbers, Cook-Reska argues that she received a "relator's share" for her Laredo claim

25

(equaling roughly 20% of the government's $9,000,000 recovery for the "Laredo Medical Center" claim). That is true enough, and Defendants have conceded Cook-Reska's entitlement to attorneys' fees on the Laredo claim. However, for present purposes all that matters is that she clearly did *not* receive a relator's share for the national ED claim (she received roughly 2% of the government's $88,257,500 recovery for the national ED claim). *See* 31 U.S.C. § 3730(d)(1) (defining a successful relator as one who receives a share of between 15 and 25% of the proceeds of the claim).[20] The statutory prerequisites to recover fees are not obviated by the government's stipulation that a small number of improper ED admissions may have taken place at Laredo (or any other concession the government might choose to make to avoid protracted relator's-share litigation).

Moreover, Cook-Reska's reliance here on the $341,000 carve-out for "ED admissions" at Laredo is misplaced and misleading. Since Cook-Reska did not actually include any specific allegations involving the ED in her complaint, any recovery for Laredo ED admissions must be contemplated as part of her allegations of "medically unnecessary inpatient procedures." *See Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 94 at 1, 3. That claim was not transferred to this Court. *See Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 106. In fact, the district court in Texas has already issued its Memorandum Opinion & Order regarding fees on all "allegations

---

[20] As she does before this Court, Cook-Reska in her arguments before the district court in Texas made every effort to blur the lines between these two distinct claims. For example, Cook-Reska refused repeated requests by Defendants to segregate her counsel's hours by claim, insisting that it would be an "impossible task" because all of her counsel's work was in furtherance of both claims. *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 94, at 13. Indeed, Cook-Reska refused to divide her time entries even after the Texas district court ordered her to file an amended petition with hours "related *solely* to claims based on allegations that [Laredo] billed government programs for medically unnecessary inpatient procedures and engaged in improper financial relationships." *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 106 at 21. Instead, "the vast majority of the entries . . . accompanying [Cook-Reska's] amended motion for fees [was] attributed to a category labeled 'both.'" Exhibit B at 30–31. The court was none too pleased and easily excluded all hours from March 9, 2011 through the present that were attributed to "both" claims. *See id.* at 30–34.

that [Laredo] billed government programs for medically unnecessary inpatient procedures," *see* Exhibit B at 30 & n.59 (internal quotation marks omitted). Cook-Reska may not recover for a claim that has already been adjudicated in another court. *Cf. Gen. Acquisition, Inc. v. GenCorp., Inc.*, 23 F.3d 1022, 1029 (6th Cir. 1994) (law prohibits duplicative recovery for injuries that have been cured by earlier award). She certainly may not rely on the $341,000 carve-out for claims at Laredo to demand nearly $3 million in fees for services her counsel performed in furtherance of a *national ED claim at other facilities.*[21]

In fact, Cook-Reska is not entitled to *any fees* for work unrelated to Laredo. The government did not award her one dime of the recovery attributable to any other Defendants (parent or subsidiary). According to her agreement with the United States, Cook-Reska received a $2,141,184.04 settlement sum from the United States for her claims of improper conduct "*at Laredo Medical Center.*" Dkt. 115-16 at ¶ 1 (emphasis added). This formulation limiting Cook-Reska's share recovery to her allegations relating to Laredo conforms to the general principle that a plaintiff may not prevail on a claim she did not allege. *See United States ex rel. Rigsby v. State Farm Fire and Cas. Co.*, 06CV433, 2014 WL 691500, at *12 (S.D. Miss. Feb. 21, 2014); *cf. United States ex rel. Longhi v. Lithium Power Techs.*, 575 F.3d 458, 475–76 (5th Cir. 2009).

In sum, Cook-Reska is not entitled to attorneys' fees on the national ED claim because she did not receive a relator's share for that claim. *See* 31 U.S.C. § 3730(d)(1). The government expressly limited her recovery to a relator's share concerning allegations against Laredo. *See*

---

[21] This, however, is precisely what Cook-Reska seeks to do. *See Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 76 at 1 ("[T]he vast majority of Cook-Reska's $3.5 million fee petition seeks reimbursement for work performed on the national ED claim."); *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 109 at 6 ("After May 2011, most of the time entries for Relator's counsel involved the work assigned by the U.S. Department of Justice in reviewing the database related to ED claim subpoenas to Defendants.")

Dkt. 115-16. Her entitlement to fees for the Laredo claim are not before this Court and have already been adjudicated by the district court in Texas. *See* Exhibit B.

### C. **Relators' Receipt, Pursuant To A Private Agreement They Negotiated With Plantz, Of A Portion Of His Recovery Of A Relator's Share, Does Not Entitle Them To A Fee Award**

None of the other relators before this Court—Reuille, Bryant, or Doghramji—received a penny from the United States. So they each rely—as they must—on their receipt of monies pursuant to a private sharing agreement to justify their fee request.

Relators admit that they executed the private agreement precisely because only one of them would be entitled to recover under the FCA. They recognized that "the False Claims Act provides that only the 'first to file' on a particular claim should recover and other later filed cases on the same fraudulent conduct should be barred" and, by entering into a sharing agreement, they sought to ensure that they would all "share proceeds paid to any of them," even though only one relator would technically be entitled to receive the statutory bounty. *Cook-Reska*, No. 4:09-cv-01565 (S.D. Tex.), Dkt. 73 at ¶ 12.[22]

The private agreement created a contractual right to receive a portion of the proceeds awarded to Dr. Plantz, but it did not (and could not) alter any of the FCA's statutory requirements. Each relator's entitlement to fees, if any, remained tethered to the same complaint-specific metrics, including whether he or she succeeded in obtaining a relator's share following a court award or settlement. *See NextCare*, 2013 WL 431828, at *2–3. Not surprisingly, other courts have rejected the suggestion that private sharing agreements could eviscerate the plain language of the FCA or somehow authorize the recovery of fees by a relator

---

[22] That Relators entered into a sharing agreement demonstrates their awareness of the risks posed by the first-to-file bar. Having realized that only one of them could be the "first to file" and receive a relator's share for the national ED claim, they should have likewise recognized that only one could recover attorneys' fees on that claim and made provisions as well for sharing of the first-to-file's attorneys' fees award.

28

whose claim, for example, is jurisdictionally barred by the first-to-file rule. The relator in *United States v. NextCare, Inc*., for example, argued that because he and another relator "had entered into a separate private agreement between themselves to share any proceeds that resulted from the litigation . . . he should be considered a successful Relator who has 'received' a Relator's share." 2013 WL 431828, at *3. The Court squarely rejected this argument, holding that relator's "separate private agreement" did not change the fact that he did not secure a relator's share, and thus was not entitled to fees. *Id.*

Relators here likewise cannot invoke their private agreement to trump the first-to-file bar (and create jurisdiction where none exists). If they could, this statutory requirement would become meaningless: innumerable relators could agree to share in the proceeds of every FCA investigation, run up their bills, and then seek attorneys' fees. That cannot be the law.

## IV. DOGHRAMJI IS BARRED FROM RECOVERING FEES UNDER 31 U.S.C. § 3730(e)(4) BECAUSE HIS LAWSUIT WAS BASED UPON ALLEGATIONS THAT HAD ALREADY BEEN DISCLOSED TO THE PUBLIC

Doghramji may not recover fees under Section 3730(d) for an additional, independent reason: he filed his complaint only *after* the fraud he alleged had already been publicly disclosed.[23] *See* 31 U.S.C. § 3730(e)(4).[24] Far from "expos[ing]" CHSI's allegedly improper conduct, Dkt. 87 at 2, Doghramji merely echoed allegations that had been made publicly by others. The FCA forbids such copycat claims and denies fees to the individuals who bring them.

---

[23] Defendants thoroughly briefed this issue for the Court in response to Doghramji's Motion for Attorney Fees, *see* Dkt. 115 at 16–29, and hereby incorporate those arguments in full. For the Court's convenience, Defendants reiterate those arguments here only in abbreviated form.

[24] The statute provides in relevant part: "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2006).

The FCA's public disclosure bar prevents "opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud." *Walburn*, 431 F.3d at 970. Like the first-to-file bar, the public disclosure bar is jurisdictional: When it applies, the court lacks authority to hear the *qui tam* action and must dismiss the case. *Poteet*, 552 F.3d at 511. And if a relator's action is blocked by the public disclosure bar, the relator cannot, as a matter of law, recover attorney's fees under 31 U.S.C. § 3730(d)(1). *See, e.g.*, *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1043–44 (6th Cir. 1994).

The public disclosure bar applies if (1) there has been any "public disclosure" of the fraud, (2) a relator's allegations are "based upon" the previously disclosed fraud, and (3) the challenged relator does not qualify as an "original source" under § 3730(e)(4)(B). 31 U.S.C. § 3730(e)(4)(A) (2006)[25]; *Poteet*, 552 F.3d at 511. As shown below, this case is a textbook example of the public disclosure bar.

## A. There Were Multiple Public Allegations Of Fraud Relating To CHSI's Inpatient Admissions Practices Prior To This Lawsuit

Before Doghramji filed his complaint on May 11, 2011 alleging that CHSI and certain hospital affiliates violated the FCA, virtually identical allegations had already been disclosed through the Tenet securities fraud lawsuit. In the midst of a takeover fight, on April 11, 2011—a

---

[25] Congress amended the public disclosure bar in 2010 as part of the Patient Protection & Affordable Care Act ("ACA"). *See* Pub. L. 111–148, § 10104(j)(2), 124 Stat. 119, 901–02. The amendments, however, are not retroactive and therefore do not apply to conduct occurring before the ACA's passage. *See, e.g.*, *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 915 (4th Cir. 2013) ("The retroactivity inquiry looks to when the underlying conduct occurred, not when the complaint was filed."); *United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 958 F. Supp. 2d 846, 856 (E.D. Tenn. 2013) ("[T]the amended language would only apply to conduct that occurred after March 23, 2010."); *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1271 n.2 (N.D. Ga. 2012) (same). Here, virtually all of Doghramji's allegations relate to conduct occurring before 2010, and therefore do not implicate the amended statute. *See, e.g.*, Dkt. 1 at ¶ 120 (examining patient admissions data from 2003 through 2009).

month before Doghramji filed his complaint—Tenet filed a complaint in federal court charging that CHSI engaged in a fraudulent scheme "to systematically steer medically unnecessary inpatient admissions at CHS hospitals" and "artificially increase[] inpatient admissions." *Tenet*, No. 3:11-cv-00732-M (N.D. Tex.), Dkt. 1 at ¶ 3. Tenet alleged that CHSI pursued this improper strategy through various means, including through targets for ED admissions, *id.* at ¶¶ 90, 61–63, 92–93, lenient admissions criteria (outlined in its "Blue Book"), *id.* at ¶¶ 10, 54, and unwarranted "one-day stays," *id.* at ¶ 114. Tenet's complaint also included a quantitative "analysis of publicly available information on hospital observation rates," *id.* at ¶ 19, to illustrate that CHSI's "observation rate" was substantially below the national average and other comparable hospital systems. *Id.* at ¶¶ 20–22. Based on these allegations, Tenet claimed that "CHS likely will be subject to significant damages," including "[u]nder the federal False Claims Act." *Id.* at ¶ 23. The filing of Tenet's complaint—which was not done under seal—plainly qualifies as a "public disclosure" under Section 3730(e)(4).

The news media widely regurgitated and repeated Tenet's allegations in national publications before Doghramji filed his action. *See, e.g.*, Michael J. de la Merced, *Tenet Accuses Community Health of Overbilling Medicare*, N.Y. TIMES, Apr. 11, 2011; Susan Kelly, *Tenet sues Community Health for Medicare Abuse*, REUTERS, Apr. 11, 2011; Avik Roy, *Healthcare Bombshell: Tenet Lawsuit Alleges Community Healthcare Cheats Medicare*, FORBES, Apr. 12, 2011; Alan Rappeport, *Tenet launches lawsuit against CHS*, FIN. TIMES, Apr. 12, 2011.

As if all of this were not enough, just before Doghramji filed their complaint CHSI itself publicly disclosed in its SEC filings the allegations that had been made in the *Tenet* and *Reuille* complaints as well as the existence of a federal investigation related to those allegations. *See* Cmty. Health Sys., Inc., Form 8-Ks (Apr. 15, 2011; Apr. 22, 2011; and Apr. 25, 2011).

31

Individually, as well as collectively, these multiple sources brought about a "public disclosure" of the fraud alleged by Doghramji.  31 U.S.C. 3730(e)(4). [26]

**B. Doghramji's Allegations Are "Based Upon" The Public Allegations Of Fraud Against CHSI**

 "[A] relator's entire complaint will be jurisdictionally barred if it is based *even partly* upon public disclosures."  *Poteet*, 552 F.3d at 515 n.7 (emphasis in original) (internal quotations omitted); *see also Walburn*, 431 F.3d at 975 ("[O]ur broad construction of the public disclosure bar . . . precludes individuals who base *any part* of their allegations on publicly disclosed information from bringing a later *qui tam* action" (emphasis in original)); *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997) (same).

Here, Doghramji's allegations are not just "partly" based upon the public disclosures above; they are almost entirely based upon them.  Doghramji alleges "essentially the same" fraud (*Poteet*, 552 F.3d at 514) as do the public disclosures:  That "CHS embarked on a scheme to increase inpatient admissions from its [emergency rooms] absent any corresponding change in the medical needs of CHS's potential patient populations."  Dkt. 1 at ¶ 1; *Compare with, e.g.*, *Tenet*, No. 3:11-cv-00732-M (N.D. Tex.), Dkt. 1 at ¶ 3 (CHSI "systematically steer[ed] medically unnecessary inpatient admissions at CHS hospitals" and "artificially increase[d] inpatient admissions").  Doghramji also alleged virtually the same details of the purported fraud as were recounted in the public disclosures, including that CHSI (1) improperly used its home-grown "Blue Book" criteria for determining admissions,[27] (2) improperly set admissions quotas

---

[26] Indeed, even if these public disclosures did not contain express allegations of the fraud—and they each do—they would still trigger the public-disclosure bar because they "present[] enough facts to create an inference of wrongdoing . . . sufficient to put the government on notice of the possibility of fraud." *Poteet*, 552 F.3d at 513 (internal quotations omitted).

[27] *Compare* Dkt. 1 at ¶¶ 4.a, 105, *with, e.g.*, *Tenet*, No. 3:11-cv-00732-M (N.D. Tex.), Dkt. 1 at ¶¶ 10, 54.

32

and pressured physicians to comply with the quotas,[28] and (3) had a disproportionately large number of one-day stays, which were likely to be unnecessary admissions.[29]  Doghramji's complaint is a virtual carbon copy of Tenet's complaint (and of the myriad news media articles summarizing Tenet's allegations).[30]

Although Doghramji may contend (as relators often do) that his allegations are not exactly identical to those that were publicly disclosed, this is irrelevant.  Merely alleging "additional details [is] insufficient to avoid [the Sixth Circuit's] broad construction of the public disclosure bar."  *Walburn*, 431 F.3d at 975; *see also Poteet*, 552 F.3d at 514–15; *United States ex rel. Osheroff v. Healthspring*, 938 F. Supp. 2d 724, 733 (M.D. Tenn. 2013).  "So long as the government is put on notice to the potential presence of fraud, even if the fraud is slightly different than the one alleged in the [relator's] complaint, the *qui tam* action is not needed."  *Dingle v. Bioport Corp.*, 388 F.3d 209, 214–15 (6th Cir. 2004).

Here, Doghramji alleges the same fraud as is alleged in the public disclosures.  There can be no doubt that the Tenet lawsuit's disclosures put the government (and anyone who read a newspaper or magazine) "on notice" of potential fraud—all before Doghramji ever filed his duplicative allegation actions.  Accordingly, Doghramji's allegations plainly are "based upon" public disclosures, and the public disclosure bar applies unless Doghramji is an "original source" (which as next explained he is not).

---

[28] *Compare* Dkt. 1 at ¶¶ 4.b, 4.e, *with, e.g.*, *Tenet*, No. 3:11-cv-00732-M (N.D. Tex.), Dkt. 1 at ¶ 9.

[29] *Compare* Dkt. 1 at ¶ 129, *with, e.g.*, *Tenet*, No. 3:11-cv-00732-M (N.D. Tex.), Dkt. 1 at ¶ 114.

[30] Indeed, Doghramji grudgingly acknowledges that Tenet had made the same allegations about CHSI affiliates' inpatient admission practices before he filed his complaint.  Dkt. 1 at ¶ 4.a n.1 ("On April 11, 2011, Tenet Healthcare Corp. sued CHS to force disclosure of its 'practice of systematically admitting, rather than observing, patients for financial rather than clinical reasons.'"); *id.* at ¶ 132 (Tenet alleged "inappropriate [emergency room] admission practices in [CHS's] hospitals"); *id.* at ¶ 242 (acknowledging the "glare of publicity from a lawsuit by Tenet").

33

## C. Doghramji Is Not An "Original Source" Of The Information On Which His Allegations Are Based

An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B) (2006) (emphasis added). Doghramji plainly lacks "direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B) (2006). "The word 'direct' requires knowledge derived from the source gained by the relator's own efforts rather than learned second-hand through the efforts of others. The relator's knowledge is considered 'independent' if it is not derived from the public disclosure." *Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 2013 WL 4510801, at *7 (M.D. Tenn. Aug. 26, 2013) (citing cases), *rev'd on other grounds*, 782 F.3d 260 (6th Cir. 2015). Further, because Doghramji seeks to invoke the Court's jurisdiction, he bears the burden of proving he is an original source. *United States ex rel. Jones v. Horizon Heathcare Corp.*, 160 F.3d 326, 333–35 (6th Cir. 1998); *In re Natural Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009).

Doghramji cannot carry this burden. Most of his complaint is a "statistical analysis" of publicly available Medicare data that purports to identify CHSI hospitals whose emergency rooms admitted more patients than their peers. Dkt. 1 at ¶¶ 5, 119–39, 177–78, 192–93, 207, 218, 221, 224, 228, 230, 232, 234, 238–40; *see also id.* at ¶ 120 (describing data set).[31] But for at least two reasons, he and his co-relators are not original sources of the information underlying these allegations. *First*, as a matter of law, merely analyzing information that already exists in the public domain, and asserting fraud based on that analysis, does not make a relator an original source. *See, e.g.*, *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 59 (1st Cir.

---

[31] The data that Doghramji analyzed is available on the CMS website: http://www.cms.gov/Research-Statistics-Data-and-Systems/Files-for-Order/LimitedDataSets/ index.html.

34

2009) ("Knowledge that is based on research into public records, review of publicly disclosed materials, or some combination of these techniques is not direct").[32] *Second*, even assuming incorrectly that Doghramji's statistical analysis could, in theory, qualify him as an original source, here Tenet had *already conducted materially the same analysis*. *See Tenet*, No. 3:11-cv-00732-M (N.D. Tex.), Dkt. 1 at ¶ 22. Doghramji's derivative work is, on its face, not original.

The balance of Doghramji's complaint alleges that CHSI, both on a "system-wide" basis and at certain individual hospitals, improperly admitted patients through use of the Blue Book, by setting inpatient admission quotas, and through other means that already had been asserted in the public disclosures. Yet for virtually all of these allegations, Doghramji does not even try to claim he is an original source, but instead acknowledges that his allegations are based on second- or third-hand information. Doghramji's system-wide allegations rely on interviews with third parties and on publicly-available information like the Blue Book or CHSI's SEC filings—none of which constitutes "direct and independent knowledge" under the statute. *See* Dkt. 1 at ¶¶ 110–18; *Natural Gas Royalties*, 562 F.3d at 1045–46 ("[S]econdhand knowledge from employees of various Defendants does not constitute 'direct and independent' knowledge"); *United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 958 F. Supp. 2d 846, 864 (E.D. Tenn. 2013). Likewise, Doghramji's allegations about individual CHSI hospitals also are based primarily on interviews with third parties, and not on any direct and independent information that Doghramji possesses. *See* Dkt 1 at ¶ 209 (explaining that Doghramji's allegations are based on

---

[32] *See also, e.g.*, *In re Natural Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009) ("Secondhand information, speculation, background information, or collateral research do not satisfy a relator's burden of establishing the requisite knowledge."); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991) (fact that relator has background information or unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is insufficient).

35

alleged interviews with current or former CHSI employees), 213–17, 219–20, 222–23, 225–27, 229, 231, 233, 235–37.[33]

Doghramji adds nothing of substance to the previously disclosed allegations and therefore is not an original source. *See, e.g.*, *Natural Gas Royalties*, 562 F.3d at 1046 (relator not original source where his "limited direct and independent information . . . is minimal in comparison to the broad scope of his allegations"); *Osheroff*, 938 F. Supp. 2d at 735 (same). To give Doghramji original source status where, as here, the government already was investigating CHSI's inpatient admissions practices as a result of the public disclosures, would stand the purpose of the public-disclosure bar on its head. *See Poteet*, 552 F.3d at 507. Accordingly, Doghramji is not an original source, and the public disclosure bar prohibits him from recovering any attorneys' fees.

## CONCLUSION

For the reasons stated above, none of the Relators before this Court is entitled to recover attorneys' fees, costs, or expenses. Defendants respectfully ask that the Court dismiss the claims with prejudice.

---

[33] Indeed, of the 74 individual CHSI hospitals referred to in the complaint, Doghramji arguably alleges direct and independent knowledge only as to the *three* hospitals where he and his co-relators were employed. Dkt 1 at ¶¶ 140, 179, 194. But virtually every allegation he makes as to these hospitals—*e.g.*, that hospital administrators pushed for greater inpatient admissions, used admissions quotas and incentive compensation, *etc.*—already was detailed at length in the Tenet lawsuit and other pre-existing public disclosures.

36

Dated: May 19, 2015

Respectfully submitted,

/s/ William M. Outhier
John Jacobson, BPR #14365
William Outhier, BPR #15609
RILEY WARNOCK & JACOBSON, PLC
1906 West End Ave.
Nashville, TN 37203
Tel: (615) 320-3700
wouthier@rwjplc.com

and

*Of counsel*
Michael L. Waldman
Lee Turner Friedman
Hannah W. Riedel
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
Tel: (202) 775-4500
rsauber@robbinsrussell.com
mwaldman@robbinsrussell.com

*Counsel for Defendants*
*(See Exhibit A)*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following via the Court's ECF filing system:

David W. Garrison
Scott P. Tift
Barrett Johnston Martin & Garrison, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219

Kit Pierson
David Young
Cohen Milstein Sellers & Toll, PLLC
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005

Reuben A. Guttman
Traci L. Buschner
Grant & Eisenhofer, P.A.
1747 Pennsylvania Avenue, N.W., Suite 875
Washington, D.C. 20006

David Rivera
Assistant U.S. Attorney
110 Ninth Avenue South, Suite A-961
Nashville, TN 37203

Mark H. Wildasin
Assistant United States Attorney
110 Ninth Avenue, South, Suite A-961
Nashville, TN 37203

Michael D. Granston
Daniel R. Anderson
Robert McAuliffe
Commercial Litigation Branch
U.S. Department of Justice, Civil Division
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044

on this the 19th day of May, 2015.

/s/ William M. Outhier