# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff, | : |
| | : |
| *ex rel.*, | : |
| | : |
| JAMES DOGHRAMJI; SHEREE COOK; and RACHEL BRYANT, | :  CASE NO. 3:11-cv-0442 (Sharp, J.) |
| | : |
| Relators, | : |
| v. | : |
| | : |
| COMMUNITY HEALTH SYSTEMS, INC. *et al.* | : |
| Defendants. | : |
| | : |

## DOGHRAMJI RELATORS' REPLY MEMORANDUM IN SUPPORT OF THEIR SUPPLEMENTAL MEMORANDUM FOR ENTITLEMENT TO ATTORNEYS' FEES, COSTS, AND EXPENSES

The *Doghramji* Relators file this Reply Memorandum ("Reply") to respond to the arguments relating to the *Doghramji* Relators made in Defendants' Memorandum in Opposition to Relators' Supplemental Memorandum for Entitlement to Attorneys' Fees, Costs, and Expenses ("Defendant's Brief"). [Dkt. 165].

Defendants offer three arguments[1] in an attempt to escape paying the *Doghramji* Relators their reasonable attorneys' fees, cost, and expenses in accordance with the Settlement Agreement CHS entered with the *Doghramji* Relators (and others) to resolve the seven consolidated *qui tam* actions [Dkt. 75-1]: (1) the *Doghramji* Relators were not first to file; (2) the *Doghramji* Relators were not directly paid a relators' share by the Government; and (3) the *Doghramji* Relators cannot recover fees because their lawsuit is barred by the public disclosure rule.

Each of these arguments fails on the merits. However, each argument also ignores the fact that Defendants already settled this matter, and in doing so did not preserve their right to litigate these questions *post-settlement*.

I.   **THE COURT IS NOT REQUIRED TO ENGAGE IN ANALYSIS OF THE FIRST TO FILE AND PUBLIC DISCLOSURE RULES TO DETERMINE RELATORS' ENTITLEMENT TO FEES**

If Defendants wanted to preserve the first-to-file and public disclosure issues for post-settlement litigation, they should have reserved the right to do so in the Settlement Agreement. They did not, and that failure is fatal to their attempt to litigate them now. The Settlement

---

[1] In addition to the three arguments advanced in their brief, Defendants claim the *Doghramji* Relators waived their first-to-file argument by not raising it in their supplemental brief. [Dkt. 165 at 20]. To the contrary, the *Doghramji* Relators, and the other relators, met their burden of showing their entitlement to fees in the Joint Motion and Memorandum [Dkt. 150 & 151] and are not required to address defenses before they are raised. *Cf. Toth v. Grand Trunk R.R.*, 306 F.3d 335, 347 (6th Cir. 2002) (refusing to exclude rebuttal evidence because plaintiffs have no duty to anticipate the evidence or theories that will be presented by the defense); *Memphis, Tennessee Area Local, American Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 904 (6th Cir. 2004) ("A complaint need not anticipate every defense and accordingly need not plead every response to a potential defense."). Moreover, by waiting for Defendants to raise their defenses before responding to those defenses, the *Doghramji* efficiently chosen to address Defendants' defenses in one substantive brief, rather than two. And, because Defendants secured the right to file a sur-reply brief, Defendants will still have the last word.

1

Agreement does preserve certain issues that may be raised by a particular party post-settlement. Indeed, with respect to one of the issues Defendants now raise – public disclosure – the United States (hereinafter, the "Government") reserved its right to contend that public disclosure bars Relators from sharing in the proceeds of the settlement (of course, the Government has *never* made such a contention). [*See* Dkt. 75-1 at ¶ 7]. The Government also reserved its right to pursue claims against Defendants for liability under IRS tax code, criminal penalties, exclusion of Defendants from federal health programs, and for liability to the Government for other conducted not covered by the Settlement Agreement. [*Id.* at ¶¶ 8-9]. And, of course, in three separate provisions, Relators specifically reserved their right to petition for recovery of reasonable fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d). [Dkt. 75-1 at 5, 7, 15]. The Settlement Agreement does not preserve any of the issues raised in Defendant's Brief, and they were therefore finally resolved by the Settlement Agreement.

Defendants point out that the Settlement Agreement also provides that they may "challenge or object to Relators' claims for attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)." [Dkt. 75-1 at ¶ 8]. Relators agree. Defendants may challenge or object to the fees and expenses sought by Relators. However, this provision does not entitle Defendants to litigate issues codified in other sections of the False Claims Act ("FCA") that Defendants did not preserve in the Settlement Agreement, including first-to-file and the public disclosure bar. Indeed, the failure to expressly reserve the challenges is fatal. For example, in *U.S. ex rel. Marena v. SmithKline Beecham Corp*., 205 F.3d 97, 107 (3rd Cir. 2000), the Third Circuit held that the Government would have waived its claims that some of relators' claims were barred by the public disclosure rule if the Government had failed to unambiguously request that the court retain jurisdiction of these claims in the settlement.

2

Because Defendants did not preserve their defenses on first-to-file, failure to obtain a relator's share, and public disclosure, the Court is without jurisdiction to hear Defendants' claims relating to those arguments. Accordingly, the Court should preclude Defendants from raising defenses to Relators' claims that they did not preserve in the Settlement Agreement. The Court should further find that all Relators party to the Settlement are entitled to recover their reasonable attorneys fees, costs and expenses, in accordance with 31 U.S.C. § 3730(d).

However, if the Court determines that it must address the merits of Defendants' arguments, each of their defenses fails for the reasons set forth below.

## II. THE DOGHRAMJI RELATORS' CLAIMS WOULD NOT HAVE BEEN BARRED BY THE FIRST-TO-FILE RULE

Even if Defendants had reserved a challenge based on the first-to-file rule, the *Doghramji* Relators' claims were not barred. As Defendants concede, a court has jurisdiction over a later-filed *qui tam* suit where it (i) is based on facts different from those alleged in a prior suit; and (ii) gives rise to separate and distinct recovery by the government. Although a *qui tam* action that fails either prong is subject to dismissal, *see* Def. Br. at p. 10 (citing *U.S. ex. rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001)), the *Doghramji* action satisfies both prongs.

The first-to-file bar is inapplicable where the later complaint alleges "a different type of wrongdoing on new and different material facts" and gives rise to a separate recovery by the government. *U.S. ex rel. Ortega v. Columba Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 (D.D.C. 2003); *see also U.S. ex rel. Capella v. United Techs. Corp.*, No. 3:94-CV02063 (EBB), 1999 WL 464536, *9-11 (D. Conn. June 3, 1999); *United States ex rel. Carter v. Halliburton Co.*, No. 1:11CV602 (JCC/JFA), 2011 WL 6178878 (E.D. Va. Dec. 12, 2011) (noting that "based on

3

different facts" element was the crucial one), *rev'd on other grounds*, *U.S. ex rel. Carter v. Haliburton*, 710 F.3d 171 (4th Cir. 2013); John T. Boese, *Civil False Claims and Qui Tam Actions*, § 4.03[C][2] at 4-189 (4th ed. 2014).

Further, as explained by the *Capella* court, when performing this two-prong inquiry, the court should consider whether there is a parasitic relationship between the earlier and later actions, "such that the subsequent suit receives support or advantage without offering any useful or proper return." *Capella,* 1999 WL 464536, *9-11. This accords with "a central purpose of Section 3730(b)(5) [which is] the preclusion of plaintiffs with merely duplicative claims." *U.S. ex rel. Fry v. Guidant Corp.*, No. 3:03-0842. 2006 WL 1102397, at *6 (M.D. Tenn. Apr. 25, 2006). The *Capella* court ruled that because the actions involved similar, but different, facts and did not provide a double recovery, the second action was not barred by Section 3730(b)(5).

Here, the *Doghramji* Complaint alleged new, material facts that had not been alleged in any prior-filed cases. In fact, it was the first complaint to allege a company-wide scheme affecting CHS hospitals across the country.[2] In *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, the district court held that the relator's later-filed complaint, which described essentially the same fraudulent conduct as the first-filed pleading, was not jurisdictionally barred because, unlike the first-filed complaint, it alleged a nationwide scheme. 694 F. Supp. 2d 48, 58-59 (D. Mass. 2010) *rev'd on other grounds*, 647 F.3d 377, *cert. denied*, 132 S. Ct. 815.

Moreover, the *Doghramji* Complaint provided the statistical analysis that permitted the Government to establish this nationwide conspiracy. While the allegations in each of the other

---

[2]    Defendants claim that the *Plantz* case was the first to file, despite the fact that *Plantz* was actually the third filed in time and despite the fact that the *Doghramji* case was the first, and only, case to allege nationwide fraud based on the statistical analysis that shaped the focus of the Government's national audit of CHS. Of course, the determination of whether a Relator's claim is the first to file is a judicial determination. *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 519 (6th Cir. 2009). There has been no such judicial determination by any Court that *Plantz* was first to file.

4

complaints focused on conduct at only one CHS facility or made general, conclusory claims regarding a nationwide scheme, the *Doghramji* Complaint contained particularized allegations that CHS used ProMed, the Blue Book, financial incentives, and the threat of termination (and or incentives) to encourage physicians to increase Emergency Room ("ER") admissions regardless of medical necessity. The *Doghramji* Relators alleged that, motivated by a need to service its mounting debts, CHS devised a scheme to grow revenues by increasing inpatient ER admissions. [Dkt. 1 at ¶¶ 1, 107-113]. CHS, however, knew that its ER growth was constrained by the limited number of sick people who could potentially need its services and, as a result, it needed to be creative in finding ways to admit more patients. For that reason, CHS's executives decided to standardize and centralize ER operations at CHS facilities, giving the executives exclusive control that they used to implement practices designed to increase ER admission rates. [*Id.* at ¶¶ 3, 116, 118]. These policies (1) set and constantly monitored admissions quotas at each hospital; (2) required the use of CHS-developed admission criteria (the Blue Book); (3) required the use of software that directed physicians in making diagnoses and determining treatments (ProMed); and (4) maintained strong controls over hospital physician contracts. [*Id.* at ¶ 4]. In addition, CHS executives and their hospital-specific counterparts worked to increase ER admission rates by (1) encouraging the admission of Medicare patients who fell into certain "soft" diagnostic categories (chest pain, abdominal pain, syncope, etc.) regardless of medical necessity; (2) pressuring ER physicians to increase admissions rates regardless of medical necessity; (3) terminating the contracts of physicians and physicians' groups that failed to meet the arbitrary, inflated admission quotas; and (4) directing case managers to justify admissions or decisions not to admit using the Blue Book's lax standards. [*Id.* at ¶ 4, 118].

5

As proof that CHS's nationwide scheme was both carried out and led to the filing of false claims, the *Doghramji* Complaint described identical conduct at CHS hospitals in Illinois, Missouri, New Jersey, Oklahoma, Pennsylvania, and Tennessee, and the impact this conduct had on admission rates.

The *Doghramji* Complaint also contained a detailed statistical analysis performed by the Service Employees International Union ("SEIU"), which revealed that CHS's pattern of aggressive admission practices caused the unnecessary admission of Medicare beneficiaries. [Dkt. 1 at ¶¶ 136-148]. The analysis demonstrated that after CHS began using ProMed and the Blue Book, and began its wrongful conduct, the ER admission percentage at a vast majority of its facilities ballooned to rates far in excess of the national average. In fact, 42.5% of CHS hospitals had admission rates so high that they were classified as outliers that warranted further investigation for Medicare fraud. [*Id.* at ¶ 139]. The statistical data also showed that admission rates at hospitals grew exponentially shortly after they were acquired by CHS, evidence that Defendants' efforts to manufacture admissions were successful. [*Id.* at ¶ 144].

The *Doghramji* Complaint also included particularized allegations describing CHS's wrongful conduct at each of the Relators' hospitals. [Dkt. 1 at ¶¶ 140-207; Dkt. 52, FAC at ¶¶ 157-224]. None of the complaints filed prior to *Doghramji* adequately alleged that CHS orchestrated a nationwide scheme to increase revenue by manufacturing admissions. Moreover, to the extent the prior-filed complaints contained allegations concerning hospitals cited in the *Doghramji* Complaint, those prior pleadings did not adequately allege violations of the FCA for all hospitals. In some complaints, there were no detailed allegations of FCA violations for each hospital. And no other complaint contained a system wide statistical analysis like that contained in the *Doghramji* Complaint. As a result, the *Doghramji* Complaint did not allege the same

6

material facts as the prior-filed complaints and, therefore, is not barred by §3730(b)(5)'s first-to-file bar.

Similarly, and in keeping with the *Capella* court's mandate that a "subsequent suit . . . offer[] a[] useful or proper return," *Capella,* 1999 WL 464536, *9-11, the *Doghramji* counsel did not simply duplicate work by other counsel. They expended considerable resources to assist in the Government's investigation — at the Government's direction. Thus, the *Doghramji* Relators' counsel offered "useful and proper" support to the case.

Finally, because the government settled all seven cases as one, there is no possibility of a double recovery.

### III. THE DOGHRAMJI RELATORS WERE PAID A RELATOR'S SHARE UNDER 31 U.S.C. § 3730(d)

Pursuant to the Settlement Agreement of this matter, the *Doghramji* Relators were paid an agreed upon portion of the government's share. Defendants offer a strained reading of the FCA's relator's fee provision to suggest that a relator must be paid a share of the government proceeds directly by the government to be entitled to attorneys' fees. They are wrong.

While the *Doghramji* Relators were not paid a bounty directly, they did receive 14% of the bounty with the Government's knowledge. [*See* Dkt. 89, Buschner Decl. at ¶ 15]. Indeed, the Government urged Relators to enter a relator's share agreement, and the parties engaged in mediation to do so. [*Id.*] Nothing in the statute makes payment of attorneys' fees contingent on direct payment of a bounty by the government, and Defendants provide no reason why the Government's administrative choice to transfer the bounty to one of several relators for further distribution should have no effect on the other relators' entitlement to fees. Rather, the only express contingency is that the "government proceed[]" with the action. The text of the provision reads:

> **(d) Award to qui tam plaintiff.**--(1) If the Government proceeds with an action brought by a person under subsection (b), *such person shall*, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. … Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. *Any such person shall also* receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant. 31 U.S.C. § 3730(d)(1) (footnote omitted) (emphasis added).

Notably, nothing in the provision mandates that "such person shall also receive attorney fees" *only* if the government pays a bounty to the relator *directly*. Instead, the critical point is that the Government proceeded with the *Doghramji* action by intervention in and settlement of the case. Accordingly, *Doghramji* Relators *shall* receive a share of the proceeds and "*shall also* receive an amount for reasonable expenses…plus reasonable attorneys' fees and costs." *Id.*

## IV. THE DOGHRAMJI RELATORS' CLAIMS WOULD NOT HAVE BEEN BARRED BY THE PUBLIC DISCLOSURE RULE

As explained above, the United States is the only party to the Settlement Agreement that preserved its ability to claim that any Relator is precluded from recovering their share or attorneys fees, costs, and expenses. The Government has not made any such claim. However, even if Defendants had reserved a challenge based on public disclosure, the *Doghramji* Relators' claims would not be barred.

The public disclosure bar was created as a limited mechanism, "[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *U.S. ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994) (citing *Marcus v. Hess*, 317 U.S. 537 (1943) (relator copied his *qui tam*

case from a criminal indictment)).  Defendants simply ignore this fact while attempting to use a

bar written for the benefit of the Government[3] as a shield to protect them from accountability.

### a.   THE PUBLIC DISCLOSURE BAR AND THE 2010 ACA AMENDMENTS

The FCA was recently amended to narrow the scope of the public disclosure rule.  Prior

to March 2010, Section 3730(e)(4)(A) of the FCA provided that

> No court shall have jurisdiction over an action under this section based upon the
> public disclosure of allegations or transactions in a criminal, civil, or
> administrative hearing, in a congressional, administrative, or Government
> Accounting Office report, hearing, audit, or investigation, or from the news
> media, unless the action is brought by the Attorney General or the person bringing
> the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2009).

An "original source," in turn, was defined as

> an individual who has direct and independent knowledge of the information on
> which the allegations are based and has voluntarily provided the information to
> the Government before filing an action under this section which is based on the
> information.

*Id.* § 3730(e)(4)(B) (2009).  Thus, public disclosure, as defined in the prior statute, stripped a

court of subject-matter jurisdiction to hear a relator's case.

The Patient Protection and Affordable Care Act of 2010, Pub. L. 111–148, § 10104(j)(2),

124 Stat. 119, 901–02 ("ACA"), amended the FCA's public disclosure bar, effective March 23,

2010.  It now reads:

> The court shall dismiss an action or claim under this section, unless opposed by
> the Government, if substantially the same allegations or transactions as alleged in
> the action or claim were publicly disclosed –
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government
> or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report,
> hearing, audit, or investigation; or

---

[3]   *See United States ex rel. Branch Consultants v. Allstate Ins. Co*., 560 F.3d 371, 381 (5th Cir. 2009).

9

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

The ACA also amended the definition of "original source.":

For purposes of this paragraph, 'original source' means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

*Id.* § 3730(e)(4)(B). The effect of these amendments was to, *inter alia*,

- eliminate the jurisdiction-stripping effect of the public disclosure bar;

- further limit the sources of information that could be considered "public disclosures" under the rule;

- expand the definition of "original source"; and

- permit the government to waive public disclosure as a bar to a relator's suit.

*See, e.g., U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 914-18 (4th Cir. 2013).

While the Fourth Circuit held that the ACA amendments applied only to conduct occurring after its passage, March 23, 2010, it is the only court of appeals to opine on the retroactivity of the amendments. *Id*. at 918-19. Though Defendants cite *May* and two district court cases, to support the application of pre-2010 public disclosure rule to cases filed after the amendments, an opinion from this judicial district supports the opposite conclusion.[4] In *Whipple v. Chattanooga-Hamilton County Hospital*, No. 3-11-0206, 2013 WL 4510801, at *2 (M.D.

---

[4]    One of those cases is from the Eastern District of Tennessee. *U.S. v. Chattanooga-Hamilton County Hosp. Authority*, 958 F. Supp. 2d 846 (E.D. Tenn. 2013). While that court applied the pre-2010 amendments to a case filed after enactment, it concerned solely claims pre-dating the amendments. That distinguishes it from the case at bar, where both the claims in the Amended Complaint and the Settlement address Defendants' illegal conduct after enactment of the 2010 amendments. *See* FAC at ¶¶ 12, 14; Doghramji Decl. at ¶ 37; Bryant Decl. at ¶ 3.

Tenn. Aug. 26, 2013) (Campbell, J.), *rev'd on other grounds*, 782 F.3d 260 (6th Cir. 2015), the district court held that the "*jurisdiction* of the Court should be determined under the statute as it existed at the time this action was filed" and applied the 2010 ACA amendments to a case filed after the effective date of the statute, but concerning some allegations of misconduct before the amendments. (Emphasis added*).* Making a distinction between adjudicating jurisdictional issues, on the one hand, and the merits of the case on the other, the court held that challenges to the merits would be "judged under the statute as it existed at the time of that alleged misconduct." *Id.* (citing *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010); *Hughes Aircraft Co. v. U.S. ex rel. Shumer*, 520 U.S. 939 (1997)).

Similarly, in *U.S. ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 44 n.3 (D. Mass 2014), the court applied the 2010 public disclosure rule to a case filed after the effective date of the amendments, finding that the Supreme Court's ruling in *Wilson* was not applicable to Booker's case because "*Wilson* merely concluded that this provision of the PPACA was not retroactive, and thus refused to apply the amended statute to an action pending as of March 23, 2010." *Id.*

While the law is not fully settled, there is no reason to apply the pre-2010 FCA here where (1) Relators' original complaint was filed on May 10, 2011, over a year after the 2010 Amendments, qualifying it for treatment consistent with *Whipple*; and (2) the claims in Relators' complaint extended beyond March 23, 2010, consistent with the terms of the Settlement Agreement. [Dkt. No. 75-1 at p. 3, ¶ D.1 (Defendants submitted false claims from January 1, 2005 to December 31, 2010); *see also* Dkt. 52, FAC at ¶¶ 12, 14 (Relators had knowledge of unlawful conduct occurring at CHS hospitals after the ACA amendments); Bryant Decl. at ¶ 3; Doghramji Decl. at ¶ 37].[5]

---

[5] While the Relators have concluded that any analysis of the public disclosure bar is not warranted under the circumstances here, the rules pertaining to a Rule 12(b)(1) motion to dismiss should apply if the Court determines

Nonetheless, as explained below, the *Doghramji* Relators' claims are not barred by either the pre- or the post-2010 version of the public disclosure bar. The *Doghramji* Relators' claims are not substantially similar to or based upon any qualifying disclosures, and even if they were, the *Doghramji* Relators are original sources.

### b. THE DOGHRAMJI RELATORS' CLAIMS ARE NOT SUBSTANTIALLY SIMILAR TO OR BASED UPON ANY QUALIFYING DISCLOSURE

When determining whether the public disclosure rule bars a complaint, the Court must first identify the relator's claims and then apply the rules on a "claim-by-claim basis." *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 579 (E.D. Va. 2011) (citing *Rockwell Int'l Corp v. United States*, 549 U.S. 457, 477 (2007)). Specifically, the court must "review the substance of the relator's complaint and identify the allegations that give rise to 'a discrete and independent cause of action for fraud.'" *Davis*, 753 F. Supp. 3d at 583 (court found six discrete claims of fraud) (quoting *U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.,* 496 F. 3d 1169, 1177 (10th Cir. 2007)). Here, the *Doghramji* Complaint alleges a nationwide pattern and practice of unlawful ED admissions occurring at 74 different hospitals operated by CHS.

The *Doghramji* Relators disclosed the allegations in their Complaint to the Government in early February 2011, prior to both the *Tenet* Complaint and the SEC filings.[6] While Relators do not dispute that the sources of information identified by Defendants' brief could qualify as "public disclosures," under the FCA's limited definition of that term, none of the information in those sources – (1) the *Reuille* case; (2) the *Tenet* lawsuit and press coverage about the lawsuit;

---

that it is required to engage in the public disclosure analysis urged by the Defendants. Defendants have asked this Court to suspend time and turn back the clocks to engage in this challenge and, therefore, there is no reason that the procedural rules that would have existed pre-dismissal should not apply. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

[6] [*See* Dkt. 91, Decl. of David Dean at ¶ 10; Dkt. 89, Decl. of Traci Buschner, and Decl. of Brian Gillis at ¶ 16, (Relators Counsel met with the Department of Justice on February 14, 2011 prior to filing their complaint)].

and (3) SEC filings – are "substantially similar"[7] to the nationwide ED admissions claims regarding 74 hospitals alleged in the *Doghramji* Complaint. For the same reasons, the *Doghramji* Complaint cannot possibly be "based upon"[8] the sources of information identified by Defendants either. *See Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994) (disclosure must reveal allegations and transactions, rather than mere information); *Dingle v. Bioport Corp*., 388 F. 3d 209, 213-14 (6th Cir. 2004) (same); *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 579-80 (E.D. Va. 2011) (same).

### 1. *Reuille* Complaint

Defendants are wrong that the *Doghramji* case was based upon the *Reuille* complaint. Most significantly, a close reading of *Reuille*'s complaint at ¶ 10.b reveals that Reuille blames "Lutheran" hospital in Indiana (where Ms. Reuille was employed) for improper admissions, not CHS. Defs. Br. at p. 4 and *Reuille* Cmplt at ¶¶ 24-25, *U.S. ex rel. v. Cmty. Health Sys. Prof'l Servs. Corp.*, No. 1:09-cv-00007 (N.D. Ind. Jan. 7, 2009). This is significant because the *Doghramji* Relators did not sue Lutheran Hospital in Indiana but, instead alleged a nationwide pattern and practice by Defendants at 74 other hospitals relating to false ED admissions. In other words, *Doghramji* and *Reuille* contain allegations that are very different in scope.[9]

### 2. The *Tenet* Lawsuit and News Stories

Defendants are also wrong that the *Doghramji* Complaint would have been barred by the *Tenet* lawsuit and the resulting news stories. As Defendants acknowledge the *Tenet* lawsuit was

---

[7] The amended FCA public disclosure rule, 31 U.S.C. §3730(e)(4)(A) (2010) states that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed…"

[8] The pre-2010 FCA statute bars claims that are "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."

[9] Defendants appear to agree, arguing that Reuille's "complaint did not alert the government to the national ED claim." Defs. Br. at 14.

13

not a FCA action, but a lawsuit alleging that CHS had made false and misleading statements to investors. Defs. Br. at 6. Tenet brought the lawsuit to fight off a bid by CHS to acquire it. Though Tenet alleges that CHS violated the FCA, the lawsuit fails to contain any specific information from anyone with inside knowledge of CHS hospitals (as the *Doghramji* Complaint does) and argues almost exclusively that CHS's Blue Book was the source of over admissions. *See e.g.* Defs. Br. at 31-32. And while Defendants make much of the statistical analysis in the *Tenet* complaint, it is obvious that the *Tenet* analysis is *not* the same statistical analysis contained in the *Doghramji* Complaint. *Id*. Even a cursory review of the *Tenet* complaint shows its statistical analysis only concerns CHS's admissions and observation rates *as opposed to other hospital chains*, such as Triad, not an analysis of 74 of Defendants' hospitals that is contained in the *Doghramji* Complaint. *Id.* For the same reason the news stories quoted by Defendants also do not bar the *Doghramji* claims, the news stories merely echo the *Tenet* allegations. Moreover, the news stories referenced by Defendants confirm that the Blue Book and data comparing other hospital chains to CHS was the focus of the *Tenet* lawsuit. *See*, Defs. Br. at 31.

Furthermore, nothing in the *Tenet* complaint covers many of the core facts or claims made by the *Doghramji* Relators, including, but not limited to allegations that CHS:

- centrally set and enforced goals for hospital-level ER admissions without regard to medical necessity and then requiring monthly reports to corporate headquarters on compliance;

- installed an electronic tracking system in the ER, linked to corporate headquarters as well as hospital administration, to monitor the status of ER patients in real time and facilitate corporate intervention in ER decision-making;

- interjected hospital administrators into medical decision-making in the ER in order to promote the admission of identified Medicare patients who fall into certain "soft" diagnostic categories – such as chest pain, abdominal pain, and syncope (fainting) – who did not meet established criteria for medically necessary admission;

14

- forced hospital administrators to set admissions quotas for the ER and for individual doctors, monitoring doctors' individual and physician group admission rates through electronic tracking, and attending physicians' meetings to pressure doctors to comply with the quotas; and

- terminating the contracts of those ER physician groups refusing to comply with CHS's unlawful goals.

[*See* Dkt. 1 at ¶ 4]. To claim that the *Doghramji* Complaint is "a virtual carbon copy" of the *Tenet* Complaint – as Defendants do – strains credulity. Defs. Br. at 33. The facts show that the *Doghramji* Relators offered an original analysis, prepared by the SEIU (then a *Doghramji* Relator, now no longer in the case), and not based upon any information from *Tenet*. Decl. of Brian Gillis at ¶ 14. Additionally, with the exception of some information about the Blue Book, none of the facts alleged by Relators is duplicative of anything in the *Tenet* complaint.

Likewise, Defendants' argument that the *Doghramji* Complaint should be barred because it merely added "additional details" is without merit. *Id*. at 33. While Defendants cite *Poteet* to support application of the public disclosure rule, the case is distinguishable because, in *Poteet*, both relators were sales managers from the same company who alleged that their employer paid kickbacks to doctors. The Sixth Circuit held Poteet's claims were barred by the public disclosure of the prior complaint because Poteet's complaint alleged the same scheme as the prior complaint, differing only by adding names of certain doctors. 552 F. 3d 503, 514. Similarly, in *Walburn*, the relator had filed a previous lawsuit alleging the same false claims and the court of appeals precluded the second law suit making the same allegations. 431 F.3d 966, 974; Accord, *Chattanooga-Hamilton Cnty. Hosp. Authority*, 958 F. Supp. 2d 846, 864 (relator's claims based upon allegations and transactions disclosed in husband's prior lawsuit and news stories).

Other cases cited by Defendants are distinguishable because the relator had no independent knowledge of the public disclosure. While "direct and independent knowledge" is

an element of the "original source" exception under the pre-ACA amendments, the facts pertaining to the source of the information is also pertinent when determining whether a complaint is "based upon" or substantially similar to a prior disclosure. Here, the SEIU Relator and the other *Doghramji* Relators had direct and independent knowledge of the fraud; that knowledge was not derived from the *Tenet* lawsuit.

For example, in *U.S. ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 735 (M.D. Tenn. 2013) the court determined that the relator had no independent information of his own aside from the disclosure in the newspaper. *See also*, *Dingle*, 388 F. 3d 209 (6th Cir. 2004) (relators sought different standard for the "based upon" prong and did not challenge "original source" determination by district court); *In re Natural Gas Royalties*, 562 F. 3d 1032, 1046 (relator provided no information regarding any named defendant and handwritten notes briefly describing telephonic interviews or attempted telephonic interviews of other defendants).

### 3. SEC Filings

All of the SEC filings cited by Defendants were filed after the *Tenet* complaint was filed in mid to late April 2011, just weeks prior to the filing of the *Doghramji* Complaint and over a month after the *Doghramji* Relators disclosed the information in their complaint to the Government. The SEC filings also fail to bar Relators' claims for many of the same reasons that the *Reuille* and *Tenet* complaints cannot bar their claims.

First, to the extent the filings mimic allegations made in the *Reuille* complaint, as the April 22, 2011 8-K does, it cannot serve to bar the nationwide ED admissions alleged by the *Doghramji* Complaint. Second, the mere mention of the Government's investigation of improper billing for inpatient care at hospitals associated with Defendants hardly reveals sufficient "allegations and transactions" to adduce that CHS engaged in nationwide fraud related to admitting patients to the hospital that did not require such care. Improper billing could relate to

16

thousands of different scenarios having nothing to do with improper emergency room admissions. For that reason, the SEC filings simply do not reveal "allegations or transactions" of the nationwide ED admissions claims at 74 hospitals or the "critical elements" of such claim "from which fraud can be inferred." *Davis*, 753 F. Supp. 2d at 591 (citing *Springfield*, 14 F. 3d at 654); *see also U.S. ex rel. Poteet v. Medtronic, Inc.,* 552 F. 3d 503, 511 (6th Cir. 2009) (public disclosure must reveal the "same kind of fraudulent activity against the government alleged by the relator"); *U.S. ex rel. Liotine v. CDW Government, Inc.*, No. 05-33-DRH, 2009 WL 3156704 (Sept. 29, 2009, S.D. Ill.) (publication did not reveal critical elements of an "overall practice by defendant or industry scheme to overcharge the government" and was not deemed to be public disclosure).

### C. THE DOGHRAMJI RELATORS ARE ORIGINAL SOURCES

Even if the Court finds that that one or more of the sources cited by Defendants qualifies as a public disclosure, the *Doghramji* Relators qualify as original sources of the information under both the pre-ACA and post-ACA public disclosure rules.[10]

Under the pre-ACA amendments, *Doghramji* Relators qualify as an original source because they disclosed their information to the Government prior to the *Tenet* complaint and they collectively have direct and independent knowledge of the allegations of fraudulent emergency room admissions by 74 of CHS's hospitals, including the nationwide coordination of these efforts by CHSI and CHSPCS.[11] The individual relators worked at hospitals operated by CHS collectively from at least 2005 to 2011 and have direct and independent knowledge of the

---

[10]     That the SEIU is no longer a relator in the case is of no consequence. *See U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, 255 F. Supp. 2d 351, 376 (E.D. Pa. 2002) (withdrawal of one relator cannot deprive the other relator of original source status); *Booker*, 9 F. Supp. 34 (that one relator obtained his knowledge indirectly through another relator poses no obstacle to the "original source" exception).

[11]     Moreover, to the extent that the court finds *Reuille* to qualify as a public disclosure, SEIU's agent, Change To Win Investment Group, had disclosed the violations to the U.S. Department of Health and Human Services in September 2010, including the statistical analysis prepared by SEIU. See, CHS 8-K (April 18, 2011), Ex. 99.1, attached to Decl. of Traci Buschner (November 24, 2014) at Ex. B; Gills Decl. at ¶¶ 12 – 13.

Chestnut Hill, Dyersburg and Heritage hospitals in Pennsylvania and Tennessee as well as information about the nationwide policies and practices that led to the over admissions in CHS hospitals. Decls. of Bryant at ¶ 3, Cook, and Doghramji at ¶3-5. SEIU also gathered information from employees working at CHS hospitals nationwide and developed a statistical analysis that demonstrated excessive emergency room admissions in 74 hospitals. Gillis Decl. at ¶ 15.

Defendants are incorrect that the sum total of this information cannot confer "original source" status on Relators. *Atkinson,* 255 F. Supp. 2d at 363 (each relator brought different information to the government and qualified as original sources). The declaration of Brian Gillis, a Research Coordinator at SEIU, indicates that he and another research analyst for SEIU "spent approximately one year developing, designing, programming, and completing a comprehensive statistical analysis of emergency room admissions at CHS facilities." Gills Decl. at 1, 5. Gillis' declaration also discusses the detailed processes and modeling he performed for SEIU, which is described in the complaint. [Dkt 1 at ¶¶ 119-131]. Gillis discussed the SEIU's findings with Relator Doghramji prior to filing the case "further confirming our [SEIU's] results and the situation at Chestnut Hill." Gillis Decl. at 15. In addition, Gillis testified that SEIU researchers contacted and spoke to approximately 100 doctors and nurses who work or previously worked at 20 CHS facilities in 7 different states. *Id*. The information gathered in these interviews also confirmed the statistical analysis performed by the SEIU. *Id*. Gillis also testified that SEIU "did not obtain or receive information, statistical evidence, or assistance from Tenet Healthcare Corporation prior to the Complaint filed in this lawsuit." *Id*. at 14.

Defendants argue that "merely analyzing information that already exists in the public domain, and asserting fraud based on that analysis, does not make a relator an original source," but their argument misses the mark. Def. Br. at 34. Nothing about the SEIU's investigation or

18

development of the statistical analysis precludes them from demonstrating the direct and independent knowledge requirement. The statistical analysis was the result of a complex, original investigation that took over a year to complete. *See* Gillis Decl. ¶¶ 4-11 (detailing complex development of the SEIU analysis). In *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F. 3d 562, 568 (11th Cir. 1994), the Eleventh Circuit held that a relator who acquired knowledge though "three years of his own claims processing, research and correspondence with members of Congress and HCFA [now CMS]" was an original source. *See also Koch v. Koch Industries, Inc.*, 1995 WL 812134, * 12 (N.D. Okla. Oct. 6, 1995) (relator may qualify as an original source where the core information underlying the relator's complaint resulted from his own investigation) (citing *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Prudential Insurance Co.*, 944 F. 2d 1149, 1161 (3d Cir. 1991)). Even under the pre-ACA public disclosure rule, raw unanalyzed data does not qualify as a public disclosure. *See U.S. ex rel. Rosner v. WB/Stellar IP Owner*, L.L.C., 739 F. Supp. 2d 396, 407 (S.D.N.Y. 2010).

Moreover, the original source information possessed by the *Doghramji* Relators is not limited to merely analyzing data. It includes information from over 100 witnesses, and information from the individual Relators who worked for CHS. Just because some of the information relied upon in the complaint is in the public domain does not preclude Relators from being original sources. A relator "need not … have personal knowledge of all of the elements of a claim … to qualify as an original source." *U.S. ex. rel. Allen v. Guidant Corp.*, 2012 WL 878023, *8 (D. Minn. Mar. 14, 2012). The *Allen* court held that the "FCA 'seeks to encourage person with first-hand knowledge of fraudulent misconduct…or those who are either close observers…to come forward." *Id.* (quoting *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995)).

19

For the same reasons articulated above, the *Doghramji* Relators are also "original sources" under the public disclosure rule in place following the 2010 ACA amendments, which the *Doghramji* Relators submit applies here. Specifically, Relators meet the first prong of Section (e)(4)(B) because they voluntarily disclosed their information to the Government prior to any qualifying public disclosure *or* – to the extent the Court finds they did not disclose prior to a qualifying public disclosure – they "have information that is independent of and materially adds to the publicly disclosed allegations" and "voluntarily provided the information to the Government before filing" their action. Indeed, the *Doghramji* Relators all had knowledge "independent" of the disclosures: SEIU began its statistical analysis in 2009; SEIU also conducted its interviews of 100 doctors and nurses prior to filing; and the individual Relators all worked for CHS hospitals where they became aware of Defendants' over admissions to the emergency room. Moreover, the *Doghramji* Relators' information materially added to the public disclosures as the Government intervened in their claims, requested that they assist in the Government's investigation, and used their statistical evidence to guide the audit of Defendants.

## V. CONCLUSION

This Court should find that all Relators to the Settlement Agreement resolving this litigation, including the *Doghramji* Relators, are entitled to recover their reasonable attorneys' fees, costs and expenses. The Court should also find that Defendants are precluded from raising first-to-file and public disclosure issues, as Defendants did not preserve these issues for post-settlement litigation in the Agreement. However, should the Court disagree that the Settlement Agreement resolves all issues except for those specifically reserved by the parties, including first-to-file and public disclosure, the Court should find that the *Doghramji* Relators are not barred by the first-to-file or the public disclosure rules for the reasons stated herein.

20

Date:  May 27, 2015              Respectfully submitted,

/s/ David W. Garrison
David W. Garrison
Scott P. Tift
**BARRETT JOHNSON**
**MARTIN & GARRISON, LLC**
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel:  (615) 244-2202
Fax: (615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

Kit A. Pierson
David A. Young
**COHEN MILSTEIN SELLERS**
       **& TOLL PLLC**
Suite 500 West
1100 New York Ave NW
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 4084699
kpierson@cohenmilstein.com
dyoung@cohenmilstein.com

Mary Thomas, Esq. (DE Bar No. 5072)
Jennifer Williams, Esq. (DE Bar. No. 5966)
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE  19801
Tel:  302.622.7148
Fax: 302.622.7100
mthomas@gelaw.com
jwilliams@gelaw.com

*Attorneys for Relators*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Doghramji Relators' Reply Memorandum in Support of Their Supplemental Memorandum for Entitlement to Attorneys' Fees, Costs, and Expenses* has been served on the following via the Court's ECF filing system on May 27, 2015:

**John R. Jacobson**

**William M. Outhier**
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
Email: jjacobson@rwjplc.com
Email: wouthier@rwjplc.com

**Michael L. Waldman**
**Richard A. Sauber**
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, NW
Suite 411L
Washington, DC 20006
Email: mwaldman@robbinsrussell.com
Email: rsauber@robbinsrussell.com

**Mark H. Wildasin**
Assistant United States Attorney
Office of the United States Attorney
Middle District of Tennessee
110 Ninth Avenue, S Suite A961
Nashville, TN 37203

**David Rivera**
United States Attorney
Office of the United States Attorney
Middle District of Tennessee
110 Ninth Avenue, S Suite A961
Nashville, TN 37203

**Michael D. Granston**
**Daniel R. Anderson**
**Robert McAuliffe**
Commercial Litigation Branch
U.S. Department of Justice, Civil Division
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044

**Andrew A. Bobb**
Office of the US Attorney
1000 Louisiana
Ste. 2300
Houston, TX 77002
(713) 567-9766
Fax: (713) 718-3303
Email: andrew.bobb@usdoj.gov

/s/ David W. Garrison
**DAVID W. GARRISON**
**BARRETT JOHNSTON**
    **MARTIN & GARRISON, LLC**