# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSE

UNITED STATES OF AMERICA,

              Plaintiff,

*ex rel.*

JAMES DOGHRAMJI; SHEREE COOK;
and RACHEL BRYANT

              Relators,

        v.

COMMUNITY HEALTH SYSTEMS, INC.
*et al.*

              Defendants.

**CASE NO. 3:11-cv-0442**

**JUDGE SHARP**
**MAGISTRATE JUDGE HOLMES**

**JURY DEMAND**

---

## MEMORANDUM IN SUPPORT OF RELATORS' RENEWED AND SUPPLEMENTAL MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS, AND EXPENSES

Relators Dr. James Doghramji, Sheree Cook, and Rachel Bryant ("Relators" or the "Doghramji Relators") seek the statutory attorneys' fees, costs, and expenses associated with their multi-year effort to expose an illegal scheme instituted by Defendant Community Health Services, Inc. ("Defendant" or "CHS") at 74 of its hospitals (collectively with CHS, "Defendants") in 29 states that cost the government millions of dollars and needlessly put patients at risk. The United States and various states intervened in this action and entered into a settlement agreement with Defendants and Relators that resulted in the return of more than $98 million to the federal and state governments; the execution of a Corporate Integrity Agreement foreclosing such conduct in the future; and the dismissal of Relators' claims with prejudice.

On August 6, 2015, after briefing and a hearing on the issue of Relators' "entitlement" to recover their fees, the Honorable Chief Judge Kevin H. Sharp determined that "all relators in this

case are entitled to attorney's fees," (Dkt. 184 at p. 13), and returned this case, and three related cases that were also resolved by the settlement agreement, "to the Magistrate Judge for consideration of each Plaintiff's request for attorney's fees and costs." (Dkt. 185). Now, pursuant to 31 U.S.C. § 3730(d) of the False Claims Act ("FCA"), the Doghramji Relators seek an award of their attorneys' fees, costs, and expenses associated with this litigation.

## INTRODUCTION

In 2011, the Relators, former CHS healthcare professionals, risked their jobs and their professional reputations in the medical field to expose Defendants' illegal conduct. They filed this *qui tam* action pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, (the "*Doghramji* Action"), alleging, *inter alia*, unlawful emergency room admission practices at hospitals nationwide owned or operated by CHS. These unnecessary admissions caused monetary injury to the government while placing patients at risk for treatment-resistant infection and medical errors. No other complaint alleging False Claims Act violations was filed in Tennessee.

The United States Department of Justice ("DOJ") spent the next three years investigating Relators' allegations, enlisting considerable assistance from Relators' counsel and from counsel to relators in six other *qui tam* actions filed against CHS in other district courts throughout the country.[1] On August 4, 2014, DOJ announced that the parties had settled all pending civil

---

[1] As noted by Nashville lawyer and former presidentially-appointed U.S. Assistant Attorney General, Frank W. Hunger, "a public-private partnership between the federal government, whistleblowers, and their counsel is a critical component of ensuring that the False Claims Act is enforced," due to the limited resources appropriated by the Government for investigating these cases. (*See* Dkt. 94, Declaration of Frank W. Hunger (hereinafter "Hunger Decl.") at ¶ 7). Mr. Hunger, who supervised the enforcement of the False Claims Act for the U.S. Department of Justice from 1993 to 1999, states in his declaration that a "dramatic increase" in recoveries by the Government under the False Claims Act has been brought about, in part, by the work of relators and their counsel. (*Id.* at ¶¶ 2, 6).

claims, including those brought by the Relators, and that CHS would pay the government $98 million, including over $88 million to settle the allegations of nationwide unnecessary ER admissions that were at the heart of Relators' complaint. (*See* Dkt. 89, Declaration of Traci L. Buschner (hereinafter "Buschner Decl."), Ex. F). The next day, the United States Attorney's Office for the Middle District of Tennessee made a similar announcement, noting that this was the largest False Claims Act settlement in the Middle District of Tennessee to date. (*Id.,* Ex. G).

The Relators are prevailing parties who are entitled to recover all reasonable attorneys' fees, costs, and expenses pursuant to the False Claims Act, 31 U.S.C. § 3730(d).[2] (*See* Dkt. 92, Declaration of Arthur R. Miller In Support Of Relators Doghramji, Bryant And Cooks' Motion For Award Of Attorneys' Fees And Expenses Pursuant To 31 U.S.C. § 3730(d) (hereinafter "Miller Decl.") at ¶ 20). In addition to realizing the substantial penalty that Defendants have paid to resolve this matter, the Relators' comprehensive Amended Complaint lends transparency to, and creates a much needed public record of, the scope and magnitude of Defendants' derelictions.[3]

## PROCEDURAL POSTURE OF RELATORS' MOTION FOR FEES, COSTS, AND EXPENSES

On August 4, 2014, DOJ announced that the Relators, the Government, and the Defendants had agreed to settle this *qui tam* lawsuit, as well as six related lawsuits. (Dkt. 75). On August 14, 2014, and in a revised order dated October 6, 2014, the Court dismissed all claims

---

[2]      Pursuant to 31 U.S.C. § 3730(d), successful relators "shall . . . receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant."

[3]      Justice Brandeis once noted that "sunlight is said to be the best of disinfectants." *See* Brandeis, Louis D.*, What Publicity Can Do*, Harper's Weekly, December 20, 1913 (*republished* at http://www.law.louisville.edu/library/collections/brandeis/node/196).

3

asserted by Relators except for Relators' claims for statutory attorneys' fees and costs under 31 U.S.C. § 3730(d), which the Court retained jurisdiction to adjudicate. (Dkt. 77, 104).

On September 29, 2014, Relators timely filed a Motion for Award of Attorneys' Fees, Costs, and Expenses pursuant to 31 U.S.C. § 3730(d). In the intervening year, Defendants doggedly, and unsuccessfully, fought to avoid any ruling by this Court on Relators' Motion by diverting the Court to jurisdictional issues that the Defendants had already given up in settlement. Specifically, Defendants argued that the Court must adjudicate two jurisdictional issues (the False Claims Act's "first-to-file" and "public disclosure" provisions) before addressing Relators' fee and expense requests (Dkt. 82, Motion to Stay; Dkt. 109, Expedited Motion to Stay; Dkt. 123, Motion to Consolidate; Dkt. 163, 165, Memoranda in Opposition). As a result, the parties spent most of the past year addressing jurisdictional issues (and incurring additional fees and expenses in the process), rather than addressing Relators' request for an award of statutory attorneys' fees, costs, and expenses.[4]

On August 6, 2015, after substantial briefing and a lengthy hearing, Judge Sharp rejected Defendants' jurisdictional challenges entirely. (Dkt. 184-85). In so doing, Judge Sharp found that "all relators in this case are entitled to attorney's fees," and returned this case "to the Magistrate Judge for consideration of each Plaintiff's request for attorney's fees and costs." (Dkt. 184 at p. 13; 185).

Now, pursuant to 31 U.S.C. § 3730(d) of the False Claims Act ("FCA"), the Doghramji Relators renew and supplement their prior motion and seek an award of their attorneys' fees, costs, and expenses associated with litigating this matter from its inception to the present.

---

[4]     On February 25, 2015, the Court denied Relators' initial Motion for Award of Attorneys' Fees, Costs, and Expenses "WITHOUT PREJUDICE to refiling at a later date, if appropriate," so that the Court could first adjudicate Defendants' two jurisdictional challenges. (Dkt. 143).

## FACTUAL BACKGROUND

CHS is the nation's largest operator of acute care hospitals. (Dkt. 89, Buschner Decl., Ex. F). Relators are each former employees of CHS hospitals. (Dkt. 52, First Amended Complaint at ¶¶ 12-14 (hereinafter "Compl.")). Relator Dr. Doghramji is a board-certified physician specializing in internal medicine and has almost twenty years of experience in his field. (*Id*. at ¶ 12). From 1994 to 2010, Dr. Doghramji served as an attending physician in CHS's Chestnut Hill Hospital Department of Emergency Medicine in Philadelphia, Pennsylvania. (*Id*. at ¶¶ 12, 66). Relator Cook was a staff Registered Nurse ("RN") and charge nurse at CHS's Heritage Medical Center in Shelbyville, Tennessee, from May 2008 to October 2009. (*Id* at ¶¶ 13, 28). Relator Bryant was employed as a staff nurse by CHS's Dyersburg Regional Medical Center in Dyersburg, Tennessee, from January 2009 through February 2011. (*Id*. at ¶¶ 14, 21).

On May 10, 2011, Relators filed a 165-page Complaint (Dkt. 1) alleging that CHS, motivated by a need to service its mounting debts, devised a scheme to grow revenues by increasing the admission of patients who presented themselves to CHS hospital emergency rooms ("ERs"). (Dkt. 52, Compl. at ¶¶ 1, 107-113). CHS, however, knew that the growth of such admissions was constrained by the limited number of sick people who could potentially need its services, and as a result, it needed to be aggressive in finding ways to admit more patients. For that reason, CHS's executives decided to centralize their control of ER operations at CHS facilities across the nation. (*Id*. at ¶¶ 3, 116). CHS used this control to implement practices that were geared towards increasing ER admission rates. (*Id*. at ¶¶ 3; 118). These policies (1) set and constantly monitored admissions quotas at each hospital; (2) required the use of CHS-developed lenient admission criteria contained in what was called the "Blue Book"; (3) required the use of standardized software called ProMed that would direct physicians in

making diagnoses and determining treatments; and (4) maintained strong controls over hospital physician contracts. (*Id.* at ¶ 4).

In addition, CHS executives and their hospital-specific counterparts worked to increase ER admission rates by (1) encouraging the admission of Medicare patients who fell into certain "soft" diagnostic categories (*e.g.*, chest pain, abdominal pain, and syncope) regardless of medical necessity; (2) pressuring ER physicians to increase admissions rates regardless of medical necessity; (3) terminating the contracts of physicians and physicians' groups that failed to meet the arbitrary admission quotas; and (4) directing case managers to justify admissions or decisions not to admit using the Blue Book's lax standards. (*Id.* at ¶ 4, 118).

As proof that CHS's scheme was carried out across the nation, and led to the filing of numerous false claims, the *Doghramji* Complaint describes substantially similar conduct at eleven CHS hospitals in Illinois, Missouri, New Jersey, Oklahoma, Pennsylvania, and Tennessee, and the impact of this conduct on admission rates. The Complaint also contains a detailed statistical analysis developed for Relators by the Service Employees International Union ("SEIU") (at the time also a relator in this action), which revealed that CHS's pattern of aggressive admission practices caused the unnecessary admission of Medicare beneficiaries at each of the 74 hospitals named in Relators' complaint. (*Id.* at ¶¶ 136-48). In fact, 42.5% of CHS hospitals had admission rates so high that they were classified as outliers that warrant further investigation for Medicare fraud. (*Id.* at ¶ 139). The statistical data also showed that these substantially elevated admission rates were the result of CHS's scheme, as the admission rates at various hospitals grew exponentially almost immediately after being acquired by CHS. (*Id.* at ¶ 144). Finally, the *Doghramji* Complaint includes particularized allegations, based on first-

hand experience, describing CHS's wrongful conduct at each of the Doghramji Relators' hospitals. (*Id.* at ¶¶ 157-224).

Prior to filing their Complaint, Relators' counsel (a) investigated Relators' claims; (b) developed and reviewed Relators' statistical analysis; and (c) prepared the disclosure statement and drafted a 165-page Complaint. In addition, certain of Relators' counsel met with attorneys at DOJ and the U.S. Attorney's Office for the Eastern District of Pennsylvania. (Dkt. 89, Buschner Decl. at ¶ 5; *see also* Dkt. 91, Dean Decl. at ¶ 10).

In or about May 9, 2011, Relators filed a detailed and extensive disclosure, as required by the FCA, with the U.S. Attorney's Office for the Middle District of Tennessee ("USA's Office"). (Dkt. 89, Buschner Decl. at ¶¶ 4-6; Dkt. 91, Dean Decl. at ¶¶ 10-12). The disclosure identified physicians and former CHS employees who could be potential witnesses in the Government's investigation. As part of the disclosure, Relators' counsel also provided critical documents from the individual Relators and a robust statistical analysis evidencing a nationwide scheme to bill Medicare for medically unnecessary admissions. Attached to the disclosure were additional key documents supporting Relators' claims and a road map for the Government to investigate the case. (Dkt. 89, Buschner Decl. at ¶ 6; Dkt. 91, Dean Decl. at ¶¶ 12-13).

After the lawsuit was filed, the law firms and the Relators met multiple times with lawyers and other representatives from DOJ and the USA's Office (collectively the "Government"). (Dkt. 89, Buschner Decl. at ¶ 7). Relators, which then also included the SEIU, were able to provide statistical evidence of medically unnecessary admissions for 74 hospitals and eye witness testimony for the three hospitals in which the Relators had worked. (*Id.*). The Government provided Relators and their counsel with copies of complaints in six other FCA cases (filed in other jurisdictions) that were all settled, together with the instant case, on August 4,

7

2014 in this Court. (Dkt. 75). Prior to the disclosure of the other six complaints, Relators were not aware of the other cases because they were still "under seal" in multiple federal courts. (Dkt. 89, Buschner Decl. at ¶ 8).

In or about the fall of 2011, the Government requested that counsel for the Doghramji Relators—as well as counsel in the six other *qui tam* actions—actively participate in its investigation, which was led by the USA's Office in Nashville, on an on-going basis. (*Id.* at ¶ 9). The Government lawyers mapped out the investigation and assigned work to all relators' counsel in an organized manner so that work was not duplicated by any of the firms involved. (*Id.* at ¶ 10). In response to the Government's specific requests, counsel for the Doghramji Relators performed the following work over the years preceding the settlement:

- Organized and analyzed thousands of documents produced, pursuant to Civil Investigative Demands ("CIDs"), to the Government by CHS;

- Drafted letters and memoranda analyzing relevant documents;

- Created lists of potential witnesses;

- Drafted a detailed memorandum comparing CHS's Blue Book (CHS's own lenient admission criteria) to Interqual (industry-recognized admission criteria);

- Compared CHS's treatment of observation stays to its use of inpatient admission;

- Conducted legal and factual research on a number of topics including, but not limited to: (1) bonuses/incentives offered to individuals for increasing admissions; (2) CHS's acquisition strategy; (3) CHS's transition from the Blue Book to Interqual; (4) CHS's financial stability; and (5) CHS's acquisition of Triad Healthcare;

- Drafted detailed outlines for the Government's use in questioning several key witnesses, including Dr. Lynn Simon; and

- Drafted CID requests to assist the investigation.

(*Id.* at ¶ 9).

Counsel for the Doghramji Relators also consulted with their non-testifying medical expert, Dr. Caroline Poplin, on behalf of the Government. (*Id.* at ¶ 11). Dr. Poplin, who is a physician and previously served as legal counsel for the U.S. Food and Drug Administration, aided the Government's understanding and investigation, including assisting with the selection of data for the Government's audit of CHS, which was performed incident to the investigation of the seven cases. (*Id.*). Dr. Poplin met with the Government on a number of occasions to provide expert medical analysis and opinions. (*Id.*). She assisted with the formulation of questions and an outline for the Government's deposition of CHS's Dr. Lynn Simon, who had critical knowledge about CHS's decision to use certain hospital admission criteria, including the Blue Book, which lay at the core of the case. (*Id.*). Dr. Poplin also assisted with analysis of CHS's Blue Book and the medical necessity standard. (*Id.*). Additionally, she participated in drafting the initial and amended Complaints in the Doghramji case. (*Id.*).

All relators' counsel for the seven actions, including counsel for the Doghramji Relators, participated in bi-monthly calls organized and led by the Government to discuss the case, strategy, discovery, and other tasks incident to the investigation. (*Id.* at ¶ 10). The investigation, though led by the Government, was a collaborative effort among the counsel for the seven actions. (*Id.*). The vast majority of the work done by Relators' counsel in the Doghramji case was done at the direction of the Government and in support of its investigation of a nationwide case against Defendants. (*Id.*). Though the Government sometimes gave assignments to certain of the relators' counsel based upon allegations of their specific complaints, the majority of the assignments were made without regard to the individual complaint. (*Id.*).

A First Amended Complaint was drafted and filed in or about August 2013, and was provided to CHS (redacted only to shield identifying information regarding the Relators)

9

pursuant to this Court's November 28, 2011 Order allowing a "partial lift" of the seal. (*Id.* at ¶ 13). CHS was provided with copies of all seven complaints in or about late August 2013. (*Id.*). CHS and the Government had already entered into discussions to resolve the case in the spring of 2013. (*Id.*). Counsel for the Doghramji Relators were tasked by the Government with performing legal research and analysis pertaining to certain defenses that CHS raised during its discussions with the Government. (*Id.*).

The Government and all of the relators' counsel, including counsel for the Doghramji Relators, were in frequent contact over the course of the investigation and subsequent settlement of the claims against CHS. (*Id.* at ¶ 14).

In the spring of 2014, the Government notified all of the relators' counsel of a "handshake" deal between CHS and the Government. (*Id.*). Before the settlement papers were finalized, the Government urged relators in all seven cases to reach agreement regarding their respective shares of the bounty resulting from the Government's settlement with CHS, which they ultimately did. (*Id.* at ¶ 15). Around the same time, Government lawyers also told counsel in all seven cases that they should submit their fees and costs to CHS pursuant to CHS's request. (*Id.* at ¶ 16). On or about June 6, 2014, the Doghramji Relators' counsel submitted their fees and costs to Defendants' counsel. (*Id.*). Upon information and belief, counsel on the six other cases also provided their fees and costs to Defendants' counsel. (*Id.*).

The Government ultimately awarded the relators a bounty of 19% of the total recovery, demonstrating that it believed all relators contributed substantially to the case. (*Id.* at ¶ 17).

On July 24, 2014, the Government intervened in the *Doghramji* case. (Dkt. 72). The Government also intervened in the other six cases in their respective federal courts. (Dkt. 89, Buschner Decl. at ¶ 18). On or about August 4, 2014, the Government filed its Settlement (Dkt.

10

75), which was approved by this Court on August 14, 2014. (Dkt. 77). The Settlement expressly resolves all seven cases. (*Id.*). The Doghramji Relators, like the relators in the other six cases, agreed to dismiss their claims against the Defendants and signed the settlement as well. (Dkt. 75 at ¶ 3, p. 7). In exchange for the relators' dismissals, Defendants agreed not to bring any actions against Relators or their counsel related to claims resolved by the Settlement. (*Id.* at ¶ 8, p.10). As part of the Settlement, Defendants agreed to enter a Corporate Integrity Agreement ("CIA") or Consent Decree with the U.S. Department of Health and Human Services, which sets forth certain injunctive relief. (*Id.* at ¶ 4, p.7-8).

In the settlement, Relators expressly reserved their right to seek their statutory fees and costs pursuant to 31 U.S.C. § 3730(d), the fee-shifting provision of the federal False Claims Act. (*Id.* at ¶ 8, p.10; Dkt. 89, Buschner Decl. at ¶ 19). Defendants, similarly, reserved their right to object and oppose those fees pursuant to 31 U.S.C. § 3730(d). (*Id.* at ¶ 8, p. 10).

Relators' counsel represented Relators from the inception of the case in 2011 on a contingent basis. They expended significant time and resources—in majority part at the Government's express request. Counsel are well-respected local and national firms that specialize in False Claims Act litigation and have a remarkable record of recovering funds stolen from the Government. (*See* Dkt. 92, Miller Decl. at ¶ 31-35). In all, Relators' counsel expended more than[5] 8,164 attorney and paralegal hours and incurred $66,682.20 in expenses on this matter. (*See* Dkt. 89, Ex. C to Buschner Decl.; Dkt. 91, Ex. A to Declaration of David P. Dean (hereinafter "Dean Decl."); Dkt. 88, Ex. A to September 29, 2014 Declaration of David W. Garrison (hereinafter "Garrison 2014 Decl."); Ex. A to contemporaneously-filed Declaration of

---

[5]    Relators are not seeking reimbursement for time spent negotiating matters with the Government and relators from the six other actions.

Daniel L. Berger (hereinafter "Berger Decl."); Ex. B to contemporaneously-filed Declaration of Kit A. Pierson (hereinafter "Pierson Decl."); Ex. A to contemporaneously-filed October 1, 2015 Declaration of David W. Garrison (hereinafter "Garrison 2015 Decl."). Pursuant to 31 U.S.C. § 3730(d), Relators seek reimbursement of these fees, costs, and expenses.

These attorneys' fees, costs, and expenses will not reduce the Government's recovery or the relators' share whatsoever. (*See* Dkt. 92, Miller Decl. at ¶ 21). Rather, Defendants will pay this mandatory award over and above the $98 million won by the government. *See* 31 U.S.C. § 3730(d) ("All such expenses, fees, and costs shall be awarded against the defendant."); (Miller Decl. at ¶ 21).

## ARGUMENT

### I.     The Doghramji Relators are entitled to reasonable fees and expenses.

Section 3730(d)(1) of the FCA provides that:

> [i]f the Government proceeds with an action brought by a person under subsection (b), such person shall . . . receive [a percentage] of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. . . . Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.

31 U.S.C. § 3730(d)(1) (emphasis added). On August 6, 2015, Judge Sharp found that "all relators in this case are entitled to attorney's fees" under this provision and returned this case "to the Magistrate Judge for consideration of each Plaintiff's request for attorney's fees and costs." (Dkt. 184 at p. 13; 185). Thus, the Defendants' jurisdictional challenges having been soundly rejected by this Court, the Doghramji Relators are prevailing parties entitled to an award of attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d).

**II.      Relators' request for $3,683,685.50 in total fees is reasonable.**

In the Sixth Circuit, the "primary concern in an attorney fee case is that the fee awarded be reasonable, that is, one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004) (internal quotation marks omitted).[6]

In calculating a reasonable attorneys' fee, the first step is to determine the value of the "lodestar" — the number of hours reasonably expended by counsel, multiplied by a reasonable hourly rate. *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005); *see also,* Dkt. 92, Miller Decl. at ¶¶ 29-30. While the district court retains discretion to adjust this value up or down to account for unusual circumstances, a "strong presumption" exists that prevailing counsel is entitled to this lodestar amount. *See Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). A "reduction in attorney fees is to be applied ***only in rare and exceptional cases*** where specific evidence in the record requires it." *Isabel*, 404 F.3d at 416 (emphasis added).

Here, Relators petition the Court to award attorneys' fees totaling $3,683,685.50. As the following analysis will show, this total is the product of (1) reasonable billing rates — ranging from $140.00 to $895.00 an hour — that are consistent with what attorneys and professional legal staff of comparable skill and experience charge in False Claims Act and complex civil

---

[6]      In determining the reasonableness of fees and costs under the False Claims Act, courts are permitted to look at cases outside of the FCA context. *See, e.g.*, *United States ex rel. Lefan v. Gen. Elec. Co.*, 397 F. App'x 144, 147-48 (6th Cir. 2010) (applying Section 1988 case law to fee awards under FCA); *see also Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005) (noting that "we rely on precedents involving attorney fees without regard to whether they involved Title VII or some other federal statute").

litigation; (2) 8,164.50 hours reasonably expended by counsel, (3) a reduction for all work performed mediating and negotiating settlement; and (4) efficient staffing of this litigation.

### a. Relators' counsel's hourly rates are reasonable and appropriate.

In nationwide False Claims Act litigation, the Sixth Circuit provides for reimbursement of a relator's reasonable attorney's fees at prevailing in-district hourly rates for a relator's in-district counsel and at prevailing national hourly rates for a relator's national counsel. *See United States ex rel. Lefan v. Gen. Elec. Co.*, 397 F. App'x 144, 147-48 (6th Cir. 2010).

In determining the prevailing market rates within a given market, a range of hourly rates will "prevail," depending upon the quality of counsel and the complexity of the case. Accordingly, the Supreme Court has explained that district courts should look not only to regional norms, but also to the services performed and the "skill, experience and reputation" of the attorneys. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *see also Cummings Inc. v. BP Prods. N. Am., Inc.*, Nos. 3:06-0890, 3:07-0834, 2010 WL 796825, at *3 (M.D. Tenn. Mar. 3, 2010) ("A reasonable hourly rate is determined by considering the skill, experience, and reputation of the attorneys involved and the market in which they practice.").

In the instant nationwide False Claims Act lawsuit, Relators engaged counsel from the Middle District of Tennessee – Barrett Johnston Martin & Garrison, LLC – as well as national counsel who specialize in False Claims Act litigation and other complex litigation – Grant & Eisenhofer, P.A.; Cohen Milstein Sellers & Toll PLLC; and James & Hoffman, P.C. Relators are entitled to an award of reasonable fees incurred at hourly rates prevailing within the Middle District of Tennessee for Relators' Middle Tennessee counsel, and at hourly rates prevailing nationally for Relators' national counsel. *See Lefan*, 397 F. App'x at 147-48.

14

### i. Barrett Johnston Martin & Garrison's hourly rates are reasonable and appropriate for complex civil litigation pursued within the Nashville, Tennessee legal market.

In determining the appropriate hourly rate for attorneys who regularly practice within the venue of the court of record, the Sixth Circuit has determined that courts should "use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Geier*, 372 F.3d at 791.

During the course of this litigation, the law firm of Barrett Johnston Martin & Garrison, LLC ("BJMG") represented Relators at hourly rates ranging from $550.00 (for senior partners with more than 50 years of experience handling complex litigation) to $150.00 (for legal staff). (*See* Dkt. 88, Garrison 2014 Decl., Ex. A; contemporaneously-filed Garrison 2015 Decl., Ex. A).

The rates listed above are within the range of hourly rates that attorneys in this region typically charge for such matters, and these reasonable rates properly reflect the skills and experience of the attorneys and professional staff at BJMG. In support of the reasonableness of these hourly rates, Relators have filed the declarations of prominent local attorneys who handle complex civil litigation — a form of proof explicitly favored by the Sixth Circuit. *See, e.g.*, *B & G Mining, Inc. v Dir., Office of Workers' Comp. Programs*, 522 F.3d 657, 666 (6th Cir. 2008) ("[C]laimant's attorney would have been well served by submitting an affidavit from an experienced attorney in the same or similar field attesting to that attorney's customary rate and the rates prevalent in the market[.]"). This type of evidence is also specifically contemplated by Local Rule 54.01(b)(3) of this Court.

Frank W. Hunger and Michael L. Russell are each experienced, respected attorneys who practice in the Nashville legal market, and who focus their practices on complex litigation. In

their sworn declarations, Mr. Hunger and Mr. Russell each attest that the above-listed hourly rates are within the current[7] prevailing range for Nashville-area attorneys and professional staff with comparable skill and experience. Thus, these attorneys' declarations support the reasonableness of the rates charged by Relators' local counsel in representing Relators. (*See* Dkt. 94, Hunger Decl. at ¶ 12; Dkt. 96, Declaration of Michael L. Russell (hereinafter "Russell Decl.") at ¶ 9).

In further support of the reasonableness of Relators' counsel's hourly rates, Relators note that nearly four years ago Middle District of Tennessee Judge Aleta A. Trauger approved the hourly rate requested herein for Mr. Barrett (*i.e.*, $550.00 per hour) and approved hourly rates for Mr. Garrison and Mr. Tift that were only modestly lower than the rates sought for these two attorneys today.[8] In the nearly four years since Judge Trauger approved those rates, Mr. Garrison and Mr. Tift have gained additional years of experience; Mr. Garrison has become a named partner; and Mr. Tift has become a partner. A copy of Judge Trauger's Order is attached hereto as Exhibit A.

Finally, Relators respectfully submit that the experience and competence of the lawyers at BJMG, as detailed in the contemporaneously filed firm resume, warrants compensation for the work they have performed at the requested prevailing market rates. (*See* contemporaneously-filed Garrison 2015 Decl., Exhibit B, BJMG Firm Resume). BJMG has charged these hourly rates to hourly paying clients of the firm for similar services, and in some cases, such as Mr.

---

[7]  Mr. Hunger and Mr. Russell each submitted the declarations referenced herein in September 2014 in support of Relators' original Motion for Award of Attorneys' Fees, Costs, and Expenses. Thus, the hourly rates sought by Barrett Johnston Martin & Garrison, LLC were within the current prevailing range for Nashville-area attorneys one year ago.

[8]  In 2011—four years ago—Judge Trauger approved hourly rates of $350.00 and $250.00 for Mr. Garrison and Mr. Tift, respectively. Today, Mr. Garrison and Mr. Tift seek approval of hourly rates of $400.00 and $300.00, respectively.

Garrison's rate, has charged higher hourly rates to hourly paying clients.  (*Id.* at ¶ 7).  For all of these reasons, Relators respectfully ask the Court to approve the hourly rates charged by BJMG in this litigation.

> ### ii. Relators' national counsel's hourly rates are reasonable and appropriate for attorneys who specialize in representing *qui tam* relators in nationwide False Claims Act litigation and other complex civil litigation.

When parties engage experienced and specialized out-of-town counsel to pursue complicated nationwide claims, as is the case here, district courts "are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases."  *Louisville Black Police Officers Org. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir. 1983).  In such cases, district courts are "justified in looking to [the attorney's] standard rate in the community where that attorney normally practices as a reflection of that attorney's training, background, expertise and skill."  *Id.* at 277; *see also Lefan*, 397 F. App'x at 147-48 (awarding out-of-state rates to out-of-state attorney who specializes in *qui tam* litigation).

Here, Relators engaged national specialists in False Claims Act litigation and complex litigation to represent them in pursuing their claims that the Defendants had violated the federal False Claims Act in hospitals across more than half of the states in the country.  Ultimately, the United States Government settled these nationwide claims for more than $88 million, representing the lion's share of the largest False Claims Act settlement in the history of the Middle District of Tennessee.  (*See* Dkt. 95, July 30, 2014 Press Release of the United States Attorney, Middle District of Tennessee, attached as Exhibit 1 to Declaration of W. Michael Hamilton).  Relators' national counsel's experience, described below and in supporting

declarations, as well as the extraordinary results, justify awarding the requested national hourly rates.

Relators' national counsel include lawyers and professional staff from the law firm of Grant & Eisenhofer, P.A. ("G&E"), with offices in Wilmington, Delaware, New York, New York, and Chicago, Illinois and, until recently, in Washington, D.C. G&E is a national litigation boutique that specializes in False Claims Act cases, as well as complex civil litigation involving shareholder and derivative securities cases, corporate governance, consumer protection, bankruptcy, and antitrust.[9] *See* www.gelaw.com. For the last ten years, G&E has been named one of the nation's "Top Ten Plaintiff's Firms" by the National Law Journal. *Id*. Mr. Guttman, Ms. Buschner, and the other attorneys at G&E[10] that worked on this case have substantial, nationwide experience in False Claims Act litigation and complex class action litigation. Mr. Guttman, who was the head of G&E's False Claims Act practice and Washington, D.C. office until recently, has approximately 29 years of experience as a litigator and has served as counsel in some of the largest government recoveries under the False Claims Act. (*See* Dkt. 89, Exhibit A to Buschner Decl. at pp. 12-13). Mr. Guttman was recently lead counsel in *United States ex rel. Sandler v. Wyeth Pharmaceuticals, Inc*., Case No. 5:10-cv-01317-M (W.D. Okla.), which resulted in a $490 million recovery for the government in July 2013.

In 2012, Mr. Guttman and Ms. Buschner served as lead counsel for the lead whistleblower, Meredith McCoyd, in *United States ex rel. Meredith McCoyd v. Abbott Laboratories*, Case No. 07-cv-81 (W.D. Va.), which resulted in a $1.6 billion recovery for the government. Also in 2012, Mr. Guttman and Ms. Buschner represented one of the four main

---

[9]     (*See* Dkt. 89, G&E Biographical Information, Exhibit A to Buschner Decl.).
[10]    Mr. Guttman and Ms. Buschner left Grant & Eisenhofer, P.A. in April 2015 and, for that reason, withdrew as counsel for Relators in this action.

whistleblowers in a case against GlaxoSmithKline that returned more than $3 billion to the government. *United States ex rel. Lois Graydon v. GlaxoSmithKline*, Case No. 11-cv-10741 (D. Mass.). They represented one of the six main whistleblowers in litigation resulting in the government's September 2009 $2.3 billion settlement with Pfizer Pharmaceutical. *United States ex rel. Glenn Demott v. Pfizer*, Case No. 05-cv-12040 (D. Mass.).

Ms. Buschner was Senior Counsel at G&E until recently and has nearly twenty years of experience litigating primarily False Claims Act cases. (*See* Dkt. 89, Exhibit A to Buschner Decl. at pp. 26-27). She is a former state prosecutor who has worked closely with Mr. Guttman on numerous False Claims Act cases, including each of those detailed above. She has extensive experience as well in scientifically oriented litigation, including representing plaintiffs in mesothelioma cases and the National Resource Defense Council in environmental litigation. According to Arthur Miller, Ms. Buschner and Mr. Guttman's "broad experiences litigating *qui tam* cases made them eminently suitable counsel for this case." (Dkt. 92, Miller Decl. at ¶ 34).

G&E represented Relators at hourly rates ranging from $895.00 to $140.00. (*See* Dkt. 89, Exhibit C to Buschner Decl.; Ex. A contemporaneously-filed Berger Decl.). These rates are consistent with the hourly rates of other firms in Washington, D.C. and New York, NY that represent clients in nationwide complex litigation. (*Id.* at ¶ 21; *see also* National Law Journal's Billing Survey, Vol. 36, No. 2 (January 13, 2014) attached as Ex. D to Buschner Decl.). In further support of the reasonableness of Relators' counsel's hourly rates, Relators note that the Northern District of California approved G&E's hourly rates last month and the Texas Court of Appeals did the same within the last three years. Copies of these orders are attached as exhibits to the contemporaneously-filed Berger Declaration. (Ex. C & D to Berger Decl.).

Relators' national counsel also include lawyers and professional staff from the law firm of Cohen Milstein Sellers & Toll PLLC ("CMST"), based in Washington, D.C. The primary CMST attorneys representing Relators, Kit Pierson and David Young, have substantial False Claims Act litigation experience.[11] Most significantly, they previously tried a similar *qui tam* case involving the use of statistical sampling to establish False Claims Act liability. This experience bears on Relator's original statistical analysis and the national audit conducted by the Government. In that action, *United States ex rel. Loughren v. UnumProvident* (D. Mass.), Mr. Pierson was lead trial counsel (and Mr. Young part of the trial team); they alleged that the nation's largest disability carrier violated the False Claims Act by causing the submission of numerous false claims for social security disability benefits to the United States. After a lengthy trial, the jury returned a verdict finding that UnumProvident had violated the False Claims Act. The legal theory was later upheld on appeal but the case was remanded due to the trial court's exclusion of certain evidence. Mr. Pierson and Mr. Young have also represented other *qui tam* Relators, as well as clients in significant antitrust class action cases and other complex civil litigation.

CMST represented Relators at hourly rates ranging from $820.00 to $240.00. (*See* contemporaneously-filed Pierson Decl., Exhibit B).

In support of G&E and CMST's expertise in representing Relators in False Claims Act litigation, Relators submit the declaration of Sam S. Sheldon, who served in the United Stated Department of Justice as the Deputy Chief of the Criminal Fraud Division and as head of the Health Care Fraud Unit from 2011 through 2013. (*See* Dkt. 93, Declaration of Sam S. Sheldon

---

[11]   (*See* Dkt. 90, CMST Biographical Information, Exhibit A to Pierson Decl.; Miller Decl. at ¶ 35).

(hereinafter "Sheldon Decl.") at ¶ 2).  In this capacity, Mr. Sheldon was responsible for overseeing the prosecution of health care fraud for the entire United States. (*Id.*). In his declaration, Mr. Sheldon states:

> I consider the lawyers from Grant & Eisenhofer, P.A. and Cohen Milstein Sellers & Toll, PLLC who represent the Relators in this matter to be highly skilled specialists, who specialize in the practice of complex civil litigation, and especially in the practice of representing *qui tam* relators in litigation brought under the False Claims Act.  I am particularly familiar with Reuben Guttman and Traci Buschner, of Grant & Eisenhofer, P.A.[12], and their work.  I consider them to be among the most accomplished lawyers in the relators' bar.  I am aware that they have handled some of the most significant *qui tam* actions in the nation.

*Id.* at ¶ 5.

Relators also submit the declaration of Brent N. Rushforth in support of CMST's expertise in representing relators in False Claims Act litigation.  Mr. Rushforth previously served as Deputy General Counsel of the Department of Defense and has been in private practice since 1980.  (*See* contemporaneously-filed Declaration of Brent N. Rushforth (hereinafter "Rushforth Decl.") at ¶ 3).  Mr. Rushforth has extensive experience in many kind of complex civil litigation, and the majority of his current practice involves *qui tam* False Claims Act litigation.  (*Id.* at ¶¶ 3-4).  Mr. Rushforth has worked with several of the CMST attorneys, including working with Mr. Pierson for 20 years, and states in his declaration that "I am very familiar with the very high level of legal expertise and the significant amount of substantive knowledge that Mr. Pierson, Mr. Young, and others at Cohen Milstein bring to complex litigation like the False Claims Act case at issue here."  (*Id.* at ¶ 6).

Relators' national counsel also included lawyers and professional staff from the law firm of James & Hoffman (J&H), based in Washington, D.C.  For over a decade, J&H and David P.

---

[12]    Mr. Sheldon completed his declaration in September 2014.  Since April 2015, Mr. Guttman and Ms. Buschner no longer work for Grant & Eisenhofer, P.A.

Dean have served as counsel to the Health Care Division of the SEIU. (*See* Dkt. 91, Dean Decl. at ¶ 2). J&H and Mr. Dean have also conducted complex litigation in the health care field, including, for example, initiating and serving as co-lead counsel in five antitrust class actions against hospitals in five cities for collusion to suppress nurse wages, resulting so far in approximately $60 million in settlements for registered nurses in Detroit and Albany. *Id.* J&H worked closely with the SEIU research department to develop the statistical analysis of CHS hospital admissions that revealed the Medicare fraud at the heart of this *qui tam* case, and on the outreach effort that identified the individual relators and witnesses with first-hand evidence of the CHS practices resulting in the fraudulent admission practices. In general, J&H specializes in labor and employment law and its members serve as General Counsel to both the SEIU and the American Airlines pilots' union. It also regularly and successfully prosecutes large class actions on behalf of employees under federal wage and hour laws, and has conducted a wide range of litigations on behalf of unions in courts across the country.

J&H represented Relators at hourly rates ranging from $771.00 to $175.00. (*See* Dkt. 91, Exhibit A to Dean Decl.).

In addition, Relators' counsel and the Government consulted with Relators' medical expert, Dr. Caroline Poplin, a graduate of Yale Law School and a medical doctor with a degree from the University of Rochester Medical School, who formerly was legal counsel for the U.S. Food and Drug Administration. (*See* Dkt. 89, Resume of Dr. Caroline Poplin, Exhibit B to Buschner Decl.). Her time spent on the case was at an hourly rate of $850.

The rates listed above for Relators' national counsel are within the range of hourly rates of attorneys who specialize in representing relators in nationwide False Claims Act litigation as well as representing plaintiffs in nationwide complex litigation, and these reasonable rates

properly reflect the skills and experience of the attorneys and professional staff at G&E, CMST, and J&H. (*See* Dkt. 89, Ex. D to Buschner Decl.). In support of the reasonableness of these hourly rates, Relators have filed the declarations of three prominent attorneys with national experience and expertise — a form of proof explicitly favored by the Sixth Circuit.

Arthur R. Miller, Sam S. Sheldon, and Brent N. Rushforth are each experienced, respected attorneys, who have experience and expertise concerning nationwide litigation like the instant case. Arthur R. Miller is one of the nation's preeminent scholars in the areas of complex litigation, class actions, copyright, and civil procedure, who taught for more than thirty years at Harvard Law School and who currently teaches at the New York University School of Law. (*See* Dkt. 92, Miller Decl. at ¶ 1). Sam S. Sheldon served in the U.S. Department of Justice as Deputy Chief of the Criminal Fraud Division and as head of the Health Care Fraud Unit from 2011 through 2013, and he now represents relators and defendants in False Claims Act litigation as a partner in the Washington, D.C. office of Quinn Emanuel Urquhart & Sullivan, LLP. (*See* Dkt. 93, Sheldon Decl. at ¶¶ 1-2). Brent N. Rushforth previously served as Deputy General Counsel of the Department of Defense, has for many years represented clients in complex civil litigation at respected firms, and now focuses on representing relators in False Claims Act litigation as a principal at McKool Smith. (*See* Rushforth Decl. at ¶¶ 2-5.)

In their sworn declarations, Mr. Miller, Mr. Sheldon, and Mr. Rushforth each attest to the fact that the above-listed hourly rates are within the current prevailing range for national specialists representing relators in pursuit of nationwide claims under the False Claims Act. (*See* Miller Decl. at ¶ 31; Sheldon Decl. at ¶ 8; Rushforth Decl. ¶¶ 8-9). Thus, these attorneys' declarations support the reasonableness of the rates charged by Relators' national counsel in representing Relators.

In addition to these three declarations, Relators submit the declarations of Mark A. Griffin, Leon Dayan, and Charles R. Both, each of whom are experienced and respected attorneys from around the country. (*See* Dkt. 97, Declaration of Mark A. Griffin (hereinafter "Griffin Decl."); Dkt. 98, Declaration of Leon Dayan (hereinafter "Dayan Decl."); Dkt. 99, Declaration of Charles R. Both (hereinafter "Both Decl.")). In their declarations, each of these attorneys testifies that the hourly rates charged by J&H in this litigation are reasonable. (Griffin Decl. at ¶ 6; Dayan Decl. at ¶ 6; Both Decl. at ¶ 9).

Finally, any attempt by CHS to argue that the hourly rates of Relators' national counsel are unreasonable is belied by the fact that CHS's counsel sought similar or higher rates in the Southern District of Florida in 2013. In that case, one of the named partners of the law firm representing CHS in this nationwide litigation, Lawrence S. Robbins, submitted an affidavit showing that partners with significant experience were billed at $700.00 to $850.00 per hour; associates with only 2 to 4 years of experience were billed at $410.00 to $485.00 per hour, and paralegals were billed at $250.00 per hour. *See* Exhibit B, a true and correct copy of a March 2013 Interim Fee Application with Affidavit of Lawrence S. Robbins.[13]

Similarly, in 2012, CHS sought reimbursement of its own counsel's national rates as part of a sanctions petition in a *qui tam* case pending in New Mexico. *See* Exhibit C, CHS Fee Petition Dated November 19, 2012. There, CHS sought rates as high as $968.00 per hour for attorneys from Skadden Arps. *Id.* at 20. In so doing, CHS contended that, "in complex cases, the proper market for assessing the reasonableness of an hourly rate is often the national or

---

[13]     Relators also issued a document request to CHS directed at the hours and hourly rates billed by its attorneys in this litigation. CHS has refused to provide this information—highly relevant to any objection by Defendants to Relators hours or fees—and Relators are filing a motion to compel contemporaneously herewith to seek its production.

24

specialized legal market." *Id.* at 15. Here, as in both cases where CHS, or its current lawyers, requested national rates for litigation carried out in Florida and New Mexico, the complexity and national scope of Relators' claims justified engaging national specialists, and those specialists, like CHS's lawyers, should properly be reimbursed at national hourly rates that are equivalent to, or lower than, the rates previously sought by CHS or its lawyers in other litigation.

For all of these reasons, the Court should determine that the hourly rates sought by Relators' national counsel are reasonable.

**b. Relators' counsel performed a reasonable and necessary amount of work representing Relators in this matter.**

Once the Court establishes reasonable hourly rates for the prevailing party's counsel, the second part of the lodestar calculation requires determining the number of hours reasonably expended. *Isabel*, 404 F.3d at 415. To establish that the hours expended were reasonable, the prevailing party must submit documentation "of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984), *see also Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991) ("Plaintiff has the burden of providing for the court's perusal a particularized billing record."). However, the Sixth Circuit has emphasized that these records need not record in great detail each minute the attorney spent on an item. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008). Once the prevailing party provides such records, the burden shifts to the opposing party to show that particular entries should not be compensated. *Perotti*, 935 F.2d at 764.

25

Here, Relators' counsel have submitted detailed records for all 8,164.50 hours worked, demonstrating that these hours were reasonably expended. Specifically, BJMG's billing records are attached to Mr. Garrison's declarations; G&E's billing records are attached to Ms. Buschner's declaration and Mr. Berger's declaration; CMST's billing records are attached to Mr. Pierson's declaration; and J&H's billing records are attached to Mr. Dean's declaration. (*See* Dkt. 89, Ex. C to Buschner Decl.; Dkt. 91, Ex. A to Dean Decl.; Dkt. 88, Ex. A to Garrison 2014 Decl.; Ex. A to contemporaneously-filed Berger Decl.; Ex. B to contemporaneously-filed Pierson Decl.; Ex. A to contemporaneously-filed Garrison 2015 Decl.).

In addition to Relators' detailed billing reports, Relators have also submitted the declarations of Traci L. Buschner, David W. Garrison, and Arthur R. Miller, which provide a summary of the significant tasks performed by Relators' counsel during this litigation. (Dkt. 89, Buschner Decl. at ¶¶ 9-14; Dkt. 92, Miller Decl. at ¶¶ 22-28; Dkt. 88, Garrison 2014 Decl. at ¶ 5). Combined, these declarations and Relators' counsel's billing records amply demonstrate that the amount of work performed by Relators' counsel during the course of this litigation was both reasonable and necessary. (*See* Miller Decl. at ¶ 21 ("Relators' application for this fee is eminently reasonable and should be approved by this Court.")). Moreover, pursuant to the Sixth Circuit precedent described above, Relators' production of such records places the burden on Defendants to show that particular hours billed by Relators' counsel should not be compensated. *See Perotti*, 935 F.2d at 764.

Furthermore, Relators' counsel performed the lion's share of the work they performed in this litigation in coordination with and at the direction of the U.S. Department of Justice. (*See* Dkt. 89, Buschner Decl. at ¶¶ 7-12; Dkt. 88, Garrison 2014 Decl. at ¶ 5). This work included conducting a document review of thousands of pages of documents, drafting factual and legal

memoranda, preparing government attorneys for interviews and depositions, and assisting the Government in conducting a national audit. These tasks were integral to the Government's successful investigation of the Defendants, and ultimately led to the settlement of the nationwide claims alleged by Relators for more than $88 million.

Frank W. Hunger, the Assistant Attorney General over the Civil Division of the U.S. Department of Justice in the Clinton Administration, explained in his declaration that such "a public-private partnership between the federal government, whistleblowers, and their counsel is a critical component in ensuring that the False Claims Act is enforced." (*See* Dkt. 94, Hunger Decl. at ¶ 7). Indeed, Mr. Hunger testified that this type of work is "exactly the type of collaborative work that is integral to the Department of Justice's successful pursuit of healthcare fraud." (*Id.* at ¶¶ 8, 9). While Mr. Hunger is currently engaged in private practice, he supervised the False Claims Act section of the Department of Justice from 1993 to 1999. (*Id.* at ¶ 2).

Most of the remainder of Relators' counsel's hours were incurred since settling the case last year, defending against CHS's arguments that the False Claims Act's "first to file" and "public disclosure" rules barred them from receiving any fees at all for their work in the case. CHS was *not* challenging the reasonableness of Relators' fees; rather, CHS was making "jurisdictional" arguments that would typically be raised on a motion to dismiss, and resolved long before any fee petition was ripe. The Court rejected Defendants' attempt to shoehorn these arguments into the settlement agreement, finding that "the Settlement Agreement reserved Plaintiff's entitlement to fees and did not preserve any challenge based upon either the first-to-file rule or the public disclosure bar." (Dkt. 185 at 14-15).

Defendants' attempt to escape their obligations under the settlement agreement cost a year of time and hundreds of hours by Relators. Moreover, while Defendants may attempt to

argue that the fees sought by Relators for the last year of litigation are excessive, it should be noted that the work performed over the last year was not limited to Relators' petitioning the Court for fees but was also spent litigating the above-referenced jurisdictional issues that Relators should never have been required to litigate post-settlement.

### c. Relators are not seeking an award of fees, costs, or expenses for time spent in mediation and in settlement negotiations.

Relators have exercised sound billing judgment by significantly limiting the type of work for which they are now seeking an award of fees, costs, and expenses. Specifically, Relators' Counsel spent hundreds of hours working with the Government and with other relators informally and in formal mediation to resolve issues concerning the allocation of the government's share among all of the relators, as well as participating in settlement negotiations, for which they are not seeking reimbursement.

Relators have also limited the amount of fees, costs, and expenses they seek by only seeking fees, costs, and expenses through July 20, 2015 (the date of the Court's hearing on Defendants' jurisdictional challenges) and by applying 2014 hourly rates to their lodestar calculations, rather than higher, 2015 hourly rates.

Relators' counsel have carefully reviewed and revised their time records at the time of their entry and in preparing for this Motion, in the exercise of sound business judgment, to ensure that they only charge for reasonable and necessary work and expenses.

### d. There are no facts in this case justifying a reduction of lodestar.

The strong presumption in this circuit is that parties entitled to a fee recovery recover their full lodestar amount. In *Isabel v. City of Memphis*, for example, the court noted that "a reduction in attorney fees is to be applied only in rare and exceptional cases where specific evidence in the record requires it." 404 F.3d at 416; *see also*, *Adcock-Ladd*, 227 F.3d at 350

("Generally, a 'strong presumption' favors the prevailing lawyer's entitlement to his lodestar fee.").

Rare and exceptional cases typically arise when the prevailing party wins only nominal relief relative to what was sought. The Sixth Circuit has emphasized, however, that "a court should not reduce attorney fees based on a simple ratio of successful claims to claims raised." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996). This holding is consistent with the Supreme Court's statement that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

Here, Relators received the relief they sought by obtaining approximately $88 million for the United States Government. Accordingly, Relators are entitled to recover their full lodestar amount. *Id.* ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.").

### III.    Relators are entitled to an award for costs/expenses totaling $66,682.20.

In addition to reasonable attorneys' fees, the Relators are also entitled to recover reasonable costs and expenses from the Defendants of $66,682.20 (representing expenses incurred by all four law firms) pursuant to 31 U.S.C. § 3730(d)(1). Recoverable expenses under the False Claims Act include "those reasonable out-of-pocket expenses incurred by attorneys and normally charged to their [fee-paying] clients," including "expenses for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, facsimiles, and

29

courier services[.]" *United States ex rel. LeFan v. Gen. Elec. Co.*, No. 4:00-cv-222, 2008 WL 152091, at *6 (W.D. Ky. Jan. 15, 2008) (citations omitted).[14]

Buschner Decl. Exhibit C; Berger Decl. Exhibit A; Pierson Decl. Exhibit B; Garrison 2014 Decl. Exhibit A; Garrison 2015 Decl. Exhibit A; and Dean Decl. Exhibit A itemize the quite reasonable costs and expenses incurred by Relators' counsel during the course of this litigation. Relators' expenses and costs are of the type attorneys would normally charge their fee-paying clients, and can be categorized as court fees, photocopying, telephone charges, legal research, postage/courier, travel (including food, transportation, and lodging), and investigators. They were incidental and necessary to furnishing effective and competent representation, including counsel's meetings with Relators, counsel's and Relators' meetings with the Government, legal research, and factual investigation. Relators are accordingly entitled to receive them from CHS under 31 U.S.C. § 3730(d)(1), as well as 28 U.S.C. § 1920.

## CONCLUSION

For the reasons stated above, Relators are entitled to an award of reasonable attorney's fees totaling $3,683,685.50 and litigation costs and expenses totaling $66,682.50. Thus, Relators respectfully request that the Court grant Relators' Renewed and Supplemental Motion for an Award of Attorney's Fees, Costs, and Expenses.

Date: October 1, 2015                    Respectfully submitted,

                                         /s/ David W. Garrison
                                         David W. Garrison
                                         Scott P. Tift
                                         **BARRETT JOHNSTON**
                                              **MARTIN & GARRISON, LLC**

---

[14]      *See also* Fed. R. Civ. Proc. 54(d)(1) (providing that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party"); 28 U.S.C. § 1920 (detailing the type of costs that may be taxed).

30

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2202
Fax: (615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

Daniel L. Berger
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
dberger@gelaw.com

Mary S. Thomas
Jennifer A. Williams
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mthomas@gelaw.com
jwilliams@gelaw.com

Kit A. Pierson
David A. Young
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 4084699
kpierson@cohenmilstein.com
dyoung@cohenmilstein.com

*Attorneys for Relators*

31

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 1, 2015, a copy of the foregoing *Relators' Memorandum in Support of Relators' Renewed and Supplemental Motion for Award of Attorneys' Fees, Costs, and Expenses* was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to the counsel of record listed below.

Michael L. Waldman
Richard A. Sauber
Robbins Russell Englert Orseck & Untereiner
1801 K Street NW, Suite 411L
Washington, DC 20006

John R. Jacobson
William M. Outhier
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203

Mark H. Wildasin
Office of the United States Attorney
Middle District of Tennessee
110 Ninth Avenue, S
Suite A961
Nashville, TN 37203

/s/ David W. Garrison
**DAVID W. GARRISON**
**BARRETT JOHNSTON**
       **MARTIN & GARRISON, LLC**