## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES DOGHRAMJI, SHERRE COOK, and RACHEL BRYANT, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 3:11-cv-0442 |
| v. | ) ) ) | |
| COMMUNITY HEALTH SYSTEMS INC., *et al.,* | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) ) | |
| UNITED STATES OF AMERICA and STATE OF TEXAS *ex rel.* AMY COOK-RESKA, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 3:14-cv-2160 |
| v. | ) ) ) | |
| COMMUNITY HEALTH SYSTEMS INC., *et al.,* | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) ) | |
| UNITED STATES OF AMERICA *ex rel.* NANCY REUILLE, | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 3:15-cv-0110 |
| v. | ) ) ) | |
| COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES, CORP., *et al.,* | ) ) ) | |
| Defendants. | ) ) ) | |

UNITED STATES OF AMERICA *ex rel.*          )
KATHLEEN A. BRYANT,                         )
                                            )
             Plaintiffs,                    )
                                            )          Case No. 3:14-cv-2195
             v.                             )
                                            )
COMMUNITY HEALTH SYSTEMS, INC., *et al.*,   )
                                            )
             Defendants.                    )

**To:  The Honorable Marvin E. Aspen, United States District Judge**

**R E P O R T   A N D   R E C O M M E N D A T I O N**

On August 6, 2015, former Chief Judge Kevin H. Sharp entered an order holding that none

of the various claims for attorneys' fees asserted by the relator plaintiffs (the "Plaintiffs" or the

"Relators") in the above-captioned cases[1] were precluded by the so-called "first-to-file" or "public

disclosure" challenges under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq. See* Docket

Entry ("DE") 185.[2] Defendants Community Health Systems, Inc. and many of its subsidiaries

---

[1] The four cases that were consolidated for purposes of the attorneys' fee dispute are *United States of America ex rel. Doghramji v. Community Health Systems, et al.,* Case No. 3:11-0442 (hereinafter referred to as the "*Doghramji* case" or "Case 3:11-0442"); *United States of America and State of Texas ex rel. Cook-Reska v. Community Health Systems, Inc., et al.,* Case No. 3:14-2160 (hereinafter referred to as the "*Cook-Reska* case" or "Case 3:14-2160"); *United States of America ex rel. Nancy Reuille v. Community Health Systems Professional Services, Corp., et al.,* Case No. 3:15-0110 (hereinafter referred to as the "*Reuille* case" or "Case 3:15-0110"); and *United States of America ex rel. Kathleen Bryant v. Community Health Systems Professional Services, Corp., et al.,* Case No. 3:14-2195 (hereinafter referred to as the "*Bryant* case" or "Case 3:14-2195"). Unless otherwise noted, all docket entries referenced in this memorandum will refer to 3:11-0442. Docket entries from the other two cases will be referenced by the case name and the corresponding docket entry (e.g. *Cook-Reska* case, DE 1 or Case 3:15-0110, DE 1).

[2] Following Judge Sharp's ruling in August of 2015, CHS stipulated to the reasonableness of an agreed-upon fee amount in the *Doghramji* case (DE 214) and the *Bryant* case (*Bryan*t, DE 69). As part of the stipulations, the Relators in those cases agreed to final judgments that permitted CHS to appeal to the Sixth Circuit the issue of the Relators' eligibility for fees. CHS subsequently sought deconsolidation of the *Doghramji* case (DE 215), which was granted on November 6, 2015 (DE 218, 219), and then proceeded with its appeal in that case. The *Bryant* case

(collectively "CHS") appealed. The Sixth Circuit ultimately reversed this Court's determination and remanded for further proceedings.[3]

On remand this case was referred to the undersigned Magistrate Judge to conduct an evidentiary hearing to determine the meaning of "Term 8," a provision in the Settlement Agreement entered into by the parties pertaining to the scope of CHS's ability to challenge any claims for attorneys' fees filed by the Relators post-settlement. DE 257 at 2. Accordingly, an evidentiary hearing was held on June 27 and 28, 2017, at which all parties were represented by counsel. *See* DE 273, 274. The parties filed post-hearing briefs that have been considered by the Court. *See* DE 276, 277, 279, and 280.

Before explicating the meaning of Term 8, the Court pauses to echo (and paraphrase) the Sixth Circuit's observations of disputed contract language representative of poor drafting on a par with that found in the instant case:

> That [the parties] now ardently argue for two opposing interpretations of the contract language, however, belies the notion that they shared any common assumptions about the contract's meaning. Regardless, the parties now rely on this court to resolve the dispute between them and [the Court is] placed at a disadvantage in so doing because of the … lack of clarity. The parties' sloppy drafting may represent carelessness or an attempt by each side to disguise its own intentions and evade hard negotiation. In either case, [the parties are urged] to take far more care in drafting future [settlement agreements], to avoid expensive litigation and unnecessarily consuming this court's resources.

*Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 424 (6th Cir. 2008).

For the reasons that follow, the undersigned Magistrate Judge concludes that the meaning of

---

was also deconsolidated (*Bryant* case at DE 70), and CHS separately appealed the final order entered in that case (*Bryant* case at DE 71). Upon CHS's motion to the Sixth Circuit, the *Bryant* appeal was remanded for further proceedings consistent with the decision in *Doghramji*. *Bryant* case at DE 78 and 79. By order of this Court entered on February 1, 2017 (DE 247), following remand, all four cases, *Doghramji, Cook-Reska*, *Reuille*, and *Bryant* were joined for hearing and resolution of the remanded attorneys' fee dispute.

[3] The parameters of the Sixth Circuit's directive are discussed in more detail below.

Term 8 must be supplied by the Court, as there was no mutuality of assent among the parties. The undersigned Magistrate Judge therefore respectfully recommends that Term 8 be construed to preserve only CHS's right to challenge the reasonableness (and not recoverability) of the Relators' attorneys' fees.

## I. INTRODUCTION AND BACKGROUND

Plaintiffs are seven separate relators who filed *qui tam* actions against CHS in various federal courts between 2009 and 2011 for several alleged violations of the FCA.[4] At the request of the United States (the "Government"), all of the Relators worked collaboratively with the Government and with each other. On August 4, 2014, Relators, CHS, and the Government filed a notice that the parties had entered into a global settlement agreement ("Settlement Agreement") that resolved all seven of these actions, which involved two types of claims against CHS: (1) one concerning "Medically Unnecessary Emergency Department Admissions" ("national ED claim"); and (2) claims that one of the CHS subsidiary hospitals in Laredo, Texas had improperly billed for inpatient procedures and engaged in improper financial relationships ("Laredo claims"). *See* DE 75, 184; *Cook-Reska*, DE 64. Pursuant to the Settlement Agreement, CHS paid the Government $88,257,500 for the national ED claim and $9,000,000 for the Laredo claims in exchange for the dismissal of all claims against it. DE 75-1 at 7-8; DE 184 at 3.

---

[4] Four of the seven *qui tam* complaints involved Relators Scott Plantz, Nancy Reuille, Amy Cook-Reska, and Kathleen Bryant (the "Non-Tennessee Relators"), who, as discussed in the procedural history below, filed complaints under seal between 2009 and 2011 in Illinois, Indiana, and Texas. DE 276-1 at 2. Two other Relators, Brian Carnithan and Thomas Mason, filed separate complaints in April of 2011. *Id.* Mason has settled his attorney fee dispute with CHS and Carnithan is currently litigating his attorney fee dispute in Illinois. *Id.*; DE 274 at 28. In May of 2011, the other three relators, which included James Doghramji, Sheree Cook, and Rachel Bryant (the "Tennessee Relators"), filed suit in the Middle District of Tennessee after meeting with representatives from the Government between February and April of 2011. DE 276-1 at 2.

In the *Doghramji* appeal, the Sixth Circuit summarized the procedural aspects pertinent to the instant dispute as follows:

> This FCA case involves seven different *qui tam* complaints, all of which alleged that CHS defrauded the Government by admitting Medicare patients for medically-unnecessary emergency room visits. The first four complaints were filed under seal between 2009 and 2011 in Illinois, Indiana, and Texas. In early 2011, the Government first told the relators in these four cases of the similarities among their *qui tam* suits, which had "triggered a nationwide investigation on the part of the U.S." The Government encouraged these relators "to work together on the cases and share any proceeds that might result." At the Government's request, these relators then reached a sharing agreement in April 2011.
>
> Appellees are three relators who were not involved in the original four cases. Appellees met with officials from the U.S. Department of Justice in Washington, D.C., U.S. Attorney's Office for the Eastern District of Pennsylvania, and U.S. Attorney's Office for the Middle District of Tennessee between February 2011 and April 2011. They disclosed the results of their investigation, begun in October 2010, which included "an original, robust statistical analysis of CHS admission practices" and an "extensive factual investigation." Their statistical analysis covered 74 different hospitals. To develop the facts of CHS's alleged fraud, they "contacted approximately 100 current and former doctors and nurses at approximately 20 CHS facilities in nine states."
>
> In May 2011, these three relators (hereinafter Tennessee Relators) filed suit under seal in the Middle District of Tennessee. The Government then partially unsealed the four other *qui tam* complaints to the Tennessee Relators for their review and requested that they "actively participate in its investigation, which was led by the U.S. Attorney's Office in Nashville, on an on-going basis." Counsel for relators thereafter engaged in a "collaborative effort" involving "bi-monthly calls with the Government." "The Government lawyers mapped out the investigation and assigned work to all relators' counsel in an organized manner," with "the majority of the assignments [being] made without regard to the individual complaint." At the Government's request, from 2011 to 2014 the Tennessee Relators' counsel organized and analyzed thousands of documents produced by CHS, drafted letters and memoranda related to these documents, created lists of witnesses, drafted outlines for questioning witnesses, and conducted extensive legal and factual research. All told, they calculated their work on the case at nearly 7,000 billable hours.
>
> Three years later, in the spring of 2014, the Government informed relators of a "handshake" deal with CHS. Because CHS required that, as part of settlement, all of the *qui tam* complaints—now seven in total—be dismissed with prejudice, the Government urged the Tennessee Relators to join the original relators' sharing agreement. After private mediation in early May 2014, relators in all seven cases reached a sharing agreement.

The Government intervened in each of the relators' actions on July 24, 2014. The Government filed a notice of settlement on August 4, 2014, and the district court unsealed the case. The settlement agreement provided that the Government and the seven relators would dismiss their claims upon payment by CHS of $88 million. As provided in § 3730(d), the Government awarded 19 percent of the total recovery to the relators, or about $16.4 million. *See* 31 U.S. § 3730(d) ("If the Government proceeds with an action brought by a person under subsection (b), such person shall ... receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim...."). This sum was split among all the individual relators in the various cases according to the sharing agreement that relators had reached before the settlement was finalized. The Tennessee Relators collectively received a 14 percent share, or about $2.3 million.

Pursuant to the settlement agreement, the district court dismissed the claims in October 2014, but retained jurisdiction to decide "statutory attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)." Between October 2014 and January 2015, three district courts in Texas and Indiana transferred their cases to the Middle District of Tennessee for resolution of fee disputes. In February 2015, the court consolidated the fee disputes in the four cases before it. The court subsequently ordered the parties to brief "whether all or some of the relators are precluded from recovery of attorneys' fees and costs by the first-to-file rule provided in 31 U.S.C. § 3730(b)(5) and/or by the public disclosure bar."

CHS argued that Term 8 of the agreement preserved its right to make first-to-file and public-disclosure challenges. The relevant sentence in Term 8 reads as follows: "All Parties agree that nothing in this Paragraph or this Agreement shall be construed in any way to release, waive or otherwise affect the ability of CHS to challenge or object to Relators' claims for attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)." Tennessee Relators argued that the phrase "pursuant to 31 U.S.C. § 3730(d)" limited the scope of CHS's objections to those listed in that provision. Because first-to-file and public-disclosure challenges are located in § 3730(b)(5) and § 3730(e)(4) respectively, not § 3730(d), Tennessee Relators reasoned that CHS failed to preserve those challenges with the relevant language in Term 8.

After briefing and oral argument, the district court adopted relators' interpretation of the agreement. It observed that the Government's reservation of FCA challenges in Term 7 included specific statutory references:

> Defendants could easily have specified that they intended to raise a challenge to Plaintiffs' entitlement to fees under the first-to-file or public disclosure provisions, or, at a minimum, simply cited Section 3730(b)(5) and (e)(4), much like the Government reserved specific statutory rights and negotiated a carve-out for those provisions.

"Given the stakes," the court reasoned, "it is difficult to believe that failure to mention the FCA's first-to-file provision ... anywhere in the 16–page Settlement

Agreement was unintentional." Indeed, the court added, § 3730(d) is referenced "at least six times," but not once is "either the first-to-file rule or the public disclosure bar" so much as mentioned. This was telling, in the court's view, because "the fact remains that the government did proceed with all seven of the underlying cases[,] ... intervened in all, and settled each case," and under a "straight forward reading of [§ 3730(d) ]," the Government's conduct would entitle relators to attorneys' fees.

After the district court ruled that CHS had failed to preserve its right to make first-to-file and public-disclosure challenges, CHS and the Tennessee Relators jointly moved for a stipulated award of $2,650,000 in fees, which the court granted. CHS then appealed.

*United States v. Cmty. Health Sys., Inc. ("Doghramji")*, 666 F.App'x 410, 411–13 (6th Cir. 2016) (internal footnotes omitted); DE 223 at 4-7. Upon consideration of the parties' arguments, the Sixth Circuit found that CHS's position that the right to challenge the Relators' entitlement to attorneys' fees based on the first-to-file and public disclosure bars was preserved by the last sentence in Term 8 and the Relators' position that the last sentence restricted CHS to objections contained in § 3730(d) are both reasonable interpretations of the provision, thus rendering Term 8 ambiguous. *Doghramji*, 666 F. App'x at 418; DE 223 at 15. The Sixth Circuit therefore reversed this Court's determination of the scope of Term 8, and remanded the cases for resolution of this ambiguity by consideration of extrinsic evidence "to ascertain the parties' original understanding" of the Settlement Agreement. *Id.* Upon remand, the several related cases were joined and referred to the undersigned Magistrate Judge for purposes of a global determination of the interpretation of Term 8 of the Settlement Agreement. DE 257.

## II. STANDARD OF REVIEW

The scope of the Sixth Circuit's remand dictates this Court's analysis. As described by the Sixth Circuit, the appeal centered on "whether CHS failed to preserve its right to challenge the entitlement of the seven relators to attorneys' fees." *Doghramji*, 666 F.App'x at 411; DE 223 at 3. The specific language of the Sixth Circuit's remand encompasses "proceedings consistent with [its] opinion." *Doghramji*, 666 F.App'x at 418; DE 223 at 16. This language is consistent with a

7

general remand. *Owner-Operator Independent Drivers Assoc., Inc. v. Comerica Bank*, 562 F.App'x 312, 331-32 (6th Cir. 2014). The mandate rule is "a specific application of the law-of-the-case-doctrine" that limits the district court on remand from the court of appeals, *Scott v. Churchill,* 377 F.3d 565, 570 (6th Cir. 2004), and which directs that

> [u]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.' The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'

*United States v. Moored,* 38 F.3d 1419, 1421 (6th Cir.1994) (quoting *United States v. Kikumura,* 947 F.2d 72, 76 (3d Cir.1991)).

If a general remand, this Court has authority to address all matters as long as remaining consistent with the remand." *United States v. Campbell*, 158 F.3d 263, 265 (6th Cir. 1999) (citing *United States v. Moore,* 131 F.3d 595, 597–98 (6th Cir.1997)). In comparison, "[l]imited remands explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate." *Id.* Limited remands should be apparent from "unmistakable language," and "[i]n the absence of an explicit limitation, the remand order is presumptively a general one." *Owner-Operator Independent Drivers Assoc.*, 562 F.App'x at 331 (internal citations omitted).

Here, the Sixth Circuit's mandate references its disposition in *Doghramji,* which states: "For the foregoing reasons, we affirm in part and reverse in part the district court's judgment and remand for further proceedings consistent with this opinion." *Doghramji*, 666 F.App'x at 418; DE 236. Although the issue discussed by the Sixth Circuit in *Doghramji* focused on ascertaining the parties' original understanding of the terms of the Settlement Agreement, the remand language imposes no limit on the issues for review and establishes no particular procedure for this Court to

8

follow. Additionally, the remand "for further proceedings consistent with this opinion" is the same language that the Sixth Circuit has deemed a general remand. *Owner-Operator Indep. Drivers*, 562 F. App'x at 332 (citing *United States v. Lopez,* 453 F. App'x 602, 604 (6th Cir.2011). The Court thus treats this as a general remand.

To resolve an ambiguity in a contract, the court looks to extrinsic evidence from which presumptions may be made and inferences drawn. *In re AmTrust Financial Corp.*, 694 F.3d 741, 750 (6th Cir. 2012) (citations omitted). When the contract in dispute is an agreement settling claims arising under federal law, the court looks to federal common law principles for resolution. *Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir. 2003) (federal common law controls the validity of a release of a federal cause of action); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1989) (same). *See also Huffer v. Herman*, 168 F.Supp.2d 815, 823-24 (S.D. Ohio 2001) (in case arising under federal law, federal common principles determine whether a valid settlement agreement exists).

## III.    DISCUSSION

### A.    Jurisdiction

Under the general mandate, the Court finds no impediment to addressing the jurisdictional arguments raised separately by CHS and by Relator Kathleen Bryant. *See Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (court must address questions pertaining to its jurisdiction before proceeding to the merits). On remand, CHS revives their argument that the first-to-file and public disclosure bars are jurisdictional limits on recovery and therefore cannot be waived by any language in the Settlement Agreement. DE 276 at 9, 23-25. This position is, however, irreconcilable with the Sixth Circuit's findings, which include the following:

> The first sentence in Term 8 effectuates a broad waiver of CHS's ability to raise "any and all manner of claims, controversies, actions, [and] causes of actions ...

arising out of agreement or imposed by statute." The second sentence in Term 8 then limits the scope of that waiver by providing that CHS reserves the right to "challenge or object to Relators' claims for attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)." The Tennessee Relators claim entitlement to attorneys' fees pursuant to § 3730(d) in Recital G of the settlement agreement. CHS's attempts to challenge the Tennessee Relators' entitlement to attorneys' fees under the first-to-file and public disclosure rules are therefore "claims, controversies, actions, [or] causes of action" that "aris[e] out of agreement or [are] imposed by statute." Accordingly, the first sentence in Term 8 operates to waive CHS's ability to challenge the Tennessee Relators' entitlement to attorneys' fees under the first-to-file and public disclosure rules *unless* the second sentence in Term 8 preserves CHS's ability to raise these challenges.

*Doghramji*, 666 F. App'x at 417 (emphasis in original). Although not expressly addressing the jurisdictional issues raised by CHS, the Sixth Circuit plainly describes the language of Term 8 as including a "broad waiver of rights, from which the last sentence of Term 8 is an exception." *Id*. This Court is constrained by the Sixth Circuit's determination that CHS waived any first-to-file and public disclosure objections to the Relators' fees, **unless** CHS can establish through extrinsic evidence that those challenges were preserved. *See also Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002) (citation omitted) (under law of the case doctrine, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation). The extent to which those challenges were properly preserved is addressed below.[5]

---

[5] The Court also notes that CHS's contention that it can assert post-settlement subject matter jurisdictional challenges to recovery of attorney's fees is problematic, at best, as even subject matter jurisdiction cannot be collaterally attacked. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153-54 (2009) (internal quotations omitted). CHS had the opportunity to contest the Court's subject matter jurisdiction as to any Relator on first-to-file or public disclosure grounds prior to entering into the Settlement Agreement. Arguably, any fee challenge made now based on lack of subject matter jurisdiction is an impermissible collateral attack. *Id*. (parties who had opportunity to challenge bankruptcy court's subject matter jurisdiction by objecting to settlement orders and order confirming plan of reorganization could not later collaterally attack bankruptcy court's jurisdiction by resisting enforcement of the orders on jurisdictional grounds).

Relator Kathleen Bryant[6] also reasserts her position that this Court is without jurisdiction to litigate fee eligibility defenses because such jurisdiction was not retained through the court orders entered in the *Bryant* matter. *See* DE 277 at n.5. Bryant's appeal to the Sixth Circuit proceeded separately from other Relators, and included an argument that the jurisdictional issues were not resolved in the *Doghramji* appeal. The Sixth Circuit declined to consider the jurisdictional issues, however, and instead remanded Bryant's appeal for further proceedings in accordance with the decision in *Doghramji*. *See* Case No. 3:14-02195 at Docket No. 78.

Bryant's arguments were already thoroughly and soundly addressed in the Court's memorandum opinion entered on August 6, 2015. *See* DE 184.[7] The Court finds Bryant's arguments no more persuasive than when first asserted. In arguing against jurisdiction, Bryant relies primarily upon the Supreme Court's decision *in Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), and the Sixth Circuit's application of that decision in *Caudill v. No. Am. Media Corp.*, 200 F.3d 914 (6th Cir. 2000) and *McAlpin v. Lexington 76 Auto Truck Stop*, 229 F.3d 491 (6th Cir. 2000). *See* DE 277 at n.5 (adopting arguments made in DE 151 and 153). All three cases, however, present factual scenarios inapposite to those presented here, because in each case no express jurisdiction over enforcement of the settlement agreement was retained by the district court.[8]

---

[6] Unless otherwise noted, all following references to "Relator Bryant" or "Bryant" are to Relator Kathleen Bryant. The Court makes this clarification because another relator, Rachel Bryant, is also a party to this litigation.

[7] The Court recognizes that this memorandum opinion was vacated by the Sixth Circuit in the *Doghramji* appeal. However, as stated, these jurisdictional issues were not directly addressed in the *Doghramji* ruling, and the prior memorandum opinion was vacated on other grounds. Because the Court concurs with the prior analysis of the jurisdictional issues, the conclusions reached are adopted and restated here.

[8] Because the cases are entirely distinguishable, the Court declines to consume any substantial part of this Report and Recommendation in discussing the merits of those cases. Simply, in *Kokkonen* the stipulation and order of dismissal did not even reference the settlement agreement much less reserve jurisdiction (511 U.S. at 377), in *Caudill* the dismissal order

In contrast, the order of dismissal in Bryant's case expressly retained jurisdiction in federal district court over her request for attorney's fees. Judge Werlein of the Southern District of Texas entered an order of dismissal in Bryant's original case, pursuant to Rule 41(a)(1)(A) of the Federal Rules of Civil Procedure, which specifically stated that "[t]he Court will retain jurisdiction … to adjudicate Relator's claims … for statutory attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)." Case No. 3:14-02195, DE 41 at 2. Bryant's request for attorney's fees was later transferred to the Middle District of Tennessee by an order of partial transfer from the Southern District of Texas. Case No. 3:14-02195, DE 49 at 3.[9] These orders plainly retained jurisdiction over post-settlement fee disputes, and for that reason, Bryant's jurisdictional arguments fail.

## B. Review of the extrinsic evidence.

As noted by the Sixth Circuit, the amount of weight to accord extrinsic evidence is a question of fact that must be determined by the trier of fact. *Doghramji*, 666 F. App'x at 418 (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 816 (6th Cir. 2007)). In reviewing the extrinsic evidence, the Court must avoid giving weight to a party's subjective intent:

> [T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention. … When a party is thus held to a meaning of which he had reason to know, it is sometimes said that the "objective" meaning of his language or other conduct prevails over his "subjective" meaning. Even so, the

---

referenced but failed to incorporate the settlement agreement (200 F.3d at 915 and 917), and in *McAlpin* the dismissal order incorporated only one inapplicable term from the settlement agreement (229 F.3d at 502).

[9] Here, the language in the Settlement Agreement specifically contemplated that this Court, if necessary, could construe and apply the provisions of the Settlement Agreement, by providing that "[t]he exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Middle District of Tennessee, Nashville Division[.]" (DE 75-1 at 16). That choice-of-forum clause specifically excepted "any disputes between CHS and any particular relator arising from that relator's request for attorneys' fees pursuant to 31 U.S.C. § 3730(d) or any claims Relators have under 31 U.S.C. § 3730(h)" (*id.*), apparently because all but one of these actions were then pending in other federal district courts. However, as discussed in more detail below, following approval of the Settlement Agreement, CHS moved to transfer venue of various fee disputes to this district.

> operative meaning is found in the transaction and its context rather than in the law or in the usages of people other than the parties.

Restatement (Second) of Contracts § 212, cmt. a. *See Street v. J.C. Bradford & Co.*, 886 F.2d at 1481 (federal common law, at a minimum, adopts the standards of the Restatement Second of Contracts). The Court thus turns to the question of the parties' understanding of the scope of challenges to attorneys' fees preserved by Term 8. In connection with the evidentiary hearing, at which multiple attorneys testified as witnesses, the parties submitted a total of 144 joint exhibits. *See* DE 269-70.[10]

After considering this extrinsic evidence, and the post-hearing filings, the Court finds that the parties on both sides of this litigation knew or had reason to know that the other likely had a different interpretation of Term 8. For apparently strategic reasons, both CHS and the Relators decided not to directly address the impact of those incongruent understandings. Because there was nothing more than a mirage of mutual assent to Term 8, the Court finds the parties did not agree to that term. The Court may therefore appropriately supply a meaning to Term 8. A reasonable meaning under all of the circumstances is that CHS waived its right to challenge the Relators' entitlement to attorneys' fees, which limits available objections to reasonableness only under § 3730(d).

### 1. Extrinsic evidence of circumstances leading up to final Settlement Agreement.

The conclusion that there is no mutual assent to Term 8 finds substantial support in the email exchanges that took place among counsel for the Relators, CHS, and the Government over the course of several months prior to the notice of settlement filing on August 4, 2014. As an initial

---

[10] The joint exhibits are referenced by the abbreviation "JEX" followed by the corresponding exhibit number and, where appropriate, the last non-zero digits of the corresponding Bates stamp number at the lower right corner of each page.

matter, the Court notes that, under the FCA, once the Government elects to intervene in a *qui tam* action, it is the Government that controls litigation on behalf of the relators:

> If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).
> ...
> The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

31 U.S.C. § 3730(c)(1)-(2). Further, as noted during the evidentiary hearing, once the Government decides to intervene, the Government "takes over the action as the plaintiff." DE 273 at 29. Although the Government did not officially intervene in the various cases until July of 2014 following execution of the Settlement Agreement, the Government undisputedly took the lead role in negotiating the terms of the final Settlement Agreement beginning in early March of 2014.

The parties were also operating under a court-imposed deadline in finalizing the Settlement Agreement, an important contextual fact about which there is no dispute. Under the FCA, complaints filed by relators are kept under seal for at least 60 days, which is meant to allow the government time to decide whether to intervene in the action. 31 U.S.C. § 3730(b). The government may, for good cause, move for extensions beyond this 60-day window, during which time the complaint remains under seal. Here, however, the district court where Relator Scott Plantz filed his complaint apparently notified the parties that there would be no extensions beyond July 14, 2014, at which point the Plantz complaint would be unsealed and become public. DE 274 at 191; JEX 62 at 335. All parties therefore treated July 14, 2014 (the "Plantz deadline") as the operative deadline to finalize a settlement.

On March 7, 2014, then Assistant U.S. Attorney ("AUSA") John-David Thomas and Richard Sauber, one of the attorneys for CHS, reached a "handshake deal" that informally resolved all claims against CHS. JEX 3.[11] From the outset of this handshake deal, CHS considered indispensable the condition that any global settlement include "dismissal with prejudice by each relator as it applies to them individually." *Id.* At the time, AUSA Thomas advised that any agreement to this expected requirement "may depend upon how CHS approaches the attorney fee issue." *Id.*

Four days later, Robert McAuliffe, another attorney for the Government, sent a draft of a proposed settlement agreement to CHS's attorneys. JEX 4. This draft included the following placeholder language, which appears to represent an implicit request that counsel for CHS prepare language for the settlement agreement addressing CHS's position regarding relator attorney's fees: "[**IF APPLICABLE**: Insert logistics relating to CHS's payment to Relators for expenses, and attorneys' fees and costs]." *Id.* at 33 (emphasis in original). Recital G, which the Sixth Circuit found favorable to the Relators' interpretation of Term 8 due to CHS's failure to respond, was also included in this initial draft, though identified as Recital F: "Relators claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relators' reasonable expenses, attorneys' fees and costs." JEX 4 at 32.

Sauber responded to the Government on March 13 with a revised version of the settlement agreement that did not alter or remove the placeholder language from the initial draft. *See* JEX 5. Nor did CHS's proposed revisions address the Relators' recited claims of entitlement to attorneys' fees. *Id.* Sauber's version did, however, add a paragraph ("Term 10") requiring the Relators to "release CHS ... from any liability to Relators arising from the filing of the Civil Action, or under

---

[11] The parameters of this agreement are not identified in the exhibit.

31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs." JEX 5 at 62-63.[12] On March 17, another attorney for CHS, Michael Waldman, sent an email to the Government's attorney, McAuliffe, requesting copies of the sealed complaints filed by each of the Relators in this case, which Waldman said would "allow [CHS] to work through some of the first-to-file issues." JEX 6. No further explanation of the substance or timing of the anticipated first-to-file issues was given.

The Government accepted the insertion of Term 10 in the draft settlement agreement on March 20, but advised CHS that any release of claims for attorneys' fees would have to be negotiated directly with the Relators. JEX 8. On April 21, the Government, via attorney Melissa Handrigan, emailed a copy of the revised settlement agreement, which included Term 10, to counsel for each of the Relators. JEX 16. This group included Reuben Guttman, Traci Buschner, and David Young (counsel for the Tennessee Relators), Mitch Kreindler (counsel for Kathleen Bryant), Matthew Organ (counsel for Scott Plantz and Nancy Reuille), Jan Soifer and Patrick O'Connell (counsel for Amy Cook-Reska and Nancy Reuille), Mark Raspanti (counsel for Thomas Mason), and Ronald Osman (counsel for Brian Carnithan). *Id.*; DE 276-1 at 2. *See* Appendix.[13] The Government requested "comments" from the Relators' counsel regarding the provisions in the draft settlement agreement and imposed a deadline of May 9 for the Relators to reach a sharing agreement delineating the manner in which they planned to distribute the statutory relator's share among the group. JEX 16 at 339.

---

[12] This was in addition to a more general release found in Term 5 of the proposed settlement agreement. JEX 8 at 83.

[13] Docket Entry 276-1 is an appendix attached to Defendants' post-hearing brief that lists the names of each Relator and their respective legal representatives. *See* DE 276-1. With names of a few additional counsel, the Court finds that the appendix accurately identifies the relevant participants in this dispute. The Court therefore utilizes the appendix for ease of reference, by attachment hereto and incorporation by reference as if set out fully herein.

The Relators discussed the proposed agreement over the next several days. On April 25, Osman suggested that CHS and the Government insert a "carve out" provision if the parties could not come to an agreement over fees, ostensibly meaning that the issue of attorneys' fees would be addressed after the parties had executed a settlement agreement. JEX 17 at 367 and 370. Osman also commented that if the attorneys' fees were not resolved in the settlement, litigation would need to occur in the district where each complaint was filed. JEX 17 at 375.[14]

Raspanti similarly referenced an attorneys' fees carve out provision, noting that "due to the scope of the Relators' release in Paragraph 5," which released CHS from any liability under the FCA subject to CHS's payment of the agreed settlement amount ("Term 5"), the Relators would need "an agreement on attorneys' fees or the usual carve out language if attorneys' fees and costs are not resolved before the execution of the final agreement." JEX 18 at 25. Soifer and O'Connell appear to have agreed with this opinion (*see* JEX 18, 19), while Kreindler proposed that Terms 5 and 10 be combined in an effort to "prevent [the Government] from separating the issue of attorneys' fees from the settlement by making clear that they are a single issue." JEX 21. Organ drafted a revised version that included Kreindler's proposal and submitted it to the Government on April 29. JEX 24 at 88 and 91. This version of the settlement agreement still included the placeholder (now renumbered as Term 3) for a description of the logistics for payment of attorneys' fees to the Relators. *Id.* at 87. In his accompanying email to the Government, Organ made clear that the suggested revisions "assume that we are able to successfully resolve the issues raised in our April 9, 2014 letter to you, including Relators' claims for attorneys' fees." *Id.* at 81.[15]

---

[14] Given the inclusion of the Relators' recital of entitlement to attorneys' fees under § 3730(d), the discussions at this time among the Relators and the Government about carving out fees are clearly referring to reasonableness objections only.

[15] The Relators' April 9 letter does not appear to have been offered as an exhibit to the evidentiary hearing.

On May 7, the Government, acting as an intermediary between the Relators and CHS for finalization of the settlement, advised the Relators that CHS had requested fees information from any Relator that planned to file an application for attorney's fees. JEX 26. This May 7 email from the Government's counsel to the Relators' attorneys identified Waldman and Sauber as the individuals to whom such information should be sent. *Id.*

David Garrison, another attorney representing the Tennessee Relators, sent the first documented correspondence to counsel for CHS on May 9, in which he identified, and expressly claimed entitlement to, more than $3 million in attorney's fees and expenses under 31 U.S.C. § 3730(d). JEX 27 at 553. Counsel for other Relators followed suit with similar communications on May 12 (Organ), May 19 (O'Connell), and June 6 (Guttman and Kreindler). JEX 28, 38, 47, 48. Other Relators also specifically referred to the fees as incurred at the request of the Government and in "furtherance of claims for which CHS will be obtaining a release from [the Relators]." JEX 38 at 2. On May 13, Guttman also inquired about CHS's anticipated "time frame" for resolving the attorneys' fees claims, to which CHS's attorney, Waldman, responded on that same day: "[W]e don't have any deadlines, but the sooner CHS has the fee requests with backup the sooner it can respond and hopefully resolve." JEX 30 at 825.[16] Despite the clear statements by each group of Relators claiming entitlement to fees, CHS did not take this opportunity to state that it intended to contest all fees other than those of the first relator to file.

On May 14, the Government's attorney, Handrigan, circulated an updated draft of the proposed settlement agreement, which removed the Term 3 placeholder language for payment of the Relators' attorneys' fees, replacing it instead with language intended to "reflect that relator's

---

[16] In a separate correspondence, Waldman clarified that "backup" referred to "copies of time records and other back up that support your claims for fees and expenses." JEX 30 at 825. But, Waldman made no other clarification of CHS's contemplated objections to fees on eligibility grounds.

share and attorneys' fees will be addressed after the settlement agreement is executed[.]" JEX 31 at 394. The operative language, in Term 15, stated the following:

> (c) Provided, however, that the following claims shall not be dismissed, unless they are settled, adjudicated, or otherwise resolved, and any required consent by the United States is obtained, and the Courts are so informed:
>
> (1) Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)[.]

*Id*. at 410. Notably, this language is almost identical to the language that was ultimately included in the final Settlement Agreement, particularly the relevant portion of Term 8, the limiting phrase "pursuant to 31 U.S.C. § 3730(d)," at the crux of the Court's analysis. The May 14 draft of the settlement agreement also included the Relators' requested provision that their fee claims could be brought in the different jurisdictions where each case was filed. *Id*.[17]

On May 15, in response to the Government's "carve out" of the attorneys' fees issue, Organ emailed counsel for the other Relators to alert them that the Government was "concerned that [Relators] are taking too long to work out relator share and attorney fee issues, but that it is still possible that we get those all resolved if we keep moving." JEX 33 at 132. Organ contacted the other Relators' counsel again the following day to assure them, regarding the placeholder deletion, that "[i]t is my understanding that the provisions were pulled from the latest draft out of a concern that there is not enough time to resolve those issues – not because [the Government] and CHS are not still willing to address those issues." JEX 34 at 417. To that end, Organ encouraged all of the Relators to quickly finalize and execute the sharing agreement pertaining to the relator's share. *Id*.

There is little doubt that the Relators, even while contemplating a carve out of objections to reasonableness of attorneys' fees, recognized at least the possibility that CHS might make some

---

[17] CHS apparently ascribed a different meaning to this venue provision as well, as discussed below.

attempt to avoid paying all of Relators' attorneys' fees.[18] The Relators attempted to directly address this possibility. On May 29, Organ sent a revised draft settlement agreement with O'Connell and Soifer's proposed revisions, which included the following unnumbered term:

> In exchange for the releases described in Paragraph 6 below ... CHS agrees to pay to Relators their reasonable expenses, attorneys' fees and costs. Any disputes between CHS and any Relator regarding the reasonableness of that Relator's request for expenses, attorneys' fees and costs shall be brought in the United States District Court in which that Relator's action is pending.

JEX 43 at 486. And included "Term 6," which stated:

> Notwithstanding the releases given in paragraphs 2-5 ... of this Agreement, or any other term of this Agreement, the following claims of the United States and/or Relators are specifically reserved and are not released:
> ...
> Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d).

*Id*. at 489-90.

On June 2, the Government hosted a teleconference with counsel for the Relators to discuss, among other things, the proposed revisions, during which, according to a subsequent email from Buschner to Organ, the Government advised the Relators that the issue of attorneys' fees was beyond the Government's purview: "I think [then AUSA John-David Thomas] is right on the fee situation, no matter what [the Government] does it's probably not going to make a difference. Hopefully we will all get our fees." JEX 45 at 925. Two days later, Handrigan sent a revised draft of the settlement agreement to CHS with an accompanying email indicating that the Relators and

---

[18] For instance, during May of 2014, the Relators' counsel were discussing ways to approach relator's share language, specifically, concessions from the Government that would require the Government to "accept the relator's share allocations as agreed among the relators," and "not impose its own allocation," all of which would "make it more difficult for CHS to refuse to pay all of [the Relators'] attorneys' fees." JEX 40 at 446. Nevertheless, simply recognizing a possible outcome does not compel a finding that the Relators' interpretation fails. As discussed below, the Relators attempted to clarify the extent to which the possibility might become a reality; attempts that were deliberately rebuffed by CHS.

the Government had agreed to reserve the attorneys' fee issue until after the settlement agreement was executed: "With regard to share/[attorney's] fees, those issues were carved out of this agreement so we can move the settlement along quickly. They can be addressed in separate agreements with relators." JEX 46 at 830. The reservation of the attorneys' fees issues was in Term 16 of this revised draft, and additionally referenced in Term 17 relating to each party bearing its own costs. *Id*. at 847-48. The June 2 revised draft also included the exception to the forum selection clause for attorneys' fees disputes to be litigated in the district where each complaint was filed. *Id*. at 848. However, the Government's revised draft did not remove the previously unnumbered term, now identified as "Term 2," in which CHS "agree[d] to pay to Relators their reasonable expenses, attorneys' fees and costs." *Id*. at 837.

On June 9, CHS, via Waldman, responded to the Government with its own revisions. JEX 50 at 893. CHS's draft deleted the Relators' proposed Term 2 and included the version of Term 8 that is the subject of the current dispute. *Id*. at 897. The draft also retained reservation of the claims for fees pursuant to § 3730(d) (but now again in numbered Term 15 due to the deletion of Term 2) and made no change to either the carve-out now in Term 16 for fees awarded under § 3730(d) or the exception to the Middle District of Tennessee forum selection clause (now Term 18). *Id*. at 901-03. Waldman's accompanying email to the Government included a statement that CHS's proposed settlement agreement "makes clear that [] CHS is preserving its rights to object to the various relators' claims for attorneys['] fees[.]" *Id*. at 886. No other information was provided as to the grounds on which CHS contemplated such objections could be made. On June 10, the Government relayed CHS's proposals, including Waldman's comments regarding fees, to the Relators and recommended that, in light of the pending dispute as to attorneys' fees, the Relators reach out to CHS's attorneys directly to resolve the issue. JEX 53 at 292.

In response, Organ set up a conference call with the other Relators and the Government. *Id*. At the same time, Buschner sent an email to Organ indicating she would assent to CHS's revisions: "I'm okay with the agreement as is .... As to CHS not agreeing to pay us fees, I assumed that would be the case." JEX 54 at 929. Organ submitted a letter to Waldman that same day, in which Organ advised that his clients were "prepared to proceed with the [attorney's] fee petition process if necessary, [although] we hope the attached un-redacted time records will help move this negotiation forward and allow us to reach an amicable resolution on this issue." JEX 57 at 936. O'Connell also sent an email to Waldman on June 10, in which he clearly stated his Relator clients' intention to seek fees under § 3730(d), and offered to submit time records as an attempt to reach a resolution of any attorney's fees issues. JEX 58. Waldman responded that CHS agreed to the conditions for submission of the time records (JEX 59), but did not state that the issues in dispute included recoverability of fees. On June 20, Soifer sent an email to counsel for Relators Scott Plantz and Kathleen Bryant recounting a conversation with Waldman in which Waldman requested a different breakdown of fees, presumably because of first-to-file issues. JEX 60. Soifer relayed that she explained to Waldman "about the first four cases all working together at the behest of the DOJ, working on the national case" and that, for that reason, all of the Relators' attorneys "needed [their] fees paid," adding that "[i]t seemed clear he had no clue." *Id*.

These and ensuing communications further illustrate that each side knew or had reason to know of the other's likely intentions regarding the scope of any attorneys' fees litigation. On June 23, O'Connell emailed Handrigan with a bleak forecast following a June 20 telephone conversation with Waldman: "[I] am not optimistic that CHS will enter into agreement to pay fees before July 21. They are already making noises about claiming first-to-file challenges to fees ... So, the fees will have to be handled after the settlement." JEX 61 at 333. The following day, Organ

emailed Waldman and Sauber to convey objections to CHS's deletion of Term 2, arguing that "because the Government is intervening in Relators' cases, and Relators are dismissing their claims in their entirety, Relators are entitled to their reasonable expenses, attorneys' fees and costs." JEX 63 at 1206. Organ further advised Waldman and Sauber that if CHS was unwilling to resolve attorneys' fees and expenses as part of the settlement, "[Relators] will need to revisit the language in the settlement agreement, and prepare our petitions for attorneys' fees." *Id.*[19]    Later email exchanges, from June 25 through July 1, between CHS's counsel and these same attorneys confirmed that this particular group of Relators asserted their entitlement to attorneys' fees, which CHS continued to refer to as an open issue.  JEX 65, 66, 69, 70.

With the Plantz deadline imminent, Sauber confirmed to the Government on July 7 that CHS would "carve out ... the attorneys['] fees" language from the Settlement Agreement and provided a revised draft to that effect so that the parties could "push this through[.]" JEX 72, 73. The updated revisions included a change to Terms 3 and 15 to indicate that nothing in the settlement agreement would be construed to release "any claims Relators *may have* for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)[.]" JEX 73 at 1229, 1237 (emphasis added). But the exception language in Term 16 to the provision of each party's responsibility for its own costs remained unchanged:  "[e]xcept for Relators' rights pursuant to 31 U.S.C. § 3730(d)" (JEX 73 at 1237), as did the exception to the forum selection clause for attorneys' fees disputes (JEX 73 at 1260) and the last sentence of Term 8 (JEX 73 at 1232) with the language currently in dispute. The Government forwarded the updated settlement agreement to Organ and noted that these revisions "carv[ed] out the attorneys' fees" from the document. JEX 74 at 663.

---

[19] Only attorneys for Relators Nancy Reuille, Amy Cook-Reska and Scott Plantz were included in these email exchanges.

Multiple email exchanges took place over the next two days among the Relators in response to CHS's revisions. On July 8, counsel for Relators Bryant (Kreindler) and Mason (Raspanti) predicted that following execution of the settlement agreement by all parties, CHS would likely argue that at least five of the Relators' claims for attorneys' fees were barred. JEX 79. While they also concurred that a "settlement under all circumstances" includes attorneys' fees," there was no interest in holding up the settlement to "advance that view." *Id*. at 746 (internal quotation marks omitted). But both also asserted that the Relators were "at a minimum, entitled to know CHS's position on [attorneys'] fees before we sign off on the settlement." *Id*. Counsel for the Tennessee Relators (Buschner) replied that while the situation was "not ideal," it was common for attorneys' fees issues to be resolved after a settlement agreement was entered and advised that "it would be a disaster" if the presiding judge learned that settlement was being impeded by disagreements regarding fees. JEX 81 at 754.

Counsel for Relator Carnithan (Osman) suggested that the Relators refuse to sign the settlement agreement "until CHS commits to payment of attorneys['] fees for all Relators" *(id*.), and noted that the Government "certainly cannot settle the case in its present posture without our agreement." JEX 82 at 460.[20] In a separate email chain to only the Non-Tennessee Relators, Kreindler asked whether anybody was "uncomfortable signing off on [the carve out of attorneys' fees] without having a clearer picture of CHS's intent on attorneys' fees[.]" JEX 83 at 464. Organ responded the following day, July 9, as follows:

> I talked to [John-David Thomas] yesterday and shared our concerns about fees and relator share. He told me that CHS is absolutely going to fight about fees and won't agree to the language I proposed before.[21] Based on our very limited interaction

---

[20] Osman's email also included this prophetic statement: "[I] will not hold up the settlement for the rest of the Relators and attorneys but I reserve the right to say 'I told you so' when all of you spend the next 2 years fighting over your fees[.]" JEX 82 at 460.

[21] This apparently refers to the proposed language Organ added to (what became) Term 2 in which CHS "agrees to pay to Relators their reasonable expenses, attorneys' fees and costs."

with CHS's lawyers, that sounds right to me. I asked Melissa to help us on the
issue by explaining all that we did at DOJ's request, and pushing them to negotiate.
She said she would to talk to some people at DOJ about that request, but I got the
distinct impression that she won't do much. And if she did, I don't think it would
make a significant impact because CHS knows DOJ will NOT allow the settlement
to get held up over our fees. So, the issue is whether to refuse to sign without
language pursuant to which CHS agrees to pay our fees, subject to a reasonableness
determination. I'm not exactly sure how that would play out, but I strongly suspect
DOJ would threaten us with all sorts of things, including relator share. And I do not
think a court would look kindly upon our refusal based on fees when there is a
process by which we can seek our fees after the settlement.

JEX 84 at 469 (capitalization in original). Kreindler replied: "I don't mind signing off on the
agreement, but I think we are entitled to know where things stand on all the outstanding issues."
JEX 85 at 427.

Kreindler then directed the following statement to Waldman and Sauber on July 9:
"[b]efore signing off on the settlement agreement, I think we are entitled to know [CHS's] position
on attorneys' fees." JEX 86 at 1292. Sauber's response was notably non-committal: "We have
consistently told [the Government] we will carve out the fees from the settlement and have sent
them a draft doing just that. We will address these issues after the settlement is accepted." *Id*.

Kreindler, clearly unimpressed, asserted that CHS's position was "not acceptable" in light
of CHS's previous request that all of the Relators provide their billing records and requested that
Sauber "provide a substantive response regarding CHS's position." JEX 91 at 1342. Sauber
refused to affirmatively indicate whether CHS planned to assert any recoverability challenges and
vaguely reiterated that CHS had "repeatedly" advised the Government that attorneys' fees would
have to be resolved after the settlement was finalized. *Id*. Sauber further advised Kreindler that
the issue could not be resolved prior to the July 14 Plantz deadline in part because "some issues
arose that will need discussion or litigation[.]" *Id*. But, no further clarification of the specific issues
to be litigated was given.

Presumably because of the impending deadline and the Government's anticipated response to any attempt by the Relators to delay the settlement for further resolution of attorneys' fees issues, the Relators proceeded with finalizing the settlement. Relators Plantz, Cook-Reska, and Reuille, via their attorneys (Organ and Soifer), advised on July 11 that they would accept the latest version of the settlement agreement, which included the CHS revisions to certain attorneys' fees provisions. JEX 92 at 502. The Tennessee Relators (via Buschner) confirmed their acceptance of the settlement agreement terms on July 14, while Relator Bryant and her attorney, Kreindler, provided their signatures on July 17. JEX 93; DE 75-1 at 27. The Government circulated the finalized settlement agreement to CHS on July 17. JEX 94. CHS executed and returned the settlement agreement on July 23 (JEX 96) and the Government filed the notice of settlement on August 4. DE 75.

## 2. Extrinsic evidence of occurrences after execution of the Settlement Agreement.

Following execution of the Settlement Agreement, CHS, via Waldman, continued inquiring about the relator's share (JEX 95, 99) until Handrigan informed Waldman of the Government's allocation on August 8, 2014. JEX 102. Shortly after that, in an August 13 call with attorneys for some of the Relators, as described in a status update by Organ to the other Relators' counsel, CHS's attorneys finally and expressly acknowledged that they intended to raise eligibility challenges to fees, in resolution of which they offered to pay a sum certain for a global settlement of all attorneys' fees issues. DE 104 at 890. Separate discussions then continued between various Relator's counsel and CHS about resolution of attorney's fees incurred on behalf of specific Relators. *See e.g.* DE 106, 109, 110, 111, and 118. During this same time, CHS continued to inquire of the Government about relator shares. *See e.g.* DE 113, 114, 116, 117. About a month later, CHS also began making requests of the various federal district courts to transfer all of the

fee applications to the Middle District of Tennessee. JEX 114. In their papers, CHS asserted that "it would be grossly inefficient—and create a risk of inconsistent judgments—for seven tribunals to pass upon [the first-to-file] issue at the same time." *Id*. at 4. However, CHS made no such contentions in response to the forum selection exception proposed by Relators during finalization of the Settlement Agreement. In fact, no evidence was offered that, pre-settlement, CHS raised any issues about the venue clause. CHS's filings to consolidate the fee requests in one court also included the statement that the Settlement Agreement "reserves the issue of which relator (if any) is **entitled** to recover attorneys' fees under 31 U.S.C. § 3730(d)." *Id*. at 8 (emphasis added). However, CHS did not include this additional clarification of entitlement to fees in the language of the Settlement Agreement, or in response to any of the Relators' multiple requests for clarity on the issue.

### 3. Testimonial evidence of the parties' understanding of the meaning of the Settlement Agreement.

At the evidentiary hearing, the parties offered additional testimonial evidence of their respective understandings of the Settlement Agreement. The Court heard testimony from: former AUSA John-David Thomas; Mitchell Kreindler, counsel for Relator Bryant; Michael Waldman, counsel for CHS; Patrick O'Connell, counsel for Relators Cook-Reska and Reuille; and, David Garrison, counsel for the Tennessee Relators.

### a. The Government

Former AUSA John-David Thomas, one of the primary attorneys for the Government at the time, testified at the remand hearing that he has no recollection of CHS ever specifically communicating that it intended to litigate first-to-file or public disclosure issues with any Relator

post-settlement. DE 273 ("Hrg. Tr.") at 45:15-18 and 45:15-46:23.[22] However, Thomas also stated that, based on his familiarity with the Relators' complaints and CHS's questions about the first relator to file, he could "read the tea leaves" that CHS was interested in the first-filed complaint for any available purpose, including to challenge entitlement to attorneys' fees. Hrg. Tr. 23:19-25 and 24:1-7, 62:21-63:22. Later in his testimony, Thomas stated that the purposes for which a settling defendant in an FCA case asks about first-filed complaints might depend on when that information was requested, implying that, even though CHS requested information in March about the timing of the filed complaints, which suggests an intention to assert a first-to-file challenge, CHS may have decided on a different course by the time of execution of the Settlement Agreement in July. Hrg. Tr. 63:8-22.

Although Thomas acknowledged that he understood from ongoing conversations with CHS's counsel that CHS intended to pay fees only to those Relators who received a relator's share (Hrg. Tr. 68:21 through 69:10), there is no indication that supposition was shared with the Relators. In fact, Thomas also testified that not all of the Government's communications with CHS or with the Relators were conveyed to the other parties. Hrg. Tr. 22:18-23:14. He also acknowledged that, generally, the communications between the Government and CHS about which Relators were going to be paid, and referring to CHS's need to work through first-to-file issues, were not conveyed to the Relators. Hrg. Tr. 86:20-87:7.

Thomas also acknowledged that CHS never specifically stated that any of the Relators were not proper parties for purposes of the settlement or not entitled to participate in the settlement. Hrg. Tr. 23:15-24:7. Nor did CHS suggest that the settlement should be delayed to allow CHS to move

---

[22] Pages 1 through 257 of the hearing transcript are found at Docket Entry No. 273. Pages 258 through 542 of the hearing transcript are found at Docket Entry No. 274. References to Docket Entries 273 and 274 are designated as "Hrg. Tr." with the transcript page and line number.

for dismissal of one or more Relators (Hrg. Tr. 24:8-12) or that the Government should not intervene in any fewer than all of the seven cases. Hrg. Tr. 28:3-5, 31:6-11. Instead, Thomas confirmed that, as part of the settlement, CHS consistently insisted on dismissal of all of the Relators' *qui tam* claims. Hrg. Tr. 24:13-15, 25: 2-5 and 16-20, 27:6-28:2.

### b. Relators

The testimony of the Relators' attorneys was, not surprisingly, substantially similar to the arguments made by the Relators throughout this contested matter about the meaning and substance of the Settlement Agreement generally and Term 8 specifically.

### i. Mitchell Kreindler

Specifically, Kreindler testified that he interpreted the final sentence of Term 8 as essentially interchangeable with the Relators' proposed provision in Term 2 that was stricken by CHS. Hrg. Tr. 128:22-129:15. Kreindler testified that he did not construe CHS's striking of the affirmative obligation to pay reasonable attorneys' fees as a statement that CHS intended to preserve challenges to both recoverability and reasonableness. Hrg. Tr. 108:7-109:19. Instead, Kreindler viewed the addition of an exception to CHS's broad release and waiver for § 3730(d) fees as consistent with the Relators' expectation that CHS was preserving only challenges to reasonableness of fees. Hrg Tr. at 109:20-110:9. Simply put, regardless of the placement of the attorneys' fee provisions, Kreindler interpreted it as carving out only objections to the amount of fees and not as to recoverability. This interpretation was supported, according to Kreindler, by CHS's agreement to leave in the venue provision for resolution of fee disputes in the federal courts where the *qui tam* complaints were originally filed. Hrg. Tr. 109:5-8. Further, in the context of having requested that CHS disclose the substance of its intentions about attorneys' fees objections, Kreindler considered this provision to be a limited reservation because CHS did not state otherwise

when asked. Hrg Tr. 169:3-17 ("I know what the agreement says, I want to know what you're really going to do.")

Kreindler's query about CHS's actual intent followed a series of email exchanges with CHS's counsel about attorney time records and other fee request information that was forwarded to CHS. Hrg. Tr. 116:16-118:20. Kreindler made multiple inquiries about the status of the fees requested. *Id.* Eventually, Kreindler requested that CHS give a more substantive, definitive response regarding its position on attorneys' fees. Hrg. Tr. 118:25; JEX 86 and 91. CHS's attorneys did not provide the requested response, instead deferring to resolution of fee issues after settlement. Hrg. Tr. 119:9-13; JEX 91. At no point, according to Kreindler, did CHS affirmatively state that it was planning to challenge fees on eligibility grounds, which Kreindler understood to mean that only reasonableness challenges were preserved. Hrg. Tr. 119:14-17.

Kreindler also testified that, in his experience in FCA cases, § 3730(d)(1) comes into play only when the relator has been successful, that is, when the government has intervened and there are funds recovered either by settlement or by judgment. Hrg. Tr. 113:11-23. Kreindler could not recall any other case in his 23 years of handling FCA cases in which a defendant raised a first-to-file, public disclosure, or other similar challenge to a relator's standing after settlement unless those issues were reserved prior to settlement. Hrg. Tr. 119:18-120:11.

On cross examination, Kreindler acknowledged that he believed during the settlement language process that CHS might have had ulterior motives. Hrg. Tr. 155:20-156:16. But, he also suggested that the extent to which CHS more overtly disclosed its intentions about first-to-file may have depended on the separate negotiations that CHS was pursuing with individual Relators. Hrg. Tr. 150:19-151:4, 167:23-168:5. Kreindler also testified that his efforts and those of other Relators' counsel for more definitive responses from CHS about the meaning of the settlement

language went unanswered, which left him with the understanding that CHS was preserving only what the Settlement Agreement provided for, namely, reasonableness of fees under § 3730(d). Hrg. Tr. 159:13-14, 166:2-4, 169:7-17, 170:20-171:3.

### ii. Patrick O'Connell

Patrick O'Connell generally echoed Kreindler's experience in FCA cases, that he too was unaware of any other case in which a defendant sought to challenge a relator's fees on eligibility grounds after settling with the relator. Hrg. Tr. 361:18-362:10. O'Connell's testimony also suggests that he too was satisfied that CHS was not going to fight fees on first-to-file or other recoverability challenges because of CHS's agreement that fees would be litigated in the districts in which the *qui tam* complaints were pending. Hrg. Tr. 383:6-13, 399:4-8. While O'Connell's testimony makes clear that he had at least some inkling that CHS might raise post-settlement eligibility issues, in his estimation, specific considerations unique to his clients afforded him a level of comfort in proceeding without an explicit clarification by CHS on the scope of the reservation. Hrg. Tr. 391:2-5, 409:6.[23] O'Connell also confirmed Kreindler's testimony that, during finalization of the settlement language, separate negotiations were ongoing between CHS and specific Relators about fees independent of the entire group. Hrg. Tr. 365:13-21. Even while discussing with CHS the possibility of first-to-file issues, O'Connell consistently told CHS's attorneys that once the Government intervened, all of the Relators were entitled to attorneys' fees as a matter of law. Hrg. Tr. 409:7-22. O'Connell clearly recalled that, during those discussions, CHS never stated it was going to refuse to pay fees for anyone who was not allocated a relator's share. Hrg. Tr. 376:22-377:21.

---

[23] According to the unrebutted testimony, CHS made no settlements of individual Relator's fees until after the Settlement Agreement was signed, in other words, after all of the Relators released CHS. Hrg. Tr. 391:22-392:5

### iii. David Garrison

The Court finds that Garrison's testimony further illuminates the dynamics among the Relators and with the Government, and is consistent with testimony given by the other Relator's attorneys, as well as that of the former Government attorney, Thomas. Of particular note is Garrison's testimony that he only communicated with the Government, and never directly with counsel for CHS, regarding language of the settlement agreement. Hrg. Tr. 449:7-10. Garrison also testified, consistent with Thomas' testimony, that the Government unilaterally decided which of the edits proposed by the Relators would be conveyed to CHS. Hrg. Tr. 449:23-450:23. *See also* Hrg. Tr. 20:17-20 (Thomas).

Undisputedly, the Relators' attorneys were not acting as co-counsel for the entire group of Relators. Hrg. Tr. 459:4-6. Garrison testified that he was unaware of many of the communications between other Relators or with CHS prior to the instant litigation. Hrg. Tr. 464:9-466:7. In fact, the undercurrent driving the Relators' interactions with other parties and with each other was the understanding that if the cases were not settled, litigation would follow and the interests of the Relators would diverge. Hrg. Tr. 460:4-11. For that reason, the primary concern of each Relator's attorney was the outcome for that Relator, and communications between a Relator and the Government or with CHS were often not even reported to the entire group of Relators. Hrg. Tr. 459:7-19, 460:12-19.[24]

---

[24] Given that the Doghramji complaint by the Tennessee Relators was the seventh one filed, the Court surmises that all of the Relators recognized there might be first-to-file issues for that group of Relators. That potential was juxtaposed against the Government's articulated interest in utilizing the resources and information that the Tennessee Relators brought to the table. Hrg. Tr. 100:1-4 and 7-10 (Kreindler testimony that the Government was "really interested in working with the Doghramji group"). Whether because of this tension, because all of the Relators were negotiating their own deals with CHS, which seems to be apparent, or some other reason, clearly, there was no consistent and universal communication by CHS or the Government with the entire group of Relators or even among that group about the settlement terms and potential issues. This presented a further obstacle to a common understanding of the meaning of Term 8.

Garrison confirmed, however, that once an agreement was reached with the Government for intervention, the Relators had some measure of confidence that fees would be paid, with any remaining litigation only as to amount. Hrg. Tr. 470:3-20, 472:4-11. For that reason, CHS's requests for attorney time records was viewed as a precursor to possible objections to reasonableness of fees, not a signal that CHS intended to object to the Relators' entitlement to fees, Hrg. Tr. 477:22-478:7. CHS did nothing to dispel that view, even after Garrison sent fee information reciting the bases for the Tennessee Relators' entitlement to fees. Hrg. Tr. 477:1-6. Garrison also echoed the testimony of Kreindler and O'Connell that until the instant litigation ensued, he was never advised by CHS, the Government, or any other Relator's attorney that CHS did not intend to pay fees to any relators other than those who received a part of the relator's share. Hrg. Tr. 460:24-461:13.

### c. CHS

The testimony of CHS's attorney, Michael Waldman, also essentially mirrored the arguments made by CHS in this litigation. Waldman confirmed that as early as March of 2014, CHS contemplated issues about attorneys' fees, including eligibility grounds. Hrg. Tr. 195:20-196:4 and JEX 6. Waldman also testified he believed that CHS's intention to challenge the Relators' entitlement to fees was made clear throughout finalization of the settlement. Hrg. Tr. 193:19-194:3. He further relied on the June 26 email exchange with Organ and other counsel for Relators Reuille, Cook-Reska, and Plantz (JEX 66) as fully apprising the Relators that CHS intended to challenge attorneys' fees on first-to-file grounds. Hrg. Tr. 214:16-22. Additionally, Waldman testified to a conversation with O'Connell in June (as described in JEX 61) in which Waldman confirmed that if CHS were unable to settle, it intended to litigate attorneys' fees, including on eligibility grounds. Hrg. Tr. 228:1-19. While Waldman testified that he expected

there was "sort of a free flow of information between the relators, one relator to other relators and to the government" (Hrg. Tr. 229:16-20), the evidence does not support that every conversation between CHS and any Relator or CHS and the Government was shared among the entire group of Relators.[25]

Waldman acknowledged during his hearing testimony that, from the earliest days of the settlement negotiations, the Relators affirmatively conveyed their position that the settlement entitled all of them to recover their reasonable attorneys' fees. Hrg. Tr. 276:10-277:11. This position was articulated in Recital G to the Settlement Agreement. Even though CHS included a recital disputing the substantive fraud claims, no language or separate recital disputing Relators' entitlement to attorneys' fees was included in the Settlement Agreement. Hrg. Tr. 277:12-278:18. No satisfactory explanation was given for this omission.[26] Waldman further acknowledged that CHS requested and received billing records from the Relators, but never directly alerted the Relators to CHS's intended challenge to the Relators' eligibility for attorneys' fees. Hrg. Tr. 297:10-301:7, 308:25-311:1, 312:5-313:9.

In addressing the forum selection exception, Waldman described the clause as neutral, with venue determinations to be left to the district court in each district in which the original *qui tam* complaint was filed (Hrg. Tr. 219:9-2). This supposed neutrality cannot however be reconciled with CHS's acknowledged concern about the possibility of conflicting court determinations of eligibility issues. Hrg. Tr. 289:20-290:23 (Waldman indicating that CHS did not want "one judge say[ing] that one relator was first-to-file and another judge … say[ing] that another relator was the first-to-file …"). Further, despite this crucial concern, CHS offered no provision in the Settlement

---

[25] See n.25.
[26] Waldman attempted to explain the lack of any response to Recital G. Hrg. Tr. 273:18-274:17. The Court finds the explanation unpersuasive.

Agreement describing how the supposedly neutral venue provision would be applied, nor for which law would control any litigation over first-to-file or other recoverability issues, even though cases were pending in at least three different federal judicial circuits. Hrg. Tr. 290:17-290:14. Moreover, no evidence was offered that CHS's interpretation of this provisions was conveyed to the Relators prior to finalization of the Settlement Agreement.

Waldman also asserted that CHS's goal in Term 8 was to allow for the broadest preservation of rights, and that listing specific matters reserved "was likely to be subject to criticism" if something was forgotten. Hrg. Tr. 245:4-18. He also testified that drafting the specifics of a broad reservation was too difficult because of various relator-specific issues. Hrg. Tr. 245:19-246:6. However, Waldman acknowledged that the specific reservations made by the Government in the Settlement Agreement included all bars to relators. Hrg. Tr. 272:7-9. Waldman further admitted that general releases, including the one in the Settlement Agreement, are typically inclusive of "as many things … as possible," so that everything is on the table, and that Term 8 could have included the same broad descriptive language as the general release in the Settlement Agreement. Hrg. Tr. 273:4-23.

### C.  Interpretation and construction of the contract.

The Court finds very little in the extrinsic evidence that illuminates the parties' original understanding of Term 8. The most reasonable conclusion to be drawn from the totality of the extrinsic evidence is that, at the time of execution of the Settlement Agreement, all parties knew there was uncertainty about the scope of the carved out attorneys' fee issues. CHS asserts that it made plain "its interest" in bringing challenges to recoverability of attorneys' fees. DE 276 at 17-23. Without addressing to what extent there is a substantive difference between "interest" and "intent," the Court does not find in the record any plain or explicit expressions of CHS's intention

to preserve post-settlement challenges to recoverability of attorneys' fees on first-to-file or other grounds. Undisputedly there were references in settlement negotiations to non-specific first-to-file issues. However, these discussions appear to have largely occurred either between CHS and the Government only or between CHS and individual Relators. CHS offered no evidence that CHS's intention to preserve post-settlement challenges to recoverability of attorneys' fees was directly communicated to the entire group of settling Relators prior to execution of the Settlement Agreement.[27] In fact, when directly asked by the Relators for CHS's substantive position on attorneys' fees, at a time when the Plantz deadline was fast approaching and decisions about settlement were pressing, CHS's attorney did not indicate that CHS intended to challenge the Relators' eligibility for attorneys' fees. Rather, CHS's counsel obliquely responded that attorneys' fees issues would have to wait until after settlement. The unwillingness of CHS's counsel to straightforwardly address that question, particularly in light of CHS's undisputed knowledge that each of the Relator's claimed entitlement to reasonable attorneys' fees, leads to the inescapable conclusion that CHS's strategy was to let the clock run on whether the Relators' would hold up the settlement for an affirmative response from CHS confirming its intent to challenge recoverability of attorneys' fees.

Additionally, the Court finds minimal credibility in the explanation offered by CHS that it believed the language of Term 8 to be the broadest possible reservation. Throughout post-

---

[27] CHS's attorney, Michael Waldman, told one of the Doghramji lawyers that CHS had "some serious first-to-file issues in particular" with Doghramji. Hrg Tr. at 231:13-14. However, Waldman did not recall when the conversation occurred, and the evidence supports that this conversation more likely took place in early August, after the Settlement Agreement was executed. *See* Hrg Tr. at 305:9-306:12 (Waldman), 480:13-482:12 (Garrison). CHS also contends that it repeatedly told the Government that CHS intended to challenge the Relators' fee requests on eligibility grounds. Hrg Tr. 193:19-194:3 (Waldman), JEX 143 at 20:12-15. That testimony is not consistent with the recollection of former AUSA Thomas, nor is there any indication that the Government conveyed that specific information to the Relators. In fact, the evidence strongly suggests that the Government washed its hands of any attorneys' fees issues.

settlement filings and during the remand hearing, CHS described the intended reservation in various ways: as a preservation of CHS's right to object to **eligibility**, as recognizing a dispute whether the Relators were **entitled** to fees under § 3730(d), as a preservation of **all rights** to object on any grounds, and as **not waiving in any way** CHS's ability to challenge or object to the Relators' claims for attorneys' fees on all grounds. Yet, none of these clarifications are found in the Settlement Agreement, nor were they relayed to the Relators in response to their express request for CHS's substantive position on attorneys' fees. It could be said that CHS was baiting Relators with a poorly worded, ambiguous reservation of rights only to switch to a definite and certain explanation of that reservation once the Settlement Agreement was executed.

Yet, to the extent that CHS acted perfidiously, the extrinsic evidence, as discussed above, demonstrates that the Relators were not entirely fooled by the ruse. Nevertheless, by not directly stating its intention to preserve challenges to recoverability of attorneys' fees, CHS left a fertile field for the seeds of the Relators' understanding of Term 8 to germinate into something different than CHS's intended meaning. A number of circumstances cultivated Relators' belief that Term 8 preserved only challenges to reasonableness of fees. For instance, CHS's non-specific allusions to first-to-file issues could just as easily have derived from any specific Relator's right to collect under the settlement. Hrg. Tr. 87:23-91:20 (Thomas) and 344:6-344:10 (Waldman). In fact, both sides were evaluating first-to-file issues well before the settlement discussions began in earnest. Hrg. Tr. 70:9-71:1 (Thomas) and Hrg. Tr. 329:18-331:2 (Waldman). Additionally, from the earliest days of the settlement discussions, the Relators consistently conveyed to CHS that they all claimed entitlement to fees under § 3730(d).[28] At least several weeks before finalization of the

---

[28] The Relators communicated their claimed entitlement to attorneys' fees with the billing records forwarded to CHS and in the recital to that effect included in the various drafts (and the final version) of the Settlement Agreement.

Settlement Agreement (if not before), CHS was also aware that the Relators had been working together at the request of the Government with the expectation that they would all be entitled to attorneys' fees. JEX 60 at 316. As a result of all of these conditions and the Government's intervention in all seven cases, by the time of the settlement, the Relators reasonably believed that potential first-to-file and public disclosure challenges were resolved. Hrg. Tr. 41:6-42:6 (Thomas) and 157:23-159:14 (Kreindler).[29]

This belief was further bolstered by CHS's agreement to the Relators' proposed language that fee disputes would be litigated in the various forums in which the *qui tam* complaints were pending. JEX 1 at 1429 (Term 18 carving out attorneys' fees litigation from the choice of forum for enforcement of the Settlement Agreement in the Middle District of Tennessee). The inclusion of this provision supports the Relators' perceived understanding that only reasonableness challenges, which often include consideration of local community standards of hourly rates and other lodestar factors, remained for litigation post-settlement. No evidence was offered that pre-settlement CHS raised any issues about the venue clause, even though in later filings seeking to change venue of the fee disputes to the Middle District of Tennessee, CHS asserted that "it would be grossly inefficient—and create a risk of inconsistent judgments—for seven tribunals to pass upon [the first-to-file] issue at the same time." JEX 114 at 4. CHS had these same concerns prior to finalization of the Settlement Agreement (*see e.g.* Hrg. Tr. 289:21-290:23), but voicing them earlier would have required CHS to fully disclose its intention to challenge the Relators' eligibility for attorneys' fees, and potentially put the settlement in jeopardy.

---

[29] Although the Government reserved for itself these potential challenges, it appears that those issues between the Relators and the Government were resolved by the Relators' agreement as to the relator's share. Hrg. Tr. 30:22-31:21, 33:2-19 (Thomas).

To be sure, there is some appeal to CHS's argument that there is no reason for CHS to have stricken the Relators' proposed Term 2, only to have limited the carve-out to objections to reasonableness under § 3730(d). The Court cannot however reconcile the certitude of this statement with CHS's opacity on this issue in the final days of finalizing the Settlement Agreement. Even though CHS now contends that there was no reason to believe that the Relators were construing Term 8 to limit the carve-out to reasonableness objections (Hrg Tr. 212:6-11), in fact, the Relators, individually and as a group, repeatedly asked for CHS's substantive position on fees prior to finalization of the Settlement Agreement. JEX 30, 69, 70, 86, 91. There should not have been any misapprehension that the Relators were asking for CHS's intentions under the carve-out language in Term 8. Nevertheless, CHS failed to even remotely convey an intention to preserve all objections on any grounds, including recoverability. Put simply, even in the face of an express inquiry about the scope of the reservation of attorneys' fee challenges, CHS at least missed, if not outright eschewed, the opportunity to bring clarity and certainty to this question. For all of these reasons, the Court discounts CHS's argument that its deletion of Relators' proposed Term 2 is definitive evidence that Term 8 preserved eligibility challenges.

Instead, the Court finds more credible the Relators' explanations of their thinking at the time of finalizing the Settlement Agreement, because any wariness they might have had about CHS's true intentions was nothing more than mere suspicion, which CHS deliberately declined to confirm or deny. Even prior to Kreindler's specific demand for CHS's substantive intentions about attorneys' fees, CHS avoided multiple other opportunities to disclose its position that most of the Relators were not entitled to fees. *See e.g.* Hrg. Tr. 297:18-298:22, 307:21-310:23.[30]

---

[30] The Court acknowledges that an email exchange between CHS and Organ alludes to first-to-file contentions late in the settlement process. JEX 66. However, as discussed below, the Court declines to give the weight to this evidence urged by CHS because this conversation appears to have been a fee settlement negotiation with those Relators represented by Organ independent of

Additionally, not all of the Relators were privy to the conversations or sharing of information between CHS and the Government or CHS and other Relators' counsel.[31] For instance, not all of the Relators were aware of the email exchange in late June, upon which CHS relies heavily as demonstrating that it fully apprised the Relators of its intended first-to-file challenges.[32] Hrg. Tr. 345:14-346:19 (Waldman); 464:11-465:13 465:14-466:7 (Garrison). More importantly, in the last days of finalizing the settlement, after the June email exchange, CHS was expressly presented with two specific opportunities to clarify its position on attorneys' fees. JEX 86, 91. These requests by the Relators for CHS to directly address this issue were rebuffed. *Id*. Short of undoing the entire settlement or facing motions to dismiss after expenditure of considerable attorney time and efforts, there is not much more that the Relators could reasonably have done to address whatever concerns they may have had. Nor did the Relators hold any leverage to materially influence the outcome of the settlement reached between CHS and the Government.

---

the process of finalizing the language of the Settlement Agreement generally. *Id*. at 1214. Further, only days after this email exchange, Kreindler made two inquiries on behalf of the entire group of Relators about CHS's substantive position on attorneys' fees. JEX 86, 91. CHS could have responded with a clear statement that it intended to challenge recoverability of fees, but it did not do so.

[31] In response to questions by the Court, CHS's attorney testified that he believed there were conversations with specific Relator's counsel about first-to-file issues. Hrg. Tr. 338:17-340:18 (Waldman). While the Court is not critical of counsel's recollection, the described conversations cannot be reconciled with the evidence of repeated email exchanges between CHS and the Relators in which no such details of CHS's position are found. If CHS had already alerted at least some of the Relators' counsel that it would raise eligibility challenges to fees, why did CHS, when expressly asked in the email from Kreindler to Sauber for a substantive statement of CHS's intentions, equivocate? Why not just refer to the prior conversation in which that intention had purportedly been relayed a number of times. Common sense supplies the answer, that there were not the detailed, substantive conversations that CHS recalls.

[32] The Organ email exchange occurred in the context of settlement negotiations specific to those Relators whom Organ represented. Further, as noted, many of the email exchanges in the final few days before execution of the Settlement Agreement appear to have been last-ditch efforts by individual Relators to negotiate potential fee dispute settlements with CHS independent of the group. JEX 63.

Hrg. Tr. 33:2-19 (Thomas), 181:17-21 (Kreindler), and 349:25-351:3 (Waldman).[33] CHS was the one stakeholder in a position to bring clarity and certainty to the intended scope of the attorneys' fees carve-out. Instead, even when pressed directly, CHS balked at a clear response.[34]

Perhaps as some explanation of the Relators' abandonment of any insistence on resolution of the attorneys' fee issue pre-settlement, the Court notes that the Government appears to have played a less than effective role as intermediary on this issue, even though, at the time, the settlement was the largest recovery by the United States in a *qui tam* case filed in the Middle District of Tennessee. Hrg. Tr. 17:4-7 (Thomas).[35] On March 7, almost five months before the notice of settlement was filed, the Government's attorney advised CHS's counsel that CHS's request to have each of the Relators' claims dismissed as a condition of settlement "may depend upon how CHS approaches the attorney fee issue." JEX 3 at 12. Nevertheless, the Government "tried to" avoid any participation in the attorneys' fees issues. Hrg. Tr. 35:19-36:8 (Thomas). The

---

[33] One side effect of this lack of universal information sharing and disparate bargaining strength was that individual Relators, who had differing interests, were, both early in the settlement discussions and late in the process, negotiating separately or at least on behalf of fewer than the entire group. Hrg. Tr. 150:19-151:4. This stemmed partly from the fact that there was no sharing agreement among the entire group until shortly before the settlement was finalized. *See* Hrg. Tr. 371:22-372:3, Hrg. Tr. 373:1-376:15 (O'Connell describing the entrance by each Relator or group of Relators into the litigation and collaboration with the Government). Understandably, each Relator's primary concern was the recoverability of his or her own attorney's fees. This allowed for CHS to take positions and make assertions in settlement negotiations of potential fee disputes with individual Relators that were not—and could not—be shared with the entire group of Relators.

[34] According to testimony at the remand hearing, CHS's attorney did not respond directly to the Relators' demand for a substantive statement of CHS's intentions about post-settlement challenges to fees, because the focus was on getting the Settlement Agreement done. Hrg. Tr. 312:5-24 (Waldman). The Court is unimpressed with this explanation. CHS's contention that the carve-out in Term 8 was intended to effect the broadest possible reservation is similarly unpersuasive given the dearth of accompanying support in the extrinsic evidence. Hrg. Tr. 263:17-267:13 (Waldman). The scope of the carve-out is essentially the very question posed by the Relators to CHS, and CHS still elected not to clarify that the intended reservation included all available challenges.

[35] This is the same point addressed at length in the *Doghramji* concurring opinion. 666 F. App'x at 419-20 (Stranch, J., concurring).

Court appreciates that the Government may have policy reasons for not interceding in fee disputes between the defendant who will ultimately pay those fees and the relators who are seeking fees. *See* Hrg. Tr. 36:13-25 (Thomas agreeing that § 3730(d) fee disputes are left for resolution between relators and defendants because fees are paid by the defendant and not the government). While the Court is not suggesting that any other action on the part of the Government would have necessarily changed the outcome, as the Relators were all represented by experienced, sophisticated counsel, some participation by the Government might at least have diminished CHS's confidence that the deal was done regardless of any position taken by the Relators. As it was, the Government's detachment certainly appears to have contributed to the failure of any resolution of this issue pre-settlement.

The Court presumes that the illusion of mutual assent implicitly agreed to by the parties rests on strategic motives because it is difficult to conceive of any other reason why a global settlement of this magnitude, financially and otherwise, failed to elicit more meticulous drafting of such a consequential provision. A global resolution with all of the Relators was a public relations imperative for CHS. Hrg. Tr. 328:18-329:5.[36] And the Relators did not want to hold up settlement over attorneys' fees. *See e.g.* JEX 84 at 469 and Hrg. Tr. 180: 1-18 (Kreindler acknowledging that carve-out of amount of fees was reasonable alternative to holding up settlement on that limited issue). Both sides were also driven by the looming deadline to finalize a settlement before the Plantz case was unsealed. Each side gambled that they could leverage the ambiguity for a favorable

---

[36] There is also an indication that CHS did not provide more specific information about its intentions in order to induce the Relators to compromise their fees. *See* Hrg. Tr. 337:16-338:1 (Waldman).

outcome that their interpretation of Term 8 would prevail, even while knowing or having reason to know of at least the possibility that the other side was interpreting the term differently.[37]

For all of these reasons, the Court cannot find that the extrinsic evidence of the parties' language and conduct answers the question of which of the two interpretations represents the parties' original understanding of the meaning of Term 8. The Court must therefore resort to other principles of contract interpretation and construction to supply the answer of the meaning of Term 8.

### 1. Manifestations of intent.

Federal common law controls interpretation of a contract provision releasing a federal cause of action. *Street v. J.C. Bradford & Co.*, 886 F.2d at 1481. Under federal law, releases in settlement agreements are viewed narrowly and if a party executing a general release has knowledge of facts sufficient to constitute a claim and wishes to except that claim from the release, the party must clearly manifest its intent to do so with an explicit reservation. *Imprimis Inv'rs LLC v. United States*, 83 Fed. Cl. 46, 62–63 (2008) (internal citations omitted). *See also United States v. William Cramp & Sons Ship & Engine Bldg. Co.,* 206 U.S. 118, 128, 27 S.Ct. 676, 679, 51 L.Ed. 983 (1907) (holding that if the parties intended to leave some things out of a general release, then their intent to do so should be made manifest)*; Overberg v. Lusby*, 727 F. Supp. 1091, 1093 (E.D. Ky.), *aff'd,* 921 F.2d 90 (6th Cir. 1990) (same). Viewing the extrinsic evidence in the light of this principle, CHS did not clearly manifest its intent to carve out of the broad release in Term 8 any challenges to recoverability of attorneys' fees, even when explicitly asked for that clarification. *See Dairyland Power Coop. v. United States,* 27 Fed.Cl. 805, 811 (1993) (a "blunderbuss

---

[37] The lawyers for each side may also have been proceeding with differing opinions about the law, which went undiscussed pre-settlement because the bases of CHS's intended challenges were not fully disclosed.

exception" that does not reasonably notify the party receiving the release of the intent of the party issuing the release will not suffice) (internal citations omitted).

Additionally, under the Restatement Second of Contracts, which courts look to as enunciating federal contract law, "wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade."  Restatement (Second) of Contracts § 202(5).  *See also Street*, 886 F.2d at 1481 (federal common law, at a minimum, adopts the standards of the Restatement Second of Contracts); *Casey v. Illinois Cent. Gulf R. Co.*, 687 F.Supp. 1112, 1114 (W.D. Ky. 1988) (same).  Here, a consistent interpretation of the parties' manifestations of their intentions about the scope of Term 8 compels a finding that Term 8 preserved only post-settlement challenges to reasonableness of attorneys' fees.

First, the Relators clearly manifested their intention of entitlement to—that is eligibility for—attorneys' fees.  They did so in correspondence to CHS with their billing records.  They also did so in Recital G to the Settlement Agreement:  "Relators and their counsel claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relators' reasonable expenses, attorneys' fees and costs."  JEX 1 at 1419.  CHS acknowledged that the Relators' position was clearly and consistently stated, without change over the course of settlement negotiations.  Hrg. Tr. 276:16-277:11 (Waldman); *see also* JEX 4 at 32 (showing that same recital of the Relators' entitlement to attorneys' fees appeared in the initial draft settlement agreement circulated to CHS on March 11, 2014).

Additionally, the consistent manifestations of CHS's intentions about Term 8 likewise support the more limited interpretation. CHS added no counter-recital to the Settlement Agreement in response to the Relators' Recital G to state that CHS contested Relators' eligibility for fees,

despite having added language in Recital F denying the substantive allegations of wrongful conduct in Recitals C and D. JEX 1 at 1416-19.[38] The forum selection exception in Term 18 for fees litigation further manifests an intended limited scope of Term 8. Objectively, a party intending to challenge recoverability of fees would insist on a single forum, to avoid the risk of conflicting determinations of first-to-file and other eligibility issues, a fact that CHS clearly recognized. Hrg. Tr. 289:21-290:23 (Waldman acknowledging CHS's concern during the settlement negotiations about potentially having to pay more than one relator as the first to file based on different outcomes in different courts).[39] Yet, CHS raised no such contentions in response to the forum selection exception proposed by the Relators. CHS's acquiescence to the venue provision is more consistent with the Relators' interpretation of Term 8 than with that of CHS.

Manifestation of a more limited Term 8 also derives from the evidence that CHS had multiple opportunities to respond to the Relators' claims of entitlement to fees by clearly stating that CHS intended to challenge eligibility. The Court gives great weight to this evidence and finds most compelling that, when explicitly asked to provide a statement of its substantive intentions about attorneys' fees, CHS did not respond that it intended to challenge the Relators' entitlement to fees. Viewing all of these actions by CHS together with those of the Relators, the consistent interpretation of the parties' manifestations is that, despite knowing of the Relators' claims of entitlement to attorneys' fees, CHS did not exclude attorneys' fees entitlement challenges from the otherwise broad release effected by Term 8, and therefore preserved only post-settlement objections to reasonableness of attorneys' fees.

---

[38] Unlike CHS, the Government did respond to Recital G by explicitly reserving its rights in Term 7. JEX 1 at 1423-24.

[39] That CHS now describes the venue provision as neutral has no purchase. CHS understood the nuances of Term 18, as shown by CHS's conduct after execution of the Settlement Agreement and the testimony of counsel during the remand hearing.

## 2. **Industry parlance.**

Additionally, the Court finds that, in industry parlance, reference to § 3730(d) contemplates objections to the amount of claimed attorneys' fees but does not extend to challenges to recoverability. The Court finds it unnecessary to address whether the language of Term 8 is or includes technical terminology, as disputed by CHS. The consideration for the Court is of the extrinsic evidence of industry custom and practice. *Park Electrochemical Corp. v. Continental Cas. Co.*, 2011 WL 703945, at *3 (E.D. N.Y. Feb. 18, 2011) (court may look to industry custom and practice in resolving contract ambiguity) (internal citations omitted). None of the attorneys who testified in this case, each of whom has extensive experience in FCA cases, could recall another instance of a defendant raising first-to-file or public disclosure eligibility challenges under the guise of attorneys' fees litigation after settling with a relator. *See* Hrg. Tr. 119:18-120:12 (Kreindler), 362:5-10 (O'Connell), 341:2-342:9 (Waldman), JEX 143 at 49:7-59:15 (Sauber deposition). The Court does not construe this testimony as establishing that there is no other such case, but rather as illustrative that CHS's construction of Term 8 as preserving post-settlement attorneys' fees challenges on eligibility grounds is outside industry custom and usage.[40]

---

[40] The Court finds little support for CHS's post-hearing argument that challenges to recoverability of attorneys' fees are frequently raised post-settlement. DE 279 at 13-15. Although CHS correctly notes that eligibility litigation occurs after settlement in *qui tam* cases, none of the cases upon which CHS relies goes to the lengths urged by CHS, namely that a defendant can pursue eligibility defenses, such as first-to-file or public disclosure, after settling with a relator, when those issues are not expressly reserved. In summary, the cases cited by CHS are distinguishable as follows: in *Federal Recovery Services, Inc. v. United States*, 72 F.3d 447, 449 (5th Cir. 1995), the government settled with the defendant after the original relators' complaints were dismissed for lack of jurisdiction, and the ensuing post-settlement litigation centered around the propriety of the dismissal; in *U.S. ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1039 (6th Cir. 1994), issues about recoverability of fees were expressly raised and preserved in connection with settlement between the government and GE, which did not include relators; in *Donald v. University of California Bd. of Regents*, 329 F.3d 1040, 1041 (9th Cir. 2003), the relators acknowledged that they first raised claims to a relator's share and fees only after the government filed a notice of dismissal following its settlement with the Board of Regents, which did not include the relators; in *U.S. ex rel. Ryan v. Endo Pharmaceuticals, Inc.*, 27 F.Supp.3d 615, 621 (E.D. Penn.

### 3. Reasonable term supplied by court.

Based on the foregoing, the Court concludes that it may also supply essential words to establish the meaning of Term 8. Under the Restatement Second of Contracts, "when the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204. Considering the extrinsic evidence on the question of what is reasonable under the circumstances, the Court finds that limiting CHS's objections to those listed in § 3730(d) is fair and reasonable given the entirety of the parties' conduct, as discussed above.[41] Specifically, the Court would add the words "on reasonableness grounds" so that the construct of the final sentence of Term 8 would be: "All parties agree that nothing in this Paragraph or this Agreement shall be construed in any way to release, waive, or otherwise affect the ability of CHS to challenge or object to Relators' claims for attorneys' fees, expenses, and costs on reasonableness grounds pursuant to 31 U.S.C. § 3730(d)."[42]

---

2014), the settlement agreement, with the approval of the relators, expressly reserved the issue of whether the relators were entitled to a share of the federal proceeds; in *U.S. ex rel. Cunningham v. Millennium Laboratories, Inc.*, 202 F.Supp.3d 198, 202 (D. Mass. 2016), some but not all of the relators joined in the settlement agreement, which expressly provided for a percentage of the settlement to be set aside for the relators with the court to decide the allocation post-settlement if the relators could not reach an agreement; in *U.S. v. NextCare, Inc.*, 2013 WL 431828, at *3 n.3 (W.D. N.C. Feb. 4, 2013), no post-settlement relator's fees were sought under the federal FCA. There appears to be no contest in any of the cases of the parties' intention to litigate the eligibility issues post-settlement. Because of this critical distinction, the Court does not find the cases to be particularly helpful in arriving at the proper meaning of Term 8 here.

[41] The Sixth Circuit has already held that this limited reservation of rights is one reasonable interpretation of Term 8. *Doghramji*, 666 F.App'x at 418.

[42] The Court also notes the Restatement Second of Contracts prefers an interpretation serving the public interest. Restatement (Second) of Contracts § 207 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred"). Although this rule is limited in application to those agreements that affect a public interest, the Court has little difficulty finding that the Settlement Agreement is one that affects the public interest.While the Sixth Circuit in *Doghramji* made no specific reference to the public interest meaning, the concurring opinion discussed at length the public policies and goals served by *qui tam* complaints, including that "[w]ithout a doubt, relators and their attorneys

### 4.  Construction against supplier of doubtful language.

Finally, even if the foregoing rules do not decisively supply the meaning of Term 8, another well-known principle, which addresses both contract interpretation and construction, points toward the same conclusion.  Although the Settlement Agreement provides that it is deemed to have been drafted by all parties and, for that reason, should not be construed against any party (JEX 1, Term 18, at 1429-30), the extrinsic evidence established that the specific language in Term 8 in dispute was supplied by CHS.  The Restatement Second of Contracts makes clear that, in choosing among meanings of specific terms or clauses within a larger agreement, courts should generally prefer the meaning that operates against the party who supplied the language.  Restatement (Second) of Contracts § 206 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").  *See also* 17A Am.Jur.2d Contracts § 336 ("A contract provision which does not clearly express the intention of the parties should be construed against the one for whose benefit it was inserted.  Contract clauses susceptible of more than one meaning, particularly those that may prove onerous to one of

---

play a vital role in rooting out health care fraud and obtaining recovery of the public monies that were intended to be spent for providing health care to veterans and poor, elderly, and disabled citizens." 666 F.App'x at 420. In fact, substantial testimony was presented during the remand hearing about the assistance provided to the Government by the Relators.  Hrg. Tr. 14:1-16:6 (Thomas); 100:9-102:8 (Kreindler); 399:24-400:7; 402:7-403:18 (O'Connell); 444:2-446:2 (Garrison). The Relators helped the Government with: preparation of lists of witnesses, subpoenas, document requests and other legal and internal documents; voluminous document review; preparation of deposition outlines; interviews of witnesses and experts; statistical analyses; compilation of information demonstrating the company-wide occurrences of the claimed inappropriate admissions; and preparation of a PowerPoint presentation for the Government's use in negotiations with CHS. The purposes of the FCA, including the goal to use *qui tam* complaints to "increase the recovery of public monies" (*id.*), and the specific circumstances of the Relators' assistance to the Government in this case qualify the Settlement Agreement as one that implicates public policy. Nevertheless, since this public policy rule was not expressly utilized by the Sixth Circuit in *Doghramji*, the Court simply notes that under such rule, the meaning of Term 8 ascribed by the Relators would be an appropriate interpretation.

the parties, should be construed against the party with superior bargaining power."); *Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1054 n.29 (11th Cir. 2018) (application of rule of *contra proferentem* is within sound discretion of trial court, after applying other rules of construction and considering extrinsic evidence, including about industry custom and practice). Although the rule is often applied to standardized contracts, ambiguities in transactional agreements entered into by sophisticated parties have also been construed against the supplier of the doubtful language. *See e.g. Orient Overseas*, 525 F.3d at 422–26 (rule applied in contract language dispute between Ford Motor Company and Orient Overseas Container Line Ltd. without necessity of concluding that the bill of lading was a contract of adhesion).[43]

The rule of construction against the supplier of the language is in effect a tiebreaker when a contract is susceptible to two equally reasonable interpretations. The principle rests on the equitable rationale that

> where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party.

Restatement (Second) of Contracts, § 206 cmt. a. The Court finds this reasoning on point with the extrinsic evidence here, and therefore concludes that Term 8 is properly construed against CHS,

---

[43] Even though the Settlement Agreement was not a standardized, non-negotiable contract, there is no dispute, as discussed above, that the Relators had little bargaining strength. *See Goesel v Boley Intern. (H.K.) Ltd.*, 806 F.3d 414, 423 (7th Cir. 2015) (clauses susceptible of more than one meaning should be construed against the party with superior bargaining power) (internal citations omitted).

thus limiting any challenges or objections to attorneys' fees to the grounds specifically listed in § 3730(d).[44]

## V. RECOMMENDATION

For all of the reasons discussed above, the undersigned Magistrate Judge respectfully recommends a determination on remand that the meaning of Term 8 is that urged by Relators, namely that the last sentence restricts any challenges by CHS to the Relators' attorneys' fees to reasonableness objections contained in 31 U.S.C. § 3730(d).

ANY OBJECTIONS to this Report and Recommendation must be filed within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Fed.R.Civ.P. 72(b) and L.R. 72.02(a). Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and

---

[44] The Court also notes that the outcome would be the same even if the parties' illusion of mutual assent is treated as a mutual misunderstanding. *See United Steelworkers of America AFL-CIO v. North Bend Terminal Co.*, 742 F.2d 256, 261 (6th Cir. 1985). Under the *North Bend Terminal* case, once a mutual misunderstanding emerges, the court may rule against the party bearing the burden of proof. *Id.* The Court disagrees with CHS's contentions that the Relators bear the burden of proof. As previously discussed, the Sixth Circuit has already held that "the first sentence in Term 8 operates to waive CHS's ability to challenge the Tennessee Relators' entitlement to attorneys' fees *unless* the second sentence in Term 8 preserves CHS's ability to raise those challenges." *Doghramji*, 666 F.App'x at 417 (emphasis in original). In its opinion, the Sixth Circuit also described this contest as centering "on whether CHS failed to preserve its right to challenge the entitlement of the seven relators to attorneys' fees." *Id.* at 411. The Sixth Circuit's language certainly suggests if not outright directs that the burden rests with CHS, which makes sense given that CHS is the party claiming to have preserved rights. *See Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1373 (Fed. Cir. 1999) (courts have long held that party intending to pursue rights beyond settlement has burden of preserving those rights in the settlement agreement) (quoting *William Cramp & Sons Ship & Engine Bldg.*, 206 U.S. 118, 128 (1907)). *See also Orient Overseas*, 525 F.3d at 429 (burden placed on party seeking to limit liability to explicitly and clearly state its own liability limits). Because CHS has the burden to demonstrate that it preserved all challenges to liability for attorneys' fees, the Court may appropriately rule against CHS and hold that CHS cannot contest the Relators' attorneys' fees on any grounds other than those listed in § 3730(d).

Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Any response to objections must be filed within fourteen (14) days of service of the objections. *See* Fed.R.Civ.P. 72(b) and L.R. 72.02(b).

Respectfully submitted,

_____
BARBARA D. HOLMES
United States Magistrate Judge